ORAL ARGUMENT NOT YET SCHEDULED

CASE NO. 22-5058

# United States Court of Appeals
# for the District of Columbia Circuit

| | | |
|---|---|---|
| **HON. THOMAS MASSIE, HON.** | : | |
| **RALPH NORMAN, HON.** | | On Appeal from the U.S. |
| **MARJORIE TAYLOR GREENE,** | : | District Court for the District |
| *in their individual and official* | | of Columbia |
| *capacities* | : | 1:21-cv-02023 |
| | | |
| Plaintiffs/Appellants | : | Oral Argument Not Yet Scheduled |
| | | |
| v. | : | |
| | | |
| **HON. NANCY PELOSI,** | : | |
| **WILLIAM J. WALKER,** | | |
| **CATHERINE SZPINDOR** | : | |
| *in their official capacities only* | | |
| | : | |
| Defendants/Appellees | | |

---

## JOINT APPENDIX

---

Christopher Wiest
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
Tel:   513/257-1895
chris@cwiestlaw.com
*Attorney for Plaintiffs/Appellants*
*Hon. Thomas Massie, Hon.*
*Ralph Norman, and Hon.*
*Marjorie Taylor Greene*

Douglas N. Letter, General Counsel
U.S. House of Representatives
Office of General Counsel
5140 O'Neill House Office Building
Washington, DC 20515
Tel: 202/225-9700
douglas.letter@mail.house.gov
*Attorney for Defendants/Appellees*
*Hon. Nancy Pelosi, William Walker,*
*and Catherine Szpindor*

Dated June 15, 2022

# TABLE OF CONTENTS

**Page**

District Court Docket, *Massie, et. al. v. Pelosi, et. al.*, DCD
1:21-cv-02023-RBW……………………………………………..JA 001

Verified Complaint, Doc. 1 (07/27/21)…………………………...JA 013

Transcript of Motion to Dismiss Hearing (12/02/21)…………….JA 044

Order Granting Defendants' Motion to Dismiss (03/02/22)………..JA 124

Memorandum Opinion and Order on Motion to Dismiss (03/02/22)...JA 125

APPEAL,CLOSED,TYPE-L

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: 1:21-cv-02023-RBW

MASSIE et al v. PELOSI et al
Assigned to: Judge Reggie B. Walton
Case in other court: USCA for the DC Circuit, 22-05058
Cause: 28:2201 Constitutionality of State Statute(s)

Date Filed: 07/27/2021
Date Terminated: 03/09/2022
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**THOMAS MASSIE**
*Hon., In his official and individual*
*capacities*

represented by **Aaron Siri**
SIRI & GLIMSTAD LLP
200 Park Avenue
Seventeenth Floor
New York, NY 10166
212-532-1091
Email: aaron@sirillp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher D Wiest**
25 Town Center Boulevard
Suite 104
Crestview Hills, KY 41017
513-257-1895
Email: chris@cwiestlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth Ann Brehm**
SIRI & GLIMSTAD LLP
200 Park Avenue
17th Floor
New York, NY 10166
212-532-1091
Fax: 646-417-5967
Email: ebrehm@sirillp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Wallace**
SIRI & GLIMSTAD LLP
200 Park Avenue

JA 001

17th Floor
New York, NY 10166
212-532-1091
Email: jwallace@sirillp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas B. Bruns**
BRUNS, CONNELL, VOLLMAR &
ARMSTRONG, LLC
4555 Lake Forest Drive
Suite 330
Cincinnati, OH 45242
513-312-9890
Fax: 513-800-1263
Email: tbruns@bcvalaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John R. Garza**
GARZA LAW FIRM, P.A.
Garza Building
17 West Jefferson Street
Suite 100
Rockville, MD 20850
301-340-8200
Email: jgarza@garzanet.com
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**MARJORIE TAYLOR GREENE**          represented by   **Aaron Siri**
*Hon., In her official and individual*                (See above for address)
*capacities*                                          *LEAD ATTORNEY*
                                                      *PRO HAC VICE*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Christopher D Wiest**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *PRO HAC VICE*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Elizabeth Ann Brehm**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *PRO HAC VICE*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Jessica Wallace**

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas B. Bruns**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John R. Garza**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RALPH NORMAN**                represented by    **Aaron Siri**
*Hon., In his official and individual*                                (See above for address)
*capacities*                                                          *LEAD ATTORNEY*
                                                                     *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Christopher D Wiest**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Elizabeth Ann Brehm**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Jessica Wallace**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Thomas B. Bruns**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **John R. Garza**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

V.

**Defendant**

JA 003

**NANCY PELOSI**                    represented by    **Douglas N. Letter**
*Hon., In her official capacity only*                U.S. HOUSE OF REPRESENTATIVES
                                                     Office of General Counsel
                                                     5140 O'Neill House Office Building
                                                     Washington, DC 20515
                                                     202-225-9700
                                                     Email: douglas.letter@mail.house.gov
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Eric Randal Columbus**
                                                     OFFICE OF GENERAL COUNSEL
                                                     District of Columbia
                                                     5140 O'Neill House Office Building
                                                     Washington, DC 20515
                                                     202-225-9700
                                                     Email: eric.columbus@mail.house.gov
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Stacie Marion Fahsel**
                                                     UNITED STATES HOUSE OF
                                                     REPRESENTATIVES
                                                     Office of General Counsel
                                                     5140 O'Neill House Office Building
                                                     Washington, DC 20515
                                                     202-590-0585
                                                     Email: stacie.fahsel@mail.house.gov
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Todd Barry Tatelman**
                                                     U.S. HOUSE OF REPRESENTATIVES
                                                     Office of General Counsel
                                                     5140 O'Neill House Office Building
                                                     Washington, DC 20515
                                                     202-225-9700
                                                     Email: todd.tatelman@mail.house.gov
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**WILLIAM J. WALKER**                represented by    **Douglas N. Letter**
*In his official capacity as Sergeant at Arms*        (See above for address)
*of the U.S. House of Representatives*                *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Eric Randal Columbus**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Stacie Marion Fahsel**
                                                     (See above for address)

JA 004

*ATTORNEY TO BE NOTICED*

**Todd Barry Tatelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CATHERINE SZPINDOR**                    represented by    **Douglas N. Letter**
*In her official capacity as Chief Admin.*                   (See above for address)
*Officer of the U.S. House of*                               *LEAD ATTORNEY*
*Representatives*                                            *ATTORNEY TO BE NOTICED*

                                                            **Eric Randal Columbus**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Stacie Marion Fahsel**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Todd Barry Tatelman**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Movant**

**JEFFREY CUTLER**                        represented by    **JEFFREY CUTLER**
*TERMINATED: 11/12/2021*                                    P.O. Box 2806
                                                            York, PA 17405
                                                            215-872-5715
                                                            PRO SE

| Date Filed | # | Docket Text |
|---|---|---|
| 07/27/2021 | 1 | COMPLAINT *with Verification* against NANCY PELOSI, CATHERINE SZPINDOR, WILLIAM J. WALKER ( Filing fee $ 402 receipt number ADCDC-8625183) filed by THOMAS MASSIE, RALPH NORMAN, MARJORIE TAYLOR GREENE. (Attachments: # 1 Exhibit "A", # 2 Civil Cover Sheet, # 3 Summons)(Garza, John) (Entered: 07/27/2021) |
| 07/27/2021 | 2 | MOTION Permission to List Non-Residential Address in Complaint Caption by MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN. (Garza, John) Modified relief on 7/29/2021 (znmw). (Entered: 07/27/2021) |
| 07/27/2021 | | NOTICE OF ERROR re 1 Complaint; emailed to jgarza@garzanet.com, cc'd -1 associated attorneys -- The PDF file you docketed contained errors: 1. Incorrect coversheet. Please use the cover sheet at https://www.dcd.uscourts.gov/new-case-forms & file using the event Civil Cover Sheet., 2. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (adh, ) (Entered: 07/27/2021) |

JA 005

| 07/27/2021 | 3 | CIVIL COVER SHEET by THOMAS MASSIE, RALPH NORMAN, MARJORIE TAYLOR GREENE filed by THOMAS MASSIE, RALPH NORMAN, MARJORIE TAYLOR GREENE.(Garza, John) (Main Document 3 replaced on 7/27/2021) (adh, ). . (Entered: 07/27/2021) |
|---|---|---|
| 07/27/2021 | | Case Assigned to Judge Reggie B. Walton. (adh, ) (Entered: 07/27/2021) |
| 07/27/2021 | 4 | SUMMONS (5) Issued Electronically as to NANCY PELOSI, CATHERINE SZPINDOR, WILLIAM J. WALKER, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(adh, ) (Entered: 07/27/2021) |
| 07/28/2021 | 5 | ENTERED IN ERROR..... MOTION for Limited Admission *of Aaron Siri* by MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN. (Attachments: # 1 Declaration, # 2 Proposed Order)(Garza, John) Modified on 7/29/2021 (znmw). (Entered: 07/28/2021) |
| 07/28/2021 | 6 | ENTERED IN ERROR.....MOTION for Limited Admission *of Elizabeth A. Brehm* by MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN. (Attachments: # 1 Declaration, # 2 Proposed Order)(Garza, John) Modified on 7/29/2021 (znmw). (Entered: 07/28/2021) |
| 07/28/2021 | 7 | ENTERED IN ERROR.....MOTION for Limited Admission *of Jessica Wallace* by MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN. (Attachments: # 1 Declaration, # 2 Proposed Order)(Garza, John) Modified on 7/29/2021 (znmw). (Entered: 07/28/2021) |
| 07/28/2021 | 8 | ENTERED IN ERROR.....MOTION for Limited Admission *of Christopher Wiest* by MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN. (Attachments: # 1 Declaration, # 2 Proposed Order)(Garza, John) Modified on 7/29/2021 (znmw). (Entered: 07/28/2021) |
| 07/29/2021 | | NOTICE OF CORRECTED DOCKET ENTRY: Docket Entries 6 MOTION for Limited Admission *of Elizabeth A. Brehm*, 5 MOTION for Limited Admission *of Aaron Siri*, 8 MOTION for Limited Admission *of Christopher Wiest*, 7 MOTION for Limited Admission *of Jessica Wallace* were entered in error and counsel is instructed to refile using the correct event and pay the filing fee for each. (znmw) (Entered: 07/29/2021) |
| 07/29/2021 | 9 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Aaron Siri, Filing fee $ 100, receipt number ADCDC-8632178. Fee Status: Fee Paid. by MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN. (Attachments: # 1 Declaration, # 2 Proposed Order)(Garza, John) (Entered: 07/29/2021) |
| 07/29/2021 | 10 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Elizabeth A. Brehm, Filing fee $ 100, receipt number ADCDC-8632227. Fee Status: Fee Paid. by MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN. (Attachments: # 1 Declaration, # 2 Proposed Order)(Garza, John) (Entered: 07/29/2021) |
| 07/29/2021 | 11 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Jessica Wallace, Filing fee $ 100, receipt number ADCDC-8632400. Fee Status: Fee Paid. by MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN. (Attachments: # 1 Declaration, # 2 Proposed Order)(Garza, John) (Entered: 07/29/2021) |
| 07/29/2021 | 12 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Christopher Wiest, Filing fee $ 100, receipt number ADCDC-8632421. Fee Status: Fee Paid. by MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN. (Attachments: # 1 |

| | | Declaration, # 2 Proposed Order)(Garza, John) (Entered: 07/29/2021) |
|---|---|---|
| 07/29/2021 | 13 | GENERAL ORDER FOR CIVIL CASES BEFORE THE HONORABLE REGGIE B. WALTON. Signed by Judge Reggie B. Walton on July 29, 2021. (lcrbw1) (Entered: 07/29/2021) |
| 07/30/2021 | | MINUTE ORDER. The Court having considered the 9 Plaintiff's Motion for Admission of Attorney Aaron Siri Pro Hac Vice, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under this Court's rules, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Aaron Siri, Siri Glimstad LLP, 200 Park Avenue, New York, New York 10166, is ADMITTED to practice before the Court pro hac vice in this case. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Reggie B. Walton on July 30, 2021. (lcrbw1) (Entered: 07/30/2021) |
| 07/30/2021 | | MINUTE ORDER. The Court having considered the 10 Plaintiff's Motion for Admission of Attorney Elizabeth A. Brehm Pro Hac Vice, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under this Court's rules, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Elizabeth A. Brehm, Siri Glimstad LLP, 200 Park Avenue, New York, New York 10166, is ADMITTED to practice before the Court pro hac vice in this case. granting 10 Motion for Leave to Appear Pro Hac Vice **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Reggie B. Walton on July 30, 2021. (lcrbw1) (Entered: 07/30/2021) |
| 07/30/2021 | | MINUTE ORDER. The Court having considered the 11 Plaintiff's Motion for Admission of Attorney Jessica Wallace Pro Hac Vice, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under this Court's rules, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Jessica Wallace, Siri Glimstad LLP, 200 Park Avenue, New York, New York 10166, is ADMITTED to practice before the Court pro hac vice in this case. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Reggie B. Walton on July 30, 2021. (lcrbw1) (Entered: 07/30/2021) |
| 07/30/2021 | | MINUTE ORDER. The Court having considered the 12 Plaintiff's Motion for Admission of Attorney Christopher Wiest Pro Hac Vice, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under this Court's rules, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Christopher Wiest, Chris Wiest Attorney at Law, PLLC, 25 Town Center Blvd., Suite 104, Crestview Hills, KY 41017, is ADMITTED to practice before the Court pro hac vice in this case. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**< /B>. Signed by Judge Reggie B. Walton on July 30, 2021. (lcrbw1) (Entered: 07/30/2021) |
| 08/03/2021 | 14 | NOTICE of Appearance by Christopher D Wiest on behalf of MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN (Wiest, Christopher) (Entered: 08/03/2021) |

| 08/04/2021 | 15 | NOTICE of Appearance by Elizabeth Ann Brehm on behalf of MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN (Brehm, Elizabeth) (Main Document 15 replaced on 8/5/2021) (ztth). (Entered: 08/04/2021) |
| --- | --- | --- |
| 08/04/2021 | 16 | NOTICE of Appearance by Aaron Siri on behalf of MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN (Siri, Aaron) (Main Document 16 replaced on 8/5/2021) (ztth). (Entered: 08/04/2021) |
| 08/05/2021 | 17 | NOTICE of Appearance by Jessica Wallace on behalf of MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN (Wallace, Jessica) (Main Document 17 replaced on 8/10/2021) (ztth). (Entered: 08/05/2021) |
| 08/08/2021 | 18 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 7/30/2021. Answer due for ALL FEDERAL DEFENDANTS by 9/28/2021. (Wiest, Christopher) (Entered: 08/08/2021) |
| 08/08/2021 | 19 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 7/30/2021. (Wiest, Christopher) (Entered: 08/08/2021) |
| 08/08/2021 | 20 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. NANCY PELOSI served on 7/29/2021 (Wiest, Christopher) (Entered: 08/08/2021) |
| 08/08/2021 | 21 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. WILLIAM J. WALKER served on 8/2/2021 (Wiest, Christopher) (Entered: 08/08/2021) |
| 08/08/2021 | 22 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. CATHERINE SZPINDOR served on 8/2/2021 (Wiest, Christopher) (Entered: 08/08/2021) |
| 08/11/2021 | 23 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Thomas B. Bruns, Filing fee $ 100, receipt number ADCDC-8660514. Fee Status: Fee Paid. by MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN. (Attachments: # 1 Declaration, # 2 Proposed Order)(Garza, John) (Entered: 08/11/2021) |
| 08/13/2021 | | MINUTE ORDER. Upon consideration of the 23 Plaintiffs' Motion for Admission of Attorney Thomas B. Bruns Pro Hac Vice, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under this Court's rules, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Thomas B. Bruns, Bruns, Connell, Vollmar & Armstrong, LLC, 4750 Ashwood Drive, Suite 200, Cincinnati, Ohio 45241, is ADMITTED to practice before the Court pro hac vice in this case. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Sig ned by Judge Reggie B. Walton on August 13, 2021. (lcrbw1) (Entered: 08/13/2021) |
| 08/20/2021 | 24 | NOTICE of Appearance by Thomas B. Bruns on behalf of MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN (Bruns, Thomas) (Entered: 08/20/2021) |
| 08/23/2021 | 25 | MOTION to Intervene by JEFFREY CUTLER. (Attachment: # 1 Text of Proposed Order, # 2 Exhibit - Addendum) (ztth) (Entered: 08/24/2021) |

JA 008

| 09/20/2021 | 26 | (SECOND) MOTION to Intervene by JEFFREY CUTLER. (ztth) (Main Document 26 replaced on 9/22/2021) (ztth). (Main Document 26 replaced on 9/22/2021) (ztth). (Entered: 09/22/2021) |
|---|---|---|
| 09/28/2021 | 27 | NOTICE of Appearance by Douglas N. Letter on behalf of NANCY PELOSI, CATHERINE SZPINDOR, WILLIAM J. WALKER (Letter, Douglas) (Entered: 09/28/2021) |
| 09/28/2021 | 28 | NOTICE of Appearance by Todd Barry Tatelman on behalf of NANCY PELOSI, CATHERINE SZPINDOR, WILLIAM J. WALKER (Tatelman, Todd) (Entered: 09/28/2021) |
| 09/28/2021 | 29 | NOTICE of Appearance by Eric Randal Columbus on behalf of NANCY PELOSI, CATHERINE SZPINDOR, WILLIAM J. WALKER (Columbus, Eric) (Entered: 09/28/2021) |
| 09/28/2021 | 30 | NOTICE of Appearance by Stacie Marion Fahsel on behalf of NANCY PELOSI, CATHERINE SZPINDOR, WILLIAM J. WALKER (Fahsel, Stacie) (Entered: 09/28/2021) |
| 09/28/2021 | 31 | MOTION to Dismiss for Lack of Jurisdiction , MOTION to Dismiss *for Failure to State a Claim* by NANCY PELOSI, CATHERINE SZPINDOR, WILLIAM J. WALKER. (Attachments: # 1 Text of Proposed Order)(Letter, Douglas) (Entered: 09/28/2021) |
| 09/29/2021 | 32 | Consent MOTION for Extension of Time to File Response/Reply as to 31 MOTION to Dismiss *for Failure to State a Claim* by MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN. (Attachments: # 1 Text of Proposed Order)(Wiest, Christopher) (Entered: 09/29/2021) |
| 09/30/2021 | | MINUTE ORDER. Upon consideration of the plaintiffs' 32 Consent Motion for Order Extending Time for Plaintiffs' Response to Defendants' Motion to Dismiss and Extending Time for Defendants' Reply in Support of Same, it is hereby ORDERED that the motion is DENIED WITHOUT PREJUDICE for counsel's failure to comply with the 13 General Order for Civil Cases Before the Honorable Reggie B. Walton, which requires that a motion for an extension of time "must include the following (otherwise it will not be considered by the Court): (a) the number of previous extensions requested and granted to each party; (b) the specific grounds for the motion, unless good cause precludes disclosure of those grounds; [and] (c) a statement of the effect that the Court's granting of the motion will have on all other previously-scheduled deadlines[.]" Signed by Judge Reggie B. Walton on September 30, 2021. (lcrbw1) (Entered: 09/30/2021) |
| 09/30/2021 | 33 | Consent MOTION for Extension of Time to File Response/Reply as to 31 MOTION to Dismiss *for Failure to State a Claim* by MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN. (Attachments: # 1 Text of Proposed Order)(Wiest, Christopher) (Entered: 09/30/2021) |
| 10/01/2021 | | MINUTE ORDER. Upon consideration of the plaintiffs' 33 Consent Motion for Order Extending Time for Plaintiffs' Response to Defendants' Motion to Dismiss and Extending Time for Defendants' Reply in Support of Same, and for good cause shown, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that, on or before October 29, 2021, the plaintiffs shall file their opposition to the defendants' motion to dismiss. It is further ORDERED that, on or before November 16, 2021, the defendants shall file their reply in support of their motion. Signed by Judge Reggie B. Walton on October 1, 2021. (lcrbw1) (Entered: 10/01/2021) |

| 10/01/2021 | | Set/Reset Deadlines: Defendant's Response due by 11/16/2021 (hs) (Entered: 10/01/2021) |
|---|---|---|
| 10/04/2021 | 34 | RESPONSE re 31 MOTION to Dismiss *for Failure to State a Claim* filed by JEFFREY CUTLER. (ztth) (Entered: 10/06/2021) |
| 10/29/2021 | 35 | Memorandum in opposition to re 31 MOTION to Dismiss *for Failure to State a Claim* filed by MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN. (Wiest, Christopher) (Entered: 10/29/2021) |
| 10/29/2021 | 36 | MOTION for Summary Judgment , MOTION for Permanent Injunction by MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN. (Attachments: # 1 Statement of Facts Statement of Material Facts Not In Dispute, # 2 Text of Proposed Order Proposed Order)(Wiest, Christopher) (Entered: 10/29/2021) |
| 10/29/2021 | 37 | NOTICE of Proposed Order *(filing proposed order)* by MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN re 35 Memorandum in Opposition (Attachments: # 1 Text of Proposed Order)(Wiest, Christopher) (Entered: 10/29/2021) |
| 11/01/2021 | 38 | RESPONSE re 31 MOTION to Dismiss *for Failure to State a Claim* filed by JEFFREY CUTLER. (ztth) (Entered: 11/02/2021) |
| 11/05/2021 | 39 | MOTION to Hold in Abeyance re 36 MOTION for Summary Judgment MOTION for Permanent Injunction , MOTION for Extension of Time to File Response/Reply as to 36 MOTION for Summary Judgment MOTION for Permanent Injunction by NANCY PELOSI, CATHERINE SZPINDOR, WILLIAM J. WALKER. (Attachments: # 1 Text of Proposed Order)(Letter, Douglas) (Entered: 11/05/2021) |
| 11/08/2021 | 40 | Memorandum in opposition to re 39 MOTION to Hold in Abeyance re 36 MOTION for Summary Judgment MOTION for Permanent Injunction MOTION for Extension of Time to File Response/Reply as to 36 MOTION for Summary Judgment MOTION for Permanent Injunction filed by MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN. (Attachments: # 1 Text of Proposed Order)(Wiest, Christopher) Modified event title on 11/9/2021 (znmw). (Entered: 11/08/2021) |
| 11/08/2021 | | MINUTE ORDER. The Court requiring additional information before resolving the 39 Defendants' Motion to Hold in Abeyance Proceedings on Plaintiffs' Motion for Summary Judgment or, in the Alternative, to Enlarge Time for Defendants' Response, it is hereby ORDERED that, on November 15, 2021, at 10:00 a.m., the parties shall appear before the Court for a motion hearing, via teleconference, by calling 1-877-873-8017 and entering the Court's access code (8583213) followed by the pound key (#). It is further ORDERED that, in light of the hearing scheduled by the Court, the deadline by which the defendants must file their opposition to the plaintiffs' motion for summary judgment is VACATED pending further Order of the Court. Signed by Judge Reggie B. Walton on November 8, 2021. (lcrbw1) (Entered: 11/08/2021) |
| 11/08/2021 | | Set/Reset Hearings: Motion Hearing set for 11/15/2021 at 12:00 PM by Telephonic/VTC before Judge Reggie B. Walton. (hs) (Entered: 11/08/2021) |
| 11/12/2021 | | Set/Reset Hearings: Motion Hearing reset for 11/15/2021 at 10:00 AM by Telephonic/VTC before Judge Reggie B. Walton. (hs) (Entered: 11/12/2021) |
| 11/12/2021 | 41 | ORDER. In accordance with the attached Order, it is hereby ORDERED that the Motion to I[n]tervene Because of Crimes (18 U.S. Code § 1519 Destruction, alteration, or falsification of records), 18 U.S. Code § 872 Extortion by Officers or Employees of |

| | | |
|---|---|---|
| | | the United States, 18 U.S.C. § 3 Accessory After the Fact Murder, Bankruptcy Fraud, 15 U.S.C. §§ 78dd-1, & Mail Fraud and to Combine Cases for Judicial Efficiency and Summary Judgment, ECF No. 25, is DENIED. It is further ORDERED that the Motion to I[n]tervene Because of Crimes (18 U.S. Code § 1519 Destruction, alteration, or falsification of records), 18 U.S. Code § 872 Extortion by Officers or Employees of the United States, 18 U.S.C. § 3 Accessory After the Fact Murder, Bankruptcy Fraud, 15 U.S.C. §§ 78dd-1, & Mail Fraud and to Combine Cases for Judicial Efficiency and Summary Judgment, ECF No. 26, is DENIED.. Signed by Judge Reggie B. Walton on November 12, 2021. (lcrbw1) (Entered: 11/12/2021) |
| 11/12/2021 | 44 | RESPONSE re 31 MOTION to Dismiss *for Failure to State a Claim* filed by JEFFREY CUTLER. (ztth) (Entered: 11/18/2021) |
| 11/15/2021 | | Minute Entry for proceedings held before Judge Reggie B. Walton: Motion Hearing held on 11/15/2021. Movant Jeffrey Cutler, held in contempt of court. Defendants 31 MOTION to Dismiss *for Failure to State a Claim; Held in Abeyance. Plaintiffs 36 MOTION for Summary Judgment MOTION for Permanent Injunction; Denied without prejudice. A written order will issue from chambers. Motion Hearing/Oral Argument set for 12/2/2021 at 02:00 PM in Courtroom 16- In Person before Judge Reggie B. Walton. (Court Reporter Cathryn Jones.) (ah)* (Entered: 11/15/2021) |
| 11/15/2021 | 42 | ORDER. In accordance with the attached Order, it is hereby ORDERED that the 2 Plaintiffs' Motion to List Non-Residential Address in Complaint Caption is GRANTED. It is further ORDERED that the 39 Defendants' Motion to Hold in Abeyance Proceedings on Plaintiffs' Motion for Summary Judgment or, in the Alternative, to Enlarge Time for Defendants' Response is GRANTED. It is further ORDERED that the 36 Plaintiffs' Motion for Summary Judgment and a Permanent Injunction is DENIED WITHOUT PREJUDICE. It is further ORDERED that, on December 2, 2021, at 2:00 p.m., the parties shall appear before the Court for a hearing regarding the 31 Motion to Dismiss of Defendants Nancy Pelosi, William J. Walker, and Catherine Szpindor. The parties shall appear before the Court in Courtroom 16 on the 6th floor at the E. Barrett Prettyman United States Courthouse, 333 Constitution Avenue, N.W., Washington, D.C. 20001. Signed by Judge Reggie B. Walton on November 15, 2021. (lcrbw1) (Entered: 11/15/2021) |
| 11/16/2021 | 43 | REPLY to opposition to motion re 31 MOTION to Dismiss *for Failure to State a Claim* filed by NANCY PELOSI, CATHERINE SZPINDOR, WILLIAM J. WALKER. (Letter, Douglas) (Entered: 11/16/2021) |
| 12/02/2021 | | Minute Entry for proceedings held before Judge Reggie B. Walton: Motion Hearing/Oral Argument held on 12/2/2021. Defendant's 31 MOTION to Dismiss, taken under advisement. (Court Reporter Cathryn Jones) (adh) (Entered: 12/02/2021) |
| 01/24/2022 | 45 | NOTICE OF SUPPLEMENTAL AUTHORITY by NANCY PELOSI, CATHERINE SZPINDOR, WILLIAM J. WALKER (Letter, Douglas) (Entered: 01/24/2022) |
| 03/08/2022 | 46 | NOTICE by NANCY PELOSI, CATHERINE SZPINDOR, WILLIAM J. WALKER (Letter, Douglas) (Entered: 03/08/2022) |
| 03/09/2022 | 47 | MEMORANDUM OPINION. Signed by Judge Reggie B. Walton on March 9, 2022. (lcrbw1) (Entered: 03/09/2022) |
| 03/09/2022 | 48 | ORDER. In accordance with the attached Order, it is hereby ORDERED that the 31 Motion to Dismiss of Defendants Nancy Pelosi, William J. Walker, and Catherine Szpindor is GRANTED. It is further ORDERED that the 1 Plaintiffs' Verified |

| | | |
|---|---|---|
| | | Complaint for Declaratory and Injunctive Relief is DISMISSED. It is further ORDERED that this case is CLOSED. Signed by Judge Reggie B. Walton on March 9, 2022. (lcrbw1) (Entered: 03/09/2022) |
| 03/10/2022 | 49 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 47 Memorandum & Opinion, 48 Order on Motion to Dismiss, by MARJORIE TAYLOR GREENE, THOMAS MASSIE, RALPH NORMAN. Filing fee $ 505, receipt number ADCDC-9095855. Fee Status: Fee Paid. Parties have been notified. (Wiest, Christopher) (Entered: 03/10/2022) |
| 03/10/2022 | 50 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 49 Notice of Appeal to DC Circuit Court. (ztth) (Entered: 03/10/2022) |
| 03/14/2022 | | USCA Case Number 22-5058 for 49 Notice of Appeal to DC Circuit Court, filed by RALPH NORMAN, MARJORIE TAYLOR GREENE, THOMAS MASSIE. (ztth) (Entered: 03/14/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/15/2022 11:10:50 | | |
| **PACER Login:** | chriswiest | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-02023-RBW |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HON. THOMAS MASSIE | : | |
| 2453 Rayburn HOB | | |
| Washington, D.C. 20515 | : | Case No. |
| *In his official and individual capacities* | | |
| | : | |
| AND | | |
| | : | **PLAINTIFFS' VERIFIED** |
| HON. MARJORIE TAYLOR GREENE | | **COMPLAINT FOR** |
| 1023 Longworth House Office Building | : | **DECLARATORY AND** |
| Washington, DC, 20515 | | **INJUNCTIVE RELIEF** |
| *In her official and individual capacities* | : | |
| | | |
| AND | : | |
| | | |
| HON. RALPH NORMAN | : | |
| 569 Cannon HOB | | |
| Washington, DC 20515 | : | |
| *In his official and individual capacities* | | |
| v. | : | |
| | | |
| HON. NANCY PELOSI | : | |
| 1236 Longworth House Office Building | | |
| Washington, DC 20515 | : | |
| *In her official capacity only* | | |
| | : | |
| AND | : | |
| | | |
| | : | |
| WILLIAM J. WALKER | | |
| Room H-124, U.S. Capitol | : | |
| First Street, SE | | |
| Washington, DC 20004 | : | |
| *In his official capacity as Sergeant* | | |
| *at Arms of the U.S. House of Representatives* | : | |
| | | |
| AND | : | |
| | | |
| CATHERINE SZPINDOR | : | |
| Room H.B.-28 U.S. Capitol | | |
| First Street, SE | : | |
| Washington, DC 20004 | | |
| *In her official capacity as Chief Admin.* | : | |
| *Officer of the U.S. House of Representatives* | | |

1

JA 013

Plaintiffs, by and through Counsel, for their Complaint state as follows:

### Introduction

1.      Defendants improperly chose to fine Plaintiffs through an imminent reduction in their compensation.  Plaintiffs, all of whom are members of Congress belonging to the minority party, engaged in the symbolic speech of not wearing a mask on the Congressional floor in defiance of the majority party's compelled symbolic speech rule.

2.      The Twenty-Seventh Amendment to the United States Constitution, proposed by James Madison with the remainder of the Bill of Rights in 1789, but not ratified until 1992, provides: "No law, varying the compensation for the services of the Senators and Representatives, shall take effect, until an election of Representatives shall have intervened."[1]

3.      The Twenty-Seventh Amendment is, at its heart, an anti-corruption measure, designed to prevent Congress from increasing, decreasing, or limiting compensation as a cudgel against political opponents.  Despite this clear and unequivocal prohibition, that is precisely what occurred in this matter.  Defendants, in violation of the Twenty-Seventh Amendment, used the reduction of Plaintiffs' compensation without an intervening election as a cudgel against Plaintiffs, who are all political opponents of Speaker Nancy Pelosi.

4.      The fines at issue are also unconstitutional under Article I, § 5, Clause 2 of the United States Constitution.  That clause grants the House authority only to "punish its members for disorderly behavior."  Merely entering the House Chamber without a mask, as Plaintiffs did on May 18 and May 29, 2021, did not constitute "disorderly behavior" because it did not disrupt the House's operations or good order, nor is it otherwise unlawful conduct.  Furthermore, Article 1,

---

[1]  https://constitutioncenter.org/blog/how-a-c-grade-college-term-paper-led-to-a-constitutional-amendment (last visited 7/23/2021).

2

Section 6 of the Constitution requires that members of Congress' compensation must "be ascertained by Law," however, the reductions in Plaintiffs' compensation at issue here were levied under only a house resolution, which does not carry the weight of "Law," making such fines *ultra vires* on their face.

### Parties

5.   Plaintiff, Hon. Thomas Massie, is the incumbent United States Congressman for Kentucky's Fourth Congressional District and is a resident of Kentucky.

6.   Plaintiff, Hon. Marjorie Taylor Greene, is the incumbent United States Congresswoman for Georgia's Fourteenth Congressional District and is a resident of Georgia.

7.   Plaintiff, Hon. Ralph Norman, is the incumbent United States Congressman for South Carolina's Fifth Congressional District and is a resident of South Carolina.

8.   Defendant, Hon. Nancy Pelosi, is the current Speaker of the House of Representatives.  She is sued in her official capacity only, and only to the extent that she is performing administrative and oversight duties of the other two Defendants, William Walker and Catherine Szpindor, as explained further herein.  She is not sued, however, for her legislative acts, including for statements made on the House floor.[2]

9.   Defendant, William Walker, is the current House Sergeant at Arms and is sued in his official capacity only.  Among other things, he is responsible for enforcing and implementing, and does enforce and implement, the challenged rules and imposition of fines, as explained below.

---

[2] In an effort to distinguish between her legislative acts, for which Plaintiffs do not sue Defendant Pelosi, and her administrative acts, we have utilized the term "Speaker Pelosi" for the legislative acts to describe the Speaker, and Defendant Pelosi, for the administrative actions for which Defendant Pelosi is sued.

JA 015

10.     Defendant, Catherine Szpindor, is the current Chief Administrative Officer of the House of Representatives and is sued in her official capacity only.  Among other things, she is responsible for enforcing and implementing, and does enforce and implement, the challenged rules and the imposition of and collection of fines through compensation reduction, as explained below.

## Jurisdiction and Venue

11.     Jurisdiction is proper over this matter pursuant to 28 U.S.C. § 1331, in that this matter arises under the Constitution, laws, or treaties of the United States, and 28 U.S.C. § 1346(a)(2).  This action seeks declaratory judgment and an injunction pursuant to 28 U.S.C. §§ 2201 and 2202.

12.     Venue is proper under 28 U.S.C. § 1391(b)(1) and/or 28 U.S.C. § 1391(b)(2).

## Facts Underpinning the Claims

13.     On or about November 3, 2020, each of the Plaintiffs were elected or re-elected to a term of office beginning January 3, 2021.

14.     On January 3, 2021, Speaker Pelosi had a partial plexiglass box constructed on the gallery of the Hall of the House so that Members of the majority who had been exposed to COVID-19 could enter the COVID-19 box to vote to re-elect her Speaker of the House.  The enclosure did not extend even half way to the ceiling and was located immediately below ventilation vents that would spread viral particles throughout the Hall of the House.  She then brought the COVID-19 positive Members into the House for that purpose.  In doing this, these Members were permitted to walk the hallways in the House, while potentially spreading COVID-19 to reach the COVID-19 box.  This was deemed permissible so that these Members could cast votes for Representative Pelosi to be elected Speaker of the House.[3]  A photograph of the COVID-19 box is below:

---

[3] https://thehill.com/homenews/house/532430-house-sets-up-separate-enclosure-for-votes-from-members-exposed-to-covid-19 (last visited 7/27/2021).

4



15.     On or about January 12, 2021, the House of Representatives, in the 117th Congress,

enacted H. Res. 38[4] by a party-line vote where none of the members belonging to the minority

party voted in favor of the resolution.  That Resolution, among other things, provided for a mask

requirement in Section 4, which states in relevant part:

> SEC. 4. (a) During a covered period[5] designated pursuant to section
> 3(s) of House Resolution 8—
>
> (1) the Sergeant-at-Arms is authorized and directed to impose a fine
> against a Member, Delegate, or the Resident Commissioner for the
> failure to wear a mask in contravention of the Speaker's announced
> policies of January 4, 2021; and

---

[4] *See* https://www.congress.gov/117/bills/hres38/BILLS-117hres38eh.pdf (last visited 7/23/2021).

[5] On or about May 15, 2020, the House of Representatives, in the 116th Congress, enacted H. Res. 965, which, among other things, created a "covered period," during which members of Congress could vote by proxy. *See* https://www.congress.gov/116/bills/hres965/BILLS-116hres965eh.pdf (last visited 7/14/2021).  The "covered period" was for a 45-day period plus additional periods if extended, and it has been repeatedly extended by the Speaker.  On or about January 4, 2021, the House of Representatives, in the 117th Congress, enacted H. Res. 8, which, among other things, incorporated the 2020 H. Res. 965 with certain changes not material to this matter, continuing the "covered period" provisions permitting voting by proxy. *See* https://www.congress.gov/117/bills/hres8/BILLS-117hres8eh.pdf (last visited 7/23/2021).

(2) a fine imposed pursuant to this section shall be treated as though imposed under clause 3(g) of rule II,[6] and shall be administered as though pursuant to clause 4(d) of rule II[7] …

(b) Subsection (a) establishes a standard of conduct within the meaning of clause 3(a)(2) of rule XI.

16.    This resolution, by incorporating 4(d) of rule II, requires the Chief Administrative Officer to "deduct the amount of any fine levied … from the net salary otherwise due the Member, Delegate, or the Resident Commissioner."[8]

17.    The Speaker's announced policies of January 4, 2021, which H. Res. 38 incorporate, states: "Members and staff will be required to wear masks at all times in the Hall of the House without exception, including while Members are under recognition. Members will not be

---

[6] That rule states: "(g)(1) The Sergeant-at-Arms is authorized and directed to impose a fine against a Member, Delegate, or the Resident Commissioner for the use of an electronic device for still photography or for audio or visual recording or broadcasting in contravention of clause 5 of rule XVII and any applicable Speaker's announced policy on electronic devices.  (2) A fine imposed pursuant to this paragraph shall be $500 for a first offense and $2,500 for any subsequent offense." https://rules.house.gov/sites/democrats.rules.house.gov/files/documents/116-House-Rules-Clerk.pdf (last visited 7/23/2021).

[7] That Rule states: "(d)(1) Upon notification from the chair of the Committee on Ethics pursuant to clause 3(g)(3)(C), the Chief Administrative Officer shall deduct the amount of any fine levied under clause 3(g) from the net salary otherwise due the Member, Delegate, or the Resident Commissioner. (d)(2) The Chief Administrative Officer is authorized to establish policies and procedures for such salary deductions." (last visited 7/23/2021).

[8] Id.

recognized unless they are wearing a mask, and recognition will be withdrawn if they remove their mask while speaking." [9]

18.     The policy in question was only applicable to the Hall of the House, one of the most highly televised areas of the House, and was not applicable to a myriad of other areas, including, without limitation, committee hearings and committee hearing rooms, other meeting rooms including the crowded and dense rooms where the majority and minority caucuses meet, the hallways leading to the chamber, including the crowded security checkpoints, crowded elevators, or the Members' dining room or other dining areas.  The rule, therefore, appears to have been designed not for safety, but to compel symbolic speech regarding, *inter alia*, masks and individual rights in the manner favored by the majority, and to compel that speech solely in an area designed to play to the television cameras that cover the Hall of the House.

19.     Wearing a mask conveys a particularized message: namely, that mandatory face coverings are medically and scientifically necessary to prevent the spread of the coronavirus, that these intrusions on bodily integrity are necessary and essential, that informed consent and civil liberties are to be suppressed in favor of government's decisions regarding public health, and that individuals cannot be given the choice to make their own decisions regarding their facial attire and medical choices.

---

[9] That policy stated in full: "As such, the Chair wishes to stress the importance of safe practices. Members and staff will be required to wear masks at all times in the Hall of the House without exception, including while Members are under recognition. Members will not be recognized unless they are wearing a mask, and recognition will be withdrawn if they remove their mask while speaking. … Members and staff will not be permitted to enter the Hall of the House without wearing a mask. Masks will be available at the entry points for any Member who forgets to bring one. The Chair views the failure to wear a mask as a serious breach of decorum. The Sergeant-at-Arms is directed to enforce this policy." At H40 to H41.  https://www.congress.gov/117/crec/2021/01/04/CREC-2021-01-04.pdf (last visited 7/14/2021).

20.     The intent of the majority's masking requirement was to force all members of the House to participate in conveying these messages by forcing them to wear a mask in televised areas only.  Those viewing the House proceedings would understand, and did understand, the message the majority was forcing the minority to participate in conveying.

21.     Being forced to wear a mask, under these circumstances, involved both compelled statements of fact and opinion, all of which were embodied in the symbolic speech in question.

22.     The masking requirement was an attempt to prescribe what shall be orthodox in politics, medicine, and science, despite a deep divide over these issues of opinion.  It has been used to force Plaintiffs and other members of the minority party to be instruments for fostering public adherence to this ideological point of view that Plaintiffs find unacceptable.  The majority's mask requirement, and the ad-hoc purported changes thereto by the Speaker, all followed on the heels of public pronouncements against mask requirements by the Plaintiffs and other members of the minority, and the majority's favored approach regarding their use.

23.     On or about May 11, 2021,[10] the Speaker unilaterally purported to grant exceptions to the mask mandate for members under recognition – that is, members involved in actively projecting their voices on the floor of the House, further demonstrating that the mask mandates: (i) were not necessary to prevent disruption; (ii) were not necessary to ensure health or safety; but (iii) were instead about compelling a form of speech and message.  Again, on June 11, 2021, the Speaker unilaterally purported to grant exceptions to the mask mandate for the vaccinated, again with an intent to send a message, namely that vaccination was necessary for safety.[11]

---

[10] *See* https://www.congress.gov/congressional-record/2021/05/11/house-section/article/H2157-6 (last visited 7/22/2021).

[11] *See* https://www.rollcall.com/2021/06/11/house-chamber-mask-mandate-lifted-for-vaccinated-members-staff/ (last visited 7/21/2021).

JA 020

24.     These exceptions were not undertaken through changes to H. Res. 8 or H. Res. 38. Rather, these exceptions were created on an ad-hoc basis by Defendant Pelosi.  They were made outside the legislative process and not from any statements on the House floor.

25.     The fact that these ad-hoc exceptions were used to punish Plaintiffs for speech the Speaker and majority disfavored is clear from Plaintiffs' treatment versus the treatment received by numerous members of the majority in the House. In fact, not one member of the majority party has been fined pursuant to H. Res. 38, but many of them have violated that rule. *See, e.g.*, ¶¶ 32, 34, 41.

26.     On May 18, and again on May 19, 2021, as seen in the following photos, Plaintiffs entered the House floor to vote without wearing masks:





27.    The reason for Plaintiffs proceeding to the floor without masks was to engage in symbolic protest speech.  This protest speech was a protest against the double standard being enforced by Defendants, the well-founded beliefs shared by Plaintiffs that mask wearing is not scientifically based, that mask wearing is not necessary for the vaccinated or naturally immune, that mask wearing is merely political theater, that one's bodily integrity should be free from government control, that individuals should have the liberty to choose what they wear on their face, and that individuals should be free to make their own medical decisions.  Plaintiffs' symbolic speech was also an effort to highlight recent scientific findings that the use of face coverings has no appreciable effect on slowing or halting the spread of COVID-19.[12]  As such, masks have become a modern-day political battle ground between, *inter alia*, freedom and bodily integrity versus governmental overreach, and Plaintiffs' actions in proceeding to the House floor without masks was quintessential symbolic speech.

28.    These Plaintiffs, in being forced to wear a mask, did not intend to and would never voluntarily convey any of the particularized messages the public recognizes in wearing a mask, but Plaintiffs nevertheless were forced to convey these unwanted messages in light of the mandate

---

[12] *See, e.g.*, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html (last visited 7/16/2021) ("People release respiratory fluids during exhalation (e.g., quiet breathing, speaking, singing, exercise, coughing, sneezing) in the form of droplets across a spectrum of sizes. These droplets carry virus and transmit infection. … The smallest very fine droplets, and aerosol particles formed when these fine droplets rapidly dry, are small enough that they can remain suspended in the air for minutes to hours"); https://www.medpagetoday.com/special-reports/exclusives/92564 (last visited 7/16/2021). ("The new guidance acknowledges that inhalation of aerosols -- which are tiny, lightweight viral particles that can float and linger in the air for extended periods of time -- is one-way COVID-19 spreads. Even when an infectious person is more than 6 feet away, aerosols have the ability to travel and infect others."); https://pubmed.ncbi.nlm.nih.gov/1524265/ (last visited 7/16/2021) ("Although surgical mask media may be adequate to remove bacteria exhaled or expelled by health care workers, they may not be sufficient to remove the submicrometer-size aerosols containing pathogens to which these health care workers are potentially exposed.").

contained in H. Res. 38, including, *inter alia*, purported imprimatur and support for mask wearing

and mandates.

29.     The Plaintiffs' symbolic speech – failing to wear a mask – involved an intent by

Plaintiffs to convey a particularized message.  Given their public positions and battle against the

majority on this issue, it was manifest that the message be understood by those who viewed their

protest as a symbolic act or display.  Indeed, news sources at the time understood and reported

these acts as symbolic speech and a protest.[13]

30.     The record is also clear that Plaintiffs' activities did not disrupt, delay, or otherwise

interfere in any way with House proceedings.  In fact, as a video of the day in question makes

plain, the proceedings in the House did not halt or stop at any time as a result of Plaintiffs' actions,

nor did the presiding officer delay the proceedings to address the lack of face coverings by

Plaintiffs.  *See*  https://www.c-span.org/video/?511817-2/house-passes-anti-asian-american-hate-

crimes-bill-364-62&start=4694&transcriptQuery=coronavirus  at 4:14:45 to 4:45:14 (last visited

7/26/2021).  Consequently, Plaintiffs solely engaged in non-disruptive symbolic political speech.

31.     Nevertheless, despite not disrupting the activities of the House in any way, to

further the majority's public message and position regarding masks, Defendants chose to

selectively enforce H. Res. 38 against Plaintiffs.  After Plaintiffs' appearances on the House floor,

Defendant Walker sent correspondence to each of the Plaintiffs imposing a fine against each

Plaintiff in the amount of $500, which according to H. Res. 38 would be deducted from Plaintiffs'

compensation through procedures overseen by Defendant Szpindor.  A true and accurate copy of

---

[13]   *See*  https://www.forbes.com/sites/andrewsolender/2021/05/20/marjorie-taylor-greene-fined-500-for-repeatedly-going-maskless-on-house-floor/?sh=5a2ed08b70e9 (last visited 7/22/2021).

JA 023

relevant portions of notifications and correspondence related to the compensation reduction is attached as **Exhibit A** (attached hereto).

32.     Plaintiffs appealed these fines to the House Ethics Committee, but in votes split between Democrats and Republicans, the Committee denied each appeal.[14]

33.     Reflecting the partisan and compelled speech nature of the majority's mask mandate, the very same day that Plaintiffs appeared on the House floor without masks, the Speaker herself also appeared on the House floor without a mask, as can be seen in the following photo taken on May 18, 2021.  Speaker Pelosi did so because she unilaterally, without any amendment to H. Res. 8 or H. Res. 38, decided that not wearing a mask was acceptable while under recognition to speak in the chamber, but not acceptable when Plaintiffs entered the chamber:

[15]

34.     Defendant Walker took no actions to fine Speaker Pelosi despite her violation of the exact same rule – H. Res. 38 – as Plaintiffs violated on the very same day.

35.     Similarly, on June 8, 2021, Representative Jamie Raskin, a Democrat, also appeared on the House floor without a face covering, as can be seen in the following photograph:

---

[14] In pursuing their partisan weaponization of the mask rule, four of the five Democratic members who sat in judgment and adjudicated Representative Greene's appeal refused to recuse themselves despite having previously signed a resolution calling for her expulsion from Congress. https://www.congress.gov/bill/117th-congress/house-resolution/260/text?r=55&s=1 (last visited 7/26/2021); https://ethics.house.gov/about/committee-members (last visited 7/26/2021).

[15] https://www.c-span.org/congress/?chamber=house&date=2021-05-18 (House Session from 5/18/2021; last visited 7/21/2021).



36.    Again, Defendant Walker took no actions to fine Representative Raskin.

37.    Thereafter, on or about June 11, 2021, Speaker Pelosi unilaterally decided that anyone who admitted they were vaccinated against COVID-19 could appear on the House floor without a mask.  Once again, Congress did not amend H. Res. 8 or H. Res. 38.  Instead, Speaker Pelosi simply decided by an *ultra vires* fiat that the rules would not be enforced against such individuals.

38.    Speaker Pelosi's June 11, 2021 fiat was a substantial change in her position from early May 2021 and was transparently reactive to Plaintiffs and other minority members' position that vaccination status is private medical information that should not need to be shared with the government.[17]   The political motivation for the June 11, 2021 policy change is further demonstrated by the fact it came after Speaker Pelosi had faced substantial opposition from the

---

[16]   https://www.c-span.org/congress/?chamber=house&date=2021-06-04  (House Session from 6/4/2021; last visited 7/21/2021).

[17]   *See* https://www.foxnews.com/politics/pelosi-slams-unvaccinated-lawmakers-house-floor-petri-dish-covid (last visited 7/23/2021); https://www.cnn.com/world/live-news/coronavirus-pandemic-vaccine-updates-05-20-21/h_ae0334e68999d960efc0b1144135d970 (last visited 7/23/2021).

JA 025

House Minority Leader Kevin McCarthy and several other Republican lawmakers over the House masking rules.[18]

39.     As Speaker Pelosi knew would happen, Congresswoman Greene did not and will not disclose her vaccination status as a protest against unwarranted invasions by the government into people's individual private medical information and decisions.[19]   Similarly, Congressman Massie had, on the dates in question, already had COVID-19 months prior, recovered from it, and demonstrated that he has robust natural immunity as a result.   Therefore, he has chosen not to receive the vaccine and had made public statements about that choice.[20]

40.     Speaker Pelosi knew that minority members were opposed to a policy which directed individuals to reveal their private health information and vaccination status.   Speaker Pelosi also knew that the minority members were opposed to speech that symbolized there was any need to engage in still experimental medical procedures.   Therefore, Speaker Pelosi was well aware that her fiat would harm members of the minority party by forcing them to engage in this compelled symbolic speech and activity, or otherwise be prohibited from entering the House floor, but not any other areas of the House where the majority decided this symbolic speech was unnecessary.

---

[18] *See* https://www.nbcnews.com/politics/politics-news/house-ends-mask-mandate-fully-vaccinated-lawmakers-staff-n1270548 (last visited 7/23/2021); *see also* https://www.newsweek.com/34-gop-reps-ask-nancy-pelosi-lift-mask-rule-house-following-new-cdc-guidelines-1591401      (last visited 7/23/2021).

[19] *See* https://www.salon.com/2021/06/16/marjorie-taylor-greene-refuses-to-say-whether-or-not-she-has-been-vaccinated-against-covid-19_partner/ (Published 6/16/2021; last visited 7/21/2021).

[20] *See* https://www.courier-journal.com/story/news/politics/elections/2020/10/22/u-s-rep-thomas-massie-says-he-wont-taking-covid-19-vaccine/3737134001/ (last visited 7/21/2021).

41.     Furthermore, Congressman Norman had already received the vaccine for COVID-19 when he appeared on the floor of the House in May without a mask, but this did not stop Defendants from issuing the fine notice and the imminent reduction in his compensation as a result.

42.     On the other hand, since Speaker Pelosi's fiat, numerous members of the majority party have failed to wear masks while on the floor of the House, and due to Defendants' selective enforcement and *ad-hoc* exceptions, none of them have been cited or fined.  The following are photos of members of the majority party on the floor of the House without a mask, in violation of H. Res 38:





---

[21] https://www.c-span.org/video/?513011-1/house-votes-create-select-committee-investigate-jan-6-capitol-attack-222-190 (House Session from 6/30/2021; last visited 7/21/2021); https://www.c-span.org/video/?512812-2/house-session-part-1 (House Session from 6/24/2021; last visited 7/21/2021).

[22] https://www.c-span.org/video/?512812-2/house-session-part-1 (House Session from 6/24/2021; last visited 7/21/2021); https://www.c-span.org/video/?512810-2/house-session-part-1 (House Session from 6/22/2021; last visited 7/21/2021).



43.   None of these members of the majority party were fined despite their violations of H. Res 38 because Speaker Pelosi unilaterally decided, without amending H. Res 38, that if recognized to speak, they did not need to wear a mask. In short, H. Res. 8 and H. Res. 38 have been weaponized on a partisan basis to punish political opponents, based on their viewpoints, and all in an effort to force the minority party to conform to the majority's political views.

44.   On July 22, 2021, Plaintiff Massie received a *Deduction of Fine Imposed Pursuant to House Resolution 38* memorandum, which read in relevant part:

> The Office of Members' Services received correspondence on July 20, 2021, from the House Committee on Ethics upholding a fine imposed pursuant to House Resolution 38 and House Rule II, clause 3(g). The fine was imposed by the House Sergeant at Arms on May 19, 2021. The Chief Administrative Officer is responsible for deducting the amount of any fine levied under House Resolution 38 and House Rule II, clause 3(g) from the net salary otherwise due to the Member, Delegate, or Resident Commissioner. I am including a copy of the Committee on Ethics and Sergeant at Arms notices for your records.
>
> The full amount of the fine, **$500.00,** will be deducted from your July 2021 payroll (to be disbursed August 1). **(Exhibit A)**

45.   The remaining Plaintiffs received correspondence materially similar to that in **Exhibit A.**

---

[23] https://www.c-span.org/video/?512812-2/house-session-part-1 (House Session from 6/24/2021; last visited 7/21/2021); https://www.c-span.org/video/?512574-1/house-session (House Session from 6/17/2021; last visited 7/21/2021).

JA 028

46.    In other contexts, symbolic speech has been embraced on the House floor by members of the majority party, particularly where it does not disrupt the proceedings of the House, as the following images of members of the House reveal:



47.    Plaintiffs' activities, including their symbolic speech consisting of not wearing ineffective masks, have not violated either law, or good order within the House.  Again, for the avoidance of all doubt, and as the video referenced in Paragraph 30 reveals, there was no disruption in proceedings of the House, and, at the time Plaintiffs proceeded to the House floor, there was no active business pending before the House nor were any debates occurring.

48.    Defendants, in selectively enforcing H. Res. 8 and H. Res. 38 against Plaintiffs in a viewpoint discriminatory manner, issued fine notices against Plaintiffs and, consequently, the unconstitutional reduction and varying of Plaintiffs' compensation is imminent.[24]

### COUNT I
### Violation of the Twenty-Seventh Amendment

49.    Plaintiffs incorporate the preceding paragraphs as if fully written herein.

---

[24] Consistent with the foregoing, the rules for security screening have also been weaponized whereby Democrats have violated those rules without fines and Republican members who have violated them have been fined.  *See Clyde et al. v. Walker et al.*, Case 1:21-cv-01605-TJK.

JA 029

50.     The Twenty-Seventh Amendment of the United States Constitution provides: "No law, varying the compensation for the services of the Senators and Representatives, shall take effect, until an election of Representatives shall have intervened."

51.     The term "varying" means that compensation may neither be increased or decreased.  A fine that is deducted from pay is a decrease in compensation.

52.     Wisely, the Twenty-Seventh Amendment was enacted, in part, to prevent the coercion or pressuring of members of Congress, either individually or as a group, through salary reductions or increases, without an intervening election.

53.     Imposing fines and then collecting them through salary reductions, pursuant to H. Res. 8 and/or H. Res. 38 and during the term in which they were enacted, constitutes a clear violation of the Twenty-Seventh Amendment.  It is undisputed that these measures were passed in the 117th Congress, and that there has been no intervening election.

54.     Accordingly, Plaintiffs seek (1) a declaratory judgment that the House of Representatives, during the 117th Congress, may not impose or collect fines, pursuant to H. Res. 8 and/or H. Res. 38, including through salary reduction, as doing so violates the Twenty-Seventh Amendment; (2) an injunction against Defendants Walker and Szpindor, during the 117th Congress, from imposing or collecting fines, or reducing Congressional salaries to collect fines, pursuant to H. Res. 8 and/or H. Res. 38; and (3) if at any time during the 117th Congress Defendant Szpindor actually reduces the compensation or salary due to Plaintiffs under the purported authority of H. Res. 8 and/or H. Res. 38, an injunction directing her to restore such sums to Plaintiffs.

**COUNT II**
**Violation of Article I, § 5**

55.     Plaintiffs incorporate the preceding paragraphs as if fully written herein.

18

JA 030

56.     Article I, § 5, Clause 2 of the United States Constitution provides, in pertinent part, "Each House may … punish its members for disorderly behavior."  "Disorderly behavior" had a clear meaning in 1789 and at common law, requiring affirmative action on the part of a member "in a manner violating law and good order."[25]

57.     Defendants' attempt to impose and enforce a fine upon members of the House for conduct that is not disorderly behavior violates Article I § 5 Clause 2.  Plaintiffs' behavior in entering the House Chamber without a mask does not and did disrupt the House's operations or good order, nor is it otherwise unlawful conduct, and is not disorderly.

58.     Furthermore, the entire House has not taken a vote to punish any of the Plaintiffs for disorderly behavior and, as such, Article I, § 5, Clause 2 is further violated by the imposition of any fines or punishments without a vote of the entire House of Representatives.

59.     Accordingly, Plaintiffs seek (1) a declaratory judgment that the House of Representatives may not impose or collect fines for the failure to wear a mask, as doing so violates Article I, § 5, Clause 2 of the United States Constitution; (2) a declaratory judgment that a vote of the entire House of Representatives is necessary to punish a member; (3) an injunction against Defendants Walker and Szpindor from imposing, collecting, or reducing the compensation of these Plaintiffs, without the vote of the entire House of Representatives authorizing that punishment, for Plaintiffs' non-disorderly conduct; and (4) if at any time Defendant Szpindor actually reduces the compensation due to Plaintiffs, an injunction directing her to restore such sums to Plaintiffs.

**COUNT III**
**Violation of Article I, §§ 6 and 7**

60.     Plaintiffs incorporate the preceding paragraphs as if fully written herein.

---

[25]  American Dictionary of the English Language, Noah Webster, 1829. http://webstersdictionary1828.com/ (last visited 7/14/2021).

JA 031

61.     Article 1, § 6 of the United States Constitution provides: "The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States."

62.     Current congressional compensation is set by "Law:" 2 U.S.C. § 4501.

63.     Article 1, § 7 of the United States Constitution provides:

> Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law.

64.     Thus, to be a "Law," sufficient to set compensation, any measure must comply with the provisions of Article 1, §§ 6 and 7 of the United States Constitution.

65.     H. Res. 8 and H. Res. 38 are not a "Law" under the Constitution, as they have not undergone the process of passage in both Houses of Congress and presentment to the President.

66.     Furthermore, collectively, these provisions improperly delegate to other officials, namely the House Sergeant of Arms, rather than Congress itself or even the House itself, the determination of compensation of members of Congress.

67.     Accordingly, Plaintiffs seek (1) a declaratory judgment that the House of Representatives may not impose or collect fines, particularly through salary reduction, pursuant to H. Res. 8 and H. Res. 38, as doing so violates Article I, §§ 6 and 7 of the United States Constitution; (2) an injunction against Defendants Walker and Szpindor from imposing or collecting fines by reducing Congressional salaries pursuant to H. Res. 8 and H. Res. 38; and (3) if at any time Defendant Szpindor actually reduces the compensation or salary due to Plaintiffs under the

20

JA 032

purported authority of H. Res. 8 and/or H. Res. 38, an injunction directing her to restore such sums to Plaintiffs.

## COUNT IV
### Violation of First Amendment

68.    Plaintiffs incorporate the preceding paragraphs as if fully written herein.

69.    The First Amendment provides in relevant part that "Congress shall make no law … abridging the freedom of speech."

70.    The requirement to wear a mask in only the Hall of the House, and only at such times and with such *ad-hoc* exceptions as determined unilaterally by Speaker Pelosi, is compelled symbolic speech.  This requirement, in these circumstances, is a symbolic act or display that is sufficiently imbued with elements of communication with both an intent to convey a particularized message and a great likelihood that the message would be understood by those who viewed the symbolic act or display.

71.    The requirement to wear a mask in only the Hall of the House, and at the time and in the manner dictated by the majority, is also an attempt to prescribe what shall be orthodox in politics, science, and medicine, despite a legitimate divergence of opinions, and constitutes viewpoint discrimination in a limited public forum.

72.    Further, Plaintiffs' failure to wear masks was done to express symbolic speech, including as a form of protest against unscientific, governmental mandates directing what people wear.  It was not disruptive.  However, the rules in question were enacted for partisan purposes based on disagreement with the views of these Plaintiffs, and they have been enforced in a partisan and viewpoint discriminatory manner to prohibit such symbolic speech from members who are not in the majority.

JA 033

73.     Further, given Plaintiffs' symbolic speech protest, the lack of disruption attending their speech, and the *ad-hoc* creation of exemptions, the requirement to wear a mask here constituted compelled speech: namely, an effort and rule designed to signal that masking in the time and manner prescribed by Speaker Pelosi was required for safety, and endorsed by these Plaintiffs, even though the message they wish to convey is the exact opposite.

74.     Moreover, even if the policies in question are not facially unconstitutional under the First Amendment, they are unconstitutional under the First Amendment as applied to these Plaintiffs.

75.     Accordingly, Plaintiffs seek (1) a declaratory judgment that the House of Representatives may not impose or collect fines, particularly through salary reduction, pursuant to H. Res. 8 and/or H. Res. 38, as doing so violates the First Amendment as applied to these Plaintiffs; (2) an injunction against Defendants Walker and Szpindor from imposing or collecting fines by reducing Congressional salaries against these Plaintiffs for the conduct in question; and (3) if at any time Defendant Szpindor actually reduces the compensation or salary due to Plaintiffs based on their exercise of symbolic speech that was not disruptive to the proceedings of the House and was based on a violation of a requirement that involved compelled speech under these circumstances, an injunction directing her to restore such sums to Plaintiffs.

JA 034

**WHEREFORE**, Plaintiffs pray that this Court award them:

- Declaratory judgment, that the fines imposed or threatened to be imposed against them are unconstitutional, pursuant to 28 U.S.C § 2201 and/or 28 U.S.C. § 2202, as alleged in this Complaint;

- An injunction, prohibiting the enforcement of the fines imposed or threatened to be imposed against them, due to unconstitutionality, pursuant to 28 U.S.C. § 2202, and, if such fines are actually deducted from their pay during the pendency of this matter, a directive that such compensation be restored;

- Their reasonable attorney fees and costs pursuant to 28 U.S.C. § 2412 and any other applicable common or statutory law; and

- Such other relief as this Court may find just.


Dated: July 27, 2021

Respectfully Submitted,

/s/Christopher Wiest
Christopher Wiest (*pro hac vice* tendered)
Chris Wiest, Attorney at Law, PLLC
25 Town Center Blvd, Ste. 104
Crestview Hills, KY 41017
chris@cwiestlaw.com
Tel: (513) 257-1895
chris@cwiestlaw.com

/s/ Aaron Siri
Aaron Siri (*pro hac vice* tendered)
Elizabeth A. Brehm (*pro hac vice* tendered)
Jessica Wallace (*pro hac vice* tendered)
SIRI & GLIMSTAD LLP
200 Park Avenue, 17th Floor
New York, New York 10166
Tel: (212) 532-1091
aaron@sirillp.com

/s/John R. Garza
John R. Garza
Bar ID: 398728
Garza Building
17 W. Jefferson Street, Suite 100
Rockville, Maryland 20850
Tel: (301) 340-8200 x 100
jgarza@garzanet.com

/s/Thomas Bruns
Thomas Bruns (*pro hac vice* tendered)
Bruns, Connell, Vollmar, Armstrong LLC
4750 Ashwood Drive, Ste. 200
Cincinnati, Ohio 45241
Tel: (513) 312-9890
tbruns@bcvalaw.com

*Attorneys for Plaintiffs*

JA 035

VERIFICATION

THOMAS MASSIE, declares:

     I, Thomas Massie, a citizen of the United States and of Kentucky, have read the foregoing

Complaint and know the contents thereof as to myself, that the same is true to my own knowledge,

and as to all other matters on information and belief and I believe them to be true.

     I verify under penalty of perjury that the foregoing is true and correct.

     Executed on this 27th day of July 2021 in Washington, D.C.

# Exhibit A

Catherine L. Szpindor
Chief Administrative Officer

*Office of the*

*Chief Administrative Officer*

*U. S. House of Representatives*

*Washington, DC 20515-6860*

TO:      The Honorable Thomas Massie
         Member of Congress

FROM:    Deborah Ellis-Jones
         Manager
         CAO Members' Services
         160 Cannon HOB

DATE:    July 22, 2021

SUBJECT: Deduction of Fine Imposed Pursuant to House Resolution 38

The Office of Members' Services received correspondence on July 20, 2021, from the House Committee on Ethics upholding a fine imposed pursuant to House Resolution 38 and House Rule II, clause 3(g).  The fine was imposed by the House Sergeant at Arms on May 19, 2021. The Chief Administrative Officer is responsible for deducting the amount of any fine levied under House Resolution 38 and House Rule II, clause 3(g) from the net salary otherwise due to the Member, Delegate, or Resident Commissioner. I am including a copy of the Committee on Ethics and Sergeant at Arms notices for your records.

The full amount of the fine, **$500.00**, will be deducted from your July 2021 payroll (to be disbursed August 1).

If you have any questions regarding the above, please do not hesitate to contact myself or Elizabeth Burnham in the CAO Members' Services office at 202-225-3644.

WILLIAM J. WALKER
SERGEANT AT ARMS

H–124 CAPITOL
(202) 225–2456

Office of the Sergeant at Arms

# U.S. House of Representatives

Washington, DC 20515–6634

May 20, 2021

The Hon. Catherine Szpindor
Chief Administrative Officer
HB-26, the Capitol
U.S. House of Representatives
Washington, D.C. 20515

Dear Mrs. Szpindor:

I write to notify you of a violation of House Resolution 38, on May 19, by Rep. Thomas Massie. The Member has a $500 fine. The Member has been notified of the fine and of their appeal rights.

I am including a copy of the notification to Rep. Thomas Massie.

Please contact me at 225-2456 if you should have any questions.

Sincerely,

William J. Walker
Sergeant at Arms

cc:    The Speaker
       Committee on Ethics

Attachment: Notification to Rep. Thomas Massie

JA 039

WILLIAM J. WALKER
SERGEANT AT ARMS

H-124 Capitol
(202) 225-2456

### Office of the Sergeant at Arms
# U.S. House of Representatives
### Washington, DC 20515–6634

May 20, 2021

## Notification of a Violation of House Resolution 38

The Honorable Thomas Massie
U.S. House of Representatives
2453 Rayburn House Office Building
Washington, DC 20515

Dear Representative Massie:

Pursuant to House Resolution 38, you were warned on May 18, 2021, of a mask violation. You were then again observed not wearing a mask on May 19, and were asked by a member of my staff to wear a mask while in the Hall of the House of Representatives unless recognized to speak by the chair (see enclosure). Pursuant to House Rules the first violation results in a $500 fine and $2,500 for any subsequent offense.

As a result of your failure to comply with House Rules, and as this is the first violation, a fine of **$500** is imposed upon you pursuant to clause 3(g) of House Rule II, and shall be administered as though pursuant to clause 4(d) of Rule II. As required by the resolution, I am notifying the Speaker, the Committee on Ethics, and the Chief Administrative Officer.

Please note that upon notification by the Sergeant at Arms of a fine, the Member, Delegate or Resident Commissioner may appeal the fine **IN WRITING** to the Committee on Ethics **NOT LATER THAN 30 CALENDAR DAYS OR FIVE LEGISLATIVE DAYS, WHICEVER IS LATER,** after the notification.

Please contact Ted Daniel, Assistant Sergeant at Arms for Chamber Operations, at 225-2456 if you should have any questions or require clarification of the rule.

Sincerely,

William J. Walker
Sergeant at Arms

cc:   The Honorable Nancy Pelosi, Speaker
Committee on Ethics
The Honorable Catherine Szpindor, CAO

Attachment: Warning letter and Ledger entry

Office of the Sergeant at Arms

## U.S. House of Representatives

Washington, DC 20515-6634

May 19, 2021

## Notification of a Violation of House Resolution 38

The Honorable Thomas Massie
U.S. House of Representatives
2453 Rayburn House Office Building
Washington, DC 20515

Dear Rep. Masssie:

Pursuant to House Resolution 38, you were observed not wearing a mask on the Floor of the House on May 18, 2021. You were then asked by a member of my staff to wear a mask while in the Hall of the House of Representatives, unless recognized to speak by the chair.

This letter is to inform you that a further violation of House Resolution 38 will result in a $500 fine for your next violation and a $2,500 fine for any subsequent violation.

Please contact Ted Daniel, Assistant Sergeant at Arms for Chamber Operations, at 225-2456 if you should have any questions or require clarification of the rule.

Sincerely,

William J. Walker
Sergeant at Arms

**Office of the Sergeant at Arms**

**Decorum Enforcement Journal**
**117th Congress**

| Last Name | First Name | St/Dis | Photo Warning Date | Photo #1 Date | | Mask Warning Date | Mask #1 Date | |
|---|---|---|---|---|---|---|---|---|
| Lucas | Frank | OK03 | | | | | | |
| Luetkemeyer | Blaine | MO03 | | | | | | |
| Luria | Elaine | VA02 | | | | | | |
| Lynch | Stephen | MA08 | | | | | | |
| Mace | Nancy | SC01 | | | | | | |
| Malinowski | Tom | NJ07 | | | | | | |
| Malliotakis | Nicole | NY11 | | | | | | |
| Maloney | Carolyn | NY12 | | | | | | |
| Maloney | Sean | NY18 | | | | | | |
| Mann | Tracey | KS01 | | | | | | |
| Manning | Kathy | NC06 | | | | | | |
| Massie | Thomas | KY04 | | | | | 5/ /   | | |
| Mast | Brian | FL18 | | | | | | |
| Matsui | Doris | CA06 | | | | | | |
| McBath | Lucy | GA06 | | | | | | |
| McCarthy | Kevin | CA23 | | | | | | |
| McCaul | Michael | TX10 | | | | | | |
| McClain | Lisa | MI10 | | | | | | |
| McClintock | Tom | CA04 | | | | | | |
| McCollum | Betty | MN04 | | | | | | |
| McEachin | A. | VA04 | | | | | | |
| McGovern | James | MA02 | | | | | | |



Theodore E. Deutch, Florida
*Chairman*
Jackie Walorski, Indiana
*Ranking Member*

Susan Wild, Pennsylvania
Dean Phillips, Minnesota
Veronica Escobar, Texas
Mondaire Jones, New York

Michael Guest, Mississippi
Dave Joyce, Ohio
John H. Rutherford, Florida
Kelly Armstrong, North Dakota

ONE HUNDRED SEVENTEENTH CONGRESS

# U.S. House of Representatives

COMMITTEE ON ETHICS

Thomas A. Rust
*Staff Director and Chief Counsel*

David W. Arrojo
*Counsel to the Chairman*

Kelle A. Strickland
*Counsel to the Ranking Member*

1015 Longworth House Office Building
Washington, D.C. 20515-6328
Telephone: (202) 225-7103
Facsimile: (202) 225-7392

July 20, 2021

The Honorable Nancy Pelosi
Speaker
H-232, The Capitol
Washington, DC 20515

Dear Speaker Pelosi:

On June 15, 2021, the Committee on Ethics (Committee) received an appeal from Representative Thomas Massie of a fine imposed pursuant to House Resolution 38 and House Rule II, clause 3(g). The appeal was received after the Committee adopted its written rules.

A majority of the Committee did not agree to the appeal.

Sincerely,

Theodore E. Deutch
Chairman

Jackie Walorski
Ranking Member

Cc:    The Honorable Thomas Massie
       U.S. House of Representatives
       2453 Rayburn House Office Building
       Washington, DC 20515

       The Honorable William J. Walker
       Sergeant at Arms
       H-124, The Capitol
       Washington, DC 20515

       The Honorable Catherine Szpindor
       Chief Administrative Officer
       HB-28, The Capitol
       Washington, DC 20515

JA 043

1                **IN THE UNITED STATES DISTRICT COURT**

2                   **FOR THE DISTRICT OF COLUMBIA**

3  THOMAS MASSIE, et al.,         .
                      Plaintiff,    .
4  vs.                            .  Docket No. CA 21-2023-RBW
                                  .
5  NANCY PELOSI, et al.,          .  Washington, D.C.
                                  .  Friday, December 2, 2021
6                Defendant.       .
   . . . . . . . . . . . . . . . .x  2:03 p.m.
7

8                   TRANSCRIPT OF MOTION HEARING

9      BEFORE THE HONORABLE SENIOR JUDGE REGGIE B. WALTON

10                 UNITED STATES DISTRICT JUDGE

11 APPEARANCES:

12 For the Plaintiffs:  Christopher D. Wiest
                        25 Town Center Boulevard
13                      Suite 104
                        Crestview Hills, KY 41017
14                      (513) 257-1895
                        Email: chris@cwiestlaw.com
15
                        Thomas B. Bruns
16                      **BRUNS, CONNELL, VOLLMAR & ARMSTRONG**
                        4750 Ashwood Drive
17                      Suite 200
                        Cincinnati, OH 45241
18                      (513) 312-9890
                        Email: tbruns@bevalaw.com
19

20

21

22

23

24

25

```
 1   For the Defendant:    Douglas N. Letter
                           U.S. HOUSE OF REPRESENTATIVES
 2                         Office of General Counsel
                           219 Cannon House Office Building
 3                         Washington, DC 20515
                           (202) 225-9700
 4                         Email: douglas.letter@mail.house.gov

 5                         Eric Randal Columbus
                           Office of General Counsel
 6                         District of Columbia
                           5140 O'Neill House Office Building
 7                         Washington, DC 20515
                           (202) 225-9700
 8                         Email: eric.columbus@mail.house.gov

 9

10

11   Court Reporter:   Cathryn J. Jones, RPR
                        Official Court Reporter
12                      Room 6521, U.S. District Court
                        333 Constitution Avenue, N.W.
13                      Washington, D.C. 20001

14

15

16

17   Proceedings recorded by machine shorthand, transcript
     produced by computer-aided transcription.
18

19

20

21

22

23

24

25
```

1                    **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  Your Honor, this is In Re:

3    Thomas Massie et al. versus Nancy Pelosi et al., Civil

4    Action Number 21-2023.  Counsel, please identify yourselves

5    for the record.

6              MR. WIEST:  Good afternoon, Your Honor.  Chris

7    Wiest, Tom Bruns, plaintiffs Congressman Thomas Massie,

8    who's in attendance, Congressman Ralph Norman, who's in

9    attendance, and Congresswoman Majorie Taylor-Greene.

10             THE COURT:  Good afternoon.

11             MR. LETTER:  Good afternoon, Your Honor.  I'm

12   Douglas Letter, the General Counsel of the U.S. House of

13   Representatives.  With me is Eric Columbus, also from the

14   Office of the General Counsel of the U.S. House of

15   Representatives.

16             THE COURT:  Good afternoon.  This matter is before

17   the Court today on the defendant's motion to dismiss this

18   case, and I guess I'll hear from the government first since

19   it is the government's motion.

20             MR. LETTER:  Thank you, Your Honor.  I understand

21   it's --

22             THE COURT:  Yes, you can take it off when you're

23   making your presentation.

24             MR. LETTER:  Thank you very much, Your Honor.

25             As I said, I'm Douglas Letter, the General Counsel

1    of the House of Representatives.

2            Your Honor, we're here in a situation where the

3    attending physician of Congress in response to a massive

4    pandemic that has killed over 750,000 Americans and

5    including members of the House of Representatives, has

6    sickened many other members of the House and staff of the

7    House.

8            THE COURT:  There have been House members or staff

9    who had actually passed as a result of the virus?

10            MR. LETTER:  Yes, your Honor.  There's been at

11    least one member of the House and one member elect of the

12    House.  We don't have statistics on whether any staff have

13    actually died in light of the COVID pandemic, but many have

14    been sickened and hospitalized and it may very well be that

15    some staff members have also died.

16            THE COURT:  Do you know how many staff members

17    have been sickened by the virus?

18            MR. LETTER:  I don't have that figure, but it is

19    quite a few have at least tested positive for COVID.  I

20    think symptoms then have varied, and we wouldn't necessarily

21    know because various members have been self quarantined and

22    so we wouldn't necessarily know how many of them have

23    actually been ill or how many have gone to the hospital.

24            THE COURT:  I assume the same would be true in

25    reference to staff?

USCA Case #22-5058    Document #1950662    Filed: 06/15/2022    Page 50 of 174

1          MR. LETTER:  That is correct, Your Honor.  We, and

2    we know, for example, we have some statistics on for

3    instance, the Capitol police for our security many, a very

4    large number of them have been sickened and needed

5    hospitalization, et cetera.  Here, we're talking

6    specifically about the affect on the House chambers, but I

7    emphasize is not just members.  There are House staff who

8    have to be in the chamber whenever the Congress, the House

9    is in session.  I myself personally are sometimes, I'm in

10   the chamber as well.

11          THE COURT:  Do you have any statistics regarding

12   the number of members or staff or Capitol police officers

13   who fall within one of the categories that make them more

14   susceptible to the virus, i.e., because of age or underlying

15   medical problems?

16          MR. LETTER:  Your Honor, do not have that.  I can

17   get all of these statistics for you if you wish.  I do not

18   have that with me today, but if Your Honor wishes we can

19   compile the -- we can get the Clerk's office or the

20   congressional, the administration office, we can compile

21   these if you wish them.

22          THE COURT:  I think that would be helpful because

23   I'm not going to make a ruling today.  Because I think I

24   need to issue a written opinion and that's going to take me,

25   I hope I can do it within 30 days with the calendar that I

1   have, but I think I should issue an opinion regarding the

2   matter since it's a matter of first impression.

3            MR. LETTER:  Certainly, Your Honor.  Let me make

4   sure my associate has written down exactly what we need from

5   you.

6            THE COURT:  Very well.

7            [Brief pause.]

8            MR. LETTER:  Your Honor, just so we get you

9   exactly what you want, can you just repeat --

10           THE COURT:  Any statistic that you have regarding

11   the number of House members who have died or who became ill

12   with the virus, also the same for staff, also the same for

13   the police services, and also the -- had a brain freeze.

14           MR. LETTER:  Happens to me all the time, Your

15   Honor.

16           THE COURT:  Regarding the number of congressional

17   staff members who are of the age that make them more

18   susceptible or have underlying medical problems that make

19   them more susceptible for both members, staff and law

20   enforcement.

21           MR. LETTER:  Yes, your Honor.  And Your Honor,

22   obviously, if you think of anything else that you want,

23   please just, I don't know whether you need to issue an order

24   or just make a request.  Obviously, we'll come up with

25   whatever statistics we've got that would be helpful to you.

1          THE COURT:  Thank you.

2          MR. LETTER:  Yes.  So this is the context, and the

3     attending physician then has issued various requirements,

4     mask requirements.  And then those have been, are enforce in

5     all sorts of location that make up the House of

6     Representative parts of the Capitol complex.  So there are

7     all sorts of places within the Capitol itself.  Then there

8     are the Houses office buildings where there are hearing

9     rooms, offices, public spaces, et cetera, and the mask

10    requirement applies in any number of these places.

11         Today though we're focused on what are called the,

12    either the hall of the House or the House chamber.  And this

13    is the only place where the full House debates and votes.

14         THE COURT:  And did the attending physician weigh

15    in in reference to what he or she thought was appropriate in

16    order to protect people in the Capitol prior to the adoption

17    of this resolution?

18         MR. LETTER:  Absolutely, Your Honor.  And that is

19    described in the first several pages of our motion to

20    dismiss.  We go through the various directives issued by the

21    attending physician.

22         And I will note as you probably have seen there

23    have been some changes at a certain point because the

24    attending physician bases all of this on what's actually

25    happening in the world, the scientific knowledge.  So there

1  have been times, for example, when members if they were

2  vaccinated members or staff did not have to wear a mask, but

3  then that was revoked given the, as I recall it came after

4  the Delta variant kicked in and became extremely dangerous.

5          Here we have a situation of extreme danger.  And

6  remember, I'm sure I'm telling you things you already know,

7  but if you'll indulge me for just a moment.  This is

8  something that passes from breathing.  Air, little droplets

9  of the virus, contain the virus, get into the air if you are

10  around somebody that has it and is breathing, and then by

11  nature of the fact that you breathe you then can get it and

12  you may die.

13          So that's what we're talking.  We're talking about

14  literally in our brief we talk about an atmosphere or

15  something, yes, we're talking about an atmosphere.  We're

16  talking about something that is happening all around you.

17          Your Honor, I didn't know to have you --

18          THE COURT:  That's why we have the plexiglass.

19          MR. LETTER:  Exactly.  So the House adopted

20  Resolution 38 to provide a system so that members would

21  follow these requirements of the, that are posed by the

22  attending physician.  And that does provide for penalties or

23  fines to be assessed.

24          Now there are warnings that are given.  There are

25  members who forget.  I suspect you're the same way

1  occasionally in my office whenever I forget and somebody

2  says mask, please.  And so there are warnings that are

3  given.  But we're talking now about the plaintiff members

4  who were assessed a fine and they have the right to appeal

5  to the Ethics Committee which then can overturn the fine,

6  but either if they don't appeal or a majority of the Ethics

7  Committee doesn't grant the appeal then a fine is imposed

8  against their compensation.

9       So that is the background behind all of this.  It

10  is absolutely clear from the case law that this suit must be

11  dismissed under the Speech or Debate Clause of the

12  Constitution.  The Supreme Court and this, the DC Circuit

13  have issued a whole raft of opinions saying that the Speech

14  or Debate Clause is to be applied broadly.  The Speech or

15  Debate Clause was included in the Constitution by the

16  framers against a background of experience in England when

17  the king would punish members of parliament who were not

18  compliant.

19       And so the framers thought this was very important

20  to provide protection against the executive and against the

21  judiciary for the legislative branch to operate.

22       THE COURT:  Let me just ask this question, could

23  the objective of keeping members and staff and law

24  enforcement safe could that have been accomplished without

25  the imposition of the fine?

1        MR. LETTER:  We believe, Your Honor, the majority

2   of the House believed that it was appropriate to put in a

3   fine requirement because as legislatures all around the

4   United States have done for couple of hundred years the

5   understanding is that people are more likely to comply when

6   there is some sort of fine or in other circumstances there's

7   imprisonment to back it up.

8        Now here, obviously here a fine, maybe I am

9   arguing against myself because maybe it doesn't work because

10  we have members who are refusing to wear masks.  We assume

11  though that in some circumstances members who might not

12  otherwise wear masks are following human nature just as they

13  follow human nature if you don't drive 90 miles an hour in a

14  40 mile zone in part because you may be a good citizen.

15  You're nervous about running somebody over.  But I'm sure a

16  key part of that is you don't want to pay the couple of

17  hundred dollar fine, and here the fines can be quite high.

18       So the fine was put in, that scheme was put in

19  just like we have fines scattered throughout all sorts of

20  municipal codes, state laws, federal laws, et cetera.  So

21  several cases here I think make your job easy in this

22  instance.  We have most recently *McCarthy versus Pelosi*,

23  where a lawsuit was brought against the Speaker and House

24  officers about the validity of the voting mechanism in the

25  House.

1      And the district judge held that it was barred by

2  speech or debate.  And it was barred I emphasize not just

3  against the Speaker, but against the Sergeant-at-Arms, the

4  House Sergeant-at-Arms and the House clerk.  Because this,

5  the DC Circuit and the Supreme Court have held that the

6  Speech or Debate Clause in order to work, to do its job has

7  to protect the staff as well because otherwise the members

8  of the House would have to do everything themselves.  That's

9  just obviously not practical.

10      So we have a situation where the DC Circuit

11  recently once again said if there's a legislative function

12  involved it doesn't matter who's doing it then Speech or

13  Debate Clause immunity kicks in and it is, the immunity is

14  absolute.  So this is --

15      THE COURT:  Has the Supreme Court ruled on the

16  sur petition in that case?

17      MR. LETTER:  No, Your Honor.  It will be, it will

18  go to -- it's scheduled to go to conference on December 10.

19  And therefore, as you know sometimes the court puts it off

20  for the next conference, et cetera.  As of now it's supposed

21  to go to conference on December 10, and therefore,

22  presumedly there's a likelihood that we would have a Supreme

23  Court determination on the 13th, if it's going to be denied.

24      As again I'm sure Your Honor is aware when they're

25  seriously thinking about practice their practice more and

USCA Case #22-5058     Document #1950662     Filed: 06/15/2022     Page 57 of 174

 1   more is to delay it for a couple of conferences while they

 2   consider the issue more.

 3          So *McCarthy versus Pelosi* directly on point here.

 4   *Consumers Union*, an older case.  In my mind not real old.

 5   It's the 1970s.  That's in my mind not long ago at all.

 6   There cases that really is very much on point because a suit

 7   there is brought against the House Sergeant-at-Arms for

 8   policies about who gets to go into the press gallery.

 9          And I want to interrupt myself to note the

10   plaintiffs, the plaintiffs here have said that -- well,

11   their case is different.  They're raising a constitutional

12   point.  All of these cases I'm going to mention involved

13   constitutional claims.  That is no different at all.  And

14   there the DC Circuit said we have to do is we have to look

15   at the atmosphere of this.

16          The House and the Senate had problems over the

17   decades with where the press should be allowed, not allowed,

18   interrupting the deliberations in the House chamber.  So

19   eventually they were allowed to be in these galleries, and

20   there were all sorts of rules and regulations about who

21   could be there.  And a disappointed group said again,

22   emphasizing a constitutional claim, we have a First

23   Amendment right that is being violated here.

24          And the DC Circuit said doesn't matter.  This is

25   about how the House chamber can operate and its barred by

1  speech or debate.  Then we have the *Rangel* case --

2          THE COURT:  I assume that *Consumer Reports* party

3  was the organization that produces the magazine Consumer

4  Reports?

5          MR. LETTER:  Yes, Your Honor.  And what that case

6  had to do with there were some very rules about the press

7  gallery.  They're difficult to draw about, are you an

8  independent publication.

9          Then we have *Rangel versus Boehner*.  A case from I

10  believe 2015.  And there Representative Rangel said that

11  terrible things had been done.  He was being investigated,

12  and he accused staffers of leaking reports against him that

13  poisoned then the atmosphere in the Ethics Committee and in

14  the House against him.  And he said this was illegal and

15  unconstitutional and very bad.  And that was his claim.  So

16  it wasn't about whether Representative Rangel voted.  It

17  wasn't about whether he could give a speech, et cetera.  It

18  was then about him being censured.  And the DC Circuit said

19  speech or debate.

20          The last one I'll mention -- I could stand up here

21  for half an hour and talk to you about cases.  The last one

22  is *Keys Eastland*, Supreme Court decision.  And there too,

23  the plaintiff said constitutional violation.  Our First

24  Amendment rights are being violated terribly.  What happened

25  here we are being pursued because of our beliefs and our

1    speech and this is illegal and wrong.

2            And the Supreme Court said majority opinion made

3    very clear you may think this is bad basically tell it to

4    the framers.  The framers when they put this clause in the

5    Constitution they knew what they were doing.  They knew that

6    there would be circumstances when there might actually be

7    something happening that was bad.  And I'm not suggesting

8    here was, but I'm saying even if there were the Supreme

9    Court emphasized it's an absolute privilege.

10           So, you know, it's not like certain kinds of

11   immunities for federal executive branch officials.  Like

12   judicial immunity and prosecutorial immunity absolute.  And

13   so it doesn't matter that you think that what is happening

14   is terrible.  So the Court need go no further if you agree

15   with us.  And as I say the overwhelming precedent in this

16   circuit and under Supreme Court doctrine this case is easy.

17           Now the plaintiffs have pointed to some other

18   cases --

19           THE COURT:  Let me just ask this, I envision why

20   it was perceived that this resolution was necessary in order

21   for Congress to carry out its functions, but could you

22   articulate exactly why it was felt this requirement of

23   wearing the mask was in fact necessary in order for Congress

24   to do the job it's obligated to do?

25           MR. LETTER:  Yes, Your Honor.  As you I'm sure you

1 know you've heard there are many members of the House, but

2 also more broadly there are many people in the United States

3 who think that they shouldn't be required to wear a mask,

4 that they feel it violates constitutional rights.  It

5 violates their sort of Americanism.  The government can't

6 tell me what to do about my own health.

7    And as you know it's not just your own health.  If

8 you don't wear a mask and you do have COVID you're going to

9 sicken people around you.  You may kill them if you don't

10 wear a mask.  But we have many people who feel that way.

11 Many members of Congress have expressed these views.  And so

12 well aware of that, and remember, the attending physician

13 had a policy in place for quite a while before Resolution 38

14 was put in place, so we had experience of what was happening

15 on the floor, in the chamber and as I repeat in other parts

16 of the House as well.

17    The plaintiffs have said something about in the

18 only place where you know people are giving speeches, et

19 cetera.  That's just not true.  In the committee rooms these

20 rules apply and applied.  So the sense was a significant

21 percentage of members and staffers, et cetera, would not

22 follow what the attending physician was requiring and so

23 this was put in place.

24    And by the way, now when we have the mask

25 requirement I believe it's still about 96 percent of the

1    republican members are following this policy.  They are not

2    being fined.  It's a tiny group, very small group

3    considering the numbers in the entire House and republican

4    members.  It's a tiny group who's being fined.  So

5    overwhelmingly, democrats and republicans are following this

6    policy.

7              As I say I don't want to argue against myself, but

8    if for some reason you're not persuaded by all of this

9    overwhelming precedent -- oh, I meant to say, the plaintiffs

10   have said well, there are some other cases.  There's the

11   *Kilbourn* case where speech or debate was not applied.  That

12   was about an arrest that took place quite a while ago.

13   *Powell versus McCormack* where --

14              THE COURT:  *Kilbourn* as I understand was an arrest

15   that took place outside of the confines of the Capitol?

16              MR. LETTER:  That is correct, Your Honor.  All of

17   those cases are discussed in the cases that I've mentioned.

18   It's not like the DC Circuit and the Supreme Court has

19   forgotten those or something.  They're right there in the

20   most recent one *McCarthy versus Pelosi*.  And the 2015 one,

21   *Rangel*.  They're there.  It's not as if the DC Circuit has

22   forgotten about this other precedent.  They've distinguished

23   it.  *Consumers Union*, same thing.

24              If for any reason as I say you're not persuaded by

25   this and you get to the merits they, under 12(b)(6) they

1  have no claim here, no valid claim.  They've argued this

2  violates the 27th Amendment.  That's the amendment that

3  changed, you know, the compensation rules because there had

4  to be a delay before a raise could go in, a change in

5  compensation could go in effect.

6         THE COURT:  Was that case directly or that statute

7  directly limited to the application of a COLA or other types

8  of raises also?

9         MR. LETTER:  It applies to I believe changes in

10  compensation, so I think it could be lower or higher

11  whichever way compensation goes.  It's quite clear --

12         THE COURT:  But it didn't just apply to the

13  application of a COLA?

14         MR. LETTER:  No, Your Honor.  What the 27th

15  Amendment does is it amends Article one.  Article one says

16  the Ascertainment Clause says that by law Congress will

17  ascertain what the compensation will be.  And the 27th

18  Amendment just then put in a provision that changes can't go

19  into effect for the same Congress, so you didn't want

20  members of Congress giving themselves a huge raise.

21         But the problem there is in imposing a fine or

22  penalty does not change compensation.  And that's the word

23  that the Constitution uses.  We gave you in our briefs,

24  opening and reply definitions, of compensation really old

25  ones and current ones.  And I thought the best way to

1    explain this is an example that we put in our briefs.

2    Professional athlete, very gifted one is making $10 million,

3    his compensation is $10 million dollars.  He commits a

4    violation of a team rule, you know, so he doesn't run out a

5    ground ball.  He violates curfew, et cetera.

6         And the team decides to fine him.  They fine him a

7    thousand dollars, $10,000.  You don't say that his

8    compensation has been reduced.  You say his compensation is

9    $10 million a year and then he was fined for this violation

10   of a rule which is exactly what is happening here.  The

11   compensation is set by law.  And then there's a fine because

12   of conduct that violates the rules that apply to members.

13        In addition, the Ascertainment Clause and the 27th

14   Amendment apply to laws.  The DC Circuit has held in a case

15   *Boehner versus Anderson*.  I actually was one of the

16   attorneys on the case, held that that means a law that is

17   passed by both houses of Congress and then presented to the

18   president.  That's what the term law means in the

19   Constitution.  So the DC Circuit has already ruled on that.

20        THE COURT:  But the plaintiffs suggests that the

21   courts have considered things other than just a legislation

22   as a law, for example, a rule adopted by the court system.

23        MR. LETTER:  Absolutely, Your Honor.  That is one

24   hundred percent correct as we know.  If the Interior

25   Department sets a regulation about what you can do on the

1    Mall that can violate First Amendment rights, certainly.

2    But the DC Circuit has already held that under the 27th

3    Amendment and the Ascertainment Clause law there means

4    something else.  Law means a statute passed by both Houses

5    of Congress, et cetera, because it had to do with the cost

6    of living increases.

7         So they may be right.  They may say law should

8    mean the same thing all throughout --

9         THE COURT:  You're referencing the *Boehner* case?

10        MR. LETTER:  That's right.

11        THE COURT:  Okay.

12        MR. LETTER:  Yes.  So again they may be right, but

13   what they're asking you to do is override the DC Circuit.

14   You and I know you can't do that.  You wouldn't even try.

15   And so that argument, I assume they're making it for

16   preservation purposes, but it's obviously not an argument

17   that you can pay any attention to.

18        Then they say the Discipline Clause.  The

19   Discipline Clause, Article I, Section five says that

20   Congress can discipline its members for disorderly behavior.

21   Plaintiffs say disorderly behavior that must be, you know,

22   assaulting or punching somebody or something like that.

23   But no, it's not what it has been understood to cover.  It

24   covers violations of internal congressional rules.  And that

25   is set out as we point out in our brief the *In Re: Grand*

1    *Jury* case from the DC Circuit made that clear.

2            So again they're asking you to ignore DC Circuit

3    precedent.  The Ascertainment and Presentation Clauses they

4    argue about those also, again, those cover laws.

5            THE COURT:  Let me just ask, would you agree that

6    the rule or resolution or whatever it is would have to be an

7    appropriate or legal resolution or rule in order for that to

8    be the case?

9            MR. LETTER:  In order --

10           THE COURT:  I mean if there was some regulation or

11   rule adopted that was totally in contradiction of the

12   Constitution, for example, under those circumstances what

13   you say would not apply, is that right?

14           MR. LETTER:  Right.  First of all, remember in my

15   argument you shouldn't even get there because of speech or

16   debate.  But if you got there and you said this rule, this

17   is House resolution was invalid I'm not sure, you'd have to

18   come up with some reason why it was invalid.  As I say it

19   can't be the 27th Amendment we know that because it doesn't

20   apply it.  It can't be the Ascertainment or Presentment

21   Clauses because again they don't apply.  We know that from

22   DC Circuit precedent.

23           And it can't have anything to do with the,

24   Discipline Clause again, because DC Circuit precedent tells

25   you otherwise.  So I think their only possible argument is

 1  it violates the First Amendment.

 2         Now there too, they've got a problem because the

 3  Supreme Court has made clear that when you're looking at

 4  something like this conduct as speech, and I want to

 5  interrupt myself to go back.  The first question is, is this

 6  even speech at all covered by the First Amendment?  The

 7  refusal to wear a mask.  I suspect that if, if counsel today

 8  you know plaintiff's counsel table all insists on taking off

 9  their masks.  I might be wrong.  You might have a hard time

10  saying that was First Amendment protected speech.

11         THE COURT:  I'd be violating an edict issued by my

12  chief judge that's for sure.

13         MR. LETTER:  And they can be disciplined, either

14  physically removed and then later fined, et cetera.  It's

15  difficult to see that as speech.  I can see if you're

16  wearing a mask, and it says I don't want to wear this mask.

17  Or this is tyranny, okay that's speech.  But saying you

18  won't wear a mask it's hard to see why -- not saying it, but

19  just doing it.  It's a little hard to see that's speech

20  protected by the First Amendment.

21         THE COURT:  Are you conceding that if they had

22  such a message on their mask that then it would be speech?

23         MR. LETTER:  That would seem to be speech

24  certainly, Your Honor, a message like that.  But that's not

25  why they're being -- nobody -- and in fact, some members

1    have worn messages on their masks and nobody has even

2    suggested that that's conduct that they would fine somebody

3    over.  I suppose we come up with some hypothetical situation

4    where maybe it's disorderly conduct.  Maybe if it's a threat

5    on it.  Touch my mask and I'll kill you.  I don't know,

6    maybe there might be some hypothetical situation like that,

7    but otherwise sure that would be valid speech.

8             THE COURT:  Okay.

9             MR. LETTER:  What the Supreme Court has made clear

10   in *O'Brien* and then other cases more recently the Texas case

11   that we've cited and relied on in our brief.  It says the

12   key question is, is there an interest in support of a goal

13   unrelated to suppression of expression.  And it's obvious

14   that we have that here.

15            The House put in this system because the attending

16   physician based on science is trying to protect members of

17   Congress and staff who have to be in the House chamber.

18   They didn't put it in because they want to have some sort of

19   bar, some kind of impression.  They put it in obviously to

20   protect health because people were dying.  Over 765,000, I

21   think people were dying.

22            So it clearly was in support of a goal unrelated

23   to suppression of expression.  And once you find that it's

24   quite clear that this is not a First Amendment violation

25   especially because as I say if members want to speak against

 1    the mask requirement, if they want to put a message on their

 2    mask something like that, free to do that.

 3             Your Honor, I think that covers everything that I

 4    want to say.  I'm just going to check with my colleague

 5    briefly to see if I've missed anything.

 6             THE COURT:  That's fine.  I'll give you a chance

 7    to respond.

 8             MR. LETTER:  Thank you very much, Your Honor.

 9             THE COURT:  Counsel for the plaintiffs.

10             MR. WIEST:  Good afternoon, Your Honor, Chris

11    Wiest for the plaintiffs.

12             Your Honor, I want to begin by pointing out this

13    case is really not about a mask mandate or COVID-19, but

14    rather about fundamental constitutional principles that

15    transcend the issue that we're here about the specific rule.

16    And really it's about legislative independence and it's

17    about the United States Constitution.

18             And where I wanted to begin because there's been

19    all this discussion about the House physician and statistics

20    and goals is the standard of review because I think it is

21    important to begin with that.  And that standard of review

22    is not that the defendants gets to come forward with their

23    version of the facts or what they would like you to

24    consider, but rather it is that you take the plaintiff's

25    complaint, you assume the allegations are true, you draw all

1    inferences in favor of the plaintiffs, and then you

2    determine whether or not the claim is plausible.

3        What is one way that we know the dismissal is

4    perhaps inappropriate?  Well the interjection of all these

5    additional facts.  The citation of materials other than the

6    complaint or inferences to draw in their favor.  And Your

7    Honor, I wanted to begin with the legislative immunity issue

8    because I think the defendants rely on that extensively and

9    then I'm going to address, if I can, the merits of the

10   actual claims.

11       But this notion and, and I think you heard it here

12   today from the defendants that there is no limiting

13   principle to what they can do is patently incorrect as a

14   matter of congressional rules.  And we know that the United

15   States Supreme Court in the *Ballin* case has been clear that

16   Congress through its rules may not ignore constitutional

17   restraints or violate fundamental rights.  And that there

18   should be a reasonable relation between the mode or method

19   of proceeding established by the rule and the result which

20   is sought to be attained.

21       THE COURT:  Well, I didn't, maybe I missed it, but

22   I didn't perceive that they are suggesting that the Congress

23   can do anything it wants.

24       MR. WIEST:  Well, Your Honor, if you think about

25   what they're suggesting it is indeed -- there is no limiting

1  principle that I have heard in terms of what the rules they

2  can enact.

3        THE COURT:  Are you suggesting that this pandemic

4  that we have experienced for almost two years now is not a

5  true significant problem confronting the American public

6  despite the fact that over 750,000 people have died?

7        MR. WIEST:  Your Honor, I think the pandemic is

8  real and it is in existence, and yet we know even from

9  United States Supreme Court precedent, recent precedent in

10 fact, that does not mean the Constitution in its limits are

11 put aside simply because of the existence of a pandemic.

12       THE COURT:  Well, if members of the House and

13 staff and law enforcement officials are susceptible to

14 contacting the virus either because of the age or because of

15 underlying medical problems are you saying that they to

16 subject themselves to possible illness or death by

17 associating themselves with people who aren't willing to

18 wear a mask that may otherwise protect them?

19       MR. WIEST:  Your Honor, three points in response

20 to that.  I think first of all, I think they could have a

21 mask requirement and there would not be a constitutional

22 problem with that.  The issue is how they are enforcing it.

23 And with respect they can no more enforce this through the

24 reduction of compensation.  They call it a fine.  But let's

25 be clear, Your Honor, there's no sheriff going out and

1    garnishing a bank account.  There's no officer writing a

2    ticket and then, you know, taking money out of your bank

3    account.  What they're doing is they're -- the method of

4    enforcement here is the actual reduction of the take home

5    pay.

6        And if for instance you were to ask Congressman

7    Massie's wife who takes the pay check in her mailbox in

8    Vanceburg, Kentucky, and she goes and she looks at it it's

9    $500 lighter as a consequence of the fine.

10       THE COURT:  Taxes are deducted from one's gross

11   compensation.  Cost for medical insurance is deducted from

12   one's compensation, and that doesn't reduce their

13   compensation.

14       MR. WIEST:  Well, Your Honor, I think it probably

15   does reduce their compensation, but all of those statutory

16   enactments that allow for those deductions were passed prior

17   to them taking office and so there's not an issue with that.

18   Here the issue is there's a new rule that's, that is being

19   enforced and enacted against them and has the effect of

20   reducing the compensation.  And the 27th Amendment would --

21       THE COURT:  So is the fine that you have a problem

22   with?  Or is it the mask requirement that you have a problem

23   with?

24       MR. WIEST:  Your Honor, I think they could

25   constitutionally assuming that there was equal enforcement,

1    I think they could constitutionally censure.  They could

2    constitutionally reprimand.  They could constitutionally

3    remove what the requisite two thirds a member of Congress

4    and discipline for failing to wear a face covering.  But the

5    issue is the 27th Amendment has taken the fine off of the

6    table, which is in fact a reduction of compensation at least

7    without an intervening election.  And this is key point.  If

8    there's an intervening election then it becomes acceptable

9    because then they're not reducing or varying or increasing

10   compensation during the term of office.

11           I did want -- and Your Honor, I do want to dig in

12   to this 27th Amendment and what it stands for and why we

13   believe it has been violated here.  But I did want to finish

14   with this notion of legislative immunity.

15           They suggest that really, if you think about it

16   what I heard is no limiting principle.  You cannot look at

17   what they did.  And some of the cases they cite it's

18   interesting.  Take the *Rangel* case.  One of the observations

19   from this court was that you could not for instance,

20   constitutionally confine the entire members of the minority

21   caucus in the House basement for the entire term, right.

22   That that was a patent violation of the Constitution, that

23   would not be permitted.

24           Could the speaker erect a gallows outside of the

25   hall of the House to go and enforce the mask mandate?

1  Certainly, one would submit that they could not enforce the

2  rules.  The Eighth Amendment would prohibited it, right?

3  There has to be a constitutional limitation on how they

4  enforce their rules and there is.  There's a lot of things

5  they can do to discipline members, but reducing compensation

6  in the middle of a term without an intervening election is

7  not one of them.  The Founders have taken that off the table

8  through the operation of the 27th Amendment.

9        THE COURT:  But isn't the 27th Amendment only

10  implicated if a law impacts on one's compensation?

11        MR. WIEST:  Well, Your Honor, I think we should

12  address that.  Because what we're -- I would submit that the

13  House rule and its operation is in fact a law within the

14  meaning of the clause.  And I realized that they cited the

15  *Boehner* case, but the *Boehner* case didn't limit reductions

16  in compensation to that.  I think we need to get back to the

17  purpose of the clause to understand it.  And I would liken

18  this, Your Honor, as you're aware, Article III, Section one

19  says, Congress cannot lower judicial compensation during

20  your term.  But why is that?  It is to ensure judicial

21  independence.

22        THE COURT:  It doesn't say anything about term.

23  In the Constitution it says my salary cannot be reduced.

24        MR. WIEST:  That's right as long as you hold the

25  office --

1          THE COURT:  Right.

2          MR. WIEST:  -- it cannot be reduced.  And the

3    reason for that, and Madison addressed it in the Federalist.

4    And we addressed it in our papers.  In particular I think

5    there was the Federalist 78, that discussed the fact that

6    quote, "In the general course of human nature a power other

7    a man's sustenance amounts to a power over his will."

8          And we wanted judicial independence.  And one of

9    the ways that we ensure that, of course, is lifetime

10   appointments.  A second way that we ensure that was to not

11   allow the reduction of compensation.  Could Congress pass a

12   rule or have some agency pass a rule that would somehow

13   reduce judicial salary?  I would submit they cannot.  Why?

14   Because it undermines the purpose and the meaning of Article

15   III, Section one.

16         And the same is true with respect to the 27th

17   Amendment.  You can vary the law that sets compensation.

18   You can raise compensation for the next term.  You can lower

19   it for the next term, but you can't change it in the middle

20   without a intervening election.  And the reason for that is

21   to ensure member independence in the same way that Article

22   III, Section one ensures judicial independence.  And if they

23   want to call it a rule or a statute it is still the force of

24   law.  They are executing something that is reducing

25   compensation of these members.

1          THE COURT:  But was the 27th Amendment adopted for

2   independence purposes?

3          MR. WIEST:  That was one of the purposes.  It was,

4   Your Honor.  There were several purposes behind it that we

5   discussed.  And there's a very, very good law review article

6   that digs into the history of it.  We didn't want -- for

7   instance, Congress reducing the salary to zero.  For

8   instance, as a campaign promise without an intervening

9   election so that the Congress members themselves could be

10  held accountable for the compensation changes up or down.

11         And again, it is an independence issue.  It is to

12  ensure that these members of Congress that their sustenance,

13  their compensation isn't going to be changed as a political

14  cudgel or anything else that --

15         THE COURT:  And you're saying that the legislative

16  history of the 27th Amendment clearly indicates that it was

17  adopted to maintain independence of congressional members?

18         MR. WIEST:  That is one of the purposes, yes, Your

19  Honor.  And there was an excellent Law Review article that

20  we cited.  It was *The Sleeper Wakes: The History and Legacy*

21  *of the Twenty Seventh Amendment*.  Mr. Bernstein authored it.

22  It was 61 Fordham Law Review 497, and he --

23         THE COURT:  What's the number of that?

24         MR. WIEST:  Yes, Your Honor.  It's 61 Fordham Law

25  Review 497, and he does a deep dive into the history and

1    purpose of the 27th Amendment.  And one of the purposes is

2    legislative independence.  It is to ensure that a majority

3    caucus isn't forcing their will on a minority through, you

4    know, changes in compensation.  And I would submit in part

5    that these rules have that very effect.

6          Now there's a --

7          THE COURT:  I mean, is that his opinion that the

8    27th Amendment was adopted for independence purposes?  Or

9    was that actually in the legislative history itself?

10         MR. WIEST:  Your Honor, he digs into that in the

11   history, at common law and in parliament that in fact gives

12   rise to the historical understanding which, of course, there

13   is plenty of Supreme Court precedent that talks about the

14   Founders understanding at the time and why they were doing

15   things.

16         The 27th Amendment was a little bit different than

17   the other amendments in that it was passed by Congress at

18   the founding, but then as you're aware, you know,

19   ratification did not occur until 1992.  But it was one of

20   the founding Bill of Rights amendments, although, it sat

21   without ratification for a couple of hundred years.

22         THE COURT:  I guess my question is not whether the

23   professor said that the purpose or one of the purposes was

24   for independence purposes, but whether someone during the

25   debate in reference to the adoption of the amendment made

1    that case?

2             MR. WIEST:  They did, Your Honor.

3             THE COURT:  Okay.

4             MR. WIEST:  And he makes that point, and I think

5    Hamilton was one of them.  And I think in part it was

6    discussed within the context and the meaning of Federalist

7    79, about again, the power over sustenance amounts to a

8    power over his will.  And there's a deep dive and a deep

9    analysis that the professor talks about with some of these

10   founding era sources that I think has to be looked at in

11   understanding of the context and the purpose of the

12   amendment.

13            And Your Honor, in part I think it's interesting

14   they don't -- the amendment itself does not talk about

15   increasing the compensation, right.  It doesn't say you

16   can't increase it without an intervening election.  It says

17   you can't vary it.  And there was a couple different

18   proposals that went on at the time of the adoption.  One of

19   which was a prohibition on only increases and another one

20   was the one that ended up getting adopted which was the

21   prohibition on any variance.

22            THE COURT:  So let me just ask then, are you

23   suggesting that under no circumstances can a penalty of a

24   fine be imposed against a congressional member despite the

25   language that's in the Constitution authorizing that because

1  any fine would be a reduction in compensation?

2          MR. WIEST:  Unless the rule or the enactment of

3  the fine occurs and then there's an intervening election at

4  which point then it would be completely --

5          THE COURT:  So a congressional member can do

6  anything prior to that election and no fine or no penalty

7  could be imposed?

8          MR. WIEST:  Your Honor, I want to be clear.  No

9  fine, no reduction in compensation.  They can be censured.

10  They can reprimanded.  They can be removed.  You know, there

11  could be additional enforcement actions.  I think some

12  members have been stripped of committees as a result of

13  discipline.  All of that is on the table, but certain things

14  are off the table.

15          We know that they can't be removed, for instance,

16  without a two thirds vote.  That's right out of the

17  Constitution.  And we know that without an intervening

18  election their pension cannot be reduced.  And the 27th

19  Amendment suggests just that.

20          Your Honor, there is this suggestion that, that

21  somehow there is immunity.  And I think probably the best

22  case that would suggest this is not covered by speech and

23  debate immunity is the *Powell versus McCormack* case.  What

24  was that case about?  This was about the exclusion of a

25  member.  Who were the target defendants that they went

 1    forward on?  Well, it was a clerk and it was a doorkeeper

 2    that was keeping the member of Congress that was duly and

 3    constitutionally elected out.  And the U.S. Supreme Court

 4    said no, it's not speech and debate, it's not immunity.

 5    That congressional member has a constitutional right to be

 6    seated, and these people are enforcing an illegal and

 7    unconstitutional order and there is no speech and debate

 8    immunity from it.  And I would submit to the Court the same

 9    is true here with respect to the reduction of these, of the

10    salary.

11           THE COURT:  Well, there's a remarkable difference

12    between precluding a member whose been duly elected by his

13    constituents of assuming his position as a congressional

14    member as compared to a fine that doesn't strip the member

15    of their ability otherwise to participate in the

16    congressional process.

17           MR. WIEST:  Your Honor, I would disagree with that

18    for this reason.  In both cases you're diminishing the

19    member's ability to engage in independent action, and there

20    are certain things taken off the table.  You cannot exclude

21    the member under *Powell*.  And under the 27th Amendment to

22    ensure member independence you cannot reduce their

23    compensation without an intervening election.  The purpose

24    of both of those is to ensure appropriate member

25    independence.

1              THE COURT:  But how is a fine in some way

2      adversely impacting on the ability of a congressional member

3      to participate in the legislative process?

4              MR. WIEST:  Your Honor, for the exact reason that

5      Alexander Hamilton stated in Federalist 79.  That again, in

6      the general course of human nature a power over a man's

7      sustenance amounts to a power over his will.  How would a

8      reduction in judicial compensation somehow, you know, exert

9      in violation of Article III, Section one, you know, subvert

10     judicial independence.  I would submit that it's the same

11     way.

12              And it's just a matter of degrees.  And I realize

13     the $500 fine, you know, is a hefty fine.  Obviously, it

14     goes up from there, but I think it gets to $5,000 a fine.

15     But when you're taking away somebody's ability to earn a

16     cudgel living that is a powerful, powerful cudgel.  And I

17     would submit that the Founders took that off the table with

18     the 27th Amendment without an intervening election.  Without

19     the people saying hey, this is okay, we're going to reelect

20     you.

21              Well, you know what, we don't like what you've

22     done with the compensation issue.  We're not going to return

23     you to office.  And that was the purpose of the 27th

24     Amendment was to allow the people to weigh in on things

25     Congress was doing from a compensation prospect, to ensure

1    that there is a intervening election.

2            And so just as the Speaker cannot erect a gallows

3    outside of the House floor to enforce rules, because the

4    Eighth Amendment would not allow the execution of members

5    and I realize that's an extreme case.  But we have to accept

6    the fact that if there are no limits then that would be

7    allowed.  Well, why can't the Speaker do that?  The Eighth

8    Amendment, of course, would prohibit that obviously.

9            And so when we look at these principles -- and I

10   think it's important to look at not just the fact that the

11   27th Amendment does talk about varying, but I think it's

12   also just from a practical prospective that paycheck that

13   they take home -- I mean they're not -- again, Your Honor,

14   they're not enforcing this through a garnishment process as

15   would a speeding ticket if a member is speeding through the

16   District and gets a ticket from the District.

17           In that instance that's coming not as a result of

18   a reduction in their paycheck, but an actual fine that is

19   coming out of their bank account.  Here, it is a reduction

20   in the paycheck.  And whether it's before tax or after tax

21   the amount that they take home in a paycheck is being

22   reduced.  And I think it's mere word play to suggest that is

23   not a reduction in compensation.  You can call it a fine,

24   but it is in fact a reduction in compensation.

25           THE COURT:  Is there a contradiction in what you

1   say?  Because it seems to me that you seem to be saying that

2   the Congress could have imposed other punishments for

3   failing to wear the mask, i.e, stripping them of a committee

4   position or whatever.  And that seems to me that would have

5   a greater impact on the role that they're supposed to play

6   as legislatures as compared to reducing their salary.

7            MR. WIEST:  Your Honor, the precedent that exists

8   is that there is no right to a committee -- there is no

9   constitutional right.  Committees are created by rules of

10  Congress.  And what Congress giveth, Congress can taketh

11  away.  And there's nothing in the Constitution that would

12  prohibit the disciplining of members that way.  There is

13  something in the Constitution that explicitly prohibits this

14  reduction in compensation, and that's the 27th Amendment.

15           THE COURT:  Okay.

16           MR. WIEST:  Your Honor, we have obviously briefed

17  and we're happy to rely on our papers to address other

18  issues.  If I can just check with my co-counsel, Your Honor.

19           THE COURT:  If you think it would be helpful to me

20  that's fine.

21           MR. WIEST:  Just very, very briefly.

22           [Brief pause.]

23           THE COURT:  Let me just ask, what does a

24  photograph have to do with this proceeding?

25           MR. WIEST:  Your Honor, this is one of the -- this

1    really the heart, the heart of and part of what we've

2    alleged in this case is that there is arbitrary enforcement

3    that is going on.  And so as these republican members are

4    being fined --

5              THE COURT:  When was that taken because we know

6    that the rule changed?  Was that taken before the resolution

7    changed that said that members who were speaking could, did

8    not have to wear a mask?

9              MR. WIEST:  Your Honor, I believe that -- first of

10   all, Judge, I do not believe that there was ever a formal

11   rule change to House Resolution 38.

12             THE COURT:  Well, I mean, there was a change as I

13   understand.  Initially members had to wear a mask even when

14   they were speaking, but then there was a determination

15   speakers did not have to wear a mask.  My question is:  Was

16   that photograph before or after that change?

17             MR. WIEST:  Your Honor, I think it may have been

18   after, but obviously there are examples in the --

19             THE COURT:  Well then that would be disingenuous

20   then to suggests that that was hypocrisy if in fact a policy

21   had changed.

22             MR. WIEST:  Well, your Honor, the Speaker I think

23   unilaterally changed the policy not the membership itself.

24   The actual text of House Resolution 38 has been the same

25   throughout all of this.

1          THE COURT:  Yeah, but I assume members of both

2    parties now after this change are able to speak without

3    wearing a mask?

4          MR. WIEST:  I think that that is correct, Your

5    Honor.

6          THE COURT:  So I just don't see if this was taken

7    after the fact it seems to me it's disingenuous that this is

8    somehow suggesting hypocrisy.

9          MR. WIEST:  Well, Your Honor, there are examples

10    obviously in the complaint that suggests I think in greater

11    detail where the Speaker had the mask down where there's not

12    been enforcement even though she's not been recognized.  And

13    the same is true with other members of the majority caucus.

14    There is a double standard.  We pled it.  I think we're

15    entitled to have those facts credited at this stage of the

16    proceedings.

17          Your Honor, I did want to distinguish just a

18    couple of cases that the defendants have cited before I sit

19    down, and I wanted to make one final point.

20          THE COURT:  Okay.

21          MR. WIEST:  They have cited the *McCarthy* case,

22    which is a recent speech and debate case out of the DC

23    Circuit.  And I would submit to the Court that what was

24    going on in *McCarthy*, which was the proxy vote rule as you

25    may recall, that is dealing with the actual, a challenge to

1    the rules.  And I do not believe in that case -- two things

2    that was an integral functioning of the House, just like a

3    committee or a vote process.  That's not what we're dealing

4    with here at all.  And so I think it's distinguishable on

5    that basis.

6         Here, we're dealing with third party actors not a

7    challenge necessarily to the rule, but third party actors

8    enforcing a rule in violation of a constitutional principle

9    which puts this case directly on point with the *Powell* case

10   which we've cited.  The other case that they've cited, of

11   course, is *Consumers Union*.  And there's some discussion --

12        THE COURT:  Do you take exception with

13   Mr. Letter's position that the reason that the immunity

14   covers staff and not just members is because in order to

15   function effectively that obviously staff have to be

16   utilized that members can't be expected to do everything?

17        MR. WIEST:  I think you have to look at and there

18   is this functional test of speech and debate immunity.  You

19   have to look at what is going on.  What is the staff doing?

20   Are they assisting Congress members with committee work?

21   Because in that case, and *Rangel* suggests it, there's going

22   to be immunity that extends to it.  Or are they flagrantly

23   violating a clear constitutional directive by varying member

24   compensation which puts this case more on line with *Kilbourn*

25   in which, you know, there was a flagrant violation of the

1    failure to seat a member.

2              And I wanted to leave the Court with, with this

3    language.  And that is language right out of the *Ballin*

4    case.  There is --

5              THE COURT:  Which case?

6              MR. WIEST:  This is *United States versus Ballin*

7    and it's 144 U.S. 1.  The pincite to it, Your Honor, is at,

8    and I'm going to get you an accurate pincite, at page five

9    of that case.  *Ballin* suggests that these rules are not

10   absolute.  And I realize we keep pounding on that.  But if

11   you take the defendant's position to its natural conclusion

12   there is no limits on the rules, and there has to be.  The

13   Constitution is the limit.

14             And we would acknowledge that there is no limit on

15   what Congress can do in terms of its rules other than the

16   constitutional floor.  There's a great deal of discretion

17   that the House and the Senate have with their rules.  But

18   Congress may not by its rules ignore constitutional

19   restraints.  It may not violate fundamental rights.  And

20   there has to be a reasonable relation between the mode or

21   method of proceeding established by the rule and the result

22   which is sought to be obtained.

23             And we would submit, Your Honor, that in this case

24   with these rules for the reasons that have been set forth in

25   our complaint and our papers particularly taking the facts

1  as true and construing them in our favor there is a

2  violation of those principles particularly as to the

3  enforcement on the 27th Amendment that is at issue in this

4  case and there is no immunity to it and we have stated a

5  claim.

6       THE COURT:  So I mean do you concede, it seems to

7  be that you are, that the Congress has the authority or had

8  the authority to require that individuals wear masks or not?

9  You're not arguing against that?

10      MR. WIEST:  We're not.

11      THE COURT:  It's just the fine?

12      MR. WIEST:  The fine is what is constitutionally

13  impermissible, yes, Your Honor.

14      THE COURT:  And your opponent says well, the fine

15 was a necessary component of the action taken by Congress

16 because without the fine it would be no incentive for the

17 congressional members to comply?

18      MR. WIEST:  Your Honor, we obviously -- one, we

19 disagree with that as a practical matter.  There's all kinds

20 of enforcement mechanisms whether it's censure.  Whether it

21 is a reprimand.  Whether it's removal if you can get to two

22 thirds.  Whether it's stripping people of a committee

23 process.  There's all kinds of options other than what is

24 constitutionally impermissible which is varying compensation

25 without an intervening election that they could have pursued

 1   that would have allowed them to pursue their ends without

 2   violating a clear constitutional directive.  And that's the

 3   problem here.

 4        THE COURT:  Those other things that you mention

 5   though would obviously take a lot of time in order to have

 6   them implied.  And in the meantime I guess the argument

 7   would be people might get sick and people might die before

 8   those sanctions could be in some way implicated.

 9        MR. WIEST:  Your Honor, I am not aware of

10   expediency ever being a permissible justification of

11   violating the United States Constitution.

12        THE COURT:  Well, I think that's true, but we are

13   talking about a phenomenon that's killing a lot of people

14   and making a lot of people sick.

15        MR. WIEST:  We are, Your Honor.  And yet I would

16   push back to the Court and suggests that that is not the end

17   all, be all or setting aside of the Constitution.  And

18   there's recent pronouncements by the U.S. Supreme Court that

19   suggests as much.  Whether it's the *Cuomo* case that came out

20   last fall about church gathering in the middle of a

21   pandemic.  Again, the Constitution is not set aside simply

22   because of the existence of a pandemic.

23        And unfortunately, these difficult times, these

24   challenging times perhaps during global pandemic are the

25   ones that most test our resolve to our constitutional

 1    principles.

 2          THE COURT:  Okay.  You've argued the alleged

 3    violation of the 27th Amendment.  What about any other

 4    constitutional violations that you claim occurred as a

 5    result of what the defendants did?

 6          MR. WIEST:  Well, and Your Honor, if you take

 7    their argument that the 27th Amendment is not violated

 8    because it's not a law that we would suggest that there's

 9    been a varying of compensation without the passage of a law

10    which violates Article I which is —— I mean, it's sort of

11    corollary depending on how you want to cut it.  If you

12    accept their argument on the 27th, then we've got the

13    Article I, Section 6 and Section 7 claims.

14          We obviously, we've argued the lack of disruption

15    in terms of disorderly conduct.  And finally, there's the

16    First Amendment claim.  And I did want to just maybe perhaps

17    finish with that because I don't think I've spoken about it

18    today.  But if you look at the Spence Johnson test, and

19    again, there doesn't need to be —— you know, we look at the

20    armbands in Tinker or the flag burning in Johnson, you know,

21    the test is is there an intent to convey a particularized

22    message.  I think there was here.  And I think what is

23    notable about the First Amendment violation is where the

24    rule applied.  It applied where the cameras where.  It

25    applied in the committee rooms.  It applied in the hall of

 1   the House.

 2          And when I use the hall of the House I don't mean

 3   the hallways outside the House, but I mean the hall of the

 4   House where they meet.  Did not apply in the cloak rooms

 5   where members pack and congregate.  And so we would submit

 6   that in light of these facts the rule itself was sort of

 7   designed to convey a message that was not necessarily health

 8   and safety, but was intended to be a commutative message.

 9          THE COURT:  What message are you suggesting was

10   being conveyed?

11          MR. WIEST:  That the requirement to wear a mask in

12   this case was to convey a message that there's a pandemic.

13   It's scary and we have to wear a mask.

14          THE COURT:  You don't disagree with that, do you?

15          MR. WIEST:  Well, Your Honor, I think people take

16   different positions about the degree of the severity of the

17   pandemic.

18          THE COURT:  That's why we have so many people

19   dying maybe.  Maybe if we took this pandemic more seriously

20   we wouldn't have so many Americans in the grave.

21          MR. WIEST:  And, Your Honor, obviously the

22   pandemic response I think there is political messaging that

23   has I think come along with it.  But the question is why was

24   there not also a mask requirement in the cloak room?  Why

25   was there also a mask requirement in the crowded hallways

1  outside the hall of the House.

2          And so we would submit that I think in light of

3  where this rule applied perhaps in addition to what, you

4  know -- did the plaintiffs by going on the floor of the

5  House without masks intend to convey a particularized

6  message?  I think they did.  Was there a great likelihood it

7  would be understood as such?  I think there was.  Obviously,

8  the media covered it as such.

9          And so I do think the Spence Johnson factors are

10  met.  And so we are dealing with what is recognized as

11  symbolic speech.  And we would submit that, you know,

12  obviously the hall of the House is a limited purpose public

13  forum.  It is designed for speech and debate within the

14  legislative branch.  And the one thing you cannot do you can

15  engage in content discrimination there, but you cannot

16  engage in viewpoint discrimination.

17          And my clients take the position, I think the case

18  law supports it, that that is a violation of the First

19  Amendment to compel speech and to punish for alternative

20  speech on the floor of the House.  And we think, you know,

21  when you look at the precedent on that that it is a

22  colorable claim.  It certainly is plausible under the motion

23  to dismiss standard.

24          THE COURT:  Let me just ask this though, could an

25  argument be made that in order to participate in the

1    legislative process that members have to be on the floor of

2    either the House or the Senate because if they're not

3    obviously they can't participate.  So to require that they

4    wear a mask at a location where they have to be in order to

5    participate seems to me is different than if they commingle

6    in a cloak room or some other location where they're doing

7    that voluntarily, where they have to be present in the

8    chambers if they want to participate in the process of

9    legislating.

10           MR. WIEST:  Well, two points to that, Your Honor.

11    First of all, we know that in fact they don't need to be

12    there to participate because remote participation it's been

13    allowed in the proxy vote rule, and so they don't

14    necessarily need to do that.  But also one has to traverse

15    the hallways outside the hall of the House and the cloak

16    room to get into the House hall itself.

17           And so I think the selective nature of where this

18    rule applied which is where the cameras were suggests that

19    we're dealing more with speech and less with conduct or

20    virus protection.  And that's what we've alleged.  And we

21    think those facts at least at this stage of the proceeding

22    are entitled to be credited by the Court.

23           Thank you, Your Honor.

24           THE COURT:  Let me take a short break so I can

25    confer with my law clerk to see if there are any questions I

 1   need to ask you before you finish your presentation.

 2             MR. WIEST:  Yes, Your Honor.

 3             [Thereupon, recess taken at 3:10 p.m., resuming at

 4             3:15 p.m.]

 5             THE COURT:  Let me just ask on the justiciable

 6   issue are you saying that the analysis that I should employ

 7   in assessing that question is pursuant to I think it's

 8   *Ballin*?

 9             MR. WIEST:  Yes, Your Honor.

10             THE COURT:  Or are you saying that the analysis is

11   pursuant to the Speech and Debate Clause?

12             MR. WIEST:  So your Honor, there's two issues that

13   you've asked.  The first is justiciability on evaluating

14   congressional rules, balance sets forth the rule of decision

15   on that.  Is it unconstitutional?  Does it violate

16   fundamental rights?  And is there a reasonable relation?

17             In terms of the speech and debate that's an

18   immunity issue that's not necessarily the same as

19   justiciability.  And obviously, you know, what we've liken

20   there is the *Powell versus McCormack* case, *Kilbourn versus*

21   *Thompson, Gravel versus United States*.  So are the cases we

22   would submit deal with the speech and debate issue in this

23   case.  And frankly --

24             THE COURT:  You're not suggesting that immunity

25   doesn't have an impact on the issue of justiciability, are

1    you?

2            MR. WIEST:  Your Honor, I think there is this --

3    there's two interrelated concepts, and I don't know that the

4    case law makes it a hundred percent clear line.  But *Ballin*

5    suggests that congressional rules can be reviewed in the

6    three circumstances cited.  And obviously, when we look at

7    *Kilbourn*, *Powell* and *Gravel*, we look at is it a core

8    fundamental function of the legislature.  Or is it someone,

9    you know, enforcer going out and enforcing an

10   unconstitutional action even if the House passed the rule.

11   And so I suppose in one degree there is an interrelation,

12   but I do think that there's a different analysis that's

13   employed between those cases.

14           THE COURT:  So are you suggesting that if I were

15   to conclude that there was a *Ballin* violation that I don't

16   even reach the speech and debate question?

17           MR. WIEST:  Your Honor, I think you need to look

18   at both.  I think one deals with just core justiciability,

19   but I do think they're interrelated.  I do think that

20   there's some interrelation there.  And obviously, you have

21   to look at what's being done.  Is it some committee that's

22   disciplining some member perhaps.  I think that would be a

23   clear speech and debate immunity issue.  Here, we've got

24   administrative actors taking action against someone that's

25   right on point we think with *Powell* that would suggest that

1    the 27th Amendment applies, you know, that there would not

2    be immunity.

3            And so I do think there are two different issues.

4    Obviously, there probably needs to be a little bit of

5    clarity from the Supreme Court or maybe DC Circuit on those

6    interplays.

7            THE COURT:  Thank you.

8            MR. WIEST:  Thank you, Your Honor.

9            THE COURT:  Any reply?

10            I guess the first question I was asked the

11    question I asked of plaintiffs' counsel is to what extent

12    *Ballin* has any application in reference to the analysis I

13    have to do in this case.

14            MR. LETTER:  Your Honor, *Ballin* has almost no

15    application.  And as I said before if you look at *McCarthy*,

16    *Rangel*, *Consumers Union*, which are speech and debate cases.

17    *Ballin* is not a Speech or Debate Clause case.  And the DC

18    Circuit has in all of those cases has discussed the exact

19    opinions that my friend, Mr. Wiest, is asking you to look

20    at.

21            Fine, you can look at them.  But the DC Circuit in

22    those three decisions discusses all of them.  Says why

23    they're distinguishable.  They're not, and *Ballin* I repeat

24    is not even a Speech or Debate Clause case.  I may be wrong

25    about this --

 1          THE COURT:  Again, I have to go back and look at

 2    the cases.  But in those cases where the appellate courts

 3    have assessed the Speech and Debate Clause question you're

 4    saying that they haven't looked at what *Ballin* held in their

 5    assessment as to whether or not a claim is justiciable.

 6          MR. LETTER:  They have noted *Ballin*.  I think it's

 7    *Consumers Union*.  I'm not positive, but I believe so.  The

 8    court has a discussion about *Ballin*, and then says, but

 9    oops, we're not talking.  This is not about review of a

10    House rule.  We're talking about the argument now is speech

11    or debate.  And so that's -- again, we're not telling you to

12    ignore any of these other opinions, et cetera, but the DC

13    Circuit has already, has each time that it has applied

14    speech or debate and found the case nonjusticiable, it has

15    examined those cases and said they're distinguishable.

16          And *Consumers Union* -- it's very hard to come up

17    with a way that *Consumers Union* is not directly on point

18    here.  Because that too involves something about how the,

19    how nonmembers are carrying out ways so that the chamber can

20    operate properly.

21          THE COURT:  Except the sanction in that case did

22    not involve a member of Congress?

23          MR. LETTER:  That's correct, Your Honor.  But

24    remember this is about justiciability.  There isn't anything

25    that says in a Speech or Debate Clause saying that, but of

1    course, if the underlying thing involves a member of

2    Congress then we can go to a judge.

3            And remember how I started out.  I said the

4    framers did a balancing.  The framers decided.  And they're

5    very explicit about this in these opinions.  They said we

6    don't want to do anything to give the executive or the

7    judicial branch power over the legislative branch as it

8    carries out its legislative function.

9            Obviously, you can rule, you know, Harvey versus

10   Madison.  You can rule that things are, that at the end of

11   the day that Congress does are unconstitutional, but the

12   framers knew exactly what they were doing.  And they, they

13   provide -- they fully recognizing as I think *Eastland* if I

14   recall correctly, is the one that says specifically yeah,

15   this may mean that some bad things happen, but it's more

16   important to have the members of Congress have this

17   immunity.

18           THE COURT:  Before I forget let me just ask

19   plaintiffs' counsel something and I'll let you respond.

20           MR. WIEST:  Yes, Your Honor.

21           THE COURT:  And that is the issue of whether what

22   occurred here amounted to disorderly conduct.

23           MR. WIEST:  We do not believe that it did, Your

24   Honor, because it did not interrupt or stop the proceedings

25   of the House.  And obviously our complaint cited the video

1    of this particular incident that gave rise to the fines.

2         It's interesting I think you can consider that

3    because it's been cited in the complaint, the video to the

4    C-SPAN coverage.  Nothing stops.  These members of Congress

5    walk out onto the floor.  I think they may have snapped a

6    selfie, and used it for speech purposes.  And then I think

7    they walked off the floor and there was a vote that was I

8    believe occurring at that time, nothing stopped.

9         I think it's hard to say that that's disorderly,

10    Your Honor, but doesn't actually impede the proceedings of

11    the House, so we would say it does not.

12         THE COURT:  One of the dictionaries I looked at

13    regarding the definition of disorderly said that if someone

14    acts in contravention of a rule or regulation just a

15    violation of it itself can be construed as a disorderly

16    conduct.

17         MR. WIEST:  Your Honor, we would respond to

18    that -- we think that that's circular reasoning.  And that

19    you know being able to punish members for disorderly conduct

20    has to have some meaning.  If it's simply a violation of

21    rules then I think the framers could have used that term,

22    you know, or punished members for a violation of the rules.

23    I mean the framers understood what rules were.  They gave

24    Congress the power to enact rules.  And yet, they didn't --

25    a different term was used.  And as you're engaged in

1    constitutional construction clearly a different definition

2    applies.

3         It cannot be all encompassing.  If that were the

4    case there would be no limit on the punishment clause.  And

5    we would submit obviously that is in and of itself a problem

6    from a constitutional prospective because there are other

7    limitations on what Congress can do from a ruling making

8    prospective.  I think *Ballin* suggests that.  I mean I

9    realize we're back to that one, but *Ballin* talks about

10   things that cannot -- Congress cannot do through its rules

11   including violate the Constitution.

12        And so you know this notion of a rule violation is

13   and of itself punishable simply because we say it's a rule

14   violation would you know render any limitations on the

15   disciplinary clause you know basically limitless and that's

16   a problem.

17        THE COURT:  I know that at some point the Speaker

18   said something to the effect that adoption of this

19   resolution would promote decorum.  What about that?  What

20   about -- I mean is a requirement that the mask be worn is

21   that advancing decorum within the chambers?

22        MR. WIEST:  Not with any, not with any historical

23   understanding of what decorum is.  Certainly we don't think

24   so, Your Honor.  I think it's a, arguably a health and

25   safety rule.  I don't think it's a decorum rule.  And I

1    don't think there's anything that was disorderly simply by

2    failing to wear a face covering particularly.  And I think

3    this is the salient fact, particularly where, you know, it

4    wasn't as if the presiding officer, you know, was banging

5    the gavel saying you three are out of order.  You four, you

6    five are out of order.

7              I think at that point that's a problem and that

8    can become disorderly if somebody is calling them out on it

9    or somehow actually disrupts the proceedings.  That's not

10   obviously what happened here.

11             THE COURT:  So are you saying that if the Speaker

12   had waited until they entered without the mask, and

13   therefore, conceivably put people who are at risk at danger

14   because they're not wearing a mask, that if the Speaker

15   waited until then and then ordered them to either put on a

16   mask or leave and they refused that that would be

17   disorderly?

18             MR. WIEST:  I think at that point the proceedings

19   are halted and somebody says you need to do this and you

20   failed to do so, I think that very well could be disorderly.

21             THE COURT:  But why does she have -- I mean

22   considering the grave nature of what we're experiencing as

23   far as the virus is concerned are you saying that she would

24   have to wait and put people at risk before action could be

25   taken and be declared disorderly?

1          MR. WIEST:  Your Honor, I think to have disorderly

2    conduct it has to somehow impede or stop the proceedings of

3    the House and here it didn't happen.  It was done during a

4    lull in the House proceedings.  Nothing was impeded

5    whatsoever by this conduct.

6          THE COURT:  Maybe, I don't know.  But I know I

7    preside over cases out in Pittsburgh.  And the first trial I

8    held out there it was clear that the jurors who had become,

9    for example, vaccinated did not want to have to be in the

10   presence of jurors who were not vaccinated.  So I mean would

11   I have to under those circumstances wait as you're sort of

12   suggesting the Speaker would have to wait until that contact

13   occurred before any action could be taken?

14         I know it's a different situation, but I think

15   it's sort of analogous because you seem to be suggesting

16   that she had to wait until people were conceivably put at

17   risk before any action could be taken.

18         MR. WIEST:  Your Honor, I think there has to be

19   something that somehow actually stops or halts or impedes

20   the proceedings of the House in some way.  And I know, I'm

21   sure the Court remembers we had the issue with the gentleman

22   that called in on the phone.  And I think you warned him and

23   he continued to impede the proceedings in this case at which

24   point then you held him in contempt.  And there's no doubt

25   that that was disorderly.  Why?  Well, it interfered with

```
 1    the operations of the court.

 2              And I think that, that distinction is critical.

 3    It cannot just be a rule violation.  There has to be a

 4    limiting factor when Congress uses that language disorderly

 5    conduct it has to mean something.  And it's not simply a

 6    rules violation because if the Founders meant that they

 7    would have used that language.  They knew what rules were.

 8    There's a separate provision that talks about Congress'

 9    ability to enact rules.

10              THE COURT:  Thank you.

11              MR. WIEST:  Thank you, Your Honor.

12              THE COURT:  Counsel, what about what your opponent

13    says about what would have to occur in order for me to

14    conclude that there was in fact disorderly conduct?

15              MR. LETTER:  Your Honor, he's wrong.  This Court,

16    for instance, and this is discussed in our opening brief

17    around page 17 and our reply brief around page 15.  The DC

18    Circuit has said that -- I think it was actually the opinion

19    of, a concurring opinion by now Justice Kavanaugh, who says

20    getting -- sorry, specifically it's violation of the rules

21    of the House is covered by the, this clause.

22              It doesn't say, you know, conduct that is actually

23    physically disruptive or anything like that.  That's not

24    what it says.  And indeed, we pointed out that the

25    definition of disorderly -- we looked at a, we cited to a
```

1   dictionary from 18 something that makes quite clear that

2   it's, it means violating the rules of the House.  Violating

3   the rules is disorderly.

4           THE COURT:  So you're saying the mere entry into

5   the chambers of the House without a mask in light of the

6   resolution would be disorderly?

7           MR. LETTER:  Yes, Your Honor, yes.  There's

8   nothing -- we are aware of nothing that would say that there

9   has to be some sort of, as I say physical disorder or

10  anything like that.  It's violating a rule of the House.  It

11  has to be a valid rule we understand that.  Violating a

12  valid rule of the House is disorderly conduct.

13          And as I said the main case we rely on is the *In*

14  *Re: Grand Jury Subpoenas* case.  I don't believe it involved

15  any kind of physical disruption or anything like that.  And

16  there, I found the quote.  Justice Kavanaugh, then Judge

17  Kavanaugh, sorry, said it's broad.  The discipline clause is

18  broad.  Quote, "It expands its authority for each House to

19  discipline and sanction its members for improper behavior."

20          And elsewhere as I said the dictionaries

21  disorderly -- they cite in their complaint certain

22  dictionaries and this is all at page 15th of our reply

23  brief.  The definition or defining disorderly to include

24  contrary to law, that's Samuel Johnson, Dictionary of the

25  English language in 1785, and Black's Law dictionary more

1    modern says disorderly includes quote "Contrary to the rules

2    of good order and behavior."

3            It's very difficult to figure out why refusing to

4    wear a mask in the middle of a pandemic is not contrary to

5    the rules of good order and behavior because of the people

6    around you.

7            THE COURT:  Let me just ask, is there some

8    interplay between what the Supreme Court said in *Ballin* and

9    the analysis it made there or the factors it said have to be

10   considered that they identified in that case, and the

11   analysis that as to be done pursuant to the speech and

12   debate analysis?

13           MR. LETTER:  No, Your Honor.  Again, they're

14   dealing with two different things.  *Ballin* is about if you

15   are violating rules of the House, and that too by the way,

16   wasn't my memory is it had nothing to do with physically

17   disruptive behavior.  And what, these are two separate

18   arguments.  The separate argument is speech or debate stands

19   or falls on its own and it includes enforcing the rules by

20   staff, et cetera, enforcing rules about how the chamber

21   operates.

22           That's *Consumers Union*.  That's why we think that

23   case is so damaging for plaintiff's claim.  And again, if

24   they want in the DC Circuit they can urge the Court to go

25   en banc and reverse *Consumers Union* even though in *Rangel*

1    and *McCarthy* both that decision was very heavily relied on.

2    They can go to the Supreme Court and ask it be reversed, but

3    they certainly can't ask you to do that.

4         THE COURT:  What's your position regarding your

5    opponent's argument that I have to apply the standard of

6    review that applies at this stage of the proceedings, and

7    therefore, only look to the allegations set forth in the

8    complaint in assessing whether dismissal is appropriate as

9    compared to all these other factors that are outside the

10   four corners of the complaint?

11        MR. LETTER:  Again, it's just simply wrong.  There

12   are all sorts of things that Your Honor is permitted to take

13   judicial notice of.  And you clearly can take judicial

14   notice of official and formal documents of the House of

15   Representatives, the orders issued by the attending

16   physician.

17        I assume counsel is not asking you to ignore what

18   everybody knows that more than 765,000 Americans have died

19   from COVID.  I assume they're not asking you to ignore that

20   very widely reported that a member of the House and a member

21   elect both died from COVID.  If counsel wants to stand up

22   here and say that I find that fascinating.  But as I say you

23   are allowed to take judicial notice of these kinds of

24   things.  These are points that are not in dispute, can't be

25   in dispute.

1          More importantly, whether speech or debate applies

2    has nothing to do with any of these.  Again, they can stand

3    up here and they can say the Constitution was violated.

4    Same claim made in *McCarthy*, *Rangel*, *Eastland*, *Consumers*

5    *Union*.  This is no different from those cases.  You can say

6    it loud.  You can say well, it really goes to the heart of

7    the Constitution.

8          The problem with, with my friend, Mr. Wiest's

9    argument is the Speech or Debate Clause is in the

10   Constitution.  This isn't something that, you know, courts

11   have made up.  As you know judicial immunity is a court made

12   doctrine.  It's valid obviously.  The Speech and Debate

13   Clause is right there in the Constitution, and we know why

14   the framers put it in there.

15         And again, the Supreme Court in *Eastland* has

16   discussed this very thing.  It's discussed how -- we know

17   that this means that in some circumstances there are going

18   to be injustices.  It means, for example, and the Supreme

19   Court has said this very thing.  A member can stand up on

20   the floor of the House and slander somebody terribly,

21   complete and total lies about somebody, and that is

22   protected by this Speech or Debate Clause.

23         We can argue it shouldn't be, that's a bad

24   provision, but that's a decision the framers made and we

25   suggests that all members of Congress have a very strong

1   interest in that.

2        THE COURT:  Anything else you'd like to say in

3   reference to the 27th Amendment argument which counsel

4   pressed very hard in support of why that would preclude me

5   from the granting your motion?

6        MR. LETTER:  I'm just going to reiterate, Your

7   Honor, your indulgence what I said before, *Boehner versus*

8   *Anderson* tells us what those, what the 27th Amendment and

9   the Ascertainment Clause mean.  And when those say law they

10  meant a law passed by both houses of Congress and presented

11  to the president.  It's right there in, again in DC Circuit

12  precedent.  So the 27th Amendment just, we know under

13  binding precedent does not apply here.

14        As far as statistics we will get you those, but

15  just so you know at pages 7 and 8 of our opening brief we

16  already provide you with some of those.

17        THE COURT:  Query, can I take those statistics

18  into consideration?  Is that going beyond what the scope of

19  my review is on a motion to dismiss?

20        MR. LETTER:  Your Honor, I think it's, what we're

21  going to provide you I believe would fall within your

22  ability to take judicial notice.  We will be providing you

23  materials --

24        THE COURT:  I wouldn't know about it unless you

25  provide it to me.  And generally judicial notice is

1    something that the Court is aware of without the assistance

2    of any outside source.

3              MR. LETTER:  Except, Your Honor, I'm certain that

4    judicial notice does cover official records.

5              THE COURT:  If they are official records, yes,

6    official government records, I agree.

7              MR. LETTER:  Yes.  What my colleague and I will be

8    doing is going back and asking for the various

9    administrative offices in Congress to give us the statistics

10   that you've asked for.  Obviously, if it turns out that some

11   of -- we won't submit any declarations or anything like

12   that, so if you feel, you know, if that's improper we won't

13   do that.  We'll just give you whatever statistics we have.

14             THE COURT:  I mean, what's going to be helpful

15   since this issue as I recall from the filings did not really

16   address the scope of what information I could consider in

17   deciding this motion if you're going to submit additional

18   information I think you need to set forth in a supplemental

19   memorandum legal authority for me considering what you're

20   going to submit, and I'll give them an opportunity to file

21   an opposition to that.

22             MR. LETTER:  Your Honor, you know, I was

23   responding to your request for the statistics.

24             THE COURT:  I understand.

25             MR. LETTER:  I'm happy to --

1          THE COURT:  I mean if you don't want to submit it

2     that's fine.  But I'm saying if you do submit something, and

3     you're saying that I can consider it in the context of

4     ruling on a motion to dismiss I need some authority as to

5     why you think it would be appropriate for me to consider

6     that information.  And if that happens then I will give them

7     the opportunity to respond, but it's your choice.

8          MR. LETTER:  Yeah, I apologize, Your Honor.  I

9     feel like I'm between a rock and a hard place here.  We

10    think the motion to dismiss as it's now provided to you

11    gives you all that you need for legal -- but I don't --

12         THE COURT:  If you're comfortable with that that's

13    fine.  I'm just saying I did make the inquiry about

14    providing that information, but then they raised a question

15    as to whether it would be appropriate for me to do so.  I

16    think that's an appropriate position to take, so I'm saying

17    that if you feel that that information is appropriate and

18    should be considered at this stage of the proceedings, and

19    you submit something I will need your legal assessment as to

20    why it's appropriate.  And as I say I'll give them the

21    opportunity to respond.

22         MR. LETTER:  Fine, Your Honor.  I think what we'll

23    do if we can submit to you material that you've requested

24    that is something you can take judicial notice of we will do

25    that.  I repeat as a legal question I don't think you need

1   it, but when a judge ask me for something I always want to

2   --

3          THE COURT:  No, I asked for it, but maybe I

4   inappropriately asked for it based upon what they said in

5   response.

6          MR. LETTER:  Right.  Very briefly just a couple of

7   other things.  Oh, by the way, the rule I think there may

8   have been some confusion, maybe not.  The rule about that

9   you don't have to wear a mask while you're speaking and

10  you're recognized that's still in effect.  And at least my

11  colleague and I looking quickly at the complaint all the

12  photographs that are in the complaint I'm fairly sure all of

13  those are members who were addressing the House.

14         So I'm not sure why they're focusing on that, Your

15  Honor.  Some of Your Honor's questions went to that.  I

16  think, Your Honor, that's really all I have.  I don't want

17  to try your patience.

18         THE COURT:  I'll do the best I can to get you a

19  written decision as expeditiously as possible.  We are

20  overwhelmed with cases right now, so I'll do the best I can

21  to get something.  I do want to get it hopefully within the

22  next 30 days before I go on vacation, so I'll do the best I

23  can to turn it around.

24         MR. LETTER:  We certainty can't ask for anything

25  more than you doing the best you can.

1          THE COURT:  Thank you.

2          [Thereupon, the proceedings adjourned at 3:40

3          p.m.]

1                          **CERTIFICATE**

2          **I, Cathryn J. Jones, an Official Court Reporter,**

3    for the United States District Court of the District of

4    Columbia, do hereby certify that I reported, by machine

5    shorthand, the proceedings had and testimony adduced in the

6    above case.

7          I further certify that the foregoing 66 pages

8    constitute the official transcript of said proceedings as

9    transcribed from my machine shorthand notes.

10          In witness whereof, I have hereto subscribed my

11   name, this the 6th day of December, 2021.

12

13                         /s/_Cathryn J. Jones

14                         Cathryn J. Jones, RPR
                           Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25

**MR. LETTER: [47]** 3/10 3/19 3/23 4/9
4/17 4/25 5/15 6/2 6/7 6/13 6/20 7/1
7/17 8/18 9/25 11/16 13/4 14/24 16/15
17/8 17/13 18/22 19/9 19/11 20/8
20/13 21/12 21/22 22/8 23/7 50/13
51/5 51/22 57/14 58/6 59/12 60/10
62/5 62/19 63/2 63/6 63/21 63/24 64/7
64/21 65/5 65/23
**MR. WIEST: [56]** 3/5 23/9 24/23 25/6
25/18 26/13 26/23 28/10 28/23 29/1
30/2 30/17 30/23 31/9 32/1 32/3 33/1
33/7 34/16 35/3 37/6 37/15 37/20
37/24 38/8 38/16 38/21 39/3 39/8
39/20 40/16 41/5 42/9 42/11 42/17
43/8 43/14 44/5 45/10 45/14 45/20
47/9 48/1 48/8 48/11 49/1 49/16 50/7
52/19 52/22 53/16 54/21 55/17 55/25
56/17 57/10
**THE COURT: [103]**
**THE DEPUTY CLERK: [1]** 3/1

**$**
**$10 [3]** 18/2 18/3 18/9
**$10 million [2]** 18/2 18/9
**$10,000 [1]** 18/7
**$5,000 [1]** 35/14
**$500 [2]** 26/9 35/13

**.**
**.x [1]** 1/6

**/**
**/s [1]** 67/13

**1**
**10 [2]** 11/18 11/21
**104 [1]** 1/13
**12 [1]** 16/25
**13th [1]** 11/23
**144 [1]** 41/7
**15 [1]** 57/17
**15th [1]** 57/22
**17 [1]** 57/17
**18 [1]** 58/1
**1785 [1]** 58/25
**1895 [1]** 1/14
**19 [1]** 23/13
**1970s [1]** 12/5
**1992 [1]** 31/19

**2**
**200 [1]** 1/17
**20001 [1]** 2/13
**2015 [2]** 13/10 16/20
**202 [2]** 2/3 2/7
**2021 [2]** 1/5 67/11
**2023 [1]** 3/4
**20515 [2]** 2/3 2/7
**21-2023 [1]** 3/4
**21-2023-RBW [1]** 1/4
**219 [1]** 2/2
**225-9700 [2]** 2/3 2/7
**25 [1]** 1/12
**257-1895 [1]** 1/14
**27th [31]** 17/2 17/14 17/17 18/13 19/2
20/19 26/20 27/5 27/12 28/8 28/9

**29/16** 30/1 30/16 31/1 31/8 31/16
33/18 34/21 35/18 35/23 36/11 37/14
37/24 40/9 44/7 44/12 50/1 62/3 62/6
62/12
**2:03 [1]** 1/6

**3**
**30 [2]** 5/25 65/22
**312-9890 [1]** 1/18
**333 [1]** 2/12
**38 [4]** 8/20 15/13 38/11 38/24
**3:10 [1]** 48/3
**3:15 [1]** 48/4
**3:40 [1]** 66/2

**4**
**40 [1]** 10/14
**41017 [1]** 1/13
**45241 [1]** 1/17
**4750 [1]** 1/16
**497 [2]** 30/22 30/25

**5**
**513 [2]** 1/14 1/18
**5140 [1]** 2/6

**6**
**61 [2]** 30/22 30/24
**6521 [1]** 2/12
**66 [1]** 67/7
**6th [1]** 67/11

**7**
**750,000 [2]** 4/4 25/6
**765,000 [2]** 22/20 60/18
**78 [1]** 29/5
**79 [2]** 32/7 35/5

**9**
**90 miles [1]** 10/13
**96 percent [1]** 15/25
**9700 [2]** 2/3 2/7
**9890 [1]** 1/18

**A**
**ability [6]** 34/15 34/19 35/2 35/15 57/9
62/22
**able [2]** 39/2 53/19
**about [66]** 5/6 8/13 8/14 8/15 8/16 9/3
10/15 10/24 11/25 12/8 12/20 12/25
13/6 13/7 13/16 13/17 13/18 13/21
15/6 15/17 15/25 16/12 16/22 18/25
20/4 23/13 23/14 23/15 23/16 23/17
23/19 24/24 27/15 28/22 31/13 32/7
32/9 32/14 33/24 33/24 36/11 43/13
43/20 44/3 44/17 44/23 45/16 50/25
51/8 51/9 51/10 51/18 52/4 52/5 54/9
54/19 54/20 57/8 57/12 57/13 59/14
59/20 61/21 62/24 64/13 65/8
**above [1]** 67/6
**absolute [4]** 11/14 14/9 14/12 41/10
**absolutely [3]** 11/9 9/10 18/23
**accept [2]** 36/5 44/12
**acceptable [1]** 27/8
**accomplished [1]** 9/24
**account [3]** 26/1 26/3 36/19
**accountable [1]** 30/10
**accurate [1]** 41/8

**accused [1]** 13/12
**acknowledge [1]** 41/14
**action [8]** 3/4 34/9 42/15 49/10 49/24
55/24 56/13 56/17
**actions [1]** 33/11
**actors [3]** 40/6 40/7 49/24
**acts [1]** 53/14
**actual [5]** 24/10 26/4 36/18 38/24
39/25
**actually [12]** 4/9 4/13 4/23 7/24 14/6
18/15 31/9 53/10 55/9 56/19 57/18
57/22
**addition [2]** 18/13 46/3
**additional [3]** 24/5 33/11 63/17
**address [4]** 24/9 28/12 37/17 63/16
**addressed [2]** 29/3 29/4
**addressing [1]** 65/13
**adduced [1]** 67/5
**adjourned [1]** 66/2
**administration [1]** 5/20
**administrative [2]** 49/24 63/9
**adopted [7]** 8/19 18/22 20/11 30/1
30/17 31/8 32/20
**adoption [4]** 7/16 31/25 32/18 54/18
**advancing [1]** 54/21
**adversely [1]** 35/2
**affect [1]** 5/6
**after [6]** 8/3 36/20 38/16 38/18 39/2
39/7
**afternoon [5]** 3/6 3/10 3/11 3/16 23/10
**again [22]** 11/11 11/24 12/21 19/12
20/2 20/4 20/21 20/24 30/11 32/7 35/5
36/13 43/21 44/19 51/1 51/11 59/13
59/23 60/11 61/2 61/15 62/11
**against [17]** 9/8 9/16 9/20 9/20 10/9
10/23 11/3 11/3 12/7 13/12 13/14 16/7
22/25 26/19 32/24 42/9 49/24
**age [3]** 5/14 6/17 25/14
**agency [1]** 29/12
**ago [2]** 12/5 16/12
**agree [3]** 14/14 20/5 63/6
**aided [1]** 2/17
**air [2]** 8/8 8/9
**al [4]** 1/3 1/5 3/3 3/3
**Alexander [1]** 35/5
**all [44]** 5/17 6/14 7/5 7/7 7/24 8/16 9/9
10/3 10/19 12/5 12/12 12/13 12/20
16/8 16/16 19/8 20/14 21/6 21/8 23/19
23/25 24/4 25/20 26/15 33/13 38/10
38/25 40/4 42/19 42/23 43/17 43/17
47/11 50/18 50/22 54/3 58/22 60/9
60/12 61/25 64/11 65/11 65/12 65/16
**allegations [2]** 23/25 60/7
**alleged [3]** 38/2 44/2 47/20
**allow [4]** 26/16 29/11 35/24 36/4
**allowed [7]** 12/17 12/17 12/19 36/7
43/1 47/13 60/23
**almost [2]** 25/4 50/14
**along [1]** 45/23
**already [5]** 8/6 18/19 19/2 51/13 62/16
**also [12]** 3/13 4/15 6/12 6/12 6/13 15/2
17/8 20/4 36/12 45/24 45/25 47/14
**alternative [1]** 46/19
**although [1]** 31/20
**always [1]** 65/1
**am [2]** 10/8 43/9
**amendment [49]** 12/23 13/24 17/2

USCA4 Appeal: 19-1730    Doc: 11    Filed: 06/15/2020    Pg: 114 of 174    Total Pages:(114 of 174)

**A**

**amendment [16]** 16/22 17/15 17/18
18/14 19/1 19/3 20/19 21/1 21/6 21/10
21/20 22/24 26/20 27/5 27/12 28/2
28/8 28/9 29/17 30/1 30/16 30/21 31/1
31/8 31/16 31/25 32/12 32/14 33/19
34/21 35/18 35/24 36/4 36/8 36/11
37/14 42/3 44/3 44/7 44/16 44/23
46/19 50/1 62/3 62/8 62/12
**amendments [2]** 31/17 31/20
**amends [1]** 17/15
**American [1]** 25/5
**Americanism [1]** 15/5
**Americans [3]** 4/4 45/20 60/18
**amount [1]** 36/21
**amounted [1]** 52/22
**amounts [3]** 29/7 32/7 35/7
**analogous [1]** 56/15
**analysis [8]** 32/9 48/6 48/10 49/12
50/12 51/9 59/9 59/11 59/12
**Anderson [2]** 18/15 62/8
**another [1]** 32/19
**any [22]** 4/12 5/11 6/10 7/10 16/24
19/17 32/21 33/1 44/3 47/25 50/9
50/12 51/12 54/14 54/22 54/22 56/13
56/17 58/15 61/2 63/2 63/11
**anything [16]** 6/22 20/23 23/5 24/23
28/22 30/14 36/6 51/24 52/6 55/1
57/23 58/10 58/15 62/2 63/11 65/24
**apologize [1]** 64/8
**appeal [3]** 9/4 9/6 9/7
**APPEARANCES [1]** 1/11
**appellate [1]** 51/2
**application [4]** 17/7 17/13 50/12 50/15
**applied [10]** 9/14 15/20 16/11 44/24
44/24 44/25 44/25 46/3 47/18 51/13
**applies [6]** 7/10 17/9 50/1 54/2 60/6
61/1
**apply [10]** 15/20 17/12 18/12 18/14
20/13 20/20 20/21 45/4 60/5 62/13
**appointments [1]** 29/10
**appropriate [10]** 7/15 10/2 20/7 34/24
60/8 64/5 64/15 64/16 64/17 64/20
**arbitrary [1]** 38/2
**are [91]**
**aren't [1]** 25/17
**arguably [1]** 54/24
**argue [3]** 16/7 20/4 61/23
**argued [3]** 17/1 44/2 44/14
**arguing [2]** 10/9 42/9
**argument [13]** 19/15 19/16 20/15
20/25 43/6 44/7 44/12 46/25 51/10
59/18 60/5 61/9 62/3
**arguments [1]** 59/18
**armbands [1]** 44/20
**Arms [3]** 11/3 11/4 12/7
**ARMSTRONG [1]** 1/16
**around [8]** 8/10 8/16 10/3 15/9 57/17
57/17 59/6 65/23
**arrest [2]** 16/12 16/14
**article [11]** 17/15 17/15 19/19 28/18
29/14 29/21 30/5 30/19 35/9 44/10
44/13
**articulate [1]** 14/22
**as [84]**
**ascertain [1]** 17/17
**Ascertainment [6]** 17/16 18/13 19/3

20/3 20/20 62/9
**Ashwood [1]** 1/16

**aside [3]** 25/17 43/17 43/21
**ask [15]** 9/22 14/19 20/5 26/6 32/22
37/23 46/24 48/1 48/5 52/18 59/7 60/2
60/3 65/1 65/24
**asked [6]** 48/13 50/10 50/11 63/10
65/3 65/4
**asking [6]** 19/13 20/2 50/19 60/17
60/19 63/8
**assaulting [1]** 19/22
**assessed [3]** 8/23 9/4 51/3
**assessing [2]** 48/7 60/8
**assessment [2]** 51/5 64/19
**assistance [1]** 63/1
**assisting [1]** 40/20
**associate [1]** 6/4
**associating [1]** 25/17
**assume [8]** 4/24 10/10 13/2 19/15
23/25 39/1 60/17 60/19
**assuming [2]** 26/25 34/13
**athlete [1]** 18/2
**atmosphere [4]** 8/14 8/15 12/15 13/13
**attained [1]** 24/20
**attendance [2]** 3/8 3/9
**attending [10]** 4/3 7/3 7/14 7/21 7/24
8/22 15/12 15/22 22/15 60/15
**attention [1]** 19/17
**attorneys [1]** 18/16
**authored [1]** 30/21
**authority [5]** 42/7 42/8 58/18 63/19
64/4
**authorizing [1]** 32/25
**Avenue [1]** 2/12
**aware [7]** 11/24 15/12 28/18 31/18
43/9 58/8 63/1
**away [2]** 35/15 37/11

**B**

**back [7]** 10/7 21/5 28/16 43/16 51/1
54/9 63/8
**background [2]** 9/9 9/16
**bad [5]** 13/15 14/3 14/7 52/15 61/23
**balance [1]** 48/14
**balancing [1]** 52/4
**ball [1]** 18/5
**Ballin [18]** 24/15 41/3 41/6 41/9 48/8
49/4 49/15 50/12 50/14 50/17 50/23
51/4 51/6 51/8 54/8 54/9 59/8 59/14
**banc [1]** 59/25
**banging [1]** 55/4
**bank [3]** 26/1 26/2 36/19
**bar [1]** 22/19
**barred [3]** 11/1 11/2 12/25
**based [2]** 22/16 65/4
**basement [1]** 27/21
**bases [1]** 7/24
**basically [2]** 14/3 54/15
**basis [1]** 40/5
**be [117]**
**became [2]** 6/11 8/4
**because [55]** 4/21 5/14 5/22 5/23 7/23
10/3 10/9 10/9 10/14 11/4 11/7 12/6
13/25 17/3 18/11 19/5 20/15 20/19
20/21 20/24 21/2 22/15 22/18 22/20
22/25 23/18 23/20 24/8 25/11 25/14
25/14 27/2 38/12 39/24 32/25 36/3

37/1 38/5 40/14 40/21 42/16 43/22
44/8 44/17 47/22 47/12 51/18 52/24
53/1 53/4 54/1 55/9 55/15 57/8 59/5
**become [2]** 55/8 56/8
**becomes [1]** 27/8
**been [28]** 4/8 4/10 4/14 4/17 4/21 4/23
5/4 7/4 7/23 8/1 9/24 13/11 18/8 19/23
23/18 24/15 27/13 33/12 34/12 38/17
38/24 39/12 39/12 41/24 44/9 47/12
53/3 65/8
**before [17]** 1/9 3/16 15/13 17/4 36/20
38/6 38/16 39/18 43/4 47/1 48/1 50/15
52/18 55/24 56/13 56/17 62/7 65/22
**begin [4]** 23/12 23/18 23/21 24/7
**behavior [6]** 19/20 19/21 58/19 59/2
59/5 59/17
**behind [2]** 9/9 30/4
**being [15]** 12/23 13/11 13/18 13/24
13/25 16/2 16/4 21/25 26/18 36/21
38/4 43/10 45/10 49/21 53/19
**beliefs [1]** 13/25
**believe [13]** 10/1 13/10 15/25 17/9
27/13 38/9 38/10 40/1 51/7 52/23 53/8
58/14 62/21
**believed [1]** 10/2
**Bernstein [1]** 30/21
**best [6]** 17/25 33/21 65/18 65/20 65/22
65/25
**between [6]** 24/18 34/12 41/20 49/13
59/8 64/9
**bevalaw.com [1]** 1/18
**beyond [1]** 62/18
**Bill [1]** 31/20
**binding [1]** 62/13
**bit [2]** 31/16 50/4
**Black's [1]** 58/25
**Boehner [6]** 13/9 18/15 19/9 28/15
28/15 62/7
**both [10]** 6/19 18/17 19/4 34/18 34/24
39/1 49/18 60/1 60/21 62/10
**Boulevard [1]** 1/12
**brain [1]** 6/13
**branch [5]** 9/21 14/11 46/14 52/7 52/7
**break [1]** 47/24
**breathe [1]** 8/11
**breathing [2]** 8/8 8/10
**brief [9]** 6/7 8/14 19/25 22/11 37/22
57/16 57/17 58/23 62/15
**briefed [1]** 37/16
**briefly [3]** 23/5 37/21 65/6
**briefs [1]** 17/23 18/1
**broad [2]** 58/17 58/18
**broadly [1]** 9/14 15/2
**brought [2]** 10/23 12/7
**Bruns [3]** 1/15 1/16 3/7
**Building [2]** 2/2 2/6
**buildings [1]** 7/8
**burning [1]** 44/20

**C**

**C-SPAN [1]** 53/4
**CA [1]** 1/4
**calendar [1]** 5/25
**call [3]** 25/24 29/23 36/23
**called [2]** 7/11 56/22
**calling [1]** 55/8
**came [2]** 8/3 43/19

USCA Case #22-5058    Document #2036572    Filed: 06/15/2023    Page 115 of 174

# C

**cameras [2]** 44/24 47/18
**campaign [1]** 30/8
**can [65]** 3/22 5/16 5/18 5/19 5/20 5/25 6/9 8/11 9/5 10/17 12/25 18/25 19/1 19/17 19/20 21/13 21/15 24/9 24/13 24/23 25/2 25/23 28/5 29/17 29/18 29/18 32/23 33/5 33/9 33/10 33/10 36/23 37/10 37/18 41/15 42/21 46/14 47/24 49/5 50/21 51/19 52/2 52/9 52/10 53/2 53/15 54/7 55/8 59/24 60/2 60/13 61/2 61/3 61/5 61/6 61/19 61/23 62/17 64/3 64/23 64/24 65/18 65/20 65/23 65/25
**can't [16]** 15/5 17/18 19/14 20/19 20/20 20/23 29/19 32/16 32/17 33/15 36/7 40/16 47/3 60/3 60/24 65/24
**Cannon [1]** 2/2
**cannot [15]** 27/16 28/19 28/23 29/2 29/13 33/18 34/20 34/22 36/2 46/14 46/15 54/3 54/10 54/10 57/10
**Capitol [6]** 5/3 5/12 7/6 7/7 7/16 16/15
**carries [1]** 52/8
**carry [1]** 14/21
**carrying [1]** 51/19
**case [59]** 3/18 9/10 11/16 12/4 12/11 13/1 13/5 13/9 14/16 16/11 17/6 18/14 18/16 19/9 20/1 20/8 22/10 23/13 24/15 27/18 28/15 28/15 32/1 33/22 33/23 33/24 36/5 38/2 39/21 39/22 40/1 40/9 40/9 40/10 40/10 40/21 40/24 41/4 41/5 41/9 41/23 42/4 43/19 45/12 46/17 48/20 48/23 49/4 50/13 50/17 50/24 51/14 51/21 54/4 56/23 58/13 58/14 59/10 59/23 67/6
**cases [22]** 10/21 12/6 12/12 13/21 14/18 16/10 16/17 16/17 22/10 27/17 34/18 39/18 43/4 43/13 50/16 50/18 51/2 51/2 51/15 56/7 61/5 65/20
**categories [1]** 5/13
**Cathryn [4]** 2/11 67/2 67/13 67/14
**caucus [3]** 27/21 31/3 39/13
**censure [2]** 27/1 42/20
**censured [2]** 13/18 33/9
**Center [1]** 1/12
**certain [6]** 7/23 14/10 33/13 34/20 58/21 63/3
**certainly [7]** 6/3 19/1 21/24 28/1 46/22 54/23 60/3
**certainty [1]** 65/24
**CERTIFICATE [1]** 67/1
**certify [2]** 67/4 67/7
**cetera [12]** 5/5 7/9 10/20 11/20 13/17 15/19 15/21 18/5 19/5 21/14 51/12 59/20
**challenge [2]** 39/25 40/7
**challenging [1]** 43/24
**chamber [9]** 5/8 5/10 7/12 12/18 12/25 15/15 22/17 51/19 59/20
**chambers [4]** 5/6 47/8 54/21 58/5
**chance [1]** 23/6
**change [7]** 17/4 17/22 29/19 38/11 38/12 38/16 39/2
**changed [6]** 17/3 30/13 38/6 38/7 38/21 38/23
**changes [5]** 7/23 17/9 17/18 30/10 31/4

**check [3]** 23/4 26/7 37/18
**chief [1]** 21/12
**choice [1]** 64/7
**chris [3]** 1/14 3/6 23/10
**Christopher [1]** 1/12
**church [1]** 43/20
**Cincinnati [1]** 1/17
**circuit [25]** 9/12 11/5 11/10 12/14 12/24 13/18 14/16 16/18 16/21 18/14 18/19 19/2 19/13 20/1 20/2 20/22 20/24 39/23 50/5 50/18 50/21 51/13 57/18 59/24 62/11
**circular [1]** 53/18
**circumstances [8]** 10/6 10/11 14/6 20/12 32/23 49/6 56/11 61/17
**citation [1]** 24/5
**cite [2]** 27/17 58/21
**cited [11]** 22/11 28/14 30/20 39/18 39/21 40/10 40/10 49/6 52/25 53/3 57/25
**citizen [1]** 10/14
**Civil [1]** 5/3
**claim [12]** 12/22 13/15 17/1 17/1 24/2 42/5 44/4 44/16 46/22 51/5 59/23 61/4
**claims [3]** 12/13 24/10 44/13
**clarity [1]** 50/5
**clause [27]** 9/11 9/14 9/15 11/6 11/13 14/4 17/16 18/13 19/3 19/18 19/19 20/24 28/14 28/17 48/11 50/17 50/24 51/3 51/25 54/4 54/15 57/21 58/17 61/9 61/13 61/22 62/9
**Clauses [2]** 20/3 20/21
**clear [16]** 9/10 14/3 17/11 20/1 21/3 22/9 22/24 24/15 25/25 33/8 40/23 43/2 49/4 49/23 56/8 58/1
**clearly [4]** 22/22 30/16 54/1 60/13
**clerk [3]** 11/4 34/1 47/25
**Clerk's [1]** 5/19
**clients [1]** 46/17
**cloak [4]** 45/4 45/24 47/6 47/15
**co [1]** 37/18
**co-counsel [1]** 37/18
**codes [1]** 10/20
**COLA [2]** 17/7 17/13
**colleague [3]** 23/4 63/7 65/11
**colorable [1]** 46/22
**COLUMBIA [3]** 1/2 2/6 67/4
**Columbus [2]** 2/5 3/13
**come [6]** 6/24 20/18 22/3 23/22 45/23 51/16
**comfortable [1]** 64/12
**coming [2]** 36/17 36/19
**commingle [1]** 47/5
**commits [1]** 18/3
**committee [11]** 9/5 9/7 13/13 15/19 37/3 37/8 40/3 40/20 42/22 44/25 49/21
**committees [2]** 33/12 37/9
**common [1]** 31/11
**commutative [1]** 45/8
**compared [3]** 34/14 37/6 60/9
**compel [1]** 46/19
**compensation [44]** 9/8 17/3 17/5 17/10 17/11 17/17 17/22 17/24 18/3 18/8 18/8 18/11 25/24 26/11 26/12 26/13 26/15 26/20 27/6 27/10 28/5 28/10 28/18 28/19 29/11 29/17 29/18

29/25 30/10 30/13 31/4 32/15 33/1 33/9 34/23 35/8 35/22 35/25 36/23 36/24 37/14 40/2 42/22 44/9
**compile [2]** 5/19 5/20
**complaint [11]** 23/25 24/6 39/10 41/25 52/25 53/3 58/21 60/8 60/10 65/11 65/12
**complete [1]** 61/21
**completely [1]** 33/4
**complex [1]** 7/6
**compliant [1]** 9/18
**comply [2]** 10/5 42/17
**component [1]** 42/15
**computer [1]** 2/17
**computer-aided [1]** 2/17
**concede [1]** 42/6
**conceding [1]** 21/21
**conceivably [2]** 55/13 56/16
**concepts [1]** 49/3
**concerned [1]** 55/23
**conclude [2]** 49/15 57/14
**conclusion [1]** 41/11
**concurring [1]** 57/19
**conduct [15]** 18/12 21/4 22/2 22/4 44/15 47/19 52/22 53/16 53/19 56/2 56/5 57/5 57/14 57/22 58/12
**confer [1]** 47/25
**conference [3]** 11/18 11/20 11/21
**conferences [1]** 12/1
**confine [1]** 27/20
**confines [1]** 16/15
**confronting [1]** 25/5
**confusion [1]** 65/8
**congregate [1]** 45/5
**Congress [44]** 4/3 5/8 14/21 14/23 15/11 17/16 17/19 17/20 18/17 19/5 19/20 22/17 24/16 24/22 27/3 28/19 29/11 30/7 30/9 30/12 31/17 34/2 35/25 37/2 37/10 37/10 37/10 40/20 41/15 41/18 42/7 42/15 51/22 52/2 52/11 52/16 53/4 53/24 54/7 54/10 57/4 61/25 62/10 63/9
**Congress' [1]** 57/8
**congressional [14]** 5/20 6/16 19/24 24/14 30/17 32/24 35/8 35/22 35/25 34/13 34/16 35/2 42/17 48/14 49/5
**Congressman [3]** 3/7 3/8 26/6
**Congresswoman [1]** 3/9
**CONNELL [1]** 1/16
**consequence [1]** 26/9
**consider [6]** 12/2 23/24 53/2 63/16 64/3 64/5
**consideration [1]** 62/18
**considered [3]** 18/21 59/10 64/18
**considering [3]** 16/3 55/22 63/19
**constituents [1]** 34/13
**constitute [1]** 67/8
**Constitution [24]** 2/12 9/12 9/15 14/5 17/23 18/19 20/12 23/17 25/10 27/22 28/23 32/25 33/17 37/11 37/13 41/13 43/11 43/17 43/21 54/11 61/3 61/7 61/10 61/13
**constitutional [20]** 12/11 12/13 12/22 13/23 15/4 23/14 24/16 25/21 28/3 34/5 37/9 40/8 40/23 41/16 41/18 43/2 43/25 44/4 54/5 54/6
**constitutionally [8]** 26/25 27/1 27/2

# C

**constitutionally** [5] 27/2 27/20 34/9 42/12 42/24
**construction** [1] 54/1
**construed** [1] 53/15
**construing** [1] 42/1
**Consumer** [2] 13/2 13/3
**Consumers** [10] 12/4 16/23 40/11 50/16 51/7 51/16 51/17 59/22 59/25 61/4
**contact** [1] 56/12
**contacting** [1] 25/14
**contain** [1] 8/9
**contempt** [1] 56/24
**content** [1] 46/15
**context** [4] 7/2 32/6 32/11 64/3
**continued** [1] 56/23
**contradiction** [2] 20/11 36/25
**contrary** [3] 58/24 59/1 59/4
**contravention** [1] 53/14
**convey** [4] 44/21 45/7 45/12 46/5
**conveyed** [1] 45/10
**core** [2] 49/7 49/18
**corners** [1] 60/10
**corollary** [1] 44/11
**correct** [5] 5/1 16/16 18/24 39/4 51/23
**correctly** [1] 52/14
**cost** [2] 19/5 26/11
**could** [32] 9/22 9/24 12/21 13/17 13/20 14/21 17/4 17/5 17/10 25/20 26/24 27/1 27/1 27/2 27/19 27/24 28/1 29/11 30/9 33/7 33/11 37/2 38/7 42/25 43/8 46/24 53/21 55/20 55/24 56/13 56/17 63/16
**counsel** [16] 2/2 2/5 3/4 3/12 3/14 3/25 21/7 21/8 23/9 37/18 50/11 52/19 57/12 60/17 60/21 62/3
**couple** [4] 10/4 10/16 12/1 31/21 32/17 39/18 65/6
**course** [7] 29/6 29/9 31/12 35/6 36/8 40/11 52/1
**court** [45] 1/1 2/11 2/11 2/12 3/17 9/12 11/5 11/5 11/19 11/23 13/22 14/2 14/9 14/14 14/16 16/18 18/22 21/3 22/9 24/15 25/9 27/19 31/13 34/3 34/8 39/23 41/2 43/16 43/18 47/22 50/5 51/8 56/21 57/1 57/15 59/8 59/24 60/2 61/11 61/15 61/19 63/1 67/2 67/3 67/14
**courts** [3] 18/21 51/2 61/10
**cover** [3] 19/23 20/4 63/4
**coverage** [1] 53/4
**covered** [4] 21/6 33/22 46/8 57/21
**covering** [2] 27/4 55/2
**covers** [3] 19/24 23/3 40/14
**COVID** [6] 4/13 4/19 15/8 23/13 60/19 60/21
**COVID-19** [1] 23/13
**created** [1] 37/9
**credited** [2] 39/15 47/22
**Crestview** [1] 1/13
**critical** [1] 57/2
**crowded** [1] 45/25
**cudgel** [3] 30/14 35/16 35/16
**Cuomo** [1] 43/19
**curfew** [1] 18/5
**current** [1] 17/25

**cut** [1] 44/11
**cwiestlaw.com** [1] 1/14

# D

**D.C** [2] 1/5 2/13
**damaging** [1] 59/23
**danger** [2] 8/5 55/13
**dangerous** [1] 8/4
**day** [2] 52/11 67/11
**days** [2] 5/25 65/22
**DC** [26] 2/3 2/7 9/12 11/5 11/10 12/14 12/24 13/18 16/18 16/21 18/14 18/19 19/2 19/13 20/1 20/2 20/22 20/24 39/22 50/5 50/17 50/21 51/12 57/17 59/24 62/11
**deal** [2] 41/16 48/22
**dealing** [6] 39/25 40/3 40/6 46/10 47/19 59/14
**deals** [1] 49/18
**death** [1] 25/16
**debate** [35] 9/11 9/14 9/15 11/2 11/6 11/13 13/1 13/19 16/11 20/16 31/25 33/23 34/4 34/7 39/22 40/18 46/13 48/11 48/17 48/22 49/16 49/23 50/16 50/17 50/24 51/3 51/11 51/14 51/25 59/12 59/18 61/1 61/9 61/12 61/22
**debates** [1] 7/13
**decades** [1] 12/17
**December** [4] 1/5 11/18 11/21 67/11
**December 10** [2] 11/18 11/21
**decided** [1] 52/4
**decides** [1] 18/6
**deciding** [1] 63/17
**decision** [5] 13/22 48/14 60/1 61/24 65/19
**decisions** [1] 50/22
**declarations** [1] 63/11
**declared** [1] 55/25
**decorum** [4] 54/19 54/21 54/23 54/25
**deducted** [2] 26/10 26/11
**deductions** [1] 26/16
**deep** [3] 30/25 32/8 32/8
**Defendant** [1] 1/6 2/1
**defendant's** [2] 3/17 41/11
**defendants** [6] 23/22 24/8 24/12 33/25 39/18 44/5
**defining** [1] 58/23
**definition** [4] 53/13 54/1 57/25 58/23
**definitions** [1] 17/24
**degree** [2] 45/16 49/11
**degrees** [1] 35/12
**delay** [2] 12/1 17/4
**deliberations** [1] 12/18
**Delta** [1] 8/4
**democrats** [1] 16/5
**denied** [1] 11/23
**Department** [1] 18/25
**depending** [1] 44/11
**described** [1] 7/19
**designed** [2] 45/7 46/13
**despite** [2] 25/6 32/24
**detail** [1] 39/11
**determination** [2] 11/23 38/14
**determine** [1] 24/2
**dictionaries** [3] 53/12 58/20 58/22
**dictionary** [3] 58/1 58/24 58/25
**did** [22] 7/14 8/2 27/11 27/13 27/17

31/19 32/2 38/7 38/15 39/17 44/5 44/16 45/4 46/4 46/6 51/21 52/4 52/23 52/24 56/9 63/164/18
**die** [2] 8/12 43/7
**died** [6] 4/13 4/15 6/11 25/6 60/18 60/21
**difference** [1] 34/11
**different** [13] 12/11 12/13 31/16 32/17 45/16 47/5 49/12 50/3 53/25 54/1 56/14 59/14 62/11
**difficult** [4] 13/7 21/15 43/23 59/3
**dig** [1] 27/11
**digs** [2] 30/6 31/10
**diminishing** [1] 34/18
**directive** [2] 40/23 43/2
**directives** [1] 7/20
**directly** [5] 12/3 17/6 17/7 40/9 51/17
**disagree** [3] 34/17 42/19 45/14
**disappointed** [1] 12/21
**disciplinary** [1] 54/15
**discipline** [9] 19/18 19/19 19/20 20/24 27/4 28/5 33/13 58/17 58/19
**disciplined** [1] 21/13
**disciplining** [2] 37/12 49/22
**discretion** [1] 41/16
**discrimination** [2] 46/15 46/16
**discussed** [8] 16/17 29/5 30/5 32/6 50/18 57/16 61/16 61/16
**discusses** [1] 50/22
**discussion** [3] 23/19 40/11 51/8
**disingenuous** [2] 38/19 39/7
**dismiss** [6] 3/17 7/20 46/23 62/19 64/4 64/10
**dismissal** [2] 24/3 60/8
**dismissed** [1] 9/11
**disorder** [1] 58/9
**disorderly** [25] 19/20 19/21 22/4 44/15 52/22 53/9 53/13 53/15 53/19 55/1 55/8 55/17 55/20 55/25 56/1 56/25 57/4 57/14 57/25 58/3 58/6 58/12 58/21 58/23 59/1
**dispute** [2] 60/24 60/25
**disruption** [2] 44/14 58/15
**disruptive** [2] 57/23 59/17
**disrupts** [1] 55/9
**distinction** [1] 57/2
**distinguish** [1] 39/17
**distinguishable** [3] 40/4 50/23 51/15
**distinguished** [1] 16/22
**district** [10] 1/1 1/2 1/10 2/6 2/12 11/1 36/16 36/16 67/3 67/3
**dive** [2] 30/25 32/8
**do** [60] 4/16 5/11 5/16 5/17 5/25 11/6 11/8 12/14 13/6 14/24 14/24 15/6 15/8 18/25 19/5 19/13 19/14 20/23 23/2 24/13 24/23 27/11 28/5 33/5 36/7 37/24 38/10 40/1 40/12 40/16 41/15 42/6 45/14 46/9 46/14 47/14 49/12 49/19 49/19 50/3 50/13 52/6 52/21 54/7 54/10 55/19 55/20 59/16 60/3 61/2 63/13 64/2 64/23 64/24 64/24 65/18 65/20 65/21 65/22 67/4
**Docket** [1] 1/4
**doctrine** [2] 14/16 61/12
**documents** [1] 60/14

US District Case #:17-3538 Document# 19-6, 662    Filed: 06/15/2018 Page 117 of 174

## D

**does [15]** 8/22 17/15 17/22 25/10 26/15 30/25 32/14 36/11 37/23 48/15 52/11 53/11 55/21 62/13 63/4
**doesn't [15]** 9/7 10/9 11/12 12/24 14/13 18/4 20/19 26/12 28/22 32/15 34/14 44/19 48/25 53/10 57/22
**doing [11]** 11/12 14/5 21/19 26/3 31/14 35/25 40/19 47/6 52/12 63/8 65/25
**dollar [1]** 10/17
**dollars [2]** 18/3 18/7
**don't [34]** 4/12 4/18 6/23 9/6 10/13 10/16 15/8 15/9 16/7 18/7 20/21 21/16 22/5 32/14 35/21 39/6 44/17 45/2 45/14 47/11 47/13 49/3 49/15 52/6 54/23 54/25 55/1 56/6 58/14 64/1 64/11 64/25 65/9 65/16
**done [6]** 10/4 13/11 35/22 49/21 56/3 59/11
**doorkeeper [1]** 34/1
**double [1]** 39/14
**doubt [1]** 56/24
**Douglas [3]** 2/1 3/12 3/25
**douglas.letter [1]** 2/4
**down [4]** 6/4 30/10 39/11 39/19
**draw [3]** 13/7 23/25 24/6
**drive [2]** 1/16 10/13
**droplets [1]** 8/8
**duly [2]** 34/2 34/12
**during [5]** 27/10 28/19 31/24 43/24 56/3
**dying [3]** 22/20 22/21 45/19

## E

**each [2]** 51/13 58/18
**earn [1]** 35/15
**Eastland [4]** 13/22 52/13 61/4 61/15
**easy [2]** 10/21 14/16
**edict [1]** 21/11
**effect [17]** 17/5 17/19 26/19 31/5 54/18 65/10
**effectively [1]** 47/15
**Eighth [3]** 28/2 36/4 36/7
**either [6]** 7/12 9/6 21/13 25/14 47/2 55/15
**elect [2]** 4/11 60/21
**elected [2]** 34/3 34/12
**election [13]** 27/7 27/8 28/6 29/20 30/9 32/16 33/3 33/6 33/18 34/23 35/18 36/1 42/25
**else [4]** 6/22 19/4 30/14 62/2
**elsewhere [1]** 58/20
**Email [4]** 1/14 1/18 2/4 2/8
**emphasize [2]** 5/7 11/2
**emphasized [1]** 14/9
**emphasizing [1]** 12/22
**employ [1]** 48/6
**employed [1]** 49/13
**en [1]** 59/25
**en banc [1]** 59/25
**enact [3]** 25/2 53/24 57/9
**enacted [1]** 26/19
**enactment [1]** 33/2
**enactments [1]** 26/16
**encompassing [1]** 54/3
**end [2]** 43/16 52/10

**ended [1]** 32/20
**ends [1]** 43/1
**enforce [6]** 7/4 25/23 27/25 26/1 26/1 36/3
**enforced [1]** 26/19
**enforcement [10]** 6/20 9/24 25/13 26/4 26/25 33/11 38/2 39/12 42/3 42/20
**enforcer [1]** 49/9
**enforcing [7]** 25/22 34/6 36/14 40/8 49/9 59/19 59/20
**engage [3]** 34/19 46/15 46/16
**engaged [1]** 53/25
**England [1]** 9/16
**English [1]** 58/25
**ensure [9]** 28/20 29/9 29/10 29/21 30/12 31/2 34/22 34/24 35/25
**ensures [1]** 29/22
**entered [1]** 55/12
**entire [3]** 16/3 27/20 27/21
**entitled [1]** 39/15 47/22
**entry [1]** 58/4
**envision [1]** 14/19
**equal [1]** 26/25
**era [1]** 32/10
**erect [2]** 27/24 36/2
**Eric [2]** 2/5 3/13
**eric.columbus [1]** 2/8
**especially [1]** 22/25
**established [2]** 24/19 41/21
**et [16]** 1/3 1/5 3/3 3/3 5/5 7/9 10/20 11/20 13/17 15/18 15/21 18/5 19/5 21/14 51/12 59/20
**Ethics [3]** 9/5 9/6 13/13
**evaluating [1]** 48/13
**even [12]** 14/8 19/14 20/15 21/6 22/1 25/8 38/13 39/12 49/10 49/16 50/24 59/25
**eventually [1]** 12/19
**ever [2]** 38/10 43/10
**everybody [1]** 60/18
**everything [3]** 11/8 23/3 40/16
**exact [2]** 35/4 50/18
**exactly [6]** 6/4 6/9 8/19 14/22 18/10 52/12
**examined [1]** 51/15
**example [7]** 5/2 8/1 18/1 18/22 20/12 56/9 61/18
**examples [2]** 38/18 39/9
**excellent [1]** 30/19
**Except [2]** 51/21 63/3
**exception [1]** 40/12
**exclude [1]** 34/20
**exclusion [1]** 33/24
**executing [1]** 29/24
**execution [1]** 36/4
**executive [3]** 9/20 14/11 52/6
**exert [1]** 35/8
**existence [3]** 25/8 25/11 43/22
**exists [1]** 37/7
**expands [1]** 58/18
**expected [1]** 40/16
**expediency [1]** 43/10
**expeditiously [1]** 65/19
**experience [2]** 9/16 15/14
**experienced [1]** 25/4
**experiencing [1]** 55/22

## F (explain column)

**explain [1]** 18/1
**explicit [1]** 52/5
**explicitly [1]** 39/13
**expressed [1]** 15/11
**expression [2]** 22/13 22/23
**extends [1]** 40/22
**extensively [1]** 24/8
**extent [1]** 50/11
**extreme [2]** 8/5 36/5
**extremely [1]** 8/4

## F

**face [2]** 27/4 55/2
**fact [17]** 8/11 14/23 21/25 25/6 25/10 27/6 28/13 29/5 31/11 36/6 36/10 36/24 38/20 39/7 47/11 55/3 57/14
**factor [1]** 57/4
**factors [3]** 46/9 59/9 60/9
**facts [6]** 23/23 24/5 39/15 41/25 45/6 47/21
**failed [1]** 55/20
**failing [3]** 27/4 37/3 55/2
**failure [1]** 41/1
**fairly [1]** 65/12
**fall [3]** 5/13 43/20 62/21
**falls [1]** 59/19
**far [2]** 55/23 62/14
**fascinating [1]** 60/22
**favor [3]** 24/1 24/6 42/1
**federal [2]** 10/20 14/11
**Federalist [4]** 29/3 29/5 32/6 35/5
**feel [5]** 15/4 15/10 63/12 64/9 64/17
**felt [1]** 14/22
**few [1]** 4/19
**figure [2]** 4/18 59/3
**file [1]** 63/20
**filings [1]** 63/15
**final [1]** 39/19
**finally [1]** 44/15
**find [2]** 22/23 60/22
**fine [40]** 9/4 9/5 9/7 9/25 10/3 10/6 10/8 10/17 10/18 17/21 18/6 18/6 18/11 22/2 23/6 25/24 26/9 26/21 27/5 32/24 33/1 33/3 33/6 33/9 34/14 35/1 35/13 35/13 35/14 36/18 36/23 37/20 42/11 42/12 42/14 42/16 50/21 64/2 64/13 64/22
**fined [5]** 16/2 16/4 18/9 21/14 38/4
**fines [4]** 8/23 10/17 10/19 53/1
**finish [3]** 27/13 44/17 48/1
**first [22]** 3/18 6/2 7/19 12/22 13/23 19/1 20/14 21/1 21/5 21/6 21/10 21/20 22/24 25/20 38/9 44/16 44/23 46/18 47/11 48/13 50/10 56/7
**five [3]** 19/19 41/8 55/6
**flag [1]** 44/20
**flagrant [1]** 40/25
**flagrantly [1]** 40/22
**floor [9]** 15/15 36/3 41/16 46/4 46/20 47/1 53/5 53/7 61/20
**focused [1]** 7/11
**focusing [1]** 65/14
**follow [3]** 8/21 10/13 15/22
**following [3]** 10/12 16/1 16/5
**force [1]** 29/23
**forcing [1]** 31/3
**Fordham [2]** 30/22 30/24

US Case #: 275058      Document #: 596858      Filed: 06/15/2024

## F

foregoing [1] 67/7
forget [3] 8/25 9/1 52/18
forgotten [2] 16/19 16/22
formal [2] 38/10 60/14
forth [4] 41/24 48/14 60/7 63/18
forum [1] 46/13
forward [2] 23/22 34/1
found [2] 51/14 58/16
Founders [4] 28/7 31/14 35/17 57/6
founding [3] 31/18 31/20 32/10
four [2] 55/5 60/10
framers [11] 9/16 9/19 14/4 14/4 52/4
52/4 52/12 53/21 53/23 61/14 61/24
frankly [1] 48/23
free [1] 23/2
freeze [1] 6/13
Friday [1] 1/5
friend [2] 50/19 61/8
full [1] 7/13
fully [1] 52/13
function [4] 11/11 40/15 49/8 52/8
functional [1] 40/18
functioning [1] 40/2
functions [1] 14/21
fundamental [5] 23/14 24/17 41/19
48/16 49/8
further [2] 14/14 67/7

## G

galleries [1] 12/19
gallery [2] 12/8 13/7
gallows [2] 27/24 36/2
garnishing [1] 26/1
garnishment [1] 36/14
gathering [1] 43/20
gave [3] 17/23 53/1 53/23
gavel [1] 55/5
general [7] 2/2 2/5 3/12 3/14 3/25 29/6
35/6
generally [1] 62/25
gentleman [1] 56/21
get [16] 5/17 5/19 6/8 8/9 8/11 16/25
20/15 28/16 41/8 42/21 43/7 47/16
62/14 65/18 65/21 65/21
gets [4] 12/8 23/22 35/14 36/16
getting [2] 32/20 57/20
gifted [1] 18/2
give [8] 13/17 23/6 52/6 63/9 63/13
63/20 64/6 64/20
given [3] 8/3 8/24 9/3
gives [2] 31/11 64/11
giveth [1] 37/10
giving [5] 15/18 17/20
global [1] 43/24
go [16] 7/20 11/18 11/18 11/21 12/8
14/14 17/4 17/5 17/18 21/5 27/25 51/1
52/2 59/24 60/2 65/22
goal [2] 22/12 22/22
goals [1] 23/20
goes [4] 17/11 26/8 35/14 61/6
going [26] 5/23 5/24 11/23 12/12 15/8
23/4 24/9 25/25 30/13 35/19 35/22
38/3 39/24 40/19 40/21 41/8 46/4 49/9
61/17 62/6 62/18 62/21 63/8 63/14
63/17 63/20
gone [1] 4/23

good [9] 3/6 3/10 3/11 3/16 10/14
23/10 30/5 59/2 59/5
got [5] 6/25 25/16 21/2 44/1 49/25
government [3] 3/18 15/5 63/6
government's [1] 3/19
Grand [2] 19/25 58/14
grant [1] 9/7
granting [1] 62/5
grave [2] 45/20 55/22
Gravel [2] 48/21 49/7
great [2] 41/16 46/6
greater [2] 37/5 39/10
Greene [1] 3/9
gross [1] 26/10
ground [1] 18/5
group [4] 12/21 16/2 16/2 16/4
guess [4] 3/18 31/22 43/6 50/10

## H

had [20] 4/9 6/13 12/16 13/6 13/11
15/13 15/14 17/3 19/5 21/21 38/13
38/21 39/11 42/7 55/12 56/8 56/16
56/21 59/16 67/5
half [1] 13/21
hall [9] 7/12 27/25 44/25 45/2 45/3
46/1 46/12 47/15 47/16
hallways [3] 45/3 45/25 47/15
halted [1] 55/19
halts [1] 56/19
Hamilton [2] 32/5 35/5
happen [2] 52/15 56/3
happened [2] 13/24 55/10
happening [6] 7/25 8/16 14/7 14/13
15/14 18/10
happens [2] 6/14 64/6
happy [2] 37/17 63/25
hard [7] 21/9 21/18 21/19 51/16 53/9
62/4 64/9
Harvey [1] 52/9
has [50] 4/4 4/5 6/4 7/3 8/10 11/6
11/15 16/18 16/21 18/8 18/14 18/19
19/2 19/23 21/3 22/1 22/9 24/15 26/19
27/5 27/13 28/3 32/10 34/5 38/24
41/12 41/20 42/7 45/23 47/14 50/12
50/14 50/18 50/18 51/8 51/13 51/13
51/13 51/14 53/20 56/2 56/18 57/3
57/5 57/18 58/9 58/11 61/2 61/15
61/19
have [129]
haven't [1] 51/4
he [14] 7/15 13/11 13/12 13/14 13/17
18/3 18/4 18/5 18/9 30/22 30/25 31/10
32/4 56/23
he's [1] 57/15
health [5] 15/6 15/7 22/20 45/7 54/24
hear [1] 3/18
heard [4] 15/1 24/11 25/1 27/16
hearing [2] 1/8 7/8
heart [3] 38/1 38/1 61/6
heavily [1] 60/1
hefty [1] 35/13
held [9] 11/1 11/5 18/14 18/16 19/2
30/10 51/4 56/8 56/24
helpful [4] 5/22 6/25 37/19 63/14
her [1] 26/7
here [36] 4/2 5/5 8/5 10/8 10/8 10/17
10/21 12/3 12/10 12/23 13/20 13/25

14/8 17/1 18/10 22/14 23/15 24/11
24/4 26/18 27/13 34/9 36/19 40/4 40/6
43/3 44/22 48/26/1/18 52/23 55/10
56/3 60/22 61/3 62/13 64/9
hereby [1] 67/4
hereto [1] 67/10
hey [1] 35/19
high [1] 10/17
higher [1] 17/10
Hills [1] 1/13
him [7] 13/12 13/14 13/18 18/6 18/6
56/22 56/24
his [10] 13/15 18/3 18/7 18/8 29/7 31/7
32/8 34/12 34/13 35/7
historical [2] 31/12 54/22
history [6] 30/6 30/16 30/20 30/25
31/9 31/11
hold [1] 28/24
home [3] 26/4 36/13 36/21
Honor [100]
Honor's [1] 65/15
HONORABLE [1] 1/9
hope [1] 5/25
hopefully [1] 65/21
hospital [1] 4/23
hospitalization [1] 5/5
hospitalized [1] 4/14
hour [2] 10/13 13/21
HOUSE [77]
houses [4] 7/8 18/17 19/4 62/10
how [14] 4/16 4/22 4/23 12/25 25/22
28/3 35/1 35/7 44/11 51/18 51/19 52/3
59/20 61/16
huge [1] 17/20
human [4] 10/12 10/13 29/6 35/6
hundred [5] 10/4 10/17 18/24 31/21
49/4
hypocrisy [2] 38/20 39/8
hypothetical [2] 22/3 22/6

## I

I'd [1] 21/11
I'll [10] 3/18 13/20 22/5 23/6 52/19
63/20 64/20 65/18 65/20 65/22
I'm [27] 3/11 3/25 5/9 5/23 8/6 8/6
10/15 11/24 12/12 14/7 14/8 14/25
20/17 23/4 24/9 41/8 51/7 56/20 62/6
63/3 63/25 64/2 64/9 64/13 64/16
65/12 65/14
I've [3] 16/17 23/5 44/17
i.e [2] 5/14 37/3
identified [1] 59/10
identify [1] 3/4
ignore [6] 20/2 24/16 41/18 51/12
60/17 60/19
Ill [28] 28/18 29/15 29/22 35/9
ill [2] 4/23 6/11
illegal [3] 13/14 14/1 34/6
illness [1] 25/16
immunities [1] 14/11
immunity [20] 11/13 11/13 14/12
14/12 24/7 27/14 33/21 33/23 34/4
34/8 40/13 40/18 40/22 42/4 48/18
48/24 49/23 50/2 52/17 61/11
impact [2] 37/5 48/25
impacting [1] 35/2
impacts [1] 28/10

USCA4 Appeal: 22-1282 Document: 9045a24b3a4d6208 Filed: 06/13/2022 Page 119 of 174

**I**

impede [3] 59/10 59/2 56/23
impeded [1] 56/4
impedes [1] 56/19
impermissible [2] 42/13 42/24
implicated [2] 28/10 43/8
implied [1] 43/6
important [4] 9/19 23/21 36/10 52/16
importantly [1] 61/1
imposed [4] 9/7 32/24 33/7 37/2
imposing [1] 17/21
imposition [1] 9/25
impression [2] 6/2 22/19
imprisonment [1] 10/7
improper [2] 58/19 63/12
inappropriate [1] 24/4
inappropriately [1] 65/4
incentive [1] 42/16
incident [1] 53/1
include [1] 58/23
included [1] 9/15
includes [2] 59/1 59/19
including [2] 4/5 54/11
incorrect [1] 24/13
increase [1] 32/16
increases [2] 19/6 32/19
increasing [2] 27/9 32/15
indeed [2] 24/25 57/24
independence [14] 23/16 28/21 29/8
29/21 29/22 30/2 30/11 30/17 31/2
31/8 31/24 34/22 34/25 35/10
independent [2] 13/8 34/19
indicates [1] 30/16
individuals [1] 42/8
indulge [1] 8/7
indulgence [1] 62/7
inferences [2] 24/1 24/6
information [5] 63/16 63/18 64/6
64/14 64/17
Initially [1] 38/13
injustices [1] 61/18
inquiry [1] 64/13
insists [1] 21/8
instance [9] 5/3 10/22 26/6 27/19 30/7
30/8 33/15 36/17 57/16
insurance [1] 26/11
integral [1] 40/2
intend [1] 46/5
intended [1] 45/8
intent [1] 44/21
interest [1] 22/12 62/1
interesting [3] 27/18 32/13 53/2
interfered [1] 56/25
Interior [1] 18/24
interjection [1] 24/4
internal [1] 19/24
interplay [1] 59/8
interplays [1] 50/6
interrelated [2] 49/3 49/19
interrelation [2] 49/11 49/20
interrupt [3] 12/9 21/5 52/24
interrupting [1] 12/18
intervening [12] 27/7 27/8 28/6 29/20
30/8 32/16 33/3 33/17 34/23 35/18
36/1 42/25
invalid [2] 20/17 20/18
investigated [1] 13/11

involve [1] 51/22
involved [3] 11/12 12/12 58/14
involves [2] 51/18 52/1
is [245]
isn't [5] 28/9 30/13 31/3 51/24 61/10
issue [21] 5/24 6/1 6/23 12/2 23/15
24/7 25/22 26/17 26/18 27/5 30/11
35/22 42/3 48/6 48/18 48/22 48/25
49/23 52/21 56/21 63/15
issued [5] 7/3 7/20 9/13 21/11 60/15
issues [3] 37/18 48/12 50/3
it [190]
it's [78]
its [15] 11/6 12/25 14/21 19/20 24/16
25/10 28/13 41/11 41/15 41/18 52/8
54/10 58/18 58/19 59/19
itself [9] 7/7 31/9 32/14 38/23 45/6
47/16 53/15 54/5 54/13

**J**

job [3] 10/21 11/6 14/24
Johnson [4] 44/18 44/20 46/9 58/24
Jones [4] 2/11 67/2 67/13 67/14
judge [8] 1/9 1/10 11/1 21/12 38/10
52/2 58/16 65/1
judicial [17] 14/12 28/19 28/20 29/8
29/13 29/22 35/8 35/10 52/7 60/13
60/13 60/23 61/11 62/22 62/25 63/4
64/24
judiciary [1] 9/21
jurors [2] 56/8 56/10
Jury [2] 20/1 58/14
just [49] 5/7 6/8 6/9 6/23 6/24 8/7 9/22
10/12 10/19 11/2 11/9 14/19 15/7
15/19 17/12 17/18 18/21 20/5 21/19
23/4 32/22 33/19 35/12 36/2 36/10
36/12 37/18 37/21 37/23 39/6 39/17
40/2 40/14 42/11 44/16 46/24 48/5
49/18 52/18 53/14 57/3 59/7 60/11
62/6 62/12 62/15 63/13 64/13 65/6
Justice [2] 57/19 58/16
justiciability [5] 48/13 48/19 48/25
49/18 51/24
justiciable [2] 48/5 51/5
justification [1] 43/10

**K**

Kavanaugh [3] 57/19 58/16 58/17
keep [1] 41/10
keeping [2] 9/23 34/2
Kentucky [1] 26/8
key [3] 10/16 22/12 27/7
Keys [1] 13/22
kicked [1] 8/4
kicks [1] 11/13
Kilbourn [5] 16/11 16/14 40/24 48/20
49/7
kill [2] 15/9 22/5
killed [1] 4/4
killing [1] 43/13
kind [2] 22/19 58/15
kinds [4] 14/10 42/19 42/23 60/23
king [1] 9/17
knew [4] 14/5 14/5 52/12 57/7
know [69]
knowledge [1] 7/25
knows [1] 60/18

**KY** [1] 1/13

lack [1] 44/14
language [6] 32/25 41/3 41/3 57/4
57/7 58/25
large [1] 5/4
last [3] 13/20 13/21 43/20
later [1] 21/14
law [30] 6/19 9/10 9/23 17/16 18/11
18/16 18/18 18/22 19/3 19/4 19/7
25/13 28/10 28/13 29/17 29/24 30/5
30/19 30/22 30/24 31/11 44/8 44/9
46/18 47/25 49/4 58/24 58/25 62/9
62/10
laws [4] 10/20 10/20 18/14 20/4
lawsuit [1] 10/23
leaking [1] 13/12
least [5] 4/11 4/19 27/6 47/21 65/10
leave [2] 41/2 55/16
Legacy [1] 30/20
legal [5] 20/7 63/19 64/11 64/19 64/25
legislating [1] 47/9
legislation [1] 18/21
legislative [13] 9/21 11/11 23/16 24/7
27/14 30/15 31/2 31/9 35/3 46/14 47/1
52/7 52/8
legislature [1] 49/8
legislatures [2] 10/3 37/6
less [1] 47/19
let [12] 6/3 9/22 14/19 20/5 32/22
37/23 46/24 47/24 48/5 52/18 52/19
59/7
let's [1] 25/24
Letter [3] 2/1 3/12 3/25
Letter's [1] 40/13
lies [1] 61/21
lifetime [1] 29/9
light [4] 4/13 45/6 46/2 58/5
lighter [1] 26/9
like [18] 10/19 14/10 14/11 16/18
19/22 21/4 21/24 22/6 23/2 23/23
35/21 40/2 57/23 58/10 58/15 62/2
63/11 64/9
likelihood [2] 11/22 46/6
likely [1] 10/5
liken [2] 28/17 48/19
limit [4] 28/15 41/13 41/14 54/4
limitation [1] 28/3
limitations [2] 54/7 54/14
limited [2] 17/7 46/12
limiting [1] 24/12 24/25 27/16 57/4
limitless [1] 54/15
limits [3] 25/10 36/6 41/12
line [2] 40/24 49/4
literally [1] 8/14
little [4] 8/8 21/19 31/16 50/4
living [1] 19/6 35/16
location [3] 7/5 47/4 47/6
long [2] 12/5 28/24
look [18] 12/14 27/16 36/9 36/10
40/17 40/19 44/18 44/19 46/21 49/6
49/7 49/17 49/21 50/15 50/19 50/21
51/1 60/7
looked [4] 32/10 51/4 53/12 57/25
looking [2] 21/3 65/11
looks [1] 26/8

## L

**loud [1]** 61/6
**lower [3]** 17/10 28/19 29/18
**lull [1]** 56/4

## M

**machine [3]** 2/17 67/4 67/9
**made [11]** 14/2 20/1 21/3 22/9 31/25 46/25 59/9 61/4 61/11 61/11 61/24
**Madison [1]** 29/3 52/10
**magazine [1]** 13/3
**mail.house.gov [2]** 2/4 2/8
**mailbox [1]** 26/7
**main [1]** 58/13
**maintain [1]** 30/17
**Majorie [1]** 3/9
**majority [5]** 9/6 10/1 14/2 31/2 39/13
**make [10]** 5/13 5/23 6/3 6/17 6/18 6/24 7/5 10/21 39/19 64/13
**makes [3]** 32/4 49/4 58/1
**making [5]** 3/23 18/2 19/15 43/14 54/7
**Mall [1]** 19/1
**man's [2]** 29/7 35/6
**mandate [2]** 23/13 27/25
**many [12]** 4/6 4/13 4/16 4/22 4/23 5/3 15/1 15/2 15/10 15/11 45/18 45/20
**mask [40]** 7/4 7/9 8/2 9/2 14/23 15/3 15/8 15/10 15/24 21/7 21/16 21/16 21/18 21/22 22/5 23/1 23/2 23/13 25/18 25/21 26/22 27/25 37/3 38/8 38/13 38/15 39/3 39/11 45/11 45/13 45/24 45/25 47/4 54/20 55/12 55/14 55/16 58/5 59/4 65/9
**masks [6]** 10/10 10/12 21/9 22/1 42/8 46/5
**MASSIE [3]** 1/3 3/3 3/7
**Massie's [1]** 26/7
**massive [1]** 4/3
**material [1]** 64/23
**materials [2]** 24/5 62/23
**matter [9]** 3/16 6/2 6/2 11/12 12/24 14/13 24/14 35/12 42/19
**may [18]** 4/14 8/12 10/14 14/3 15/9 19/7 19/7 19/12 24/16 25/18 38/17 39/25 41/18 41/19 50/24 52/15 53/5 65/7
**maybe [13]** 10/8 10/9 22/4 22/4 22/6 24/21 44/16 45/19 45/19 50/5 56/6 65/3 65/8
**McCarthy [8]** 10/22 12/3 16/20 39/21 39/24 50/15 60/1 61/4
**McCormack [3]** 16/13 33/23 48/20
**me [29]** 3/13 5/18 5/24 6/3 6/14 8/7 9/22 14/19 15/6 20/5 32/22 37/1 37/4 37/19 37/23 39/7 46/24 47/5 47/24 48/5 52/18 57/13 59/7 62/4 62/25 63/19 64/5 64/15 65/1
**mean [20]** 19/8 20/10 25/10 31/7 36/13 38/12 42/6 44/10 45/2 45/3 52/15 53/23 54/8 54/20 55/21 56/10 57/5 62/9 63/14 64/1
**meaning [4]** 28/14 29/14 32/6 53/20
**means [7]** 18/16 18/18 19/3 19/4 58/2 61/17 61/18
**meant [3]** 16/9 57/6 62/10
**meantime [1]** 43/6

**mechanism [1]** 10/24
**mechanisms [1]** 42/20
**media [1]** 45/19
**medical [4]** 5/15 6/18 25/15 26/11
**meet [1]** 45/4
**member [25]** 4/11 4/11 27/3 29/21 32/24 33/5 33/25 34/2 34/5 34/12 34/14 34/14 34/21 34/22 34/24 35/2 36/15 40/23 41/1 49/22 51/22 52/1 60/20 60/20 61/19
**member's [1]** 34/19
**members [60]** 4/5 4/6 4/8 4/15 4/16 4/21 5/7 5/12 6/11 6/17 6/19 8/1 8/2 8/20 8/25 9/3 9/17 9/23 10/10 10/11 11/7 15/1 15/11 15/21 16/1 16/4 17/20 18/12 19/20 21/25 22/16 22/25 25/12 27/20 28/5 29/25 30/9 30/12 30/17 33/12 36/4 37/12 38/3 38/7 38/13 39/1 39/13 40/14 40/16 40/20 42/17 45/5 47/1 52/16 53/4 53/19 53/22 58/19 61/25 65/13
**membership [1]** 38/23
**memorandum [1]** 63/19
**memory [1]** 59/16
**mention [3]** 12/12 13/20 43/4
**mentioned [1]** 16/17
**mere [2]** 36/22 58/4
**merits [2]** 16/25 24/9
**message [9]** 21/22 21/24 23/1 44/22 45/7 45/8 45/9 45/12 46/6
**messages [1]** 22/1
**messaging [1]** 45/22
**met [1]** 46/10
**method [3]** 24/18 26/3 41/21
**middle [4]** 28/6 29/19 43/20 59/4
**might [7]** 10/11 14/6 21/9 21/9 22/6 43/7 43/7
**mile [1]** 10/14
**miles [1]** 10/13
**million [3]** 18/2 18/3 18/9
**mind [2]** 12/4 12/5
**minority [2]** 27/20 31/3
**missed [2]** 23/5 24/21
**mode [2]** 24/18 41/20
**modern [1]** 59/1
**moment [1]** 8/7
**money [1]** 26/2
**more [18]** 5/13 6/17 6/19 10/5 11/25 12/1 12/2 15/2 22/10 25/23 40/24 45/19 47/19 52/15 58/25 60/18 61/1 65/25
**most [3]** 10/22 16/20 43/25
**motion [10]** 1/8 3/17 3/19 7/19 46/22 62/5 62/19 63/17 64/4 64/10
**Mr [2]** 50/19 61/8
**Mr. [2]** 30/21 40/13
**Mr. Bernstein [1]** 30/21
**Mr. Letter's [1]** 40/13
**much [4]** 3/24 12/6 23/8 43/19
**municipal [1]** 10/20
**must [2]** 9/10 19/21
**my [23]** 6/4 9/1 12/4 12/5 15/6 20/14 21/11 22/5 23/4 28/23 31/22 37/18 38/15 46/17 47/25 50/19 59/16 61/8 62/19 63/7 65/10 67/9 67/10
**myself [5]** 5/9 10/9 12/9 16/7 21/5

## N

**N.W [1]** 2/12
**name [1]** 67/11
**NANCY [2]** 1/5 3/3
**natural [1]** 41/11
**nature [7]** 8/11 10/12 10/13 29/6 35/6 47/17 55/22
**necessarily [6]** 4/20 4/22 40/7 45/7 47/14 48/18
**necessary [3]** 14/20 14/23 42/15
**need [16]** 5/24 6/4 6/23 14/14 28/16 44/19 47/11 47/14 48/1 49/17 55/19 63/18 64/4 64/11 64/19 64/25
**needed [1]** 5/4
**needs [1]** 50/4
**nervous [1]** 10/15
**new [1]** 26/18
**next [4]** 11/20 29/18 29/19 65/22
**no [34]** 1/4 11/17 12/13 14/14 17/1 17/1 17/14 19/23 24/12 24/25 25/23 25/25 26/1 27/16 32/23 33/6 33/6 33/8 33/9 34/4 34/7 36/6 37/8 37/8 41/12 41/14 42/4 42/16 50/14 54/4 56/24 59/13 61/5 65/3
**nobody [2]** 21/25 22/1
**nonjusticiable [1]** 51/14
**nonmembers [1]** 51/19
**Norman [1]** 3/8
**not [115]**
**notable [1]** 44/23
**note [2]** 7/22 12/9
**noted [1]** 51/6
**notes [1]** 67/9
**nothing [8]** 37/11 53/4 53/8 56/4 58/8 58/8 59/16 61/2
**notice [7]** 60/13 60/14 60/23 62/22 62/25 63/4 64/24
**notion [3]** 24/11 27/14 54/12
**now [14]** 8/24 9/3 10/8 11/20 14/17 15/24 21/2 25/4 31/6 39/2 51/10 57/19 64/10 65/20
**number [7]** 3/4 5/4 5/12 6/11 6/16 7/10 30/23
**numbers [1]** 16/3

## O

**O'Brien [1]** 22/10
**O'Neill [1]** 2/6
**objective [1]** 9/23
**obligated [1]** 14/24
**observations [1]** 27/18
**obtained [1]** 41/22
**obvious [1]** 22/13
**obviously [29]** 6/22 6/24 10/8 11/9 19/16 22/19 35/13 36/8 37/16 38/18 39/10 40/15 42/18 43/5 44/14 45/21 46/7 46/12 47/3 48/19 49/6 49/20 50/4 52/9 52/25 54/5 55/10 61/12 63/10
**occasionally [1]** 9/1
**occur [2]** 31/19 57/13
**occurred [3]** 44/4 52/22 56/13
**occurring [1]** 53/8
**occurs [1]** 33/3
**off [9]** 3/22 11/19 21/8 27/5 28/7 33/14 34/20 35/17 53/7
**office [13]** 2/2 2/2 2/5 2/6 3/14 5/19 5/20 7/8 9/1 26/17 27/10 28/25 35/23

US DC Case #22-5058    Document #1960691    Filed: 06/15/2022    Page 121 of 174

**O**

**officer [2]** 26/15 54/4
**officers [2]** 5/12 10/24
**offices [2]** 7/9 63/9
**official [7]** 2/11 60/14 63/4 63/5 63/6 67/2 67/8 67/14
**officials [2]** 14/11 25/13
**oh [3]** 1/17 16/9 65/7
**okay [8]** 19/11 21/17 22/8 32/3 35/19 37/15 39/20 44/2
**old [2]** 12/4 17/24
**older [1]** 12/4
**once [2]** 11/11 22/23
**one [40]** 4/11 4/11 5/13 13/20 13/21 16/20 16/20 17/15 17/15 18/2 18/15 18/23 24/3 27/18 28/1 28/7 28/18 29/8 29/15 29/22 30/3 30/18 31/1 31/19 31/23 32/5 32/18 32/19 32/20 35/9 37/25 39/19 42/18 46/14 47/14 49/11 49/18 52/14 53/12 54/9
**one's [3]** 26/10 26/12 28/10
**ones [3]** 17/25 17/25 43/25
**only [6]** 7/13 15/18 20/25 28/9 32/19 60/7
**oops [1]** 51/9
**opening [3]** 17/24 57/16 62/15
**operate [3]** 9/21 12/25 51/20
**operates [1]** 59/21
**operation [2]** 28/8 28/13
**operations [1]** 57/1
**opinion [6]** 5/24 6/1 14/2 31/7 57/18 57/19
**opinions [4]** 9/13 50/19 51/12 52/5
**opponent [2]** 42/14 57/12
**opponent's [1]** 60/5
**opportunity [3]** 63/20 64/7 64/21
**opposition [1]** 63/21
**options [1]** 42/23
**order [17]** 6/23 7/16 11/6 14/20 14/23 20/7 20/9 34/7 40/14 43/5 46/25 47/4 55/5 55/6 57/13 59/2 59/5
**ordered [1]** 55/15
**orders [1]** 60/15
**organization [1]** 13/3
**other [25]** 4/6 10/6 14/17 15/15 16/10 16/22 17/7 18/21 22/10 24/5 29/6 31/17 37/2 37/17 39/13 40/10 41/15 42/23 43/4 44/3 47/6 51/12 54/6 60/9 65/7
**otherwise [6]** 10/12 11/7 20/25 22/7 25/18 34/15
**our [22]** 5/3 7/19 8/14 13/23 13/25 13/25 17/23 18/1 19/25 22/11 29/4 31/7 41/25 41/25 42/1 43/25 43/25 52/25 57/16 57/17 58/22 62/15
**out [26]** 14/21 18/14 19/25 19/25 23/12 25/25 26/2 33/16 34/3 36/19 39/22 41/3 43/19 49/9 51/19 52/3 52/8 53/5 55/5 55/6 55/8 56/7 56/8 57/24 59/3 63/10
**outside [8]** 16/15 27/24 36/3 45/3 46/1 47/15 60/9 63/2
**over [13]** 4/4 10/15 12/16 22/3 22/20 25/6 29/7 32/7 32/8 35/6 35/7 52/7 56/7
**override [1]** 19/13
**overturn [1]** 9/5

**overwhelmed [1]** 65/20
**overwhelming [2]** 14/15 16/9
**overwhelmingly [1]** 16/5
**own [3]** 15/6 15/7 59/19

**P**

**p.m [4]** 1/6 48/3 48/4 66/3
**pack [1]** 45/5
**page [4]** 41/8 57/17 57/17 58/22
**pages [3]** 7/19 62/15 67/7
**pandemic [13]** 4/4 4/13 25/3 25/7 25/11 43/21 43/22 43/24 45/12 45/17 45/19 45/22 59/4
**papers [3]** 29/4 37/17 41/25
**parliament [2]** 9/17 31/11
**part [6]** 10/14 10/16 31/4 32/5 32/13 38/1
**participate [7]** 34/15 35/3 46/25 47/3 47/5 47/8 47/12
**participation [1]** 47/12
**particular [2]** 29/4 53/1
**particularized [2]** 44/21 46/5
**particularly [4]** 41/25 42/2 55/2 55/3
**parties [1]** 39/2
**parts [2]** 7/6 15/15
**party [3]** 13/2 40/6 40/7
**pass [2]** 29/11 29/12
**passage [1]** 44/9
**passed [7]** 4/9 18/17 19/4 26/16 31/17 49/10 62/10
**passes [1]** 8/8
**patent [1]** 27/22
**patently [1]** 24/13
**patience [1]** 65/17
**pause [2]** 6/7 37/22
**pay [4]** 10/16 19/17 26/5 26/7
**paycheck [4]** 36/12 36/18 36/20 36/21
**PELOSI [5]** 1/5 3/3 10/22 12/3 16/20
**penalties [1]** 8/22
**penalty [3]** 17/22 32/23 33/6
**pension [3]** 33/18
**people [24]** 7/16 10/5 15/2 15/9 15/10 15/18 22/20 22/25 25/6 25/17 34/6 35/19 35/24 42/22 43/7 43/7 43/13 43/14 45/15 45/18 55/13 55/24 56/16 59/5
**perceive [1]** 24/22
**perceived [1]** 14/20
**percent [3]** 15/25 18/24 49/4
**percentage [1]** 15/21
**perhaps [5]** 24/4 43/24 44/16 46/3 49/22
**permissible [1]** 43/10
**permitted [2]** 27/23 60/12
**personally [1]** 5/9
**persuaded [2]** 16/8 16/24
**petition [1]** 11/16
**phenomenon [1]** 43/13
**phone [1]** 56/22
**photograph [2]** 37/24 38/16
**photographs [1]** 65/12
**physical [2]** 58/9 58/15
**physically [1]** 21/14 57/23 59/16
**physician [11]** 4/3 7/3 7/14 7/21 7/24 8/22 15/12 15/22 22/16 23/19 60/16
**pincite [2]** 41/7 41/8
**Pittsburgh [1]** 56/7

**place [8]** 7/13 15/13 15/14 15/18 15/23 16/12 16/15 64/9
**places [2]** 7/7 9/9
**plaintiff [3]** 1/3 9/3 13/23
**plaintiff's [2]** 21/8 23/24 59/23
**plaintiffs [13]** 1/12 3/7 12/10 12/10 14/17 15/17 16/9 18/20 19/21 23/9 23/11 24/1 46/4
**plaintiffs' [2]** 50/11 52/19
**plausible [2]** 24/2 46/22
**play [2]** 36/22 37/5
**please [3]** 3/4 6/23 9/2
**pled [1]** 39/14
**plenty [1]** 31/13
**plexiglass [1]** 8/18
**point [16]** 7/23 12/3 12/6 12/12 19/25 27/7 32/4 33/4 39/19 40/9 49/25 51/17 54/17 55/7 55/18 56/24
**pointed [2]** 14/17 57/24
**pointing [1]** 23/12
**points [3]** 25/19 47/10 60/24
**poisoned [1]** 13/13
**police [5]** 5/3 5/12 6/13
**policies [1]** 12/8
**policy [5]** 15/13 16/1 16/6 38/20 38/23
**political [2]** 30/13 45/22
**posed [1]** 8/21
**position [7]** 34/13 37/4 40/13 41/11 46/17 60/4 64/16
**positions [1]** 45/16
**positive [2]** 4/19 51/7
**possible [3]** 20/25 25/16 65/19
**pounding [1]** 41/10
**Powell [7]** 16/13 33/23 34/21 40/9 48/20 49/7 49/25
**power [8]** 29/6 29/7 32/7 32/8 35/6 35/7 52/7 53/24
**powerful [2]** 35/16 35/16
**practical [3]** 11/9 36/12 42/19
**practice [2]** 11/25 11/25
**precedent [13]** 14/15 16/9 16/22 20/3 20/22 20/24 25/9 25/9 31/13 37/7 46/21 62/12 62/13
**preclude [1]** 62/4
**precluding [1]** 34/12
**presence [1]** 56/10
**present [1]** 47/7
**presentation [3]** 3/23 20/3 48/1
**presented [2]** 18/17 62/10
**Presentment [1]** 20/20
**preservation [1]** 19/16
**preside [1]** 56/7
**president [2]** 18/18 62/11
**presiding [1]** 55/4
**press [3]** 12/8 12/17 13/6
**pressed [1]** 62/4
**presumedly [1]** 11/22
**principle [4]** 24/13 25/1 27/16 40/8
**principles [4]** 23/14 36/9 42/2 44/1
**prior [3]** 7/16 26/16 33/6
**privilege [1]** 14/9
**probably [4]** 7/22 26/14 33/21 50/4
**problem [11]** 17/21 21/2 25/5 25/22 26/21 26/22 43/3 54/5 54/16 55/7 61/8
**problems [4]** 5/15 6/18 12/16 25/15
**proceeding [4]** 24/19 37/24 41/21 47/21

US3 Doc49058b3a-CD58 Document 1D982862 Filed: 06/15/20 Page 574 P58/24

# P

**proceedings** [15] 2/17 9/16 52/24 53/10 55/9 55/18 56/2 56/4 56/20 56/23 60/6 64/18 66/2 67/5 67/8
**process** [7] 34/16 35/3 36/14 40/3 42/23 47/1 47/8
**produced** [1] 2/17
**produces** [1] 13/3
**Professional** [1] 18/2
**professor** [2] 31/23 32/9
**prohibit** [2] 36/8 37/12
**prohibited** [1] 28/2
**prohibition** [2] 32/19 32/21
**prohibits** [1] 37/13
**promise** [1] 30/8
**promote** [1] 54/19
**pronouncements** [1] 43/18
**properly** [1] 51/20
**proposals** [1] 32/18
**prosecutorial** [1] 14/12
**prospect** [1] 35/25
**prospective** [3] 36/12 54/6 54/8
**protect** [5] 7/16 11/7 22/16 22/20 25/18
**protected** [3] 21/10 21/20 61/22
**protection** [2] 9/20 47/20
**provide** [7] 8/20 8/22 9/20 52/13 62/16 62/21 62/25
**provided** [1] 64/10
**providing** [2] 62/22 64/14
**provision** [3] 17/18 57/8 61/24
**proxy** [2] 39/24 47/13
**public** [3] 7/9 25/5 46/12
**publication** [1] 13/8
**punching** [1] 19/22
**punish** [3] 9/17 46/19 53/19
**punishable** [1] 54/13
**punished** [1] 53/22
**punishment** [1] 54/4
**punishments** [1] 37/2
**purpose** [8] 28/17 29/14 31/1 31/23 32/11 34/23 35/23 46/12
**purposes** [10] 19/16 30/2 30/3 30/4 30/18 31/1 31/8 31/23 31/24 53/6
**pursuant** [3] 48/7 48/11 59/11
**pursue** [1] 43/1
**pursued** [2] 13/25 42/25
**push** [1] 43/16
**put** [18] 10/2 10/18 10/18 14/4 15/14 15/23 17/18 18/1 22/15 22/18 22/19 23/1 25/11 55/13 55/15 55/24 56/16 61/14
**puts** [3] 11/19 40/9 40/24

# Q

**quarantined** [1] 4/21
**Query** [1] 62/17
**question** [13] 9/22 21/5 22/12 31/22 38/15 45/23 48/7 49/16 50/10 50/11 51/3 64/14 64/25
**questions** [2] 47/25 65/15
**quickly** [1] 65/11
**quite** [7] 4/19 10/17 15/13 16/12 17/11 22/24 58/1
**quote** [4] 29/6 58/16 58/18 59/1

# R

**raft** [1] 9/13
**raise** [3] 17/4 17/20 29/18
**raised** [1] 64/14
**raises** [1] 17/8
**raising** [1] 12/11
**Ralph** [1] 3/8
**Randal** [1] 2/5
**Rangel** [10] 13/1 13/9 13/10 13/16 16/21 27/18 40/21 50/16 59/25 61/4
**rather** [2] 23/14 23/24
**ratification** [2] 31/19 31/21
**RBW** [1] 1/4
**Re** [3] 3/2 19/25 58/14
**reach** [1] 49/16
**real** [2] 12/4 25/8
**realize** [4] 35/12 36/5 41/10 54/9
**realized** [1] 28/14
**really** [9] 12/6 17/24 23/13 23/16 27/15 38/1 61/6 63/15 65/16
**reason** [8] 16/8 16/24 20/18 29/3 29/20 34/18 35/4 40/13
**reasonable** [3] 24/18 41/20 48/16
**reasoning** [1] 53/18
**reasons** [1] 41/24
**recall** [4] 8/3 39/25 52/14 63/15
**recent** [4] 16/20 25/9 39/22 43/18
**recently** [3] 10/22 11/11 22/10
**recess** [1] 48/3
**recognized** [3] 39/12 46/10 65/10
**recognizing** [1] 52/13
**record** [1] 3/5
**recorded** [2] 2/17
**records** [3] 63/4 63/5 63/6
**reduce** [4] 26/12 26/15 29/13 34/22
**reduced** [5] 18/8 28/23 29/2 33/18 36/22
**reducing** [6] 26/20 27/9 28/5 29/24 30/7 37/6
**reduction** [13] 25/24 26/4 27/6 29/11 33/1 33/9 34/9 35/8 36/18 36/19 36/23 36/24 37/14
**reductions** [1] 28/15
**reelect** [1] 35/19
**reference** [5] 4/25 7/15 31/25 50/12 62/3
**referencing** [1] 19/9
**refusal** [1] 21/7
**refused** [1] 55/16
**refusing** [2] 10/10 59/3
**regarding** [6] 5/11 6/1 6/10 6/16 53/13 60/4
**REGGIE** [1] 1/9
**regulation** [3] 18/25 20/10 53/14
**regulations** [1] 12/20
**reiterate** [1] 62/6
**relation** [3] 24/18 41/20 48/16
**relied** [2] 22/11 60/1
**rely** [3] 24/8 37/17 58/13
**remarkable** [1] 34/11
**remember** [5] 8/6 15/12 20/14 51/24 52/3
**remembers** [1] 56/21
**remote** [1] 47/12
**removal** [1] 42/21
**remove** [1] 27/3
**removed** [3] 21/14 33/10 33/15

# R

**render** [1] 54/14
**repeat** [4] 6/9 15/15 50/23 64/25
**reply** [4] 17/22 50/9 57/1 58/22
**reported** [2] 60/20 67/4
**Reporter** [4] 2/11 2/11 67/2 67/14
**reports** [3] 13/2 13/4 13/12
**Representative** [2] 7/6 13/10 13/16
**REPRESENTATIVES** [6] 2/1 3/13 3/15 4/1 4/5 60/15
**reprimand** [2] 27/2 42/21
**reprimanded** [1] 33/10
**republican** [3] 16/1 16/3 38/3
**republicans** [1] 16/5
**request** [2] 6/24 63/23
**requested** [1] 64/23
**require** [2] 42/8 47/3
**required** [1] 15/3
**requirement** [11] 7/10 10/3 14/22 15/25 23/1 25/21 26/22 45/11 45/24 45/25 54/20
**requirements** [3] 7/3 7/4 8/21
**requiring** [1] 15/22
**requisite** [1] 27/3
**resolution** [12] 7/17 8/20 14/20 15/13 20/6 20/7 20/17 38/6 38/11 38/24 54/19 58/6
**resolve** [1] 43/25
**respect** [3] 25/23 29/16 34/9
**respond** [5] 23/7 52/19 53/17 64/7 64/21
**responding** [1] 63/23
**response** [4] 4/3 25/19 45/22 65/5
**restraints** [2] 24/17 41/19
**result** [6] 4/9 24/19 32/12 36/17 41/21 44/5
**resuming** [1] 48/3
**return** [1] 35/22
**reverse** [1] 59/25
**reversed** [1] 60/2
**review** [9] 23/20 23/21 30/5 30/19 30/22 30/25 51/9 60/6 62/19
**reviewed** [1] 49/5
**revoked** [1] 8/3
**right** [23] 9/4 12/23 16/19 19/7 19/10 19/12 20/13 20/14 27/21 28/2 28/24 29/1 32/15 33/16 34/5 37/8 37/9 41/3 49/25 61/13 62/11 65/6 65/20
**rights** [7] 13/24 15/4 19/1 24/17 31/20 41/19 48/16
**rise** [2] 31/12 53/1
**risk** [3] 55/13 55/24 56/17
**rock** [1] 64/9
**role** [1] 37/5
**room** [4] 2/12 45/24 47/6 47/16
**rooms** [4] 7/9 15/19 44/25 45/4
**RPR** [2] 2/11 67/14
**rule** [42] 18/4 18/10 18/22 20/6 20/7 20/11 20/16 23/15 24/19 26/18 28/13 29/12 29/12 29/23 33/2 38/6 38/11 39/24 40/7 40/8 41/21 44/24 45/6 46/3 47/13 47/18 48/14 49/10 51/10 52/9 52/10 53/14 54/12 54/13 54/25 54/25 57/3 58/10 58/11 58/12 65/7 65/8
**ruled** [2] 11/15 18/19
**rules** [39] 12/20 13/6 15/20 17/3 18/12 19/24 24/14 24/16 25/1 28/2 28/4 31/5 36/3 37/9 40/1 41/9 41/12 41/15 41/17

USCA Case #22-3038      Document #1971653      Filed: 06/13/2023      Page 123 of 174

**R**

**rules [20]** 41/18 41/24 48/14 49/5 53/21 53/22 53/23 53/24 54/10 57/6 57/7 57/9 57/20 58/2 58/3 59/1 59/5 59/15 59/19 59/20
**ruling [3]** 5/23 54/7 64/4
**run [1]** 18/4
**running [1]** 10/15

**S**

**safe [1]** 9/24
**safety [2]** 45/8 54/25
**said [33]** 3/25 11/11 12/10 12/14 12/21 12/24 13/10 13/14 13/18 13/23 14/2 15/17 16/10 20/16 31/23 34/4 38/7 50/15 51/15 52/3 52/5 53/13 54/18 57/18 58/13 58/17 58/20 59/8 59/9 61/19 62/7 65/4 67/8
**salary [5]** 28/23 29/13 30/7 34/10 37/6
**salient [1]** 55/3
**same [15]** 4/24 6/12 6/12 8/25 16/23 17/19 19/8 29/16 29/21 34/8 35/10 38/24 39/13 48/18 61/4
**Samuel [1]** 58/24
**sanction [2]** 51/21 58/19
**sanctions [1]** 43/8
**sat [1]** 31/20
**say [30]** 14/15 16/7 16/9 16/24 18/7 18/8 19/7 19/18 19/21 20/13 20/18 22/25 23/4 28/22 32/15 37/1 53/9 53/11 54/13 57/22 58/8 58/9 60/22 60/22 61/3 61/5 61/6 62/2 62/9 64/20
**saying [21]** 9/13 14/8 21/10 21/17 21/18 23/15 30/15 35/19 37/1 48/6 48/10 51/4 51/25 55/5 55/11 55/23 58/4 64/2 64/3 64/13 64/16
**says [19]** 9/2 17/15 17/16 19/19 21/16 22/11 28/19 28/23 32/16 42/14 50/22 51/8 51/25 52/14 55/19 57/13 57/19 57/24 59/1
**scary [1]** 45/13
**scattered [1]** 10/19
**scheduled [1]** 11/18
**scheme [1]** 10/18
**science [1]** 22/16
**scientific [1]** 7/25
**scope [2]** 62/18 63/16
**seat [1]** 41/1
**seated [1]** 34/6
**second [1]** 29/10
**Section [7]** 19/19 28/18 29/15 29/22 35/9 44/13 44/13
**security [1]** 5/3
**see [7]** 21/15 21/15 21/18 21/19 23/5 39/6 47/25
**seem [3]** 21/23 37/1 56/15
**seems [5]** 37/1 37/4 39/7 42/6 47/5
**seen [1]** 7/22
**selective [1]** 47/17
**self [1]** 4/21
**selfie [1]** 53/6
**Senate [3]** 12/16 41/17 47/2
**SENIOR [1]** 1/9
**sense [1]** 15/20
**separate [3]** 57/8 59/17 59/18
**Sergeant [3]** 11/3 11/4 12/7
**Sergeant-at-Arms [3]** 11/3 11/4 12/7

**seriously [2]** 11/25 45/19
**services [1]** 6/13
**session [1]** 45/3
**set [6]** 18/11 19/25 41/24 43/21 60/7 63/18
**sets [3]** 18/25 29/17 48/14
**setting [1]** 43/17
**Seventh [1]** 30/21
**several [3]** 7/19 10/21 30/4
**severity [1]** 45/16
**she [6]** 7/15 26/8 26/8 55/21 55/23 56/16
**she's [1]** 39/12
**sheriff [1]** 25/25
**short [1]** 47/24
**shorthand [3]** 2/17 67/5 67/9
**should [6]** 6/1 12/17 19/7 24/18 28/11 48/6 64/18
**shouldn't [3]** 15/3 20/15 61/23
**sick [2]** 43/7 43/14
**sicken [1]** 15/9
**sickened [4]** 4/6 4/14 4/17 5/4
**significant [2]** 15/20 25/5
**simply [7]** 25/11 43/21 53/20 54/13 55/1 57/5 60/11
**since [3]** 3/18 6/2 63/15
**sit [1]** 39/18
**situation [6]** 4/2 8/5 11/10 22/3 22/6 56/14
**slander [1]** 61/20
**Sleeper [1]** 30/20
**small [1]** 16/2
**snapped [1]** 53/5
**so [81]**
**some [39]** 4/15 5/2 7/23 10/6 10/11 13/6 14/17 16/8 16/10 20/10 20/18 21/25 22/3 22/6 22/18 22/19 27/17 29/12 32/9 33/11 35/1 40/11 43/8 47/6 49/20 49/21 49/22 52/15 53/20 54/17 56/20 58/9 59/7 61/17 62/16 63/10 64/4 65/8 65/15
**somebody [9]** 8/10 9/1 10/15 19/22 22/2 55/8 55/19 61/20 61/21
**somebody's [1]** 35/15
**somehow [7]** 29/12 33/21 35/8 39/8 55/9 56/2 56/19
**someone [4]** 31/24 49/8 49/24 53/13
**something [25]** 8/8 8/15 8/16 14/7 15/17 16/19 19/4 19/22 21/4 23/2 29/24 37/13 51/18 52/19 54/18 56/19 57/5 58/1 61/10 63/1 64/2 64/19 64/24 65/1 65/21
**sometimes [2]** 5/9 11/19
**sorry [2]** 57/20 58/17
**sort [8]** 10/6 15/5 22/18 44/10 45/6 56/11 56/15 58/9
**sorts [5]** 7/5 7/7 10/19 12/20 60/12
**sought [2]** 24/20 41/22
**source [1]** 63/2
**sources [1]** 32/10
**spaces [1]** 37/2
**SPAN [1]** 53/4
**speak [2]** 22/25 39/2
**speaker [11]** 10/23 11/3 27/24 36/2 36/7 38/22 39/11 54/17 55/11 55/14 56/12
**speakers [1]** 38/15

**speaking [3]** 38/7 38/14 65/9
**specific [1]** 23/15
**specifically [3]** 9/6 52/14 57/10
**speech [50]** 9/11 9/13 9/14 11/2 11/6 11/12 13/1 13/17 13/19 14/1 16/11 20/15 21/4 21/6 21/10 21/15 21/17 21/19 21/22 21/23 22/27 33/22 34/4 34/7 39/22 40/18 46/11 46/13 46/19 46/20 47/19 48/11 48/17 48/22 49/16 49/23 50/16 50/17 50/24 51/3 51/10 51/14 51/25 53/6 59/11 59/18 61/1 61/9 61/12 61/22
**speeches [1]** 15/18
**speeding [2]** 36/15 36/15
**Spence [2]** 44/18 46/9
**spoken [1]** 44/17
**staff [20]** 4/6 4/8 4/12 4/15 4/16 4/25 5/7 5/12 6/12 6/17 6/19 8/2 9/23 11/7 22/17 25/13 40/14 40/15 40/19 59/20
**staffers [2]** 13/12 15/21
**stage [4]** 39/15 47/21 60/6 64/18
**stand [4]** 13/20 60/21 61/2 61/19
**standard [5]** 23/20 23/21 39/14 46/23 60/5
**stands [2]** 27/12 59/18
**started [1]** 52/3
**state [1]** 10/20
**stated [2]** 35/5 42/4
**STATES [11]** 1/1 1/10 10/4 15/2 23/17 24/15 25/9 41/6 43/11 48/21 67/3
**statistic [1]** 6/10
**statistics [11]** 4/12 5/2 5/11 5/17 6/25 23/19 62/14 62/17 63/9 63/13 63/23
**statute [3]** 17/6 19/4 29/23
**statutory [1]** 26/15
**still [3]** 15/25 29/23 65/10
**stop [2]** 52/24 56/2
**stopped [1]** 53/8
**stops [2]** 53/4 56/19
**strip [1]** 34/14
**stripped [1]** 33/12
**stripping [2]** 37/3 42/22
**strong [1]** 61/25
**subject [1]** 25/16
**submit [21]** 28/1 28/12 29/13 31/4 34/8 35/10 35/17 39/23 41/23 45/5 46/2 46/11 48/22 54/5 63/11 63/17 63/20 64/1 64/2 64/19 64/23
**Subpoenas [1]** 58/14
**subscribed [1]** 67/10
**subvert [1]** 35/9
**such [3]** 21/22 46/7 46/8
**suggest [5]** 27/15 33/22 36/22 44/8 49/25
**suggested [1]** 22/2
**suggesting [11]** 14/7 24/22 24/25 25/3 32/23 39/8 45/9 48/24 49/14 56/12 56/15
**suggestion [1]** 33/20
**suggests [12]** 18/20 33/19 38/20 39/10 40/21 41/9 43/16 43/19 47/18 49/5 54/8 61/25
**suit [2]** 9/10 12/6
**Suite [2]** 1/13 1/17
**supplemental [1]** 63/18
**support [3]** 22/12 22/22 62/4
**supports [1]** 46/18

JA 121

US Supreme Case #22-585B     Document #28030802     Filed 06/16/1985     Page 124 of 174

**S**

supposed [2] 22/3 49/11
supposed [2] 11/20 37/5
suppression [2] 22/13 22/23
Supreme [21] 9/12 11/5 11/15 11/22
13/22 14/2 14/8 14/16 16/18 21/3 22/9
24/15 25/9 31/13 34/3 43/18 50/5 59/8
60/2 61/15 61/18
sur [1] 11/16
sur petition [1] 11/16
sure [11] 6/4 8/6 10/15 11/24 14/25
20/17 21/12 22/7 56/21 65/12 65/14
susceptible [4] 5/14 6/18 6/19 25/13
suspect [2] 8/25 21/7
sustenance [4] 29/7 30/12 32/7 35/7
symbolic [1] 46/11
symptoms [1] 4/20
system [3] 8/20 18/22 22/15

**T**

table [7] 21/8 27/6 28/7 33/13 33/14
34/20 35/17
take [21] 3/22 5/24 23/24 26/4 27/18
36/13 36/21 40/12 41/11 43/5 44/6
45/15 46/17 47/24 60/12 60/13 60/23
62/17 62/22 64/16 64/24
taken [11] 27/5 28/7 34/20 38/5 38/6
39/6 42/15 48/3 55/25 56/13 56/17
takes [1] 26/7
taketh [1] 37/10
taking [6] 21/8 26/2 26/17 35/15 41/25
49/24
talk [4] 8/14 13/21 32/14 36/11
talking [9] 5/5 8/13 8/13 8/15 8/16 9/3
43/13 51/9 51/10
talks [4] 31/13 32/9 54/9 57/8
target [1] 33/25
tax [2] 36/20 36/20
Taxes [1] 26/10
Taylor [1] 3/9
Taylor-Greene [1] 3/9
tbruns [1] 1/18
team [2] 14/4 18/6
tell [2] 14/3 15/6
telling [2] 8/6 51/11
tells [2] 20/24 62/8
term [10] 18/18 27/10 27/21 28/6
28/20 28/22 29/18 29/19 53/21 53/25
terms [4] 25/1 41/15 44/15 48/17
terrible [2] 13/11 14/14
terribly [2] 13/24 61/20
test [4] 40/18 43/25 44/18 44/21
tested [1] 4/19
testimony [1] 67/5
Texas [1] 22/10
text [1] 38/24
than [8] 18/21 24/5 31/16 41/15 42/23
47/5 60/18 65/25
Thank [10] 3/20 3/24 7/1 23/8 47/23
50/7 50/8 57/10 57/11 66/1
that [462]
that's [54] 5/24 8/13 8/18 11/8 12/5
15/19 17/2 17/22 18/18 19/10 21/12
21/17 21/19 21/24 22/2 23/6 26/18
28/24 32/25 33/16 36/5 36/17 37/14
37/20 40/3 43/2 43/12 43/13 45/18
47/20 48/17 48/18 49/12 49/21 49/24

51/11 51/23 53/9 53/18 54/15 55/7
55/9 57/23 58/24 59/22 59/22 61/23
61/24 63/12 64/2 64/12 64/16 65/16
65/16
their [29] 9/8 11/25 12/11 15/5 20/25
21/9 21/22 22/1 23/1 23/22 24/6 26/12
26/15 28/4 30/12 30/13 31/3 33/18
34/15 34/22 36/18 36/19 37/6 41/17
43/1 44/7 44/12 51/4 58/21
them [23] 4/22 5/4 5/13 5/21 6/17 6/19
15/9 25/18 26/17 26/19 28/7 32/5 37/3
42/1 43/1 43/6 50/21 50/22 55/8 55/15
63/20 64/6 64/20
themselves [5] 11/8 17/20 25/16
25/17 30/9
then [46] 4/20 7/3 7/4 7/7 8/3 8/10
8/11 9/5 9/7 11/12 13/1 13/9 13/13
13/18 17/18 18/9 18/11 18/17 19/18
21/14 21/22 22/10 24/1 24/9 26/2 27/8
27/9 31/18 32/22 33/3 33/4 36/6 38/14
38/19 38/20 44/12 51/8 52/2 53/6
53/21 55/15 55/15 56/24 58/16 64/6
64/14
there [114]
there's [37] 4/10 10/6 11/11 11/22
16/10 18/11 23/18 25/25 26/1 26/17
26/18 27/8 28/4 30/5 31/6 32/8 33/3
34/11 37/11 39/11 40/11 40/21 41/16
42/19 42/23 43/18 44/8 44/15 45/12
48/12 49/3 49/12 49/20 55/1 56/24
57/8 58/7
therefore [1] 11/19 11/21 55/13 60/7
Thereupon [2] 48/3 66/2
these [30] 5/17 5/21 7/10 8/21 12/12
12/19 15/11 15/19 24/4 29/25 30/12
31/5 32/9 34/6 34/9 36/9 38/3 41/9
41/24 43/23 43/23 45/6 51/12 52/5
53/4 59/17 60/9 60/23 60/24 61/2
they [104]
they're [27] 11/24 12/11 13/7 16/19
16/21 19/13 19/15 20/2 21/25 24/25
26/3 26/3 27/9 36/13 36/14 37/5 47/2
47/6 49/19 50/23 50/23 51/15 52/4
55/14 59/13 60/19 65/14
they've [4] 16/22 17/1 21/2 40/10
thing [6] 16/23 19/8 46/14 52/1 61/16
61/19
things [17] 8/6 13/11 18/21 28/4 31/15
33/13 34/20 35/24 40/1 43/4 52/10
52/15 54/10 59/14 60/12 60/24 65/7
think [103]
thinking [1] 11/25
third [2] 40/6 40/7
thirds [3] 27/3 33/16 42/22
this [114]
THOMAS [4] 1/3 1/15 3/3 3/7
Thompson [1] 48/21
those [28] 7/4 16/17 16/19 20/4 20/4
20/12 26/15 26/16 34/24 39/15 42/2
43/4 43/8 47/21 49/13 50/5 50/18
50/22 51/2 51/5 56/11 61/5 62/8 62/9
62/14 62/16 62/17 65/13
though [6] 7/11 10/11 39/12 43/5
46/24 59/25
thought [3] 7/15 9/19 17/25
thousand [1] 18/7
threat [1] 22/4

three [4] 25/19 49/6 50/22 55/5
through [8] 7/20 24/16 25/23 28/8
31/3 36/14 36/15 56/10
throughout [3] 10/19 19/8 38/25
ticket [3] 26/2 36/15 36/16
time [7] 6/14 21/9 31/14 32/18 43/5
51/13 53/8
times [3] 8/1 43/23 43/24
Tinker [1] 44/20
tiny [2] 16/2 16/4
today [7] 3/17 5/18 5/23 7/11 21/7
24/12 44/18
Tom [1] 3/7
too [4] 13/22 21/2 51/18 59/15
took [4] 16/12 16/15 35/17 45/19
total [1] 61/21
totally [1] 20/11
Touch [1] 22/5
Town [1] 1/12
transcend [1] 23/15
transcribed [1] 67/9
transcript [3] 1/8 2/17 67/8
transcription [1] 2/17
traverse [1] 47/14
trial [1] 56/7
true [9] 4/24 15/19 23/25 25/5 29/16
34/9 39/13 42/1 43/12
try [2] 19/14 65/17
trying [1] 22/16
turn [1] 65/23
turns [1] 63/10
Twenty [1] 30/21
two [21] 25/4 27/3 33/16 40/1 42/21
47/10 48/12 49/3 50/3 59/14 59/17
types [1] 17/7
tyranny [1] 21/17

**U**

U.S [7] 2/1 2/12 3/12 3/14 34/3 41/7
43/18
unconstitutional [5] 13/15 34/7 48/15
49/10 52/11
under [11] 9/11 14/16 16/25 19/2
20/12 32/23 34/21 34/21 46/22 56/11
62/12
underlying [4] 5/14 6/18 25/15 52/1
undermines [1] 29/14
understand [6] 3/20 16/14 28/17
38/13 58/11 63/24
understanding [5] 10/5 31/12 31/14
32/11 54/23
understood [3] 19/23 46/7 53/23
unfortunately [1] 43/23
unilaterally [1] 38/23
Union [10] 12/4 16/23 40/11 50/16
51/7 51/16 51/17 59/22 59/25 61/5
UNITED [11] 1/1 1/10 10/4 15/2 23/17
24/14 25/9 41/6 43/11 48/21 67/3
unless [1] 33/2 62/24
unrelated [2] 22/13 22/22
until [5] 31/19 55/12 55/15 56/12
56/16
up [14] 6/24 7/5 10/7 13/20 20/18 22/3
30/10 32/20 35/14 51/16 60/21 61/3
61/11 61/19
upon [1] 65/4
urge [1] 59/24

USCA4 Case #22-1058   Document #1985667   Filed: 06/15/2022   Pg 125 of 174

## U

**use [3]** 14/15 62/8 63/6
**use [1]** 45/2
**used [4]** 53/6 53/21 53/25 57/7
**uses [2]** 17/23 57/4
**utilized [1]** 40/16

## V

**vacation [1]** 65/22
**vaccinated [3]** 8/2 56/9 56/10
**valid [5]** 17/1 22/7 58/11 58/12 61/12
**validity [1]** 10/24
**Vanceburg [1]** 26/8
**variance [1]** 32/21
**variant [1]** 8/4
**varied [1]** 4/20
**various [4]** 4/21 7/3 7/20 63/8
**vary [2]** 29/17 32/17
**varying [5]** 27/9 36/11 40/23 42/24 44/9
**version [1]** 23/23
**versus [14]** 3/3 10/22 12/3 13/9 16/13 16/20 18/15 33/23 41/6 48/20 48/20 48/21 52/9 62/7
**very [28]** 3/24 4/14 5/3 6/6 9/19 12/6 13/6 13/15 14/3 16/21 18/2 23/8 30/5 30/5 31/5 37/21 37/21 51/16 52/5 55/20 59/3 60/1 60/20 61/16 61/19 61/25 62/4 65/6
**video [2]** 52/25 53/3
**viewpoint [1]** 46/16
**views [1]** 15/11
**violate [5]** 19/1 24/17 41/19 48/15 54/11
**violated [5]** 12/23 13/24 27/13 44/7 61/3
**violates [7]** 15/4 15/5 17/2 18/5 18/12 21/1 44/10
**violating [9]** 21/11 40/23 43/2 43/11 58/2 58/2 58/10 58/11 59/15
**violation [21]** 3/23 18/4 18/9 22/24 27/22 35/9 40/8 40/25 42/2 44/3 44/23 46/18 49/15 51/25 53/20 53/22 54/12 54/14 57/3 57/6 57/20
**violations [2]** 19/24 44/4
**virus [9]** 4/9 4/17 5/14 6/12 8/9 8/9 25/14 47/20 55/23
**VOLLMAR [1]** 1/16
**voluntarily [1]** 47/7
**vote [5]** 33/16 39/24 40/3 47/13 53/7
**voted [1]** 13/16
**votes [1]** 7/13
**voting [1]** 10/24

## W

**wait [4]** 55/24 56/11 56/12 56/16
**waited [2]** 55/12 55/15
**Wakes [1]** 30/20
**walk [1]** 53/5
**walked [1]** 53/7
**WALTON [1]** 1/9
**want [30]** 6/9 6/22 10/16 12/9 16/7 17/19 21/4 21/16 22/18 22/25 23/1 23/4 23/12 27/11 27/17 27/13 29/23 30/6 33/8 39/17 44/11 44/16 47/8 52/6 56/9 59/24 64/1 65/1 65/16 65/21
**wanted [5]** 23/18 24/7 29/8 39/19 41/2

**wants [2]** 24/23 60/21
**warned [1]** 56/22
**warnings [2]** 49/5 9/2
**was [110]**
**Washington [4]** 1/5 2/3 2/7 2/13
**wasn't [4]** 13/16 13/17 55/4 59/16
**way [16]** 8/25 15/10 15/24 17/11 17/25 24/3 29/10 29/21 35/1 35/11 37/12 43/8 51/17 56/20 59/15 65/7
**ways [2]** 29/9 51/19
**we [120]**
**we'll [3]** 6/24 63/13 64/22
**we're [24]** 4/2 5/5 7/11 8/13 8/13 8/15 8/15 9/3 23/15 28/12 35/19 35/22 37/17 39/14 40/3 40/6 42/10 47/19 51/9 51/10 51/11 54/9 55/22 62/20
**we've [9]** 6/25 22/11 38/1 40/10 44/12 44/14 47/20 48/19 49/23
**wear [22]** 8/2 10/10 10/12 15/3 15/8 15/10 21/7 21/16 21/18 25/18 27/4 37/3 38/8 38/13 38/15 42/8 45/11 45/13 47/4 55/2 59/4 65/9
**wearing [4]** 14/23 21/16 39/3 55/14
**weigh [2]** 7/14 35/24
**well [30]** 4/14 5/10 6/6 11/7 12/10 15/12 15/16 16/10 24/4 24/21 24/24 25/12 26/14 28/11 34/1 34/11 35/21 36/7 38/12 38/19 38/22 39/9 42/14 43/12 44/6 45/15 47/10 55/20 56/25 61/6
**went [3]** 32/18 33/25 65/15
**were [26]** 8/1 9/4 9/17 12/19 12/20 13/6 14/5 14/8 22/20 22/21 26/6 26/16 30/4 31/14 33/25 38/7 38/14 47/18 49/14 52/12 53/23 54/3 56/10 56/16 57/7 65/13
**what [83]**
**what's [5]** 7/24 30/23 49/21 60/4 63/14
**whatever [4]** 6/25 20/6 37/4 63/13
**whatsoever [1]** 56/5
**when [19]** 3/22 8/1 9/16 10/5 11/24 14/4 14/6 15/24 21/3 35/15 36/9 38/5 38/13 45/2 46/21 49/6 57/4 62/9 65/1
**whenever [2]** 5/8 9/1
**where [26]** 4/2 7/8 7/13 10/23 11/10 12/17 15/18 16/11 16/13 22/4 23/18 39/11 39/11 44/23 44/24 44/24 45/4 45/5 46/3 47/4 47/6 47/7 47/17 47/18 51/2 55/3
**whereof [1]** 67/10
**whether [18]** 4/12 6/23 13/16 13/17 24/2 31/22 31/24 36/20 42/20 42/20 42/21 42/22 43/19 51/5 52/21 60/8 61/1 64/15
**which [23]** 9/5 18/10 24/19 27/6 31/12 32/19 32/20 33/4 39/22 39/24 40/9 40/10 40/24 40/25 41/5 41/22 42/24 44/10 44/10 47/18 50/16 56/23 62/3
**whichever [1]** 17/11
**while [4]** 12/1 15/13 16/12 65/9
**who [25]** 4/9 5/7 5/13 6/11 6/11 6/17 8/25 9/4 9/17 10/10 10/11 12/8 12/20 15/3 15/10 22/17 25/17 26/7 33/25 38/7 55/13 56/8 56/10 57/19 59/13
**who's [4]** 3/8 3/8 11/12 16/4
**whole [1]** 9/13
**whose [1]** 34/12

**why [24]** 8/18 14/19 14/22 20/18 21/18 21/25 27/12 28/20 29/13 31/14 36/7 39/24 45/23 45/25 50/22 55/21 56/25 59/3 59/22 61/13 62/4 64/5 64/20 65/14
**widely [1]** 60/20
**Wiest [4]** 1/12 3/7 23/11 50/19
**Wiest's [1]** 61/8
**wife [1]** 26/7
**will [15]** 7/22 11/17 11/17 17/16 17/17 29/7 31/3 32/8 35/7 62/14 62/22 63/7 64/6 64/19 64/24
**willing [1]** 25/17
**wish [2]** 5/17 5/21
**wishes [1]** 5/18
**within [9]** 5/13 5/25 7/7 28/13 32/6 46/13 54/21 62/1 62/5
**without [21]** 9/24 27/7 28/6 29/20 30/8 31/21 32/16 33/16 33/17 34/23 35/18 35/18 39/2 42/16 42/25 43/1 44/9 46/5 55/12 58/5 63/1
**witness [1]** 67/10
**won't [3]** 21/18 63/11 63/12
**word [2]** 17/22 36/22
**work [3]** 10/9 11/6 40/20
**world [1]** 7/25
**worn [2]** 22/1 54/20
**would [78]**
**wouldn't [5]** 4/20 4/22 19/14 45/20 62/24
**writing [1]** 26/1
**written [3]** 5/24 6/4 65/19
**wrong [5]** 14/1 21/9 50/24 57/15 60/11

## Y

**yeah [3]** 39/1 52/14 64/8
**year [1]** 18/9
**years [3]** 14/10 25/4 31/21
**yes [18]** 3/22 4/10 6/21 7/2 8/15 13/5 14/25 19/12 30/18 30/24 42/13 48/2 48/9 52/20 58/7 58/7 63/5 63/7
**yet [25]** 25/8 43/15 53/24
**you [224]**
**you'd [2]** 20/17 62/2
**you'll [1]** 8/7
**you're [26]** 3/22 8/25 10/15 15/8 16/8 16/24 19/9 21/3 21/15 28/18 30/15 31/18 34/18 35/15 42/9 48/24 51/3 53/25 56/11 58/4 63/17 63/19 64/3 64/12 65/9 65/10
**you've [6]** 15/1 35/21 44/2 48/13 63/10 64/23
**your [118]**
**yourselves [1]** 3/4

## Z

**zero [1]** 30/7
**zone [1]** 10/14

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HON. THOMAS MASSIE, in his official and individual capacities, <u>et al.</u>, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 21-2023 (RBW) |
| v. | ) ) | |
| HON. NANCY PELOSI, in her official capacity as Speaker of the United States House of Representatives, <u>et al.</u>, | ) ) ) ) | |
| Defendants. | ) ) | |

## <u>ORDER</u>

In accordance with the Memorandum Opinion issued on this same date, it is hereby

**ORDERED** that the Motion to Dismiss of Defendants Nancy Pelosi, William J. Walker, and Catherine Szpindor, ECF No. 31, is **GRANTED**.  It is further

**ORDERED** that the Plaintiffs' Verified Complaint for Declaratory and Injunctive Relief, ECF No. 1, is **DISMISSED**.  It is further

**ORDERED** that this case is **CLOSED**.

**SO ORDERED** this 9th day of March, 2022.


REGGIE B. WALTON
United States District Judge


JA 124

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HON. THOMAS MASSIE, in his official and individual capacities, <u>et al.</u>,<br><br>Plaintiffs,<br><br>v.<br><br>HON. NANCY PELOSI, in her official capacity as Speaker of the United States House of Representatives, <u>et al.</u>,<br><br>Defendants. | Civil Action No. 21-2023 (RBW) |

## <u>MEMORANDUM OPINION</u>

The plaintiffs, the Honorable Thomas Massie, the Honorable Marjorie Taylor Greene, and the Honorable Ralph Norman, all members of the United States House of Representatives (the "House"), bring this civil action against the defendants, the Honorable Nancy Pelosi, in her official capacity as Speaker of the House; William J. Walker, in his official capacity as the Sergeant-at-Arms of the House; and Catherine Szpindor, in her official capacity as the Chief Administrative Officer of the House.  <u>See</u> Plaintiffs' Verified Complaint for Declaratory and Injunctive Relief ("Compl.") ¶¶ 5–10, ECF No. 1.  The plaintiffs allege violations of the Twenty-Seventh Amendment to the United States Constitution, <u>see</u> <u>id.</u> ¶¶ 49–54; Article I, Section 5 of the Constitution, <u>see</u> <u>id.</u> ¶¶ 55–59; Article I, Sections 6 and 7 of the Constitution, <u>see</u> <u>id.</u> ¶¶ 60–67; and the First Amendment to the Constitution, <u>see</u> <u>id.</u> ¶¶ 68–75.  Currently pending before the Court is the defendants' motion to dismiss the plaintiffs' Complaint.  <u>See</u> Motion to Dismiss of Defendants Nancy Pelosi, William J. Walker, and Catherine Szpindor ("Defs.' Mot.") at 1, ECF

No. 31.  Upon careful consideration of the parties' submissions,[1] the Court concludes for the following reasons that it must grant the defendants' motion and dismiss the plaintiffs' Complaint.

## I.       BACKGROUND

The following allegations are taken from the plaintiffs' Complaint, unless otherwise noted.

### A.     Regulatory Background

On May 15, 2020, in response to the COVID-19 pandemic, the 116th Congress "enacted H[ouse] Res[olution] 965, which, among other things, created a 'covered period,' during which members of Congress could vote by proxy."  Compl. ¶ 15 n.5.  House Resolution 965 stated that

> at any time after the Speaker or the Speaker's designee is notified by the Sergeant-at-Arms, in consultation with the Attending Physician, that a public health emergency due to a novel coronavirus is in effect, the Speaker or the Speaker's designee, in consultation with the Minority Leader or the Minority Leader's designee, may designate a period (hereinafter in this resolution referred to as a "covered period") during which a Member who is designated by another Member as a proxy . . . may cast the vote of such other Members or record the presence of such other Member in the House.

H.R. Res. 965 § 1(a), 116th Cong. (May 15, 2020), https://www.congress.gov/bill/116th-congress/house-resolution/965/text.  House Resolution 965 further provided that "a covered period shall terminate [forty-five] days after the Speaker or the Speaker's designee designates such period[,]" but that

> [i]f, during a covered period, the Speaker or the Speaker's designee receives further notification from the Sergeant-at-Arms, in consultation with the Attending Physician, that the public health emergency due to a novel coronavirus remains in effect, the Speaker or the Speaker's designee, in consultation with the Minority

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Memorandum in Support of Defendants' Motion to Dismiss ("Defs.' Mem."), ECF No. 31; (2) the Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Pls.' Opp'n"), ECF No. 35; (3) the Reply in Support of Defendants' Motion to Dismiss ("Defs.' Reply"), ECF No. 43; (4) the defendants' Notice of Supplemental Authority ("Defs.' 1st Notice"), ECF No. 45; and (5) the defendants' Notice ("Defs.' 2d Notice"), ECF No. 46.

Leader or the Minority Leader's designee, may extend the covered period for an additional [forty-five] days.

Id. § 1(b)(1).  Since the passage of House Resolution 965 on May 15, 2020, the covered period "has been repeatedly extended by the Speaker[,]" Compl. ¶ 15 n.5,[2] and, on January 4, 2021, House Resolution 965 was incorporated by the 117th Congress in House Resolution 8, see H.R. Res. 8, 117th Cong. (Jan. 4, 2021), https://www.congress.gov/bill/117th-congress/house-resolution/8/text?q=%7B%22search%22%3A%5B%22house+resolution+8%22%2C%22house%22%2C%22resolution%22%2C%228%22%5D%7D&r=3&s=6 (providing that "House Resolution 965, One Hundred Sixteenth Congress, shall apply in the One Hundred Seventeenth Congress in the same manner as such resolution applied in the One Hundred Sixteenth Congress" with minor changes); Compl. ¶ 15 n.5 (alleging that, "[o]n or about January 4, 2021, the House . . . , in the 117th Congress, enacted H[ouse] Res[olution] 8, which, among other things, incorporated the 2020 H[ouse] Res[olution] 965 with certain changes not material to this matter").

---

[2] The plaintiffs' Complaint includes allegations regarding the Speaker's actions in extending the covered period. See Compl. ¶ 15 n.5.  To the extent that these allegations challenge the Speaker's authority to extend the covered period, the Court concludes that the Speaker is entitled to Speech or Debate Clause immunity for her extensions of the covered period.  In McCarthy v. Pelosi, the Circuit held that the Speaker's designation of a covered period is protected by the Speech or Debate Clause.  See 5 F.4th 34, 41 (D.C. Cir. 2021), cert. denied, 142 S.Ct. 897 (2022) (concluding that "conduct implementing the [ ] resolution [establishing internal rules for proxy voting] . . . is itself a legislative act" and "falls comfortably within the immunity afforded by the Speech or Debate Clause").  The Speaker's extension of the covered period is triggered by the same mechanism as the initial designation of a covered period.  Compare H.R. Res. 965 § 1(a) (stating that the Speaker may designate a covered period "at any time after the Speaker or the Speaker's designee is notified by the Sergeant-at-Arms, in consultation with the Attending Physician, that a public health emergency due to a novel coronavirus is in effect"), with id. § 1(b)(1)–(2) (stating that the Speaker may extend a covered period if she "receives further notification from the Sergeant-at-Arms, in consultation with the Attending Physician, that the public health emergency due to a novel coronavirus remains in effect").  And, like the initial designation of a covered period, the extension of a covered period concerns the "implementation of proxy voting[,]" McCarthy, 5 F.4th at 39.  Therefore, in light of the Circuit's holding in McCarthy that the designation of a covered period is a legislative act, see id., and the fact that the plaintiffs make no argument as to why the extension of the covered period is not controlled by McCarthy, see generally Pls.' Opp'n, the Court concludes that the Speaker's extension of the covered period for proxy voting is a legislative act entitled to Speech or Debate Clause immunity.

JA 127

1. **The House's Mask Policy**

On January 4, 2021, the Speaker announced the following policies regarding "conduct during a covered period" ("the House's mask policy"):

> [u]nder clause 2 of rule I, the Chair is required to preserve order and decorum in the [House] Chamber.[3]  This includes the responsibility to ensure the protection of Member and staff safety and health during proceedings.  This responsibility is of paramount importance, particularly in the midst of a pandemic.  As such, the Chair wishes to stress the importance of safe practices.  Members and staff will be required to wear masks at all times in the [House Chamber] without exception, including while Members are under recognition.  Members will not be recognized unless they are wearing a mask, and recognition will be withdrawn if they remove their mask while speaking.  The Chair expects all Members and staff to adhere to this requirement as a sign of respect for the health, safety, and well-being of others present in the Chamber and surrounding areas.  Members and staff will not be permitted to enter the [House Chamber] without wearing a mask.  Masks will be available at the entry points for any Member who forgets to bring one.  The Chair views the failure to wear a mask as a serious breach of decorum.  The Sergeant-at-Arms is directed to enforce this policy.  Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes.  Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby.  The Chair will continue the practice of providing small groups of Members with a minimum of [five] minutes within which to cast their votes.  Members are encouraged to vote with their previously assigned group.  After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote.  It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity be maintained in the Chamber at all times.  To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing.  All announced policies, including those addressing decorum in debate and the conduct of votes by electronic device, shall be carried out in harmony with this policy during the pendency of a covered period.

---

3 The parties refer interchangeably to the "House Chamber" and the "Hall of the House."  Compare Compl. ¶ 14 (referring to the "Hall of the House"), with id. ¶ 57 (referring to the "House Chamber"); Defs.' Mem. at 16 (referring to the "Hall of the House"), with Defs.' Reply at 16 (referring to the "House Chamber").  Because the two terms refer to the same room, see House Chamber, Architect of the Capitol, https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building/house-wing/house-chamber (last visited Mar. 9, 2022) ("The House Chamber, also known as the 'Hall of the House of Representatives,' is a large assembly room located in the center of the U.S. Capitol's south wing."), the Court will refer to the room as the "House Chamber."

167 Cong. Rec. H40–41 (daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore),

https://www.congress.gov/congressional-record/2021/1/4/house-section/article/H38-7; see

Compl. ¶ 17 & n.9.

### 2. House Resolution 38

On January 12, 2021, the House "enacted H[ouse] Res[olution] 38[,]" Compl. ¶ 15,

which stated, inter alia:

> SEC. 4. (a) During a covered period designated pursuant to section 3(s) of House
> Resolution 8—
>
>> (1) the Sergeant-at-Arms is authorized and directed to impose a fine
>> against a Member, Delegate, or the Resident Commissioner for the failure
>> to wear a mask in contravention of the Speaker's announced policies of
>> January 4, 2021[.]

H.R. Res. 38 § 4(a)(1), 117th Cong. (Jan. 12, 2021), https://www.congress.gov/117/bills/

hres38/BILLS-117hres38eh.pdf.

Fines imposed pursuant to House Resolution 38 are "treated as though imposed under

clause 3(g) of rule II," id. § 4(a)(2), which "authorize[s] and direct[s the Sergeant-at-Arms] to

impose a fine against a Member, Delegate, or the Resident Commissioner for the use of an

electronic device for still photography or for audio or visual recording or broadcasting in

contravention of" the relevant rules and policies, H.R. Rule II, cl. 3(g)(1),

https://rules.house.gov/sites/democrats.rules.house.gov/files/117-House-Rules-Clerk.pdf; see

Compl. ¶ 15 n.6. Fines imposed under clause 3(g) of Rule II amount to "$500 for a first offense

and $2,500 for any subsequent offense[,]" H.R. Rule II, cl. 3(g)(2), and may only be imposed

subject to the following three procedures, see id. cl. 3(g)(3). First, "[t]he Sergeant-at-Arms shall

promptly notify the Member, Delegate, or the Resident Commissioner[;] the Speaker[;] the Chief

Administrative Officer[;] and the Committee on Ethics of any such fine." Id. cl. 3(g)(3)(A).

Second, the "Member, Delegate, or Resident Commissioner may appeal the fine in writing to the

Committee on Ethics[,] not later than [thirty] calendar days or five legislative days, whichever is later, after notification[.]" Id. cl. 3(g)(3)(B).  In the event that the Member, Delegate, or Resident Commissioner submits such an appeal, "the Committee on Ethics shall have [thirty] calendar days or five legislative days, whichever is later, to either dismiss the fine or allow it to proceed[,]" id. cl. 3(g)(C), however, pursuant to House Resolution 38, all of these "time periods . . . [do] not commence until the Committee on Ethics has adopted written rules, and the chair of the Committee on Ethics [has] notif[ied] all Members, Delegates, or the Resident Commissioner with pending appeals upon such commencement[,]" H.R. Res. 38 § 4(a)(2)(A).  Moreover, "fine[s] subject to appeal under clause 3(g)(3) of [R]ule II shall proceed unless dismissed within the time period provided under clause 3(g)(3)(C) of [R]ule II." Id. § 4(a)(2)(B).  Third and finally, "[u]pon a determination regarding the appeal or if no appeal has been filed at the expiration of the [relevant] period . . . , the chair of the Committee on Ethics shall promptly notify the Member, Delegate, or the Resident Commissioner[;] the Speaker[;] and the Chief Administrative Officer[,]" and the "Speaker shall promptly lay such notification before the House." H.R. Rule II, cl. 3(g)(C).

House Resolution 38 further provides that fines "shall be administered as though pursuant to clause 4(d) of [R]ule II[.]" H.R. Res. 38 § 4(a)(2).  Under clause 4(d) of Rule II, "[u]pon notification from the chair of the Committee on Ethics pursuant to clause 3(g)(3)(c)[ of Rule II], the Chief Administrative Officer shall deduct the amount of any fine levied under clause 3(g) from the net salary otherwise due the Member, Delegate, or the Resident Commissioner."  H.R. Rule II, cl. 4(d)(1); see Compl. ¶ 16.

Additionally, House Resolution 38 provides that the authorization to impose a fine for failure to comply with the House's mask policy "establishes a standard of conduct within the

meaning of clause 3(a)(2) of [R]ule XI." H.R. Res. 38 § 4(b). Clause 3(a)(2) of Rule XI

authorizes the Committee on Ethics to

> investigate, subject to [the limitations set forth in] paragraph (b)[, which proscribe
> "resolution[s], report[s], recommendation[s], [investigations,] or advisory
> opinion[s] relating to the official conduct of a Member, Delegate, Resident
> Commissioner, officer, or employee of the House" except in certain
> circumstances], an alleged violation by a Member, Delegate, Resident
> Commissioner, officer, or employee of the House of the Code of Official Conduct
> or of a law, rule, regulation, or other standard of conduct of such Member,
> Delegate, Resident Commissioner, officer, or employee in the performance of the
> duties or the discharge of the responsibilities of such individual.

H.R. Rule XI, cl. 3(a)(2).

### 3. Subsequent Amendments of the House's Mask Policy

On May 11, 2021, the Speaker announced a modification of the House's mask policy, <u>see</u>

Compl. ¶ 23, which stated that "while masks continue[d] to be required in the Hall of the House,

Members [we]re permitted to remove their masks temporarily while under recognition." 167

Cong. Rec. H2157 (daily ed. May 11, 2021) (announcement by the Speaker),

https://www.congress.gov/congressional-record/2021/5/11/house-section/article/H2157-6; <u>see</u>

Compl. ¶ 23 ("On or about May 11, 2021, the Speaker unilaterally purported to grant exceptions

to the mask mandate for members under recognition[.]" (footnote omitted)). "This

announcement [wa]s incorporated within the policy on conduct during a covered period of

January 4, 2021[, <u>i.e.</u>, the House's mask policy,] and the Sergeant-at-Arms [wa]s directed to

enforce mask requirements consistent with this announcement." 167 Cong. Rec. H2157 (daily

ed. May 11, 2021) (announcement by the Speaker).

Subsequently, on June 11, 2021, the Speaker announced a further modification to the

House's mask policy, which established "exceptions to the mask mandate for [Members who

are] vaccinated[ against the COVID-19 virus]." Compl. ¶ 23; <u>see</u> 167 Cong. Rec. H2715 (daily

ed. June 14, 2021) (announcement by the Speaker), https://www.govinfo.gov/content/pkg/

JA 131

CREC-2021-06-14/pdf/CREC-2021-06-14-house.pdf (announcing on June 14, 2021, that, "[c]onsistent with updated guidance from the Attending Physician, . . . masks are no longer required in the Hall of the House for Members and staff who have been fully vaccinated" and that "[t]his announcement is incorporated within the policy on conduct during a covered period of January 4, 2021").  According to the plaintiffs, the June 11, 2021 modification to the House's mask policy "was transparently reactive to [the p]laintiffs['] and other minority members' position that vaccination status is private medical information that should not need to be shared with the government" because it "came after [the] Speaker [ ] had faced substantial opposition from the House Minority Leader Kevin McCarthy and several other Republican lawmakers over the House masking rules."  Compl. ¶ 38.

## B.    Factual Background

The plaintiffs allege that, "[o]n May 18, [2021,] and again on May 19, 2021," they "entered the House [Chamber] to vote without wearing masks[,]" id. ¶ 26, in order to "engage in symbolic protest speech[,]" id. ¶ 27.  Specifically, the plaintiffs represent that they wanted to (1) engage in a "protest against the double standard being enforced by [the d]efendants[,]" id.; (2) demonstrate "the well-founded beliefs shared by [the p]laintiffs that mask[-]wearing is not scientifically based," "mask[-]wearing is not necessary for the vaccinated or naturally immune," "mask[-]wearing is merely political theater," "one's bodily integrity should be free from government control," "individuals should have the liberty to choose what they wear on their face," and "individuals should be free to make their own medical decisions[,]" id.; and (3) "highlight recent scientific findings that the use of face coverings has no appreciable effect

JA 132

on slowing or halting the spread of COVID-19[,]" id.[4]  Although the plaintiffs acknowledge that

they were not complying with the House's mask policy, they contend that their "activities did not

disrupt, delay, or otherwise interfere in any way with House proceedings[,]" which "did not halt

or stop at any time as a result of [the p]laintiffs' actions[,]" and "the presiding officer [did not]

delay the proceedings to address the lack of face coverings by [the p]laintiffs."  Id. ¶ 30.

Moreover, they note that, had the June 11, 2021 amendment to the House's mask policy,

permitting vaccinated Members to remove their masks, see 167 Cong. Rec. H2715 (daily ed.

June 14, 2021) (announcement by the Speaker), been in effect when the plaintiffs appeared in the

House Chamber without masks on May 18, 2021, and May 19, 2021, plaintiff Representative

Norman would have been in compliance, since he "had already received the vaccine for COVID-

19 when he appeared on the floor of the House in May without a mask[.]"  Id. ¶ 41.  However,

because the Speaker did not announce the modification to the House's mask policy that

permitted vaccinated Members to remove their masks until June 11, 2021, see id. ¶ 37, plaintiff

Representative Norman was still "issu[ed] the fine" for his failure to wear a mask on May 18,

2021, and May 19, 2021, id. ¶ 41.

    Following the plaintiffs' actions on May 18, 2021, and May 19, 2021, "[d]efendant

Walker sent correspondence to each of the [p]laintiffs imposing a fine against each [p]laintiff in

the amount of $500, which[,] according to H[ouse] Res[olution] 38[,] would be deducted from

[that p]laintiff's compensation through procedures overseen by [d]efendant Szpindor."  Id. ¶ 31.

The "[p]laintiffs appealed these fines to the House Ethics Committee, but in votes split between

---

[4] Specifically, the plaintiffs cite sources stating that "respiratory fluids [released] during exhalation . . . carry virus
and transmit infection" and "[t]he smallest very fine droplets . . . are small enough that they can remain suspended in
the air for minutes to hours[;]" "[e]ven when an infectious person is more than [six] feet away, aerosols have the
ability to travel and infect others[;]" and "[a]lthough surgical mask[s, one type of mask,] may be adequate to remove
bacteria exhaled or expelled by health[-]care workers, they may not be sufficient to remove [ ] submicrometer-size
aerosols containing pathogens."  Compl. ¶ 27.

JA 133

[Members of the Committee who are] Democrats and [Members of the Committee who are] Republicans, the Committee denied each appeal." Id. ¶ 32.

"On July 22, 2021, [plaintiff Representative] Massie received a Deduction of Fine Imposed Pursuant to House Resolution 38 memorandum, which read in relevant part:

> [t]he Office of Members' Services received correspondence on July 20, 2021, from the House Committee on Ethics upholding a fine imposed pursuant to House Resolution 38 and House Rule II, clause 3(g).  The fine was imposed by the House Sergeant[-]at[-]Arms on May 19, 2021.  The Chief Administrative Officer is responsible for deducting the amount of any fine levied under House Resolution 38 and House Rule II, clause 3(g) from the net salary otherwise due the Member, Delegate, or Resident Commissioner.  I am including a copy of the Committee on Ethics and Sergeant[-]at[-]Arms notices for your records.
>
> The full amount of the fine, $500.00, will be deducted from your July 2021 payroll (to be disbursed August 1).

Id. ¶ 44; see generally id., Exhibit ("Ex.") A (Letter from Deborah Ellis-Jones, Manager, CAO Members' Servs., to the Hon. Thomas Massie, Member of Congress (July 22, 2021) ("Fine Notice")) at 1.  The other "[p]laintiffs [each] received correspondence materially similar" to the memorandum received by plaintiff Representative Massie.  Id. ¶ 45.

On May 18, 2021, the same day that the plaintiffs initially appeared in the House Chamber without masks, "the Speaker herself also appeared on the House floor without a mask . . . while under recognition to speak in the [C]hamber[.]" Id. ¶ 33.  "Defendant Walker took no actions to fine Speaker Pelosi despite her violation of the exact same rule—H[ouse] Res[olution] 38—as [the p]laintiffs violated on the very same day[,]" id. ¶ 34, because of the May 11, 2021 modification of the House's mask policy enabling Members to remove their masks "while under recognition to speak in the [C]hamber," id. ¶ 33.  Similarly, "on June 8, 2021, Representative Jamie Raskin, a Democrat, also appeared on the House floor without a face covering," id. ¶ 35, while under recognition to speak, and "[d]efendant Walker took no actions to

fine Representative Raskin[,]" id. ¶ 36.  Following the May 11, 2021 modification of the House's

mask policy, "numerous members of the majority party [ ] failed to wear masks while on the

floor of the House[;]" however, "none of them [were] cited or fined[,]" id. ¶ 42, because they

were "recognized to speak," id. ¶ 43.  According to the plaintiffs, "H[ouse] Res[olution] 8 and

H[ouse] Res[olution] 38 have been weaponized on a partisan basis to punish political opponents,

based on their viewpoints, and all in an effort to force the minority party to conform to the

majority's political views."[5]  Id.

**C.     Procedural Background**

On July 27, 2021, the plaintiffs filed their Complaint, see id. at 23, alleging constitutional

violations of the Twenty-Seventh Amendment, see id. ¶¶ 49–54; Article I, Section 5, see id.

¶¶ 55–59; Article I, Sections 6 and 7, see id. ¶¶ 60–67; and the First Amendment, see id. ¶¶ 68–

75.  In response, on September 28, 2021, the defendants filed their motion to dismiss, see Defs.'

Mot. at 2; on November 12, 2021, the plaintiffs filed their opposition; see Pls.' Opp'n at 1; and

on November 16, 2021, the defendants filed their reply, see Defs.' Reply at 1.  On December 2,

2021, the Court held oral argument on the defendants' motion, see Min. Entry (Dec. 2, 2021),

and took the motion under advisement.

---

[5] On March 8, 2022, the defendants filed a notice, representing that, "on February 28, 2022, the Speaker of the House pro tempore announced" that,

> [c]onsistent with updated guidance from the Attending Physician, the Chair wishes to inform Members that masks are no longer required in the Hall of the House.  The Chair would further note that all Members and staff may continue to wear masks at their discretion.  This announcement is incorporated within the policy on conduct during a covered period of January 4, 2021, and supersedes all other announced policies that are in conflict.

Defs.' 2d Notice at 1 (quoting 168 Cong. Rec. H1151 (daily ed. Feb. 28, 2022)).  According to the defendants, "[t]his announcement does not affect fines previously assessed to any Members for violations of the [version of] the [House's] mask policy [ ] in effect[ at the time the fines were issued]."  Id.

## II.      STANDARD OF REVIEW

"Federal [district] courts are courts of limited jurisdiction[,]" Kokkonen v. Guardian Life

Ins. Co. of Am., 511 U.S. 375, 377 (1994), and "[a] motion for dismissal under [Federal Rule of

Civil Procedure] 12(b)(1) 'presents a threshold challenge to the [C]ourt's

jurisdiction[,]'" Morrow v. United States, 723 F. Supp. 2d 71, 75 (D.D.C. 2010) (Walton, J.)

(quoting Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)).  Thus, the Court is obligated to

dismiss a claim if it "lack[s] . . . subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  Because

"[i]t is to be presumed that a cause lies outside [the Court's] limited jurisdiction," Kokkonen,

511 U.S. at 377, the plaintiff bears the burden of establishing that the Court has subject-matter

jurisdiction, see Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).

"In deciding a [Rule] 12(b)(1) motion, the [C]ourt need not limit itself to the allegations

of the complaint."  Grand Lodge of the Fraternal Ord. of Police v. Ashcroft, 185 F. Supp. 2d 9,

14 (D.D.C. 2001).  Rather, the "[C]ourt may consider such materials outside the pleadings as it

deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case."

Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); see Jerome

Stevens Pharms., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Additionally, the Court must "assume the truth of all material factual allegations in the complaint

and 'construe the complaint liberally, granting [the] plaintiff the benefit of all inferences that can

be derived from the facts alleged[.]'"  Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp., 642 F.3d

1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005)).

However, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in

resolving a [Rule] 12(b)(1) motion than in resolving a [Rule] 12(b)(6) motion for failure to state

JA 136

a claim." Grand Lodge, 185 F. Supp. 2d at 13–14 (first and second alterations in original) (internal quotation marks omitted).

### III.    ANALYSIS

The defendants move to dismiss the plaintiffs' Complaint, arguing that (1) the "[p]laintiffs' suit is barred by the Constitution's Speech or Debate Clause[,]" Defs.' Mem. at 11; and (2) the plaintiffs fail to state a claim upon which relief can be granted, see id. at 15–30.  In response, the plaintiffs argue that (1) "the challenged conduct is not a speech or debate function[,]" Pls.' Opp'n at 4, and (2) they "have stated claims upon which relief can be granted[,]" id. at 18 (capitalization omitted).  Because "a court must first establish as an antecedent matter that it has jurisdiction[,]" Kaplan v. Cent. Bank of the Islamic Republic of Iran, 896 F.3d 501, 510 (D.C. Cir. 2018), the Court begins its analysis by addressing the jurisdictional question—namely, whether the defendants are entitled to immunity under the Speech or Debate Clause.  For the following reasons, the Court concludes that the defendants are entitled to immunity under the Speech or Debate Clause.[6]

Pursuant to the Speech or Debate Clause, "Senators and Representatives . . . for any Speech or Debate in either House . . . shall not be questioned in any other Place."  U.S. Const. art. I, § 6, cl. 1.  The Clause "provides absolute immunity from civil suit[,]" Rangel v. Boehner, 785 F.3d 19, 23 (D.C. Cir. 2015), for any "conduct [that] is an integral 'part of . . . the due functioning of the [legislative] process[,]'" Fields v. Off. of Eddie Bernice Johnson,

---

[6] Because the Court concludes that it lacks subject-matter jurisdiction over the plaintiffs' Complaint because the defendants are entitled to immunity under the Speech or Debate Clause, the Court need not address the parties' arguments regarding whether the plaintiffs have adequately stated a claim under Rule 12(b)(6).  See McCarthy, 5 F.4th at 38 (noting that the Speech or Debate Clause "state[s a] jurisdictional objection[]"); Passut v. Cardona, 540 F. Supp. 27, 35 (D.D.C. 2021) (Walton, J.) (noting that "the Court is obligated to dismiss a claim if it 'lack[s] [ ] subject[-]matter jurisdiction" (alterations in original)).

459 F.3d 1, 9 (D.C. Cir. 2006) (quoting United States v. Brewster, 408 U.S. 501, 526 (1972))

(first alteration added).

     "The Supreme Court has consistently read the Speech or Debate Clause 'broadly' to

achieve its purposes[,]" id. (quoting Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 501

(1975)), and thus, "although the Clause speaks of 'Speech or Debate,' it extends further to all

'legislative acts[,]'" id. (quoting Doe v. McMillan, 412 U.S. 306, 312 (1973)).  See also Gravel

v. United States, 408 U.S. 606, 618 (1972) (noting that to "confine the protections of the Speech

or Debate Clause to words spoken in debate would be an unacceptably narrow view").

Consequently, "[t]he 'key consideration . . . is the act presented for examination, not the

actor[,]'" McCarthy v. Pelosi, 5 F.4th 34, 39 (D.C. Cir. 2021), cert. denied, 142 S.Ct. 897 (2022)

(quoting Walker v. Jones, 733 F.2d 923, 929 (D.C. Cir. 1984)), and "[t]he Clause applies to aides

and staff 'insofar as [their] conduct . . . would be a protected legislative act if performed by [a]

Member[,]'" id. (quoting Gravel, 408 U.S. at 618) (all but the first alteration in original).

     Legislative acts include not only "core legislative acts[, e.g.,] 'how [a Member] spoke,

how he [or she] debated, how he [or she] voted, or anything he [or she] did in the chamber or in

committee[,]'" Fields, 459 F.3d at 9 (quoting Brewster, 408 U.S. at 526) (second alteration in

original), but also acts that fall into at least one of the two categories identified by the Supreme

Court in Gravel v. United States: (1) "matters pertaining 'to the consideration and passage or

rejection of proposed legislation,' and [(2)] 'other matters which the Constitution places within

the jurisdiction of either House[,]'" McCarthy, 5 F.4th at 40 (quoting Gravel, 408 U.S. at 625).

However, legislative acts must be an "integral part[ of these matters,]" Gravel, 408 U.S. at 625

(emphasis added), rather than merely having "some nexus to legislative functions,'" Fields, 459

F.3d at 10 (quoting Brewster, 408 U.S. at 528) (emphasis in original), or being "merely 'related

JA 138

to,' as opposed to 'part of,' the 'due functioning' of the 'legislative process,'" id. (quoting

Brewster, 408 U.S. at 514).

The defendants argue that the "[p]laintiffs' suit is barred by the [ ] Speech or Debate

Clause" because "[t]he Clause provides absolute immunity from civil suit for Members of

Congress, Officers, and their aides for all 'legislative acts'—a term that the [District of

Columbia] Circuit has broadly construed to include execution and implementation of the House's

internal rules."  Defs.' Mem. at 11 (citing McCarthy, 5 F.4th at 38–40; Consumers Union of U.S.

v. Periodical Correspondents' Ass'n, 515 F.2d 1341, 1351 (D.C. Cir. 1975)).  In response, the

plaintiffs argue that "the congressional staff functions at issue . . . are purely administrative in

nature and not within the Speech or Debate Clause's ambit."  Pls.' Opp'n at 4.  For the following

reasons, the Court concludes that the defendants' actions "are quintessentially legislative acts

falling squarely within the Clause's ambit[,]" McCarthy, 5 F.4th at 39, because they fall under

both Gravel categories: (1) they regulate Members' conduct in the House Chamber as Members

participate in the "consideration and passage or rejection of proposed legislation[,]" and (2) they

fall within the House's authority to enact rules regarding its legislative process and to discipline

Members for non-compliance, which are "matters which the Constitution places within the

jurisdiction of [the] House[,]" Gravel, 408 U.S. at 625.

A.     **The First Gravel Category**

The Court begins by considering whether the defendants' actions fall within the first

category of legislative acts recognized in Gravel, namely, whether the defendants' actions are

"an integral part of the deliberative and communicative processes by which Members participate

in committee or House proceedings with respect to the consideration and passage or rejection of

proposed legislation[.]"  See Gravel, 408 U.S. at 625.  The defendants argue that their actions are

15

JA 139

"an integral part of the [House's] deliberative and communicative processes[,]" id., because they concern "an internal rule designed to protect the health of all persons in the [House Chamber], where all House-wide debate and voting on legislation occurs," Defs.' Mem. at 15.  In response, the plaintiffs argue that the "administrative functions of mask enforcement and payroll deductions" do not "constitute 'legislative acts.'"  Pls.' Opp'n at 10.  For the following reasons, the Court agrees with the defendants that their actions fall within Gravel's first category.

To start, the Court considers the nature of the actions taken by the defendants.  See McCarthy, 5 F.4th at 39 ("The 'key consideration . . . is the act presented for examination[.]'" (quoting Walker, 733 F.2d at 929)).  The plaintiffs' Complaint challenges the actions taken by the Speaker,[7] the Sergeant-at-Arms, and the Chief Administrative Officer in the enforcement of

---

[7] In their Complaint, the plaintiffs clarify that the Speaker "is sued in her official capacity only, and only to the extent that she is performing administrative and oversight duties of the other two [d]efendants, [ ] Walker and [ ] Szpindor[.]"  Compl. ¶ 8.  In their opposition, the plaintiffs elaborate further, arguing that the Speaker

is a proper [d]efendant [so long as]: (a) she is not sued in connection with the enactment or passage of any challenged legislation itself (and she is not); (b) she is not questioned in connection with such enactment or passage of legislation (and she will not be); but rather (c) is sued solely in connection with administrative directives she gave to [defendants] Walker or Szpindor to engage in enforcement of mandates outside of official directives from the floor (which is the scope of her involvement in this matter).

Pls.' Opp'n at 18.  Consistent with their position, according to the plaintiffs, the scope of their suit against the Speaker is limited to "administrative directives" issued by the Speaker that were not "official directives from the floor[.]"  Id.; see Compl. ¶ 8 (alleging that the Speaker "is not sued [ ] for her legislative acts, including for statements made on the House floor").

Despite this purported clarification, the plaintiffs' Complaint contains no allegations that the Speaker issued any "administrative directives" that were not "official directives from the floor[,]" Pls.' Opp'n at 18, or performed any "administrative and oversight duties[,]" Compl. ¶ 8, regarding defendants Walker and Szpindor in their execution of fines pursuant to House Resolution 38.  Instead, the only actions taken by the Speaker set forth in the Complaint are directives issued from the House floor, i.e., (1) extensions of the forty-five-day "covered period[,]" id. at 5 n.5; see, e.g., 166 Cong. Rec. H9169 (daily ed. Dec. 31, 2020) (announcement by the speaker) (extending the covered period as of December 31, 2020); 167 Cong. Rec. H1711 (daily ed. Apr. 5, 2021) (announcement by the speaker pro tempore) (extending the covered period as of April 5, 2021); 167 Cong. Rec. H2404 (daily ed. May 17, 2021) (announcement by the speaker pro tempore) (extending the covered period as of May 20, 2021); (2) announcement of the House's mask policy on January 4, 2021, from the House floor, see Compl. ¶ 17 & n.9; see also 167 Cong. Rec. H40–41 (daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore); and (3) announcement of the amendments to the House's mask policy on May 11, 2021, and June 11, 2021, from the House floor, see Compl. ¶¶ 23–24, 33, 37, 38, 40, 43, 70; see also 167 Cong. Rec. H2157 (daily ed. May 11, 2021) (announcement by the Speaker) (May 11, 2021 amendment to the House's mask policy); 167 Cong. Rec. H2715 (daily ed. June 14, 2021)

(continued . . .)

16

the House's mask policy and the issuance of fines for violations of that policy pursuant to House

Resolution 38.  See Compl. ¶ 75 (stating that the plaintiffs seek "a declaratory judgment that the

House . . . may not impose or collect fines" and "an injunction against [d]efendants Walker and

Szpindor from imposing or collecting fines by reducing Congressional salaries").  The House's

mask policy sets forth the circumstances requiring Members and staff to wear masks in the

House Chamber.  See id. ¶ 17 (as of January 4, 2021, requiring that "Members and staff . . . wear

masks at all times in the [House Chamber]"); id. ¶ 23 (as of May 11, 2021, "grant[ing]

exceptions to the [House's] mask [policy] for members under recognition"); id. (as of June 11,

2021, "grant[ing] exceptions to the [House's] mask [policy] for [Members and staff who are

fully] vaccinated"). This policy stems from the Speaker's obligation to "preserve order and

decorum in the Chamber" pursuant to "clause 2 of [House R]ule I[,]" 167 Cong. Rec. H40–41

(daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore); see Compl. ¶ 17 & n.9.  In

furtherance of this policy, the House passed House Resolution 38, which "authorize[s] and

direct[s the] impos[ition of] a fine . . . for the failure to wear a mask in contravention of the"

House's mask policy.  H.R. Res. 38 § 4(a)(1); see Compl. ¶ 15.  And, as a result of the House's

mask policy and House Resolution 38, defendant Walker issued notices of fines to the plaintiffs

and, following the plaintiffs' appeals to the House Committee on Ethics, defendant Szpindor

deducted the amount of the fines from the plaintiffs' paychecks.  See Compl. ¶¶ 31, 44–45.

---

(. . . continued)
(announcement by the Speaker) (June 11, 2021 amendment to the House's mask policy).  Although the plaintiffs allege that the amendments to the House's mask policy were "not from any statements on the House floor[,]" Compl. ¶ 24, "[w]here, as here, a complaint's factual allegations are contradicted by exhibits of which the Court may take judicial notice, the Court need no longer accept as true [a] plaintiff's version of events[,]" Lewis v. District of Columbia, 195 F. Supp. 3d 53, 60 (D.D.C. 2016) (Walton, J.).  Therefore, despite the plaintiffs' statements in their Complaint and opposition to the defendants' motion to dismiss that the Speaker "is not sued . . . for statements made on the House floor[,]" Compl. ¶ 8, or for "official directives from the floor[,]" Pls.' Opp'n at 18, those actions are the only ones alleged to have been taken by the Speaker.  Accordingly, the Court will consider whether the Speaker is entitled to immunity under the Speech or Debate Clause for announcing the House's mask policy and subsequent amendments to that policy together with the actions of Walker and Szpindor in imposing fines on the plaintiffs.

JA 141

In accordance with the Circuit's decision in <u>McCarthy v. Pelosi</u>, the Court concludes that the defendants' actions are part of the process of enabling the legislative processes in the House Chamber to occur.  In <u>McCarthy</u>, the Circuit concluded that several administrative steps incident to proxy voting were legislative acts because they were part of the "rules governing how Members can cast their votes on legislation and mark their presence for purposes of establishing a legislative quorum."  5 F.4th at 37.  Viewed independently, the administrative steps in <u>McCarthy</u>—which included notification of "the existence of a public health emergency due to COVID-19[,]" "designat[ion] of a covered period[,]" "accept[ance of] proxy letters from Members and maintain[ance of] a proxy list[,]" <u>id.</u> at 39—may not be "integral parts of the deliberative and communicative processes by which Members participate in committee and House proceedings[,]" <u>Gravel</u>, 408 U.S. at 625.  However, when considered as components of the scheme that enabled Members to cast votes—<u>i.e.</u>, as part of the "administration of voting by Members[,]" <u>McCarthy</u>, 5 F.4th at 40—these actions "concern[ed] core legislative acts[,]" <u>id.</u> at 39.

Along the same lines, in <u>Consumers Union v. Periodical Correspondents' Ass'n</u>, the Circuit concluded that the Periodical Correspondents' Association's regulation of admission to the press galleries located in the House Chamber was a legislative act because it was a "delegated legislative function[]" that was "an integral part of the legislative machinery" and, therefore, an "act[] generally done in relation to the business before Congress."  515 F.2d at 1350.  By managing admission to the press galleries, the Association was "regulati[ng] [ ] the very atmosphere in which lawmaking deliberations occur[ed]."[8]  <u>Walker</u>, 733 F.2d at 930

---

[8] The plaintiffs argue, in a footnote, that "[t]he <u>Consumers Union</u> court rested its decision in part on the undisputed assumption that the [d]efendants there were acting in good faith[,]" Pls.' Opp'n at 12 n.9 (citing <u>Consumers Union</u>, 515 F.2d at 1350), whereas, here, the "[p]laintiffs make no such concession" and instead "contend that H[ouse

(continued . . .)

JA 142

(discussing <u>Consumers Union</u>).  By adopting and implementing the press gallery rules,

lawmakers were regulating their own lawmaking environment, and therefore "the Speech or

Debate Clause barred [the court] from hearing the suit."  <u>Barker v. Conroy</u>, 921 F.3d 1118, 1128

(D.C. Cir. 2019) (discussing <u>Consumers Union</u>).

 Here, the defendants' actions constitute part of the scheme that regulates "order and

decorum in the Chamber[,]" 167 Cong. Rec. H40–41 (daily ed. Jan. 4, 2021) (announcement by

the Speaker Pro Tempore), <u>i.e.</u>, how Members must act in the House Chamber—the very place

where Members engage in the legislative process by introducing, considering, and voting on

proposed legislation.  <u>See</u> History, Art & Archives: Tour the House Chamber, U.S. House of

Representatives, https://history.house.gov/Education/Capitol-Tour/House-Chamber-Tour/ (last

visited Mar. 9, 2022) (noting that, "[a]s the central space for the House, [the House Chamber is]

the location where Members introduce, debate, and vote on legislation").  From the House's

mask policy through the Chief Administrative Officer's deduction of the fines from the

plaintiffs' paychecks, the defendants' actions sought to ensure that Members would comply with

the code of conduct set forth in the House's mask policy while Members were engaging in the

---

(. . . continued)

]Res[olution] 38 is not only unlawful, but being implemented in a discriminatory and malign manner intentionally harassing members of the House minority[,]" <u>id.</u> (citing Compl. ¶¶ 31–43).  The plaintiffs are correct that the <u>Consumers Union</u> decision noted the fact that "[i]t [wa]s conceded that [one of the defendants—the Periodical Correspondents' Association—was] acting in good faith[,]" <u>Consumers Union</u>, 515 F.2d at 1350.  However, despite the <u>Consumers Union</u> notation of the Association's good faith, <u>id.</u>, ultimately, the only pertinent question before the Circuit in determining whether the Speech or Debate Clause applied was whether the conduct constituted "legislative acts" within the ambit of the Clause, not whether the acts were done in good faith."  <u>See</u> <u>Eastland v. U.S. Servicemen's Fund</u>, 421 U.S. 491, 508–09 (1975) ("If the mere allegation that a valid legislative act was undertaken for an unworthy purpose would lift the protection of the Clause, then the Clause simply would not provide the protection historically undergirding it.").  As the Supreme Court has observed, immunity under the Speech or Debate Clause is absolute and does not depend on an actor's good faith.  <u>See</u> <u>id.</u> at 503 ("[O]nce it is determined that Members are acting within the legitimate legislative sphere[,] the Speech or Debate Clause is an absolute bar to interference." (internal quotation marks omitted)); <u>Rangel</u>, 785 F.3d at 23 (noting that the Clause "provides absolute immunity from civil suit").  Therefore, the plaintiffs' allegations here that the defendants acted in bad faith have no bearing on the Court's assessment of whether the defendants are entitled to the protection of the Speech or Debate Clause.

legislative process.  Thus, similar to the ways in which the notification of "the existence of a

public health emergency due to COVID-19[,]" "designat[ion of] a covered period[,]"

"accept[ance of] proxy letters from Members[,] and maintain[ance of] a proxy list[,]" McCarthy,

5 F.4th at 39, served as part of the "administration of voting by Members" in McCarthy, id. at

40–41, the defendants' actions are merely "part and parcel[,]" Gravel, 408 U.S. at 626, of the

overall scheme to "preserve order and decorum in the Chamber[,]" 167 Cong. Rec. H40–41

(daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore), when the House conducts

its legislative business.  Accordingly, because the defendants' actions "squarely concern 'the

direct business of passage or rejection of proposed legislation[,]'" McCarthy, 5 F.4th at 39

(quoting Consumers Union, 515 F.2d at 1351), they fall under Gravel's first category.

     The plaintiffs present several arguments in opposition to this conclusion.  First, they

argue that the defendants' actions fall within "the vast array of administrative functions

performed by the House [that] do not fall within the Speech or Debate Clause[,]" Pls.' Opp'n at

10, analogizing this case to Walker v. Jones, see id. at 9–10.  See id. at 9 (arguing that, "[a]s

then-Judge Ginsb[u]rg pointed out in Walker, the argument that every administrative function

performed by the House falls within the Speech or Debate Clause is 'far-fetched[]'" (quoting

Walker, 733 F.2d at 931)).  In Walker, the Circuit concluded that a complaint of discriminatory

termination by the former "general manager of the House . . . Restaurant System" against the

"Chairman of the Subcommittee on Services of the House of Representatives Committee on

House Administration" and the "Staff Director of the Subcommittee[,]" 733 F.2d at 926, was not

barred by the Speech or Debate Clause because the general manager's "job as general manager

of food services entailed no function relating to the process of making laws[,]" id. at 930–31.  In

reaching this conclusion, the Circuit distinguished the administrative services provided to

Members from the legislative process, finding that

> [p]ersonnel who attend to food service, medical care, physical fitness needs, parking, and haircutting for members of Congress no doubt contribute importantly to our legislators' well-being and promote their comfort and convenience in carrying out Article I business.  But these staff members, unlike those who help prepare for hearings or assist in the composition of legislative measures, cater to human needs that are not "intimately cognate," Davis v. Passman, 544 F.2d at 879, to the legislative process.

Id. at 931.

In this case, however, the challenged actions are not analogous to "food service, medical

care, physical fitness needs, parking, and haircutting[,]" id. See Pls.' Opp'n at 9–10.  As the

Circuit noted in Walker, the only link between those functions and the legislative process is the

extent to which they "promote[d legislators'] comfort and convenience in carrying out Article I

business."  Walker, 733 F.2d at 931.  Here, in contrast, the defendants' actions can only be

characterized as "administrative[,]" Pls.' Opp'n at 10, to the extent that they concern the actual

administration of the "legislative process" itself, Walker, 733 F.2d at 931, namely how Members

must conduct themselves while participating in the legislative process in the House Chamber.[9]

Cf. McCarthy, 5 F.4th at 40–41 (concluding that the steps taken to enable proxy voting were part

of the "administration of voting by Members").

Second, the plaintiffs point to the Circuit's decision in Barker v. Conroy, see Pls.' Opp'n

at 12, in which the Circuit concluded that the House Chaplain's "administration of the guest

chaplain program is not an integral part of the House's deliberative and communicative

---

[9] Certainly, the House's administration of the payroll process in general for Members and other staff may be the type of "administrative function" that is more similar to "food service, medical care, physical fitness needs, parking, and haircutting for members of Congress[.]"  See Walker, 733 F.2d at 931.  However, the plaintiffs challenge the payroll process only to the extent that fines are deducted from their paycheck as part of the enforcement of the House's mask policy.  See Compl. ¶ 59 (asserting that the plaintiffs seek, inter alia, "a declaratory judgment that the House . . . may not impose or collect fines for the failure to wear a mask" (emphasis added)).  Therefore, the House's pure administration of its payroll system in general is not at issue in this case.

processes[,]" Barker, 921 F.3d at 1128 (internal quotation marks omitted).  The plaintiffs argue

that, "[j]ust as a chaplain's prayer prior to House deliberations does not 'regulate the very

atmosphere in which lawmaking deliberations occur' and 'poses no threat to the integrity of the

legislative process,' neither does enforcing mask wearing or the administration of payroll

deductions."  Pls.' Opp'n at 12 (quoting Barker, 921 F.3d at 1128).  In Barker, the Circuit

considered whether the House Chaplain was entitled to immunity under the Speech or Debate

Clause for his rejection of an application by a "self-professed atheist" to deliver the House's

opening prayer as a "guest chaplain[.]"  921 F.3d at 1121–22.  Concluding that the House

Chaplain's rejection of the application was not a "legislative act[,]" the Circuit distinguished its

earlier decision in Consumers Union because "any rules pertaining to the opening prayer—an

event that occurs at the very beginning of the legislative session before any deliberating

whatsoever—could not similarly be said to regulate 'the very atmosphere in which lawmaking

deliberations occur.'"  Id. at 1128 (quoting Walker, 733 F.2d at 930).

Here, however, as in Consumers Union, there is no question that the defendants' actions

"regulate 'the very atmosphere in which lawmaking deliberations occur.'"  Id. (quoting Walker,

733 F.2d at 930).  As the Court noted above, the defendants' actions are part of the scheme that

regulates Members' behavior as they engage in "lawmaking deliberations[,]" id., as well as other

quintessentially legislative activities such as voting.  Therefore, unlike in Barker, which noted

that "[t]he Supreme Court itself has described legislative prayer not as a part of the legislative

process, but rather as a 'symbolic expression' that simply 'lends gravity to public business,

reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a

common aspiration to a just and peaceful society[,]'" id., the defendants' actions are not so

plainly divorced from the legislative process.  Furthermore, unlike in Barker, which concluded

that "opening prayer" is "an event that occurs at the very beginning of the legislative session

before any deliberating whatsoever[,]" id., there is no clear temporal distinction between the

behavior for which the plaintiffs were fined and lawmaking deliberations.  See Compl. ¶ 26

(noting that the "[p]laintiffs entered the House floor to vote without wearing masks[,]" along

with a photograph taken from C-SPAN television coverage, depicting the House in session while

the plaintiffs posed for a photograph without wearing masks).

      Third, the plaintiffs argue that Consumers Union is distinguishable because that case

implicated concerns about lawmakers' independence from the press, whereas this case implicates

the plaintiffs' independence from the majority party in the House.  See Pls.' Opp'n at 11–12

(arguing that "no such consideration of lawmakers' independence exists; indeed, the opposite is

true" because the "[d]efendants are using H[ouse] Res[olution] 38 to dissuade and punish

Republican members of Congress from being able to speak or debate based on viewpoint").  As

the plaintiffs correctly note, see id. at 11–12 (quoting Barker, 921 F.3d at 1128), the Circuit has

described lawmakers' independence as one "essential" part of its decision in Consumers Union:

> [In Consumers Union, we] conclud[ed] that the [Periodical Correspondents']
> Association's denial of the [plaintiff] organization's application "fell within the
> sphere of legislative activity" protected by the Clause[.  Consumers Union, 515
> F.2d] at 1350 (internal quotation marks omitted).  Essential to that determination
> was the fact that Congress itself had developed the press gallery rules to protect
> legislators' independence: Congress designed the rules to ensure that the
> galleries would "be used by bona fide reporters who [would] not abuse the
> privilege of accreditation by importuning Members on behalf of private interests
> or causes."  Id. at 1347.  As [ ] explained in a later case, because the
> Association's denial of the organization's application involved "regulation of the
> very atmosphere in which lawmaking deliberations occur," the Speech or Debate
> Clause barred [the Circuit] from hearing the suit.  Walker[ ], 733 F.2d [at] 930[.]

Barker, 921 F.3d at 1128 (fifth alteration and some emphasis in original).[10]  However, in arguing

that "no such considerations of lawmakers' independence exist" in this case, Pls.' Opp'n at 11–

12, the plaintiffs fail to acknowledge that the Speech or Debate Clause serves to protect

lawmakers' independence from outside influences—even from the judiciary.  See, e.g., Brewster,

408 U.S. at 516 (noting that "Speech or Debate Clause must be read broadly to effectuate its

purpose of protecting the independence of the Legislative Branch"); Johnson, 383 U.S. at 178

(stating that the judiciary should not "possess directly or indirectly, an overruling influence over

the [Congress] in the administration of [its] respective powers" (quoting The Federalist No. 48

(James Madison))); Gravel, 408 U.S. at 616–17 (noting that "the central role of the Speech or

Debate Clause[ is ]to prevent intimidation of legislators by the Executive and accountability

before a possibly hostile judiciary").  As a challenge in federal court to the House's regulation of

its Members' conduct during the legislative process, this case directly implicates the traditional

concerns underlying the Speech or Debate Clause regarding the potential harms of judicial

intrusion into legislative acts.  Moreover, although the plaintiffs argue that the only concerns

about lawmakers' independence present here concern the defendants' use of House Resolution

38 "to dissuade and punish Republican members of Congress from being able to speak or debate

---

[10] The plaintiffs emphasize the second half of the Circuit's description of the essential parts of its decision in
Consumers Union, namely, that the "press gallery rules [were developed] to protect legislators' independence[,]"
Barker, 921 F.3d at 1128.  See Pls.' Opp'n at 11–12.  However, the plaintiffs overlook the first half of the Circuit's
sentence on the subject—in full, the Circuit stated that "[e]ssential to [its] determination [in Consumers Union] was
the fact that Congress itself had developed the press gallery rules to protect legislators' independence[,]" Barker,
921 F.3d at 1128 (emphasis added).  Therefore, the congressional intent "to protect legislators' independence[,]" id.,
was only one of the "[e]ssential[,]" id., components of the Circuit's decision in Consumers Union.  And here,
similarly to the press gallery rules in Consumers Union, the House itself adopted both the rules endowing the
Speaker with authority to "preserve order and decorum" in the House, H.R. Rule I, cl. 2, see H.R. Res. 8 (adopting
the rules of the House for the 117th Congress), and House Resolution 38, which authorizes the defendants to impose
and collect the fines challenged by the plaintiffs in this case, see H.R. Res. 38 § 4(a)(1).

based on viewpoint[,]"[11] Pls.' Opp'n at 12, neither Barker, Consumers Union, nor any other case

cited by the plaintiffs recognizes concerns for an individual lawmaker's independence from other

lawmakers as pertinent to the inquiry under the Speech or Debate Clause.

Fourth, the plaintiffs argue that "the deliberations, communications, and debate by

Members and their staff are an entirely different function from carrying out a deed, which must

be analyzed on its own merits[,]" and, therefore, even if the House is entitled to Speech or

Debate Clause immunity for passing House Resolution 38, the defendants do not "'inherit' that

immunity as implementing employees and Members." Pls.' Opp'n at 14.  As support for their

argument, the plaintiffs cite three cases in which the Supreme Court has distinguished between

legislative acts by Members and non-legislative acts by legislative staff.  See id. at 14–15 (citing

Kilbourn v. Thompson, 103 U.S. 168, 200 (1880); Dombrowski v. Eastland, 387 U.S. 82, 84

(1967); Powell v. McCormack, 395 U.S. 486, 506 (1969)).  However, in each of those cases, the

conduct about which the Speech or Debate Clause was held not to apply was deemed not to be a

legislative act.  See Kilbourn, 103 U.S. at 200 (holding that the House employee who had

arrested a private citizen pursuant to a House resolution was not entitled to Speech or Debate

Clause immunity); Dombrowski, 387 U.S. at 85 (holding that the committee counsel who was

charged with conspiring with state officials to carry out an illegal seizure of records that the

committee sought for its own proceedings was not entitled to Speech or Debate Clause

immunity); Powell, 395 U.S. at 506 (holding that the House employees who had enforced the

---

[11] Despite this argument in their opposition to the defendants' motion to dismiss, the plaintiffs make no allegation in their Complaint that wearing a mask or otherwise complying with the House's mask policy actually impedes their ability "to speak or debate based on viewpoint[,]" Pls.' Opp'n at 12.  See generally Compl.  Moreover, neither the House's mask policy announced on January 4, 2021, see 167 Cong. Rec. H40–41 (daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore), nor the May 11, 2021, see 167 Cong. Rec. H2157 (daily ed. May 11, 2021) (announcement by the Speaker), or June 11, 2021, see 167 Cong. Rec. H2715 (daily ed. June 14, 2021) (announcement by the Speaker), amendments to the policy, support the proposition that complying with the policy infringed on a Member's ability to participate in the legislative process.

House's exclusion of an elected representative were not entitled to Speech or Debate Clause immunity).  As the Supreme Court noted in <u>Gravel</u>, Speech or Debate Clause "[i]mmunity was unavailable" in those cases "because [the congressional employees] engaged in illegal conduct that was not entitled to Speech or Debate Clause protection."  408 U.S. at 620.  Therefore, as noted in <u>McCarthy</u>, "[t]he 'key consideration . . . is the act presented for examination, not the actor[,]'" 5 F.4th at 39 (quoting <u>Walker</u>, 733 F.2d at 929), and the mere fact that the defendants are either legislative staff or not sued in their legislative capacity, <u>see</u> <u>supra</u> n.7, does not preclude them from immunity under the Speech or Debate Clause.

In sum, by delegating authority to the Speaker to "preserve order and decorum[,]" H.R. Rule I, cl. 2 (117th Cong.), and passing House Resolution 38 to compel Members to abide by the House's mask policy, <u>see</u> H.R. Res. 38 § 4(a)(1), the House is regulating "the very atmosphere in which lawmaking deliberations occur[,]" <u>Walker</u>, 733 F.2d at 930.  Accordingly, the Court concludes that all of the defendants' actions "implicate[] <u>Gravel</u>'s first category" because they "concern 'the direct business of passage or rejection of proposed legislation[,]'" <u>McCarthy</u>, 5 F.4th at 40 (quoting <u>Consumers Union</u>, 515 F.2d at 1351).[12]

### B.    The Second <u>Gravel</u> Category

The Court now turns to <u>Gravel</u>'s second category, namely, whether the defendants' actions fall within "other matters which the Constitution places within the jurisdiction of either House."  <u>Gravel</u>, 408 U.S. at 625.  The defendants argue that "the challenged acts are undeniably legislative" because "[t]he Constitution [ ] specifically grants to Congress the authority to adopt

---

[12] Although <u>Gravel</u> suggests that an action is a "legislative act" if it falls under either of the two categories recognized in that case, <u>see</u> 408 U.S. at 625 (noting that legislative acts "must be an integral part of the deliberative and communicative processes . . . with respect to the consideration and passage or rejection of proposed legislation <u>or</u> with respect to other matters which the Constitution places within the jurisdiction of either House" (emphasis added)), the Court will consider both categories, as the Circuit did in <u>McCarthy</u>, <u>see</u> 5 F.4th at 40 (noting that, "while both this case and <u>Consumers Union</u> thus implicate <u>Gravel</u>'s second category, this case, unlike <u>Consumers Union</u>, also implicates <u>Gravel</u>'s first category").

JA 150

its own rules and discipline its Members." Defs.' Mem. at 13. In response, the plaintiffs argue

that the defendants' actions are not "within the jurisdiction of [the] House[,]" Gravel, 408 U.S.

at 625, because "the House has ignored the constitutional restraints upon its rulemaking

authority[,]" Pls.' Opp'n at 5. For the following reasons, the Court concludes that the

defendants' actions also constitute "other matters which the Constitution places within the

jurisdiction of either House[,]" Gravel, 408 U.S. at 625, because the House's authority to

establish the rules of the House and to discipline Members for non-compliance with those rules,

including through the actions challenged in this case, stems from the Constitution itself.

Under Article I, Section 5, Clause 2 of the Constitution, the House has the authority to

"determine the Rules of its Proceedings" and "punish its Members for disorderly Behavior[.]"

U.S. Const. art. I, § 5, cl. 2. This includes the authority to discipline Members for breaches of

decorum, see Rangel, 785 F.3d at 23 (noting that "a congressional disciplinary proceeding" is "a

'legislative' matter that 'the Constitution places within the jurisdiction of [the] House'" (quoting

Gravel, 408 U.S. at 625));[13] Jack Maskell, Expulsion, Censure, Reprimand, and Fine in the

House of Representatives 1–2, Cong. Rsch. Serv., RL31382 (2016) (hereinafter "Maskell")

---

[13] In their opposition, the plaintiffs seek to contrast the proceedings in Rangel with the defendants' actions in this case, arguing that, in Rangel, "those staff members were doing their work in place of, and at the direction of, Members themselves, and disciplinary proceedings are a function that Members historically have done themselves[,]" whereas, here, "carrying out mask enforcement and payroll deductions are not remotely 'an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings,' nor do they constitute 'other matters which the Constitution places within the jurisdiction of the House.'" Id. (quoting Gravel, 408 U.S. at 625). However, the plaintiffs offer no further explanation as to why congressional discipline would not also include the issuance of fines. See generally Pls.' Opp'n. Moreover, in Rangel, the Circuit noted that "a congressional disciplinary proceeding" was "a 'legislative' matter that 'the Constitution places within the jurisdiction of [the] House[,]'" 785 F.3d at 23 (quoting Gravel, 408 U.S. at 625), and cited as authority for this position Article I, Section 5, Clause 2, id. (citing U.S. Const. art. I, § 5, cl. 2). Neither Rangel nor Article I, Section 5, Clause 2, provides any support for the proposition that only disciplinary proceedings that occur in front of committees are "place[d] within the jurisdiction of [the] House" within the meaning of Article I, Section 5, Clause 2, see Rangel, 785 F.3d at 23; U.S. Const. art. I, § 5, cl. 2. Accordingly, the Court concludes that Rangel supports the conclusion that congressional discipline, broadly speaking, is "a 'legislative' matter that 'the Constitution places within the jurisdiction of [the] House[.]'" See Rangel, 785 F.3d at 23 (alteration in original) (quoting Gravel, 408 U.S. at 625).

JA 151

(noting that "the institution of the House has the right to discipline those who breach its privileges or decorum, or who damage its integrity or reputation"); and this authority extends to fining Members, see Kilbourn, 103 U.S. at 190 (noting "the power of punishment in either House by fine"); Lewis Deschler, Deschler's Precedents of the United States House of Representatives, H. Doc. 94-661, 94th Cong., 2d Sess., Ch. 12 § 17 (1979) (noting that "[a] fine may be levied by the House against a Member pursuant to its constitutional authority to punish its Members"); cf. Maskell, supra, at 14 (noting that the House "fined a Member in 1969 the sum of $25,000 to be repaid by automatically withdrawing a certain amount regularly from his pay, for various conduct offenses, including the misuse of official committee appropriations, payroll, and expenses" and fined a Member $10,000 as part of a reprimand "for misuse of official resources in compelling official congressional staff to work on political campaigns").  Here, as discussed above, see supra Section III.A, the defendants' actions fell within the scope of the scheme of disciplining Members for failing to comply with the "Rules of [the House's] Proceedings[,]" U.S. Const. art. I, § 5, cl. 2—the defendants fined the plaintiffs pursuant to House Resolution 38, which was passed by the House to enforce compliance with its mask policy, which was enacted pursuant to the Speaker's authority under House Rule I, clause 2, to "preserve order and decorum[,]" 167 Cong. Rec. H40–41 (daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore).  Accordingly, the defendants' actions fall squarely within the House's authority to establish its own rules and to discipline its Members for failure to comply with those rules.

Despite what the Court has just outlined, the plaintiffs argue that, although the "House certainly has the constitutional authority to enact rules for discipline and safety, it may not do so by violating the Constitution."  Pls.' Opp'n at 7 (citing United States v. Ballin, 144 U.S. 1, 5

(1892));[14] see id. at 4–7.  Specifically, the plaintiffs identify three constitutional provisions that

they contend "limit[] the [House's] rulemaking power" in this case, id.: (1) the Twenty-Seventh

Amendment, see Compl. ¶¶ 49–54; (2) Article I, Sections 6 and 7, see id. §§ 60–67; and (3) the

First Amendment, see id. §§ 68–75.[15]  For the following reasons, the Court concludes that none

of these constitutional provisions limit the House's authority under Article I, Section 5, Clause 2,

to adopt the mask policy and House Resolution 38.

### 1.   Whether the Twenty-Seventh Amendment Limits the House's Authority under Article I, Section 5, Clause 2 to Adopt the Mask Policy and House Resolution 38

The Court begins by assessing the plaintiffs' argument regarding the Twenty-Seventh

Amendment.  The plaintiffs argue that "the implementation of punitive fines under H[ouse]

Res[olution] 38 via salary deductions explicitly violates the prohibition against salary reductions

of the [Twenty-Seventh] Amendment[.]"  Pls.' Opp'n at 5.  In response, the defendants argue

that "House Resolution 38 does not vary Member 'compensation' within the meaning of the

Twenty-Seventh Amendment" because it "affects Member salary only conditionally and

indirectly based on the Member's own behavior" and "does not change [a] Member['s]

---

[14] As the defendants correctly note, see Defs.' Reply at 6, Ballin did not concern the Speech or Debate Clause—rather, it addressed when a challenge to internal congressional rules was a nonjusticiable political question, see Ballin, 144 U.S. at 5.  However, Ballin does address when a Court may review whether a congressional rule exceeds Congress's rulemaking and disciplinary authority under Article I, Section 5, Clause 2.  See id.  Accordingly, here, in order to consider whether the House's rulemaking and disciplinary authority under Article I, Section 5, Clause 2, places the defendants' actions "within the jurisdiction of [the] House[,]" Gravel, 408 U.S. at 625—and, therefore, within the scope of the Speech or Debate Clause—the Court must consider Ballin to the extent that the plaintiffs argue that the defendants have exceeded the House's rulemaking and disciplinary authority because the House's mask policy and House Resolution 38 violate other constitutional provisions.

[15] The plaintiffs also argue that the House lacks the authority under Article I, Section 5, Clause 2, to fine the plaintiffs for their failure to comply with the House's mask policy because the plaintiffs' failure to wear masks, albeit non-compliant, is not "disorderly[.]"  See Pls.' Opp'n at 31–35.  However, "in order to present a justiciable challenge to congressional procedural rules, [the p]laintiffs must identify a separate provision of the Constitution that limits the rulemaking power."  Common Cause v. Biden, 909 F. Supp. 2d 9, 28 (D.D.C. 2012) (emphasis added).  Because the plaintiffs' argument regarding the meaning of "disorderly" implicates the scope of Article I, Section 5, Clause 2, rather than a limit placed on the House's rulemaking authority by another constitutional provision, the plaintiffs' challenge under Article I, Section 5, Clause 2, is non-justiciable.  Cf. id. (concluding that Common Cause's challenge to a Senate rule was non-justiciable because the plaintiffs "identif[ied] no explicit constitutional restraints upon the [challenged] Senate[] [ ] [r]ule" at issue).

'compensation' for [his or her] 'services.'"  Defs.' Reply at 8.  For the following reasons, the
Court concludes that the plaintiffs' compensation, as the term is used in the Twenty-Seventh
Amendment, is not varied by the deduction of disciplinary fines from the plaintiffs' paychecks.

Pursuant to the Twenty-Seventh Amendment, "[n]o law varying the compensation for the
services of the Senators and Representatives shall take effect, until an election of Representatives
shall have intervened."  U.S. Const. amend. XXVII.  As demonstrated by the shared use of the
phrase "compensation for [ ] services[,]" U.S. Const. art. I, § 6, cl. 1; U.S. Const. amend XXVII,
the Twenty-Seventh Amendment modifies the Ascertainment Clause found in Article I,
Section 6, Clause 1, which provides that "[t]he Senators and Representatives shall receive a
Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the
United States[,]" U.S. Const. art. I, § 6, cl. 1.  See Richard B. Bernstein, The Sleeper Wakes: The
History and Legacy of the Twenty-Seventh Amendment, 61 Fordham L. Rev. 497, 502 (1992)
(noting that "[t]he compensation amendment was intended to amend Article I, Section 6,
Clause 1 of the United States Constitution"); see also id. at 526 (noting that the text of the
proposed amendment put forth by the "committee named by the House [in 1789] to frame
proposed amendments" edits the text of the Ascertainment Clause); House Committee Report
(July 28, 1789), reprinted in Creating the Bill of Rights: The Documentary Record from the First
Federal Congress 14–28 (Helen E. Veit et al., eds., 1991) (reflecting that an early draft of the
amendment explicitly edited the language in Article I, Section 6).

As the parties both note, this amendment was originally "proposed in the First Congress
on June 8, 1789[,] by Representative James Madison[,]" but was not ratified until May 7, 1992,
when "Michigan became the thirty-eighth state to ratify [the] amendment[.]"  Bernstein, supra,
at 498.  "According to Madison, and to all the ratifying states that stated their understanding, the

JA 154

purpose of the amendment is to ensure that a congressional pay increase 'cannot be for the

particular benefit of those who are concerned with determining the value of the service.'"

Boehner v. Anderson, 30 F.3d 156, 159 (D.C. Cir. 1994) (quoting James Madison, Speech in the

House of Representatives (June 8, 1789), in The Congressional Register, June 8, 1789, reprinted

in Creating the Bill of Rights, supra, at 84; 138 Cong. Rec. S6836 (May 19, 1992) (documents

supplementing remarks of Senator Byrd) (text of state resolutions concerning Madison

amendment)).  Furthermore, as acknowledged by the plaintiffs, see Pls.' Opp'n at 19–25, the

background of the Twenty-Seventh Amendment also reflects a concern regarding the ways in

which candidates for the House of Commons of Great Britain "at first bid for their constituents'

approval and support by promising to take lower wages, and later raised the stakes by pledging

not to accept wages altogether[,]" Bernstein, supra, at 500–01; see id. at 526 (noting comments

by House Members in 1789 regarding an initial draft of the amendment that "it might serve as a

tool for designing men" to "reduce the wages very low, much lower than it was possible for any

gentleman to serve without injury to his private affairs, in order to procure popularity at home"

(quoting Debates in the House of Representatives (Aug. 14, 1789), in The Congressional

Register, reprinted in Creating the Bill of Rights, supra)).

      To determine the meaning of the term "compensation" as used in the Twenty-Seventh

Amendment, the Court first looks to definitions of the term at the time of the drafting of the

Ascertainment Clause and what would become the Twenty-Seventh Amendment.[16]  See United

---

[16] As noted above, the Twenty-Seventh Amendment and the Ascertainment Clause reference the same phrase—
"compensation for [ ] services[,]" U.S. Const. art. I, § 6, cl. 2; U.S. Const. amend. XXVII—and the Twenty-Seventh
Amendment modifies the Ascertainment Clause, see Bernstein, supra, at 502 (noting that "[t]he compensation
amendment was intended to amend Article I, Section 6, Clause 1 of the United States Constitution"); see also id. at
526 (noting that the text of the proposed amendment put forth by the "committee named by the House [in 1789] to
frame proposed amendments" edits the text of the Ascertainment Clause); House Committee Report (July 28, 1789),
reprinted in Creating the Bill of Rights, supra, at 14–28 (reflecting that an early draft of the amendment explicitly
edited the language in Article I, Section 6).  Therefore, the Court concludes that the meaning of the word
(continued . . .)

States v. Sprague, 282 U.S. 716, 731 (1931) ("The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning; where the intention is clear there is no room for construction and no excuse for interpolation or addition.").  These definitions demonstrate that the meaning of "compensation" from the time of the drafting of the Ascertainment Clause and what would become the Twenty-Seventh Amendment is clear: the provision of "something equivalent[.]" Samuel Johnson, Dictionary of the English Language 181 (6th ed. 1785), https://heinonline.org/ HOL/Index?index=cow/denlwwd&collection=lbr; see also id. ("Recompence; something equivalent; amends."); A New General English Dictionary 169 (14th ed. 1771), https:// heinonline.org/HOL/Page?handle=hein.lbr/ngengd0001&id=1&collection=lbr&index=ldic ("[T]he satisfying or making returns for any thing done, or favours received."); 1 John Ash, The New and Complete Dictionary of the English Language 111 (2d ed. 1795), https:// heinonline.org/HOL/Page?collection=lbr&handle=hein.lbr/ncdctel0001&id=200&men_ tab=srchresults ("A recompence, amends.").  Therefore, by using the phrase "compensation for the[ir] services[,]" the Ascertainment Clause and the Twenty-Seventh Amendment were referencing the remuneration that Members receive in return for their "services" as Members, see U.S. Const. art. I, § 6, cl. 1; U.S. Const. amend. XXVII, which, pursuant to the Ascertainment Clause, is "ascertained by Law[] and paid out of the Treasury of the United States[,]" U.S. Const. art. I, § 6, cl. 1.

Furthermore, the history of congressional salaries demonstrates that the amount of the compensation referred to in the Ascertainment Clause and the Twenty-Seventh Amendment has

---

(. . . continued)
"compensation" is the same in both the Twenty-Seventh Amendment and the Ascertainment Clause, and will analyze the amendment and the clause collectively.

JA 156

changed over time through the passage of legislation.  Initially, "[b]itter argument in the summer and fall of 1789 resulted in a statute establishing that Senators and Representatives were to be paid six dollars per day for actual attendance at legislative sessions, as well as six dollars per day for time spent traveling to and from the seat of the federal government[,]" Bernstein, supra, at 533 (citing 6 Documentary History of the First Federal Congress 1789–1791, at 1833–45 (Charlene Bangs Bickford & Helen E. Veit, eds., 1986)); see also 1 Stat. 70–71 (Sept. 22, 1789), and it was "[o]nly in 1855" when "Congress [was] emboldened to alter the basis of its compensation to an annual salary, which it then held in place for ten years[,]" id. at 533–34; see 11 Stat. 48 (Aug. 16, 1856).  See generally Congressional Quarterly's Guide to Congress at 635–49 (4th ed. 1991); see also Cong. Rsch. Serv., RL 97-1011, Salaries of Members of Congress: Recent Actions and Historical Tables tbl. 1 (updated Jan. 25, 2022) ("Salaries of Members of Congress") (reflecting congressional pay since 1789).  Since the passage of the Ethics Reform Act of 1989, congressional pay has included an annual cost-of-living adjustment ("COLA"), see 2 U.S.C. § 4501(2)(A), which "employs a formula based on changes in private sector wages and salaries as measured by the Employment Cost Index" and which "automatically goes into effect unless" (1) "Congress statutorily prohibits the adjustment[,]" (2) "Congress statutorily revises the adjustment[,]" or "[t]he annual base pay adjustment for [General Schedule] employees is established at a rate less than the scheduled adjustment for Members, in which case Members would be paid the lower rate[,]" Salaries of Members of Congress, supra, at 2.  See Boehner, 30 F.3d at 162 (holding that "the COLA provision of the Ethics Reform Act of 1989" does not violate the Twenty-Seventh Amendment" because it did not go into effect until "after [an] election" following the passage of the Act "and the seating of the new Congress").  Since 2009,

Congress has denied itself the annual adjustment, see Salaries of Members of Congress, supra, at 2, and, thus, a Representative's annual salary has remained at $174,000 per year, see id. at 19.

Therefore, the "compensation" received by Members in return for their "services[,]" U.S. Const. art. I, § 6, cl. 1; U.S. Const. amend. XXVII, is the compensation set by the most recent applicable statute prescribing congressional pay, thus comporting with the Ascertainment Clause's requirement that such compensation be "ascertained by [l]aw[,]" U.S. Const. art. I, § 6, cl. 1.[17]  And, consequently, a Member's current "compensation" is the $174,000 annual salary that was deemed to be the "something equivalent" to the congressional service provided by Members, see Dictionary of the English Language, supra, at 181, as set by the most recent compensation-setting statute, the Ethics Reform Act of 1989.

Having determined the constitutional meaning of what constitutes "compensation[,]" the Court concludes that this "compensation[,]" U.S. Const. art. I, § 6, cl. 1; U.S. Const. amend. XXVII, is not altered within the meaning of the Twenty-Seventh Amendment by the deduction of fines from the plaintiffs' paychecks.  House Resolution 38 does not purport to modify the compensation designated in the Ethics Reform Act of 1989, see generally H.R. Res. 38, and, as the plaintiffs themselves acknowledge, "the fines [do] not change th[eir] underlying salary level of $174,000 per annum[,]" Pls.' Opp'n at 30.  Rather, the fines are independent "deduct[ions] . . . from the net salary otherwise due the Member[,]" H.R. Rule II, cl. 4(d)(1), triggered by the plaintiffs' non-compliance with the House's Rules and policies regarding decorum.

---

[17] The plaintiffs acknowledge that the Ascertainment Clause requires compensation to be set by statute.  See Pls.' Opp'n at 35 n.28 (arguing that the term "Law," in Article I, Section 6 . . . refers to enactments of bills by Congress that have been presented to the President").

The plaintiffs muster only conclusory arguments to the contrary, asserting that, "[w]hile the fines may not change the underlying salary level of $174,000 per annum, it defies logic (and math) to suggest that deducting money does not vary, i.e., reduce, those Members' actual compensation for their services." Pls.' Opp'n at 30 (underline added). As an initial matter, the Court notes that, although the plaintiffs refer to their "actual compensation[,]" id., the term "actual" is not found in either the Twenty-Seventh Amendment or the Ascertainment Clause, see U.S. Const. art. I, § 6, cl. 1; U.S. Const. amend. XXVII, and accordingly has no relevance to the Court's analysis of the amendment's language, see Sprague, 282 U.S. at 731 (noting that, "where the intention is clear[,] there is no room for construction and no excuse for interpolation or addition"). Moreover, the plaintiffs offer no support for the proposition that the "compensation" referred to in the Twenty-Seventh Amendment refers to the amount they receive in their paychecks after any deductions from their gross salary, rather than to the gross salary set by law. See generally id. Rather, contrary to the plaintiffs' argument, as discussed above, the "compensation" received by the plaintiffs in return for their "services[,]" U.S. Const. art. I, § 6, cl. 1; U.S. Const. amend. XXVII, is their salary of $174,000, as set by the most recent compensation-setting statute. And, as the plaintiffs acknowledge, neither House Resolution 38 nor the defendants' actions alter this amount. See Pls.' Opp'n at 30 ("[T]he fines [do] not change th[e plaintiffs'] underlying salary level of $174,000 per annum[.]"). Moreover, in light of the plaintiffs' vague, generalized, and unsupported arguments, see, e.g., Pls.' Opp'n at 30 (arguing based on unspecified "logic[] and math[]"); id. ("Without question the fine reduces the Member's salary before he [or she] ever receives it."), the Court is unconvinced that the plaintiffs' "compensation[,]" U.S. Const. art. I, § 6, cl. 1; U.S. Const. amend. XXVII, was altered by the mere fact that the mechanism chosen by the House to collect these fines—"deduct[ions]

JA 159

. . . from the net salary otherwise due the Member[,]" H.R. Rule II, cl. 4(d)(1)—occurred before

the plaintiffs received their paychecks.[18]

Accordingly, the Court concludes that the deduction of fines from the plaintiffs'

paychecks pursuant to House Resolution 38 does not violate the Twenty-Seventh Amendment,

and, therefore, the Twenty-Seventh Amendment does not limit the House's authority to adopt the

mask policy or House Resolution 38 pursuant to its rulemaking and disciplinary authority under

Article I, Section 5, Clause 2.[19]

### 2.   Whether Article I, Sections 6 and 7 Limit the House's Authority under Article I, Section 5, Clause 2 to Adopt the Mask Policy and House Resolution 38

Second, the Court turns to the plaintiffs' argument regarding Article I, Sections 6 and 7.

As noted previously, the Ascertainment Clause in Article I, Section 6, Clause 1, states that "[t]he

Senators and Representatives shall receive a Compensation for their Services, to be ascertained

by Law, and paid out of the Treasury of the United States."  U.S. Const. art. I, § 6, cl. 1.

Article I, Section 7, Clause 2 sets forth the process of bicameralism and presentment, requiring

that "[e]very bill which shall have passed the House of Representatives and the Senate, shall,

before it become a Law, be presented to the President of the United States[.]"  U.S. Const. art. I,

§ 7, cl. 2.  Relying on these two provisions as support for their position, the plaintiffs assert that

"the implementation of H[ouse] Res[olution] 38 abrogates the protections of Article I,

[Sections] 6 and 7[] because measures related to Members' compensation must be set as law,

---

[18] The plaintiffs deem the conclusion that the deduction of fines from their paychecks does not vary their "compensation" within the meaning of the Twenty-Seventh Amendment to be "merely word play, as reducing the bottom line on a paycheck is a reduction in compensation."  Pls.' Opp'n at 36.  However, again, the plaintiffs offer no support for the proposition that "compensation[,]" <u>as it is used in the Ascertainment Clause and the Twenty-Seventh Amendment</u>, refers to the amount that they receive in their paychecks, as opposed to the congressional salary established by law.  <u>See</u> Pls.' Opp'n at 36.

[19] The parties also dispute whether House Resolution 38 is a "law" within the meaning of the Twenty-Seventh Amendment.  <u>See</u> Defs.' Mem. at 17–20; Pls.' Opp'n at 25–29.  However, in light of the Court's conclusion that House Resolution 38 does not vary the plaintiffs' compensation, <u>see</u> <u>supra</u> Section III.B.1, the Court need not determine whether House Resolution 38 is a "law" within the scope of the Twenty-Seventh Amendment.

which requires passage by both chambers of Congress and presentment to the President[.]"  Pls.'

Opp'n at 5.

In light of the Court's prior conclusion that neither the House's mask policy nor House

Resolution 38 affects the plaintiffs' "compensation for their services" within the purview of the

Twenty-Seventh Amendment and the Ascertainment Clause, see supra Section III.B.1, it must

similarly conclude that the Ascertainment Clause's requirement that "compensation" must "be

ascertained by law[,]" U.S. Const., art. I, § 6, pursuant to the procedures in Article I, Section 7,

does not apply.  Accordingly, the Court concludes that the deduction of fines from the plaintiffs'

salaries pursuant to House Resolution 38 does not violate Article I, Sections 6 and 7, and neither

of those provisions limit the House's authority to adopt the mask policy and House

Resolution 38 under its rulemaking and disciplinary authority.

### 3.  Whether the First Amendment Limits the House's Authority under Article I, Section 5, Clause 2 to Adopt the Mask Policy and House Resolution 38.

Third and finally, the plaintiffs argue that the House's mask policy and House

Resolution 38 "punish[ M]embers for contrary viewpoint-based symbolic speech, in

contravention of the First Amendment."[20]  Pls.' Opp'n at 5.  In response, the defendants argue

that the House's mask policy and House Resolution 38 do not violate the First Amendment

---

[20] Although the plaintiffs also make reference to an argument that the House's mask policy and House Resolution 38 violate the First Amendment as "compelled viewpoint-based symbolic speech[,]" Pls.' Opp'n at 11, they do not actually present any such argument in the two-and-a-half-page sub-section of their opposition under that section heading, see id. from 42–44 (the section titled "Compelled speech (the requirement to be masked)").  Instead, that sub-section copies word-for-word—and without any citation—a discussion of the compelled speech doctrine in the United States Court of Appeals for the Tenth Circuit's decision in Cressman v. Thompson, 719 F.3d 1139 (10th Cir. 2013).  Compare Pls.' Opp'n at 42–44, with Cressman, 719 F.3d at 1151–52.  As the defendants correctly note in response, the lack of argument by the plaintiffs is "fatal to [the p]laintiffs' claim[,]" Defs.' Reply at 19, because the Court is without any basis on which to consider whether the House's mask policy and House Resolution 38 constitute compelled speech.  Moreover, "an argument in a dispositive motion that the opponent fails to address in an opposition may be deemed conceded[.]"  Rosenblatt v. Fenty, 734 F. Supp. 2d 21, 22 (D.D.C. 2010).  Therefore, to the extent that the plaintiffs present a claim that the House's mask policy and House Resolution 38 violate the First Amendment by compelling the wearing of masks in the House Chamber, the Court will deem the claim conceded and grant the defendants' motion to dismiss that claim for that reason.

JA 161

because the interest underlying the policy is "important" and "unrelated to the suppression of

expression[,]" and "the incidental restriction on [the plaintiffs'] alleged First Amendment

freedoms is no greater than is essential to the furtherance of [the stated] interest[s]."  Defs.' Mot.

at 28 (internal quotation marks omitted).  For the following reasons, the Court agrees with the

defendants.

Although "[t]he First Amendment literally forbids the abridgment only of 'speech[,]'"

courts "have long recognized that its protection does not end at the spoken or written word."

Texas v. Johnson, 491 U.S. 397, 404 (1989).  Accordingly, "conduct may be 'sufficiently

imbued with elements of communication to fall within the scope of the First . . . Amendment[],'"

provided that (1) "'[a]n intent to convey a particularized message was present'" and (2) "'the

likelihood was great that the message would be understood by those who viewed it."  Id.

(quoting Spence v. Washington, 418 U.S. 405, 409 (1974)).  However, "[t]he government

generally has a freer hand in restricting expressive conduct than it has in restricting the written or

spoken word[,]" although "[i]t may not, however, proscribe particular conduct because it has

expressive elements."  Id. at 406 (emphasis in original).  If a law is "directed at the

communicative nature of [the] conduct[, it] must, like a law directed at speech itself, be justified

by the substantial showing of need that the First Amendment requires."  Id. (internal quotation

marks omitted) (emphasis in original).  However, in "those cases in which 'the governmental

interest is unrelated to the suppression of free expression[,]" id. at 407 (quoting United States v.

O'Brien, 391 U.S. 367, 377 (1968)), "'a sufficiently important governmental interest in

regulating the nonspeech element can justify incidental limitations on First Amendment

freedoms,'" Nicopure Labs, LLC v. Food & Drug Admin., 266 F. Supp. 3d 360, 410 (D.D.C.

2017) (quoting O'Brien, 391 U.S. at 376), so long as the "regulation [ ] leave[s] open ample

alternative channels for communication[,]" id. (citing Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)).[21]

Here, it is undisputed that the plaintiffs allege "[a]n intent to convey [several] particularized message[s,]" id., in not wearing masks in the House Chamber—specifically, that

> mask[-]wearing is not scientifically based, [ ] mask[-]wearing is not necessary for the vaccinated or naturally immune, [ ] mask[-]wearing is merely political theater, [ ] one's bodily integrity should be free from government control, [ ] individuals should have the liberty to choose what they wear on their face, . . . individuals should be free to make their own medical decisions[, and] . . . the use of face coverings has no appreciable effect on slowing or halting the spread of COVID-19.

Compl. ¶ 27. See Defs.' Mot. at 28 (conceding that the "[p]laintiffs allege an intent to convey a particularized message" (internal quotation marks omitted)).  However, even assuming that "the likelihood was great that the message [that the plaintiffs contend they intended to convey by their actions] would be understood by those who viewed it[,]" Johnson, 491 U.S. at 404, which would entitle the plaintiffs' conduct to First Amendment protection, see id., the Court cannot conclude for several reasons that the House's mask policy or House Resolution 38 violate the First Amendment.

Under United States v. O'Brien,

---

[21] The plaintiffs also present a two-sentence argument that, "when it comes to the symbolic speech at issue [here], one viewpoint was favored over another" and "viewpoint discrimination is ipso facto unconstitutional in" the House Chamber because it is "a limited public forum[,]" Pls.' Opp'n at 45 (underline in original).  Even assuming that the plaintiffs are correct that the adoption of a mask policy pursuant to scientific guidance to combat the spread of COVID-19 constitutes the "favor[ing]" of "one viewpoint . . . over another[,]" id., the single case cited by the plaintiffs, Good News Club v. Milford Central School, addressed the regulation of pure speech, rather than expressive conduct, see 533 U.S. 98, 104 (2001) (noting that the prohibited actions were "religious instruction and Bible study").  As noted above, see supra Section III.B.3, "[t]he government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word[,]" Johnson, 491 U.S. at 406, as reflected by the distinct inquiry under Johnson and O'Brien for expressive conduct where the challenged restriction is unrelated to the suppression of expression.  Because the plaintiffs have not provided any support for the proposition that they have plausibly alleged a claim of viewpoint discrimination, the Court is without any basis on which to consider the plaintiffs' argument.  Accordingly, the Court will grant the defendants' motion to dismiss the plaintiffs' viewpoint discrimination claim.  See Cummings ex rel. J.C. v. Woodson Senior High Sch., 563 F. Supp. 2d 256, 259 (D.D.C. 2008) (dismissing Cummings's "IDEA claims" because "[t]he brief she filed [ ] is filled with irrelevant legal principles and citations on [unrelated] topics").

JA 163

> a government regulation is sufficiently justified if [(1)] it is within the constitutional power of the [g]overnment; [(2)] if the governmental interest is unrelated to the suppression of free expression; and [(3)] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

Id. at 377.  Regarding the first O'Brien factor, as noted above, see supra Section III.B, the House

has the authority under Article I, Section 5, Clause 2, to adopt rules regarding the legislative

process and to discipline Members for non-compliance.[22]  See U.S. Const. art. I, § 5, cl. 2 ("Each

House may determine the Rules of its Proceedings" and "punish its Members for disorderly

Behavior").  Therefore, O'Brien's first factor is satisfied.

Regarding the second O'Brien factor, the reasons underlying both the House's mask

policy and House Resolution 38 are "unrelated to the suppression[,]" O'Brien, 391 U.S. at 377,

of the messages the plaintiffs claim they intended to convey by refusing to wear masks.  The

House's mask policy expressly references its underlying reasoning, namely, the Speaker's

"responsibility to ensure the protection of Member and staff safety and health during

proceedings[,]" which "is of paramount importance, particularly in the midst of a pandemic."

---

[22] The Court notes the circularity of the first inquiry under O'Brien as applied to this case.  In this section of this Memorandum Opinion, the Court is addressing whether the House does, in fact, have the authority under Article I, Section 5, Clause 2, to adopt the mask policy and House Resolution 38, see Section III.B.1–3, and under Ballin, the Court may only do so by determining whether other constitutional provisions limit Article I, Section 5, Clause 2. Furthermore, because the Court has already determined that the mask policy and House Resolution 38 do not violate either the Twenty-Seventh Amendment or Article I, Sections 6 and 7, see supra Section III.B.1–2, the only remaining issue regarding whether the mask policy and House Resolution 38 are within the House's rulemaking authority is whether they violate the First Amendment, i.e., through this very analysis under O'Brien.

If the House's mask policy and House Resolution 38 satisfy the O'Brien factors, then there is no constitutional violation and the House has acted within its rulemaking authority—which, in turn, would satisfy the first O'Brien factor.  See O'Brien, 391 U.S. at 377 (listing the first factor as whether the regulation "is within the constitutional power of the [g]overnment").  Conversely, if the policy and the resolution do not satisfy the O'Brien factors, then the House has not acted within its rulemaking authority (because the First Amendment would prevent the House from enacting its mask policy and House Resolution 38 under its rulemaking and disciplinary authority), and the first O'Brien factor would not be satisfied.  Therefore, because the remaining O'Brien factors are met, and, broadly speaking, the House has the authority under Article I, Section 5, Clause 2, to enact rules regarding the legislative process and to discipline its own members, see U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings" and "punish its Members for disorderly Behaviour"), the Court concludes that the first requirement of the O'Brien inquiry is satisfied in this case.

JA 164

167 Cong. Rec. H40–41 (daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore).

Similarly, although House Resolution 38 does not expressly set forth the reasons for its adoption,

it applies only "[d]uring a covered period[,]" H.R. Res. 38 § 4(a), as designated by House

Resolutions 8 and 965, i.e., during "a public health emergency due to a novel coronavirus[,]"

H.R. Res. 965 § 1(a).  Thus, the conduct of not wearing a mask in the House Chamber is

"singl[ed] out . . . for proscription[,]" Johnson, 491 U.S. at 406 (internal quotation marks

omitted), not for the purpose of restricting the plaintiffs' intended messages, but rather because

of "the importance of [requiring] safe practices" "in the midst of a pandemic[,]" 167 Cong. Rec.

H40–41 (daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore).  Accordingly, the

Court concludes that the House's mask policy and House Resolution 38 were implemented in

order to help prevent the spread of COVID-19, not "because [the failure to wear a mask in the

House Chamber may] ha[ve] expressive elements[,]" Johnson, 491 U.S. at 406 (emphasis in

original), and O'Brien's second factor is satisfied.

Finally, concerning the third O'Brien factor, the Court concludes that "the incidental

restriction" on the plaintiffs' "alleged First Amendment freedoms is no greater than is essential

to the furtherance of [the House's] interest[,]" id., in preventing the spread of the COVID-19

virus amongst Members of the House and their staff.  Since March 2020, the United States has

been grappling with the devastating effects of the COVID-19 pandemic, including an ever-rising

death toll from the virus.  See, e.g., Ctrs. for Disease Control & Prevention ("CDC"), COVID

Data Tracker: Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC,

by State/Territory, https://covid.cdc.gov/covid-data-tracker/#trends_totaldeaths (last visited

March 9, 2022)  ("CDC COVID-19 Death Tracker") (reflecting the number of COVID-19

JA 165

related cases and deaths in the United States since January 23, 2020);[23] Roman Cath. Diocese of

Brooklyn v. Cuomo, 141 S. Ct. 63, 73 (2020) (Kavanaugh, J., dissenting from denial of

application for injunctive relief) ("[T]he COVID-19 pandemic remains extraordinarily serious

and deadly."); Agua Caliente Band of Cahuilla Indians v. Mnuchin, No. 20-01136, 2020 WL

2331774, at *1 (D.D.C. May 11, 2020) (noting "the devastating impacts of the COVID-19

pandemic").  Although "[m]ost people with COVID-19 have mild symptoms, [ ] some people

become severely ill."  CDC, Basics of COVID-19, https://www.cdc.gov/coronavirus/2019-

ncov/your-health/about-covid-19/basics-covid-19.html ("CDC COVID-19 Basics Factsheet")

(last visited March 7, 2022).  This includes "[o]lder adults and people who have certain

underlying medical conditions[,]" who "are at increased risk of severe illness from COVID-

19[,]" but also people "with minor or no symptoms [who] suffer from post-COVID conditions[,]

or [so-called] 'long COVID.'"  Id.  On January 4, 2021, when the Speaker announced the

House's mask policy, the CDC reported the deaths of 2,092 people on that day in the United

States due to COVID-19, which brought the nation's cumulative total of deaths from the virus to

370,527.  See CDC COVID-19 Death Tracker.  By January 12, 2021, when the House adopted

House Resolution 38, the number had risen to 3,602 deaths reported on that day and 397,752

total deaths across the country.  See id.  By May 18, 2021, and May 19, 2021, when the plaintiffs

appeared in the House Chamber without masks, although the nation's daily death rate had

decreased substantially to 604 and 607, respectively, the total number of deaths in the country

had increased to 588,764.  See id.

---

[23] As a "government document[] available from [a] reliable source[,]" Democracy Forward Found. v. White House
Off. of Am. Innovation, 356 F. Supp. 3d 61, 62 n.2 (D.D.C. 2019), the Court may take judicial notice of this report
by the CDC.  Moreover, the "[C]ourt may consider such materials outside the pleadings as it deems appropriate to
resolve the question [of] whether it has jurisdiction to hear the case."  Scolaro, 104 F. Supp. 2d at 22.

JA 166

Additionally, as acknowledged by articles cited by the plaintiffs in their Complaint, the virus is "a highly infectious disease[,]" Costa v. Bazron, 456 F. Supp. 3d 126, 129 (D.D.C. 2020).  See Compl. at 10 n.12 (collecting articles); Amanda D'Ambrosio, Droplets vs Aerosols: What's More Important in COVID-19 Spread?, MedPage Today (May 13, 2021), https://www.medpagetoday.com/specialreports/exclusives/92564 ("D'Ambrosio") (noting that "inhalation of aerosols—which are tiny, lightweight viral particles that can float and linger in the air for extended periods of time—is one way [in which] COVID-19 spreads" and, "[e]ven when an infectious person is more than [six] feet away, aerosols have the ability to travel and infect others"); see also CDC COVID-19 Basics Factsheet, supra (noting that COVID-19 "is very contagious and has quickly spread around the world").

Contrary to the plaintiffs' assertion regarding the existence of "recent scientific findings that the use of face coverings has no appreciable effect on slowing or halting the spread of COVID-19[,]" Compl. ¶ 27,[24] the consensus within the scientific community is clear that

---

[24] In their Complaint, the plaintiffs assert that their intended messages are based on "well-founded beliefs[.]" Compl. ¶ 27.  To support their assertion that their "symbolic speech was also an effort to highlight recent scientific findings that the use of face coverings has no appreciable effect on slowing or halting the spread of COVID-19[,]" id., they cite three articles which state that (1) "[p]eople release respiratory fluids during exhalation . . . in the form of droplets" that "carry virus and transmit infection" and form "aerosol particles . . . when [ ] fine droplets rapidly dry[,]" id. at 10 n.12 (quoting CDC, SARS-CoV-2 Transmission (updated May 7, 2021), https://www.cdc.gov/ coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html#:~:text=People%20release% 20respiratory%20fluids%20during,across%20a%20spectrum%20of%20sizes.&text=These%20droplets%20carry%2 0virus%20and,rapidly%2C%20within%20seconds%20to%20minutes ("CDC COVID-19 Transmission Factsheet")); (2) "new guidance acknowledges that inhalation of aerosols . . . is one[ ]way [in which] COVID-19 spreads[,]" id. (quoting D'Ambrosio, supra); and (3) "[a]lthough surgical mask[s] [ ] may be adequate to remove bacteria exhaled or expelled by health[-]care workers, they may not be sufficient to remove the submicrometer-size aerosols containing pathogens to which these health[-]care workers are potentially exposed[,]" id. (quoting Chih-Chieh Chen & Klaus Willeke, Aerosol Penetration Through Surgical Masks, 20 Am. J. Infect. Control 177–84 (1992), https://www.ajicjournal.org/article/S0196-6553(05)80143-9/pdf).

It is unclear whether the plaintiffs have accurately consumed the content of the three articles they cite to support their assertion of the existence of "recent scientific findings that the use of face coverings has no appreciable effect on slowing or halting the spread of COVID-19[,]" Compl. ¶ 27.  See id. at 10 n.12.  The CDC article, which states that COVID-19 is spread through droplets, including aerosol particles, specifically states that "the available evidence continues to demonstrate that existing recommendations to prevent [COVID-19] transmission remain effective[,]" including, inter alia, "community use of well-fitting masks (e.g., barrier face coverings,

(continued . . .)

43

JA 167

masks—and, in particular, well-fitting, protective masks—are effective in slowing the spread of

the COVID-19 virus, as demonstrated by the very articles cited by the plaintiffs in their

Complaint, see id. at 10 n.12 (citing articles); CDC, SARS-CoV-2 Transmission (updated May 7,

2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-

transmission.html#:~:text=People%20release%

20respiratory%20fluids%20during,across%20a%20spectrum%20of%20sizes.&text=These%20dr

oplets%20carry%20virus%20and,rapidly%2C%20within%20seconds%20to%20minutes ("CDC

COVID-19 Transmission Factsheet") (stating that "the available evidence continues to

demonstrate that existing recommendations to prevent [COVID-19] transmission remain

effective[,]" including, inter alia, "community use of well-fitting masks (e.g., barrier face

coverings, procedure/surgical masks" (underline added)); D'Ambrosio, supra (noting a statement

by "Monica Gandhi, MD, MPH, an infectious disease expert at the University of California San

Francisco" that "wearing a tight-fitting mask in poorly ventilated spaces, as well as spending

time outdoors—where ventilation is about as good as it gets—have proven to be critical infection

prevention approaches").  For these reasons, the Court concludes that any "incidental restriction

---

(. . . continued)
procedure/surgical masks)[.]"  CDC COVID-19 Transmission Factsheet, supra (underline added).  Similarly, the
MedPage Today article contains a statement by "Monica Gandhi, MD, MPH, an infectious disease expert at the
University of California San Francisco" that "wearing a tight-fitting mask in poorly ventilated spaces, as well as
spending time outdoors—where ventilation is about as good as it gets—have proven to be critical infection
prevention approaches."  D'Ambrosio, supra.  Finally, although Chen and Willeke do conclude that "surgical
mask[s] . . . may not be sufficient to remove the submicrometer-sized aerosols containing pathogens to which [ ]
health[-]care workers are potentially exposed[,]" Chen, supra, at 177, they address only one type of mask—surgical
masks—and do not specifically refer to COVID-19 or coronaviruses, see generally id.  Furthermore, the Court
questions whether the Chen and Willeke article, which was published in 1992, see id., could plausibly be called a
"recent scientific finding[,]" Compl. ¶ 27.  Finally, as noted by the CDC, healthcare personnel have been using
respirators—not surgical masks—during the COVID-19 pandemic, see CDC, Summary of N95 Respirator Strategies
(updated Apr. 9, 2021), https://www.cdc.gov/coronavirus/2019-ncov/hcp/checklist-n95-strategy.html, which are a
more protective type of mask, see CDC, Types of Masks and Respirators (updated Jan. 28, 2022),
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/types-of-masks.html.  Accordingly, the plaintiffs
offer no credible support for their allegation that there are "recent scientific findings that the use of face coverings
has no appreciable effect on slowing or halting the spread of COVID-19[,]" Compl. ¶ 27.

JA 168

on [the plaintiffs'] alleged First Amendment freedoms" by requiring them to wear masks while

in the House Chamber and imposing fines for their failure to do so "is no greater than is essential

to the furtherance of[,]" O'Brien, 391 U.S. at 377, the government's interest in limiting the

spread of the COVID-19 virus in the House Chamber.  As the defendants correctly note, see

Defs.' Mem. at 29, the plaintiffs had myriad means of expressing their stated messages,

including wearing masks or other clothing containing the messages they wanted to convey, or

making speeches from the House Chamber or elsewhere on the subject.  Cf. Terry v. Reno, 101

F.3d 1412, 1413, 1420 (D.C. Cir. 1996) (concluding that the Freedom of Access to Clinic

Entrances Act, which "prohibit[ed] the use or threat of force or physical obstruction against a

person seeking to obtain or provide reproductive health services . . . survives O'Brien's third

inquiry" in part because it "leaves open ample alternative means for communication" since

"protestors may still stand outside reproductive health facilities and express their anti-abortion

message").  On the other hand, to permit the plaintiffs not to wear masks would defeat the very

purpose of the mask policy, i.e., limiting the spread of the virus to other House Members and

staff.

      In response, the plaintiffs argue that "[t]he protest in this case was not actually disruptive

to any proceedings (any more than wearing white to a State of the Union [ ] to protest the

President), and therefore it was protected[.]"  Pls.' Opp'n at 42 (emphasis in original).  The

plaintiffs analogize this case to Tinker v. Des Moines Independent Community School District,

in which the Supreme Court held that a school violated the First Amendment when it prohibited

students from wearing black armbands to protest the Vietnam War when "the record [did] not

demonstrate any facts which might reasonably have led school authorities to forecast substantial

disruption of or material interference with school activities[,]" 393 U.S. 503, 514 (1969).  Tinker

JA 169

provides no support for the plaintiffs' position.  Not wearing masks—and, thereby, to use the

language quoted by the plaintiffs in their Complaint, "releas[ing] respiratory fluids during

exhalation" that "carry virus and transmit infection" without any sort of preventative mechanism

in the middle of a deadly pandemic caused by a highly contagious virus, Compl. at 10 n.12

(quoting CDC COVID-19 Transmission Factsheet, supra)—is not comparable to wearing an

armband on top of one's clothing.  However, even assuming that the plaintiffs are correct that not

wearing masks is not "actually disruptive[,]" Pls.' Opp'n at 42 (emphasis in original), in this

case, any relative disruption caused by the plaintiffs' conduct is not pertinent to whether the

mask policy and House Resolution 38 satisfy all three requirements under O'Brien, see Johnson

at 377.  Although, as the plaintiffs correctly state, see Pls.' Opp'n at 42, Johnson noted that "no

disturbance of the peace actually occurred or threatened to occur because of Johnson's burning

of the [American] flag[,]" 491 U.S. at 408, the Supreme Court considered the existence of a

disturbance in its First Amendment analysis in Johnson because the government in that case

asserted an "interest in preventing breaches of the peace[,]" id. at 407.  The House has not

asserted a similar interest here, see generally Defs.' Mem.; Defs.' Reply; 167 Cong. Rec. H40–

41 (daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore); H.R. Res. 38, and

therefore the relative level of disruption caused by the plaintiffs' alleged expressive conduct is

not pertinent to the Court's analysis.

        The plaintiffs present no other response to the defendants' arguments that the purpose of

the House's mask policy and House Resolution 38 is "unrelated to the suppression of

expression[,]" Defs.' Mot. at 28 (quoting Johnson, 491 U.S. at 407), and that the policy and the

Resolution "easily meet[] all [of the] O'Brien requirements[,]" id. at 29.  See generally Pls.'

Opp'n at 36–42 (presenting the plaintiffs' symbolic speech argument).  Accordingly, and for the

JA 170

foregoing reasons, the Court concludes that any "incidental impact on speech caused by the conduct limitations of" the House's mask policy and House Resolution 38 "is outweighed by the strong governmental interests behind the" policies, <u>Palestine Info. Off. v. Shultz</u>, 853 F.2d 932, 934 (D.C. Cir. 1988), and therefore, the policy and House Resolution 38 do not violate the First Amendment.

Therefore, neither the Twenty-Seventh Amendment; Article I, Sections 6 and 7; nor the First Amendment present a limit to the House's authority under Article I, Section 5, Clause 2, to adopt its mask policy and House Resolution 38.[25] Thus, and for the reasons stated above, <u>see supra</u> Section III.B, the Court concludes that the House's mask policy and House Resolution 38 also fall under <u>Gravel</u>'s second category because they constitute "other matters which the Constitution places within the jurisdiction of either House[,]" <u>Gravel</u>, 408 U.S. at 625.

In summary, because the defendants' actions fall under both <u>Gravel</u> categories, the defendants are entitled to the protection of the Speech or Debate Clause.

### IV.    CONCLUSION

For the foregoing reasons, the Court concludes that it must grant the defendants' motion and dismiss the plaintiffs' Complaint.

**SO ORDERED** this 9th day of March, 2022.[26]

REGGIE B. WALTON
United States District Judge

---

[25] Because the Court concludes that the House has not "ignore[d] constitutional restraints or violate[d] fundamental rights," <u>Ballin</u>, 144 U.S. at 5, it need not proceed to the next step of the inquiry under <u>Ballin</u>, namely whether there is "a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained[,]" <u>id.</u>

[26] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.

JA 171

## CERTIFICATE OF SERVICE

I certify that on this day the foregoing Joint Appendix was served electronically on all parties via CM/ECF.

/s/ Christopher Wiest
Christopher Wiest

June 15, 2022