**ORAL ARGUMENT NOT YET SCHEDULED**

**CASE NO. 22-5058**

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
# 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 𝔆𝔬𝔩𝔲𝔪𝔟𝔦𝔞 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

|  |  |  |
|---|---|---|
| **HON. THOMAS MASSIE, HON. RALPH NORMAN, HON. MARJORIE TAYLOR GREENE,** *in their individual and official capacities* | : : : | On Appeal from the U.S. District Court for the District of Columbia 1:21-cv-02023 |
| Plaintiffs/Appellants | : | |
| v. | : | |
| **HON. NANCY PELOSI, WILLIAM J. WALKER, CATHERINE SZPINDOR,** *in their official capacities only* | : : : | |
| Defendants/Appellees | | |

## PLAINTIFFS/APPELLANTS' BRIEF

Christopher Wiest
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd., Suite 104
Crestview Hills, KY 41017
Tel:   513/257-1895
chris@cwiestlaw.com

Thomas Bruns
Bruns Connell Volmar Armstrong
4555 Lake Forrest Dr., Suite 330
Cincinnati, OH 45242
Tel:   513/312-9890
tbruns@bcvalaw.com

*Attorneys for Plaintiffs/Appellants Hon. Thomas Massie, Hon. Ralph Norman, Hon. Marjorie Taylor Greene*

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties

Plaintiffs-Appellants are Hon. Thomas Massie, Hon. Ralph Norman, and Hon. Marjorie Taylor Greene.  Defendants-Appellees are Hon. Nancy Pelosi, William J. Walker, and Catherine Szpindor.

### B. Rulings under Review

The rulings under review are the Order, Doc. 48 (Mar. 9, 2022), and Memorandum Opinion, Doc. 47 (Mar. 9, 2022), in *Massie v. Pelosi*, No. 1:21-cv-02023, 2022 U.S. Dist. LEXIS 41944 (D.C.C. 2022) (Reggie Walton, Jr., J.), granting Defendants-Appellees' motion to dismiss, Doc. 31 (Sept. 28, 2021).

### C. Related Cases

This case has not previously been before this Court or any other.  A related case, involving some (but not all) of the same legal issues, some (but not all) of the same Defendants, and challenging a separate rule is pending in the D.C. District Court, in *Clyde v. Walker*, 1:21-cv-01605.  Counsel for Plaintiffs-Appellants are unaware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

Dated June 15, 2022                              /s/Christopher Wiest
                                                     Christopher Wiest
                                                     *Counsel for Plaintiffs-Appellants*

i

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND
RELATED CASES .................................................................................... i

TABLE OF AUTHORITIES .................................................................. iv

STATEMENT CONCERNING ORAL ARGUMENT ......................................... xiv

JURISDICTIONAL STATEMENT .............................................................1

STATEMENT OF THE ISSUES...............................................................1

INTRODUCTION ................................................................................2

STATEMENT OF THE CASE AND FACTS ..........................................2

SUMMARY OF THE ARGUMENT ......................................................11

ARGUMENT .....................................................................................11

I.    The District Court Erred in Granting Defendants' Motion to Dismiss Where
      Plaintiffs Stated Claims Upon Which Relief Can Be Granted.................... 11

      A. Standard of Review ................................................................ 11

      B. The Fines Levied Under the Rule Violate the Twenty-Seventh
         Amendment by Varying (Reducing) Members' Actual Compensation.. 12

         1. A primary purpose of the Twenty-Seventh Amendment is to prevent
            the reduction of Congressional salaries without an intervening
            election, because the Founders expressly recognized the majority
            could misuse its power to threaten the integrity and independence of
            Members, thus dissuading individuals of modest means from serving
            in Congress ....................................................................... 12

         2. House Resolution 38 is a "Law" that Varies Compensation in
            Violation of the Twenty-Seventh Amendment ................................. 20

      C. Under Article I, §5, The Imposition of Fines for Behavior that is Not
         Disorderly is Beyond the Power of the House ....................................... 29

D. A Claim Has Been Stated for a Violation of Article I, §§ 6 and 7 ......... 32

E. A Claim Has Been Stated Under the First Amendment .......................... 34

   1. Symbolic speech (going to the floor unmasked) ................................ 34

   2. Compelled speech (the requirement to be masked) ........................... 39

   3. Forum analysis ................................................................................... 42

II. The District Court Erred in Concluding Defendants Had Speech and Debate Immunity ...................................................................................................... 43

A. Supreme Court & D.C. Circuit Precedents Mandate That House Rules Subject to Allegations of Unconstitutionality Be Subject to Judicial Review ....................................................................................................... 44

B. Enforcing a Mask Mandate & Administering Payroll Are Not Core Legislative Functions Covered by the Speech or Debate Clause ............ 46

C. To Prevent Illegal Conduct, House Employees Are Not Immune From Suit, Even if the Members of Congress Who Authorized That Conduct Are Immune ............................................................................................. 52

CONCLUSION ....................................................................................................... 55

CERTIFICATE OF SERVICE .............................................................................. 56

CERTIFICATE OF COMPLIANCE ..................................................................... 56

# TABLE OF AUTHORITIES

## Cases

*Anderson v. City of Hermosa Beach*,
　621 F.3d 1051 (9th Cir. 2010) ............................................................38

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
　576 U.S. 787 (2015) ...........................................................................23

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ...........................................................................12

*Axson-Flynn v. Johnson*,
　356 F.3d 1277 (10th Cir. 2004) .......................................................... 42

*Barker v. Conroy*,
　921 F.3d 1118 (D.C. Cir. 2019).............................................. 48, 50, 51

*Bell Atlantic Corporation v. Twombly*,
　550 U.S. 544 (2007) ........................................................................... 12

*Blau v. Fort Thomas Pub. Sch. Dist.*,
　401 F.3d 381 (6th Cir. 2005) .............................................................. 37

* *Boehner v. Anderson*,
　30 F.3d 156 (D.C. Cir. 1994) ......................................... 21, 22, 45, 46

*Bregman v. Perles*,
　747 F.3d 873 (D.C. Cir. 2014) ........................................................... 12

*Brown v. Louisiana*,
　383 U.S. 131 (1966) ...........................................................................34

*Callins v. Collins*,
　510 U.S. 1141 (1994) .........................................................................20

*Capitol Square Review & Advisory Bd. v. Pinette*,
　515 U.S. 753 (1995) ...........................................................................42

iv

*Church of Am. Knights of the Ku Klux Klan v. Kerik*,
356 F.3d 197 (2d Cir. 2004) .................................................................... 37

*Clinton v. City of New York*,
524 U.S. 417 (1998) ................................................................................ 33

*Cohen v. California*,
403 U.S. 15 (1971) ..................................................................................34

*Columbia Broadcasting System, Inc. v. United States*,
316 U.S. 407 (1942) ................................................................................22

*Consumers Union of U.S. v. Periodical Correspondents' Ass'n*,
515 F.2d 1341 (D.C. Cir. 1975) ................................................... 44, 49, 50

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................................20

* *Doe v. McMillan*,
412 U.S. 306 (1973) ................................................................. 46, 48, 53

*Dombrowski v. Eastland*,
387 U.S. 82 (1967) .................................................................................. 53

*Engel v. Vitale*,
370 U.S. 421 (1962) ................................................................................14

*Evans v. Gore*,
253 U.S. 245 (1920) ................................................................................ 27

*Ex parte City Bank of New Orleans*,
44 U.S. 292 (1844) ..................................................................................31

*Exxon Corp. v. FTC*,
589 F.2d 582 (D.C. Cir. 1978) ................................................................21

*Fields v. Office of Johnson*,
459 F.3d 1 (D.C. Cir. 2009)......................................................................54

*Food Employees v. Logan Valley Plaza, Inc.*,
391 U.S. 308 (1968) ................................................................................34

*Fulton v. City of Philadelphia*,
  141 S.Ct. 1868 (2021) ..........................................................................19

*Goldwater v. Carter*,
  617 F.2d 697 (D.C. Cir. 1979) (*en banc*) ........................................... 45

*Good News Club v. Milford Cent. Sch.*,
  533 U.S. 98 (2001) ................................................................................43

* *Gravel v. United States*,
  408 U.S. 606 (1972) ................................................... 46, 47, 48, 49, 51, 52, 53

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ..............................................................................47

*Holloman ex rel. Holloman v. Hartland*,
  370 F.3d 1252 (11th Cir. 2004) ............................................................ 38

*Horne v. Dept. of Agric.*,
  576 U.S. 351 (2015) ..............................................................................15

*Humphrey v. Baker*,
  848 F.2d 211 (D.D.C. 1988) ..................................................................33

* *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) ............................................. 34, 35, 36, 37, 38, 41

*Johanns v. Livestock Marketing Ass'n*,
  544 U.S. 550 (2005) ..............................................................................41

*Jordan v. Hutcheson*,
  323 F.2d 597 (4th Cir. 1963) ................................................................21

*JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure, Ltd.*,
  536 U.S. 88 (2002) ................................................................................15

*Kaahumanu v. Hawaii*,
  682 F.3d 789 (9th Cir. 2012) ................................................................ 37

*Kennedy v. Sampson*,
  511 F.2d 430 (D.C. Cir. 1974) .............................................................. 45

* *Kilbourn v. Thompson*,
  103 U.S. 168 (1880) .......................................................... 47, 52, 53, 54

*Kisor v. Wilkie*,
  139 S.Ct. 2400 (2019) ....................................................................15

*Law v. Siegel*,
  571 U.S. 415 (2014) ..................................................................... 23

*McCarthy v. Pelosi*,
  5 F.4th 34 (D.C. Cir. 2021) ......................................................... 47, 53

*McGrain v. Daugherty*,
  273 U.S. 135 (1927) .......................................................................14

*Michel v. Anderson,*
  14 F.3d 623 (D.C. Cir. 1994) ........................................................ 25

*Moore v. U.S. House of Rep.*,
  733 F.2d 946 (D.C. Cir. 1984).........................................................45

* *NFIB v. Sebelius*,
  567 U.S. 519 (2012) ................................................................ 28, 29

* *NLRB v. Canning*,
  573 U.S. 513 (2014) ............................................................ 24, 25, 44

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009) ..................................................................... 43

*Pressler v. Simon*,
  428 F. Supp. 302 (D.C.D. 1976) ...................................................... 33

* *Powell v. McCormack*,
  395 U.S. 486 (1969) ............................................................ 2, 28, 53, 54

*Rangel v. Boehner*,
  20 F. Supp. 3d 148 (D.C.D. 2013) .................................................... 30

* *Rangel v. Boehner*,
  785 F.3d 19 (D.C. Cir. 2015) .................................................. 46, 47, 51

*Ransom v. FIA Card Servs., N.A.*,
 562 U.S. 61 (2011) ........................................................................... 29

*Riley v. Nat'l Federation of the Blind of North Carolina, Inc.*,
 487 U.S. 781 (1988) ..........................................................................41

*Rucho v. Common Cause*,
 139 S.Ct. 2484 (2019) ......................................................................17

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
 547 U.S. 47 (2006) ........................................................................... 41

*Sch. Dist. of Abingon Twp. v. Schemp*,
 374 U.S. 203 (1963) ......................................................................... 17

*Schacht v. United States*,
 398 U.S. 58 (1970) ............................................................................34

*Schaffer v. Clinton*,
 240 F.3d 878 (10th Cir. 2001) .......................................................... 19

*Scialabba v. Cuellar de Osorio*,
 573 U.S. 41 (2014) ............................................................................23

*Singer v. United States*,
 380 U.S. 24 (1965) ........................................................................... 17

* *Spence v. Washington*,
 418 U.S. 405, 94 S. Ct. 2727, 41 L. Ed. 2d 842 (1974) (per curiam) ........... 35, 36

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
 309 F.3d 144 (3d Cir. 2002) .............................................................37

* *Texas v. Johnson*,
 491 U.S. 397 (1989) ....................................................... 34, 35, 36, 39

*Timbs v. Indiana*,
 139 S.Ct. 682 (2019).........................................................................14

* *Tinker v. Des Moines*,
 393 U.S. 503 (1969) ....................................................... 34, 35, 38, 39

*Torres v. Madrid*,
    141 S.Ct. 989 (2021)........................................................................20

*U.S. Term Limits v. Thornton*,
    514 U.S. 779 (1995) .......................................................................17

\* *United States v. Ballin,*
    144 U.S. 1 (1892) ................................. 2, 21, 28, 29, 30, 44, 45, 46, 50

*United States v. Brewster*,
    408 U.S. 501 (1972) .................................................................. 48, 52

*United States v. Cabrales*,
    524 U.S. 1 (1998) ..........................................................................14

*United States v. Grace*,
    461 U.S. 171 (1983) ......................................................................34

\* *United States v. Hatter*,
    532 U.S. 557 (2001) ......................................................................27

*United States v. Hvass*,
    355 U.S. 570 (1958) ..................................................................... 22

*United States v. Rostenkowski*,
    59 F.3d 1291 (D.C. Cir. 1995)..................................................... 21, 45

*United States v. United Foods, Inc.*,
    533 U.S. 405 (2001) .................................................................. 34, 41

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) ..................................................................... 23

*Vander Jagt v. O'Neill*,
    699 F.2d 1166 (D.C. Cir. 1983).......................................................45

\* *Walker v. Jones*,
    733 F.2d 923 (D.C. Cir. 1984)........................ 47, 48, 49, 52, 53, 54, 55

*Washington Activity Group v. White*,
    342 F.Supp. 847 (D.D.C. 1971), *aff'd*, 479 F.2d 922 (D.C. Cir. 1973)...............24

*Watkins v. United States*,
   354 U.S. 178 (1957) ...................................................................21

*Weiss v. United States*,
   510 U.S. 163 (1994) ...................................................................17

*West Virginia State Board of Education v. Barnette*,
   319 U.S. 624 (1943) ..................................................... 39, 40, 41, 42

*Wooley v. Maynard*,
   430 US 705 (1977) ........................................................... 40, 41, 42

*Yellin v. United States*,
   374 U.S. 109 (1963) .............................................................. 21, 45

**Constitutional Provisions**

U.S. Const., Art. I .......................................................................... 30

U.S. Const., Art. I, § 2 .................................................................. 25

U.S. Const., Art. I, § 5 ........................................................... 1, 32, 44

U.S. Const., Art. I, § 5, cl. 2 ..................................................... 29, 50

U.S. Const., Art. I, § 6 ....................................................... 1, 32, 33, 50

U.S. Const., Art. I, § 6, cl.1 ......................... 2, 16, 43, 44, 46, 48, 52, 55

U.S. Const., Art. I, § 7 ........................................................ 1, 33, 50

U.S. Const., Art. I, § 7, cl. 2 ....................................................... 33

U.S. Const., Art. III ..................................................................... 27

U.S. Const., Amend. I ................................. 1, 34, 35, 40, 42, 43, 46, 50

U.S. Const., Amend. XXVII ... 1, 2, 11, 12, 13, 20, 22, 25, 26, 27, 28, 29, 32, 46, 49

## Statutes & Resolutions

28 U.S.C. §1291 ................................................................................ 1

28 U.S.C. §1331 ................................................................................ 1

28 U.S.C. §1346(a) ............................................................................1

28 U.S.C. § 2071 ..............................................................................22

H.R. Res. 8, 117th Cong. (2021)........................................................3, 9

H.R. Res. 38, 117th Cong. (2021)................... 2, 3, 4, 8, 9, 10, 20, 21, 25, 26, 34, 46

H.R. Res. 965, 116th Cong. (2020) .........................................................3

## Other Authorities

1 Edward Porritt with Annie G. Porritt, The Unreformed House of Commons: Parliamentary Representation Before 1832 (1909).............................................. 15

1 The Records of the Federal Convention of 1787 (Max Farrand ed., 1937) .................................................................................... 16, 17, 18

Bernard Bailyn, The Ideological Origins of the American Revolution (enlarged ed. 1992) ............................................................... 15

* Richard B. Bernstein, The Sleeper Wakes: The History and Legacy of the Twenty-Seventh Amendment, 61 FORDHAM L. REV. 497 (Dec. 1992) .................................................................................... 12, 13, 15, 16

Edmund Cody Burnett, The Continental Congress (1941)..................................... 16

Debates in the House of Representatives (Aug. 14, 1789), in The Congressional Register, Aug. 14, 1789 ................................................. 19

"Disorderly," Black's Law Dictionary, 6th ed., 1991 (abridged).......................... 31

"Disorderly," Samuel Johnson, A Dictionary of the English Language, (1785).... 31

Jack P. Greene, The Quest for Power (1963) ....................................... 16

Alexander Hamilton, *Federalist Paper No. 79* (May 28, 1788)............................. 19

https://ethics.house.gov/about/committee-members.................................................. 9

https://pubmed.ncbi.nlm.nih.gov/1524265/ .................................................7

https://rules.house.gov/sites/democrats.rules.house.gov/files/documents/116-House-Rules-Clerk.pdf ......................................................................................4, 25

https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html ....................................................................................................7

https://www.congress.gov/117/crec/2021/01/04/CREC-2021-01-04.pdf ...................4

https://www.congress.gov/bill/117th-congress/house-resolution/260/text?r=55&s=1 ...........................................................................................................................9

https://www.c-span.org/congress/?chamber=house&date=2021-05-18................. 10

https://www.c-span.org/video/?511817-2/house-passes-anti-asian-american-hate-crimes-bill-364-62&start=4694&transcriptQuery=coronavirus ........................... 8

https://www.forbes.com/sites/andrewsolender/2021/05/20/marjorie-taylor-greene-fined-500-for-repeatedly-going-maskless-on-house-floor/?sh=5a2ed08b70e9....... 8

https://www.medpagetoday.com/special-reports/exclusives/92564 .......................... 7

https://www.smithsonianmag.com/history/where-did-term-gerrymander-come-180964118/ ................................................................................................. 17

Justice John Marshall Harlan: *Lectures on Constitutional Law, 1897-98, Lecture 7, Nov. 20, 1897*, 81 GEO. WASH. L. REV. Arguendo 12, 84 (July 2013)........................................................................................................ 32

Robert P. Ludlum, *"The Antislavery 'Gag-Rule': History and Argument,"* 26 J. OF NEGRO HIST. No. 2 (April 1941).......................................................24

Richard B. Morris, The Forging of the Union, 1781-1789 (1987)......................... 16

Jack N. Rakove, The Beginnings of National Politics: An Interpretive History
    of the Continental Congress (1979)........................................................ 16

The Eighteenth-Century Constitution: 1688-1815
    (E. Neville Williams ed., 1960).......................................................... 15

*Authorities on which Plaintiffs/Appellants chiefly rely are marked with asterisks.

## STATEMENT CONCERNING ORAL ARGUMENT

This appeal raises important issues under the Twenty-Seventh Amendment and other important Constitutional provisions, most of which are issues of first impression in this Circuit. Oral argument is thus warranted.

## JURISDICTIONAL STATEMENT

The District Court had federal question jurisdiction over Plaintiffs' claims under 28 U.S.C. §1331 and 28 U.S.C. §1346(a).  On March 9, 2022 the District Court granted Defendants' Motion to Dismiss, which is a final order. [Memorandum Opinion, Doc. 47, J.A. 125-171; Judgment, Doc. 48, J.A. 124].  A timely notice of appeal was filed on March 10, 2022. [Notice of Appeal, Doc. 49]. Accordingly, this Court has jurisdiction over Plaintiffs' appeal under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

The appeal presents the following issues:

(1) Whether reductions of Members' compensation violate the Twenty-Seventh Amendment, where such reductions occur pursuant to rules that were enacted in the same session, and without an intervening election;

(2) Whether a chamber of Congress can punish Members for conduct that is not disorderly under Article I § 5;

(3) Whether Article I, §§ 6 and 7 are violated where the compensation of Members of Congress is reduced pursuant to a House Rule, rather than through laws duly enacted in a previous session;

(4) Whether the House can punish Members for engaging in symbolic speech protected by the First Amendment; and

1

(5) Whether the Speech or Debate Clause prevents challenges to Congressional rules that violate the Constitution.

## INTRODUCTION

In the aftermath of the Civil War, the House majority party cast aside proper respect for constitutional limitations by its unconstitutional exclusion of minority party Members. This unflattering legacy was recalled by the Supreme Court in *Powell v. McCormack*, 395 U.S. 486, 544 (1969), and that decision confirmed there are limits on what rules the majority party can enact. Now, treading a similar unconstitutional path, the current majority of the House of Representatives used its rulemaking authority to punish duly-elected Members of the minority party by means equally prohibited under the express language of the Constitution. *See United States v. Ballin*, 144 U.S. 1, 5 (1892).

In violation of the Twenty-Seventh Amendment, the House majority directed salary reductions upon Members of the minority for violation of a House Rule that was passed in the same session. Simply put, the methods the House has chosen under H.R. 38, both textually and as implemented, violate the Constitution. Consequently, the judgment below should be reversed.

## STATEMENT OF THE CASE AND FACTS

Plaintiffs include three Members of Congress: Hon. Thomas Massie, KY-4; Hon. Marjorie Taylor Greene, GA-14; and Hon. Ralph Norman, SC-5. (Pl.'s Ver.

Compl., Doc. 1, ¶¶5-7, JA015).  Each of the Plaintiffs were elected or re-elected on November 3, 2020 to a term of office beginning January 3, 2021.  (*Id.* at ¶13, JA016).

Defendants are Speaker of the House Nancy Pelosi, House Sergeant at Arms William Walker, and House Chief Administrative Officer Catherine Szpindor.  (*Id.* at ¶¶8-10, JA015-JA016).

On or about January 12, 2021, the House of Representatives enacted H. Res. 38[1] by a party-line vote.  (*Id.* at ¶15, JA017).  That Resolution, among other things, provided for a mask requirement in Section 4, which states in relevant part:

> SEC. 4. (a) During a covered period[2] designated pursuant to section 3(s) of House Resolution 8—
>
> (1) the Sergeant-at-Arms is authorized and directed to impose a fine against a Member, Delegate, or the Resident Commissioner for the failure to wear a mask in contravention of the Speaker's announced policies of January 4, 2021; and

---

[1]   *See*   https://www.congress.gov/117/bills/hres38/BILLS-117hres38eh.pdf   (last visited 6/9/2022).

[2]   On May 15, 2020, the House enacted H. Res. 965, which, among other things, created a "covered period," during which members of Congress could vote by proxy. *See*   https://www.congress.gov/116/bills/hres965/BILLS-116hres965eh.pdf   (last visited 6/9/2022).  The "covered period" was for a 45-day period, but it has been repeatedly extended by the Speaker.  On or about January 4, 2021, the House of Representatives, in the 117th Congress, enacted H. Res. 8, which, among other things, incorporated the 2020 H. Res. 965 with certain changes not material to this matter, continuing the "covered period" provisions permitting voting by proxy. *See* https://www.congress.gov/117/bills/hres8/BILLS-117hres8eh.pdf   (last visited 6/9/2022).

(2) a fine imposed pursuant to this section shall be treated as though imposed under clause 3(g) of rule II,[3] and shall be administered as though pursuant to clause 4(d) of rule II[4] …

(b) Subsection (a) establishes a standard of conduct within the meaning of clause 3(a)(2) of rule XI.  *Id.*

This resolution, by incorporating 4(d) of rule II, required the Chief Administrative Officer to "deduct the amount of any fine levied … from the net salary otherwise due the Member …."  (*Id.* at ¶16, JA018).

The Speaker's announced policies of January 4, 2021, which H. Res. 38 incorporated, stated: "Members and staff will be required to wear masks at all times in the Hall of the House without exception…"[5]  (*Id.* at ¶17, JA018-JA019).

The policy in question was only applicable to the Hall of the House, one of the most highly televised areas of the House, and was not applicable to a myriad of

---

[3] That rule states: "(g)(1) The Sergeant-at-Arms is authorized and directed to impose a fine against a Member … for the use of an electronic device for still photography or for audio or visual recording or broadcasting in contravention of clause 5 of rule XVII and any applicable Speaker's announced policy on electronic devices.  (2) A fine imposed pursuant to this paragraph shall be $500 for a first offense and $2,500 for any subsequent offense." https://rules.house.gov/sites/democrats.rules.house.gov/files/documents/116-House-Rules-Clerk.pdf (last visited 6/9/2022).

[4] That Rule stated in relevant part: "(d)(1) … the Chief Administrative Officer shall deduct the amount of any fine levied under clause 3(g) from the net salary otherwise due the Member … The Chief Administrative Officer is authorized to establish policies and procedures for such salary deductions." (last visited 6/9/2022).

[5] That policy stated in relevant part: "As such, the Chair wishes to stress the importance of safe practices.  Members and staff will be required to wear masks at all times in the Hall of the House without exception, … The Sergeant-at-Arms is directed to enforce this policy." at H40 to H41. https://www.congress.gov/117/crec/2021/01/04/CREC-2021-01-04.pdf (last visited 6/9/2022).

other areas, including, without limitation, the crowded and dense rooms where the majority and minority caucuses meet, the hallways leading to the chamber, including the crowded security checkpoints, crowded elevators, the Members' dining room or other dining areas.  (*Id.* at ¶18, JA019).

Wearing a mask in this context conveys a particularized message: namely, that mandatory face coverings are medically and scientifically necessary to prevent the spread of the coronavirus, that these intrusions on bodily integrity are necessary and essential, that informed consent and civil liberties are to be suppressed in favor of government's decisions regarding public health, and that individuals cannot be given the choice to make their own decisions regarding their facial attire and medical choices.  (*Id.* at ¶19, JA019).   The intent of the majority's masking requirement was to force all House Members to participate in conveying these messages. (*Id.* at ¶20, JA020).   Those viewing House proceedings would understand, and did understand, the message the majority was forcing the minority to participate in conveying.  *Id.*   Being forced to wear a mask, under these circumstances, involved both compelled statements of fact and opinion, all of which were embodied in the symbolic speech in question.  (*Id.* at ¶21, JA020).

The masking requirement was an attempt to prescribe what shall be orthodox in politics, medicine, and science, despite a deep divide over these issues of opinion.  (*Id.* at ¶22, JA020).  The majority's mask requirement followed public

pronouncements by Plaintiffs and other Members of the minority against mask requirements and the majority's favored approach regarding their use. *Id.*

On May 18, and again on May 19, 2021, as seen in the following photos, Plaintiffs entered the House floor without masks in order to vote:





(*Id.* at ¶26, JA021).

The reason for Plaintiffs proceeding to the floor without masks to vote was to engage in symbolic protest speech. (*Id.* at ¶27, JA022). This protest speech was in support of the beliefs shared by Plaintiffs that mask wearing is not scientifically

based, that mask wearing is not necessary for the vaccinated or naturally immune, that mask wearing is merely political theater, that one's bodily integrity should be free from government control, that individuals should have the liberty to choose what they wear on their face, and that individuals should be free to make their own medical decisions. *Id.* Plaintiffs' symbolic speech was also an effort to highlight then-recent scientific findings that the use of face coverings has no appreciable effect on slowing or halting the spread of COVID-19.[6] *Id.* Plaintiffs' actions in proceeding to the House floor maskless was quintessential symbolic speech. *Id.*

Plaintiffs did not intend to and would never voluntarily convey any of the particularized messages the public recognizes in wearing a mask, but Plaintiffs nevertheless were forced to convey these unwanted messages in light of the

---

[6] *See, e.g.*, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html (last visited 6/9/2022) ("People release respiratory fluids during exhalation (e.g., quiet breathing, speaking, singing, exercise, coughing, sneezing) in the form of droplets across a spectrum of sizes. These droplets carry virus and transmit infection. … The smallest very fine droplets, and aerosol particles formed when these fine droplets rapidly dry, are small enough that they can remain suspended in the air for minutes to hours"); https://www.medpagetoday.com/special-reports/exclusives/92564 (last visited 6/9/2022). ("The new guidance acknowledges that inhalation of aerosols -- which are tiny, lightweight viral particles that can float and linger in the air for extended periods of time -- is one-way COVID-19 spreads."); https://pubmed.ncbi.nlm.nih.gov/1524265/ (last visited 6/9/2022) ("Although surgical mask media may be adequate to remove bacteria exhaled or expelled by health care workers, they may not be sufficient to remove the submicrometer-size aerosols containing pathogens to which these health care workers are potentially exposed.").

7

mandate contained in H. Res. 38, including, *inter alia*, purported imprimatur and support for mask wearing and mandates. (*Id.* at ¶28, JA022-JA023).

Plaintiffs' symbolic speech – refusing to wear a mask – involved an intent by Plaintiffs to convey a particularized message. (*Id.* at ¶29, JA023). And it was understood by those who viewed their protest as a symbolic act or display. *Id.* Indeed, news sources at the time understood and reported these acts as symbolic speech and a protest.[7] *Id.*

The record is also clear that Plaintiffs' activities did not disrupt, delay, or otherwise interfere in any way with House proceedings. (*Id.* at ¶30, JA023).[8] The proceedings in the House did not halt at any time, nor did the presiding officer delay the proceedings to address the lack of face coverings by Plaintiffs. *Id.*

After Plaintiffs' appearances on the House floor, Defendant Walker sent correspondence to each of the Plaintiffs imposing a fine against each Plaintiff in the amount of $500, which according to H. Res. 38 would be deducted from Plaintiffs' compensation through procedures overseen by Defendant Szpindor. (*Id.* at ¶31, JA023-JA024). The notifications and correspondence related to the

---

[7]    *See*    https://www.forbes.com/sites/andrewsolender/2021/05/20/marjorie-taylor-greene-fined-500-for-repeatedly-going-maskless-on-house-floor/?sh=5a2ed08b70e9 (last visited 6/9/2022).

[8]    *See*    https://www.c-span.org/video/?511817-2/house-passes-anti-asian-american-hate-crimes-bill-364-62&start=4694&transcriptQuery=coronavirus at 4:14:45 to 4:45:14 (last visited 6/9/2022).

compensation reduction were attached as **Exhibit A** to Plaintiffs' Complaint. *Id.* at JA037-041.

Plaintiffs appealed these fines to the House Ethics Committee, but in votes split along party lines between Democrats and Republicans, the Committee denied each appeal.[9]  (*Id.* at ¶32, JA024).

The very same day that Plaintiffs appeared on the House floor without masks, the Speaker herself also appeared on the House floor without a mask, as can be seen in the following photo taken on May 18, 2021.  (*Id.* at ¶33, JA024). Speaker Pelosi did so, without any amendment to H. Res. 8 or H. Res. 38, because she unilaterally decided it was acceptable to not wear a mask while under recognition to speak in the chamber:

---

[9] In pursuing their partisan weaponization of the mask rule, four of the five Democratic members who sat in judgment and adjudicated Representative Greene's appeal refused to recuse themselves despite having previously signed a resolution calling for her expulsion from Congress. https://www.congress.gov/bill/117th-congress/house-resolution/260/text?r=55&s=1 (last visited 6/9/2022); https://ethics.house.gov/about/committee-members (last visited 6/9/2022).



*Id.*

Despite the clear and unambiguous language of the rule – H. Res. 38 – Defendant Walker took no actions to fine Speaker Pelosi for her violation of the rule on the very same day as Plaintiffs' violation.   (*Id.* at ¶34, JA024).

Since Speaker Pelosi's flouting of H. Res. 38, numerous Members of the majority party have failed to wear masks while on the floor of the House.  Due to Defendants' selective enforcement and *ad-hoc* exceptions, none of those majority Members have been cited or fined.  (*Id.* at ¶42, JA027-JA028).

On July 22, 2021, Plaintiff Massie received a *Deduction of Fine Imposed Pursuant to House Resolution 38* memorandum, which read in relevant part:

> … The Chief Administrative Officer is responsible for deducting the amount of any fine levied under House Resolution 38 and House Rule II, clause 3(g) from the net salary otherwise due to the Member, Delegate, or Resident Commissioner. I am including a copy of the Committee on Ethics and Sergeant at Arms notices for your records.

---

[10] https://www.c-span.org/congress/?chamber=house&date=2021-05-18   (House Session from 5/18/2021; last visited 6/9/2022).

> The full amount of the fine, **$500.00,** will be deducted from your July 2021 payroll (to be disbursed August 1).

(*Id.* at ¶44, JA028).

The remaining Plaintiffs received correspondence materially similar to that in Exhibit A. (*Id.* at ¶45, JA028). Defendants issued these fine notices and unconstitutionally reduced Plaintiffs' compensation during the pendency of this matter. (*Id.* at ¶46, JA029). However, in other contexts, symbolic speech has been embraced by Members of the majority party while on the House floor, particularly where it did not disrupt the proceedings of the House. (*Ibid.*).

## SUMMARY OF THE ARGUMENT

The District Court erred in dismissing the Complaint, because the actions complained of violate several provisions of the United States Constitution, including the Twenty-Seventh Amendment. As a matter of fact, the District Court upheld a reduction in compensation under a rule enacted without an intervening election in contravention of the plain language, and clear import, of the Twenty-Seventh Amendment.

## ARGUMENT

### I.   The District Court Erred in Granting Defendants' Motion to Dismiss Where Plaintiffs Stated Claims Upon Which Relief Can Be Granted

#### A.   Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

11

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiffs, draw all reasonable inferences in their favor, and accept all well-pleaded allegations in the complaint as true. *Bregman v. Perles*, 747 F.3d 873, 875 (D.C. Cir. 2014).

### B. The Fines Levied Under the Rule Violate the Twenty-Seventh Amendment by Varying (Reducing) Members' Actual Compensation

The Twenty-Seventh Amendment plainly states that "No law varying the compensation for the services of the Senators and Representatives shall take effect, until an election of Representatives shall have intervened." U.S. Const., Amend. XXVII.

1. <u>A primary purpose of the Twenty-Seventh Amendment is to prevent the reduction of Congressional salaries without an intervening election, because the Founders expressly recognized the majority could misuse its power to threaten the integrity and independence of Members, thus dissuading individuals of modest means from serving in Congress</u>

What is known today as the Twenty-Seventh Amendment began as the second amendment in the original Bill of Rights draft proposed by James Madison and adopted by the First Congress in 1789. *See generally,* Richard B. Bernstein, *The Sleeper Wakes: The History and Legacy of the Twenty-Seventh Amendment*, 61 FORDHAM L. REV. 497, 521-31 (Dec. 1992) ("*Sleeper*"). Between 1789 and 1791, this "compensation amendment" was ratified by only six states, making it

ineligible to join the ten amendments that were approved as the Bill of Rights. *Id.* at 532-33. In response to a large (and retroactive) pay increase Congress granted itself in 1873, Ohio added its name to the states ratifying the amendment that year. *Id.* at 534. Then, nothing else happened with the amendment until 1978, when Wyoming ratified it. *Id.* at 537. Next, Maine ratified the amendment in 1983, and that began a cascade of state ratifications,[11] with Michigan providing the thirty-eighth approval necessary to make it, in 1992, the Twenty-Seventh Amendment to the Constitution. *Id.* at 537, 539 n.214.

While the Twenty-Seventh Amendment is commonly, but wrongly, thought of today as merely a limitation on Congress' ability to vote itself a pay raise (as will be demonstrated below), that was merely one of its purposes. Ignoring this historical reality, the District Court fell into the trap of elevating this purported intent behind enactment of the law over the clear and unambiguous language of the law. Regardless, had pay raises been the only concern behind enactment, the language would have stated as much. However, its plain language prohibits any law "varying the compensation," not just those that increase it.

---

[11] The sudden interest in the Twenty-Seventh Amendment was driven by a sophomore at the University of Texas-Austin who, while looking for a paper topic for a government class, discovered that the proposed amendment could be ratified because, unlike later amendment proposals, Congress had put no time limit on state ratifications. *Sleeper*, 61 FORDHAM L. REV. at 536-37.

American understanding of British parliamentary practice is vital to construing the purpose of the Constitution adopted in 1787. *See, e.g., Timbs v. Indiana*, 139 S.Ct. 682, 695 (2019) (Thomas, J. concurring) (looking to Parliamentary practice in construing the meaning of the Eighth Amendment's Excessive Fines Clause); *U.S. v. Cabrales*, 524 U.S. 1 n.1 (1998) (Ginsburg, J.) (in construing the Constitution's criminal venue requirement, pointing to American colonists' negative reaction to Parliament's practice of hauling Americans to Britain for trial); *Engel v. Vitale*, 370 U.S. 421, 425-27 (1962) (in construing Establishment Clause, discussing Americans' negative reaction to Parliament dictating religious practices); *McGrain v. Daugherty*, 273 U.S. 135, 161 (1927) (noting Parliamentary power in determining Congressional constitutional authority to compel witness testimony).

In addition to concerns about pay increases, the Founders were also greatly concerned that diminishing congressional pay could be used to pressure Members from exercising independent judgment, which could prevent qualified men of modest means from serving in the new national legislature. The founding generation was well aware, for instance, of the practice of candidates for the British House of Commons promising to reduce (or even eliminate!) their wages in order to garner popularity with their constituents, which had that very effect.

14

*Sleeper* at 500-01.[12]    Americans in the 1770s and 1780s found such conduct debasing to the notion of representative government, and believed it had "led members of Parliament to override the Americans' rights under the British constitution." *Id.* at 501.[13]

Similarly relevant in ascertaining constitutional intent is the Founders' understanding of the colonial and state legislative practices prior to 1789.  *See, e.g., Kisor v. Wilkie*, 139 S.Ct. 2400, 2437 (2019) (Gorsuch, J., concurring) (noting colonial legislative interference with judicial independence in the context of evaluating permissible deference under the Constitution executive rulemaking); *Horne v. Dept. of Agric.,* 576 U.S. 351, 359 (2015) (analyzing the Takings Clause with reference to the New York Legislature's reaction to property seizures by the Continental Army); *JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure, Ltd.,* 536 U.S. 88, 94-95 (2002) (analyzing Article III's alienage jurisdiction with reference to state legislatures' practices during and after the Revolutionary War).

From 1774 until the Constitution's ratification in 1789, during the Continental Congresses and into the period of the Articles of Confederation, state legislatures, who were responsible for paying their congressional delegates, used

[12] Citing 1 Edward Porritt with Annie G. Porritt, The Unreformed House of Commons: Parliamentary Representation Before 1832, at 151-203 (1909).

[13] Citing 1 Poritt at 96-98; The Eighteenth-Century Constitution: 1688-1815, at 151-52 (E. Neville Williams ed., 1960); Bernard Bailyn, The Ideological Origins of the American Revolution 46-51, 85-93, 130-138 (enlarged ed. 1992).

that leverage to punish those delegates for ignoring state interests. And those delegates were an easy target for fiscal belt-tightening during the poor economy that followed the American Revolution. *Sleeper* at 501- 02.[14] Delegates had to wait longer and longer to be paid, if at all. "Even those delegates who had independent means, and thus did not rely on the small salaries paid by the states, did not accept this situation lightly. Notable American politicians began to write scathing letters to their home states, demanding to know how long they were to serve their country without being paid for it." *Id.* at 502.

Hence, the new national legislature's independence and stability was a major concern at the 1787 Constitutional Convention. *Id.*[15] In discussing how congressional pay should be set (in the context of debating what eventually became known as the Constitution's "Ascertainment Clause"[16]), the delegates avidly debated the potential harms of both insufficient congressional remuneration and its potential diminishment. So, these discussions are highly relevant in ascertaining

[14] Citing Jack P. Greene, The Quest for Power (1963); Edmund Cody Burnett, The Continental Congress at 420, 421, 425, 629, 650, 710, 713 (1941); Richard B. Morris, The Forging of the Union, 1781-1789, at 91-94 (1987); Jack N. Rakove, The Beginnings of National Politics: An Interpretive History of the Continental Congress 235-38 (1979).

[15] Citing 1 The Records of the Federal Convention of 1787, at 20-22 (Max Farrand ed., 1937) (all references are to James Madison's notes unless otherwise indicated).

[16] "The Senators and Representatives shall receive a compensation for their services, to be ascertained by law, and paid out of the treasury of the United States." U.S. Const., Art. 1, § 6, cl.1.

the Founders' concerns regarding congressional compensation as they highlight the error made by the District Court.  *See, e.g., Rucho v. Common Cause*, 139 S.Ct. 2484, 2495 (2019) (referring to the Convention debate in ascertaining the authority granted under Article I's Election Clause); *U.S. Term Limits v. Thornton*, 514 U.S. 779, 790-91 (1995) (same regarding Article I's Qualifications Clause); *Weiss v. U.S.*, 510 U.S. 163, 187 n.2 (1994) (Souter, J., concurring) (same regarding the Appointments Clause); *Singer v. U.S.*, 380 U.S. 24, 31 (1965) (same regarding Article III's criminal venue requirement and the Sixth Amendment); *Sch. Dist. of Abingon Twp. v. Schemp*, 374 U.S. 203, 254 n.19 (1963) (Brennan, J., concurring) (same regarding the First Amendment).

Echoing the well-known concern about House of Commons candidates seeking voter favor by promising to cut their pay, Massachusetts delegate Elbridge Gerry[17] noted that "one principal evil" of democracy was "the want of due provision for those employed in the administration of Governnt [sic]. It would seem to be a maxim of democracy to starve the public servants."  The Records of the Federal Convention of 1787, at 48 (Max Farrand ed., 1937).

Virginia delegate George Mason raised the problematic history of low pay discouraging capable men from public service, "[t]he parsimony of the States

---

[17] Later Governor of Massachusetts, Gerry gifted his name to the American political lexicon in the word "gerrymandering." *See generally,* https://www.smithsonianmag.com/history/where-did-term-gerrymander-come-180964118/.

might reduce the provision so low as had already happened in choosing delegates to Congress, the question would be not who were most fit to be chosen, but who were most willing to serve." *Id* at 216. Nathaniel Gorham of Massachusetts and Edmund Randolph of Virginia both raised the threat to congressional independence created by the possibility of salary reductions. Gorham pointed out that state legislatures "were always paring down salaries in such a manner as to keep out of offices men most capable of executing the functions of them." *Id* at 372. Randolph, in turn, stressed that "[i]f the States were to pay the members of the Natl. Legislature, a dependence would be created that would vitiate the whole System." *Id.*

With the proposed Constitution setting no restraint on either increasing or decreasing congressional salaries, it became the second of Madison's proposed amendments in the Bill of Rights he offered in the First Congress. As in the Constitutional Convention, Representatives discussed the sorry history of the House of Commons manipulating wages. Congressman Theodore Sedgwick stated that "'designing men'… … might reduce the wages very low, much lower than it was possible for any gentleman to serve without injury to his private affairs, in order to procure popularity at home, provided a diminution of pay was looked upon as a desirable thing; it might also be done in order to prevent men of shining and disinterested abilities, but of indigent circumstances, from rendering their

18

fellow citizens those services they are well able to perform, and render a seat in this house less eligible than it ought to be." Debates in the House of Representatives (Aug. 14, 1789), in The Congressional Register, Aug. 14, 1789.

Thus, diminution of salary was as much a consideration for the Founders as were pay raises. *See, e.g., Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1903 (2021) ("Since the First Congress also framed and approved the Bill of Rights, we have often said that its apparent understanding of the scope of those rights is entitled to great respect."). The Founders well understood, in proposing what later was ratified as the Twenty-Seventh Amendment, that financial means should not be used to coerce national legislators from independent judgment, and financial means should not be used in an attempt to exclude those of modest means from public service. Those foundational concerns are precisely what underlie this case: using financial pressure, through the manipulation of salary by the House Democratic Majority, to deprive Republican Members, and only Republican Members, of their political independence.

"In the general course of human nature, a power over a man's subsistence amounts to a power over his will." Alexander Hamilton, *Federalist Paper No. 79* (May 28, 1788). *See also Schaffer v. Clinton*, 240 F.3d 878, 884-85 (10th Cir. 2001) (noting that Hamilton was speaking of ***a decrease in compensation***, and that such a decrease would be a real injury providing standing under the Twenty-

Seventh Amendment).  Simply put, the historical record is crystal clear that the Twenty-Seventh Amendment was enacted not just to prevent congressional pay increases through self-dealing, but just as importantly, to protect Members from pay *decreases* being used as an instrument for either political pressure or exclusion.

2. House Resolution 38 is a "Law" that Varies Compensation in Violation of the Twenty-Seventh Amendment

The text and tradition of a constitutional provision control its interpretation. *See, e.g., Torres v. Madrid,* 141 S.Ct. 989, 995-96 (2021) (referencing a dictionary definition from 1828 when examining the meaning of the term "seizure" in the Fourth Amendment); *District of Columbia v. Heller*, 554 U.S. 570, 576-77 (2008) (the Constitution's "words and phrases were used in their normal and ordinary as distinguished from technical meaning," as understood by ordinary voters); *see also, Callins v. Collins*, 510 U.S. 1141 (1994) (Scalia, J., concurring) (examining the text of the Fifth Amendment when defining the scope of a prohibition on the death penalty).

Notwithstanding Defendants' arguments to the contrary, House Resolution 38 is a "law" for purposes of the Twenty-Seventh Amendment.  By its plain terms, the Amendment applies not just to "statutes," but to "law."  Nothing in the text or the history of the Amendment suggests that the words "no law" apply only to statutes enacted pursuant to bicameralism and presentment.  The opposite is true.

20

The Supreme Court, this Court, and Congress itself all recognize that a congressional rule is a "law" subject to the provisions of the Constitution.

"[T]he courts will intervene to protect constitutional rights from infringement by Congress, including its committees and members." *Exxon Corp. v. FTC*, 589 F.2d 582, 590 (D.C. Cir. 1978) (citing *Yellin v. United States*, 374 U.S. 109, 143-144 (1963); *Watkins v. United States*, 354 U.S. 178, 188 (1957); *U.S. v. Ballin*, 144 U.S. 1, 5 (1892); *Jordan v. Hutcheson*, 323 F.2d 597 (4th Cir. 1963)). "The Bill of Rights is applicable to . . . all forms of governmental action." *Watkins*, 354 U.S. at 188. Where constitutional rights are violated, the judiciary has warrant to interfere with Congress's internal procedures. *Exxon*, 589 U.S. at 590.

The Supreme Court expressly held in *Ballin* that the houses of Congress "may not by [their] rules ignore constitutional restraints or violate fundamental rights." 144 U.S. at 5. Unambiguous House rules, such as the mandatory payroll deduction of punitive fines required under H. Res. 38, are plainly subject to judicial review. *U.S. v. Rostenkowski*, 59 F.3d 1291, 1307 (D.C. Cir. 1995).

Defendants cited *Boehner v. Anderson* for the false proposition that only statutes that are the product of bicameralism and presentment are a "law" for purposes of the Twenty-Seventh Amendment, *citing* 30 F.3d 156 (D.C. Cir. 1994). The *Bohener* court said nothing of the sort, and the case did not even purport to

21

pose the question of what governmental actions constituted a "law" under the Amendment.  *See id.* at 158-59.  The only "law" at issue there was a statute challenged by then-Congressman Boehner that authorized automatic cost-of-living increases in subsequent sessions of Congress.  *Id.*  This Court rejected Boehner's argument, correctly holding that nothing in the Twenty-Seventh Amendment obligated Congress to enact a new law for each separate pay raise; only an intervening session between the enacting law and any subsequent pay adjustment was required by the plain language of the Amendment.  *Id.* at 160-62.

Like the houses of Congress, the federal courts are empowered to enact their own rules, and the Supreme Court has held that a local court rule was a "law" for purposes of the federal perjury statute.  *U.S. v. Hvass*, 355 U.S. 570, 574-75 (1958).  Incorporating the common understanding that a "rule" issued by a governmental institution with binding effect is a "law," the *Hvass* Court explained:

> The phrase 'a law of the United States,' as used in the perjury statute, is not limited to statutes, but includes as well Rules and Regulations which have been lawfully authorized and have a clear legislative base.  28 U.S.C. § 2071 provides: 'The Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business.  Such rules shall be consistent with Acts of Congress and rules of practice and procedure prescribed by the Supreme Court.' . . . These statutes and Rule 83 leave no room to doubt that the District Court was lawfully authorized to prescribe its local rules and that they have a clear legislative base.  *Id*. at 575-76 (citations omitted); *accord, Columbia Broadcasting System, Inc. v. U.S.*, 316

22

U.S. 407, 416 (1942) (an agency rule that has binding
legal effect on those it regulates is a "law").

Here, the House issued a rule with binding legal effect on its Members
(which is why we are here), and that makes it a "law" for purposes of
constitutional scrutiny.  "When seeking to discern the meaning of a word in the
Constitution, there is no better dictionary than the rest of the Constitution itself."
*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787,
829 (2015) (Roberts, C. J., dissenting); *cf. Scialabba v. Cuellar de Osorio*, 573
U.S. 41, 60 (2014); *Law* v. *Siegel*, 571 U.S. 415, 422 (2014).

The same terminology used in contemporaneously drafted constitutional
provisions presumably carry the same meaning.  *See U.S. v. Verdugo-Urquidez*,
494 U.S. 259, 265 (1990) (reasoning that "the people" is "a term of art employed
in select parts of the Constitution and has the same meaning in each part of the
Constitution").

No less than John Quincy Adams believed that a House rule was a "law"
governed by the strictures of the First Amendment.  From 1837 until 1844, the
House imposed what was infamously known as the "Gag Rule," whereby any
petitions concerning slavery were automatically tabled as off-limits for debate.  In
December of 1837, during the voting on the Gag Rule in the 25th Congress, rather
than answer with a vote, Adams, before he was silenced by calls to order, said "I
hold the resolution to be a violation of the Constitution of the United States…"

The next day he completed his remark, " … of the rights of my constituents, and of the people of the United States to petition, and of my right to freedom of speech, as a member of this House."   Robert P. Ludlum, "*The Antislavery 'Gag-Rule': History and Argument,*" 26 J. OF NEGRO HIST. No. 2 at 210-11 (April 1941) (internal citation omitted).

Agreeing with Adams, this Court held that by necessary implication, the First Amendment's "Congress shall make no law" phrase applies even to House regulations concerning the display of artwork in the U.S. Capitol.  *Washington Activity Group v. White*, 342 F.Supp. 847, 848-50, 852-55 (D.D.C. 1971), *aff'd*, 479 F.2d 922 (D.C. Cir. 1973).   In *White*, the Court held that even though the houses of Congress were entitled to great deference in formulating standards for internal governance, those standards could be invalidated if they violated First Amendment protections.  *Id.* at 852-53.  Without question, if the House regulations in *White* weren't "law," the court could not have found them violative of the First Amendment which, by its terms, applies only to "law."

Likewise, in *NLRB v. Canning*, 573 U.S. 513 (2014), the Supreme Court held, consistent with its earlier jurisprudence on the justiciability of the rules of each chamber, that although the Senate's view as to when it was "in session" under its own rules was entitled to great deference, it is ultimately the judiciary's role to

determine if those decisions are consistent with the controlling constitutional provisions. *Id.* at 551-52.

In the same vein, this Court held in *Michel v. Anderson* that the judiciary had both the right and the obligation to ascertain if a House rule granting certain voting rights to Delegates from U.S. territories complied with Article I of the Constitution 14 F.3d 623, 627 (D.C. Cir. 1994) ("There are limitations to the House's rulemaking power, and Art. I, § 2 is such a limit."). The same principal applies here: H.R. 38 is "a law" for purposes of the Twenty-Seventh Amendment, and it's a law that plainly contravenes the requirement that Member compensation not be "varied."

House Resolution 38 "varies compensation" of Members by explicitly targeting their salary. It states: "(2) a fine imposed pursuant to this section shall be treated as though imposed under clause 3(g) of rule II,[18] and shall be administered as though pursuant to clause 4(d) of rule II."[19] That rule specifically targets

---

[18] That rule states: "(g)(1) The Sergeant-at-Arms is authorized and directed to impose a fine against a Member … for the use of an electronic device … (2) A fine imposed pursuant to this paragraph shall be $500 for a first offense and $2,500 for any subsequent offense." https://rules.house.gov/sites/democrats.rules.house.gov/files/documents/116-House-Rules-Clerk.pdf (last visited 6/9/2022).

[19] That Rule states: "(d)(1) … the Chief Administrative Officer shall deduct the amount of any fine levied under clause 3(g) from the net salary otherwise due the Member, Delegate, or the Resident Commissioner. (d)(2) The Chief Administrative Officer is authorized to establish policies and procedures for such salary deductions." (last visited 6/9/2022).

deduction of salary.  And the Resolution explicitly forecloses other ways Members might pay the fines in question – leaving only their salary or other personal funds to answer.  This ensures maximum pressure is brought to bear on those Members who rely on their Congressional salary as their sole or primary means of support.[20]

Defendants claimed that "fines imposed and collected pursuant to House Resolution 38 do not change the 'compensation for services' of House Members." While the fines may not change the underlying salary level of $174,000 per annum, it defies logic (and math) to suggest that deducting money does not vary (here reduce) those Members' actual compensation for their services.  Without question, Plaintiffs here received less in compensation than Members whose salary was not so reduced.  Moreover, whatever authority Congress may have had to fine Members and deduct those fines directly from Member salaries prior to 1992, the Twenty-Seventh Amendment now precludes such authority, at least for punitive fines imposed under the guise of disciplining disorderly behavior, unless an election intervenes.[21]

---

[20] Plaintiffs here exemplify the Founders' concern over manipulating pay to exert pressure, as Representative Massie relies on his Congressional salary as his primary means of support, while Representative Greene deducts nearly all of her paychecks to pay her federal withholding taxes, as she has the benefit of prior saved income from which she can sustain herself until she files her tax return each year, and then she will receive all of this money back when she receives her income tax refund.

[21] Plaintiffs take no position in this case on salary deductions for absences, restitution-based fines, or individual court-ordered garnishments, as such

To justify this patently unconstitutional varying (here reduction) in compensation, the District Court accepted Defendants' word play that these reductions, which are only enforced through payroll reductions, are fines and thus outside the ambit of the clause.

But to engage in such mental gymnastics runs afoul of decades of jurisprudence on another analogous clause of the Constitution – Article III's limitation on reductions in judicial compensation.   Like the Twenty-Seventh Amendment, Article III's Compensation Clause has as its purpose ensuring the independence of government actors.  *United States v. Hatter*, 532 U.S. 557 (2001); *Evans v. Gore*, 253 U.S. 245 (1920), overruled in part by *Hatter*.  In *Evans*, the Supreme Court held that it was not permissible to take taxes from the income of federal judges where those taxes were imposed after the judge took office.  *Id.*  It did not matter that the taxes were for the public good: what mattered was **it was a deduction from the paycheck**.  *Id.*   The same is true with the "fines" here because, regardless of the word play, the result is the same.

In *Hatter*, the Supreme Court revisited *Evans*, but noted that judicial compensation could not be reduced to "punish them."   532 U.S. 557 at 577.   In other words, under *Hatter*, if the reductions in pay there, or fines imposed here,

---

circumstances may be governed by considerations not relevant to this case, particularly where the rules establishing and authorizing these deductions pre-date the start of the current Congress: that fact alone takes them outside the ambit of the Twenty-Seventh Amendment.

were imposed as punishment, they are illicit reductions in compensation. Yet, the District Court explicitly embraced such a purpose here, in flat contravention of the Twenty-Seventh Amendment, because, and *only because*, the purpose of the fines here was to punish. It erred in doing so.

Defendants and the District Court cite to fines imposed by the House as far back as 1856, and cases interpreting their legality, which is 136 years before the Twenty-Seventh Amendment was ratified in 1992. As such, that precedent is inapposite. Similarly, unchallenged fines imposed since 1992 have no precedential value to the present case. Rather, *Powell v. McCormack*, 395 U.S 486 (1969), is instructive. In *Powell,* Congress sought to exclude Representative Powell from being seated but, *inter alia*, the Supreme Court rejected House Defendants' arguments that prior exclusions of other Members demonstrated the constitutionality of the practice. *Id.* at 541-48. The Supreme Court noted that none of the previously excluded Members had judicially challenged their exclusions. *Id.* The *Powell* Court further held that such exclusions were unconstitutional when done for reasons beyond the limits of the Qualifications Clause. *Id.* at 550; *see also*, *Ballin*, 144 U.S. at 5.

Defendants and the District Court may call this a fine, but it "looks like a [pay variance] in many respects." *NFIB v. Sebelius*, 567 U.S. 519, 563 (2012). In *Sebelius*, the Court upheld the penalty because it came in the form of a payment

28

"to the IRS when [the violator] pays his taxes." *Id.* Particularly relevant was that the penalty was "collect[ed] … 'in the same manner as taxes.'" *Id.* Consequently, the Supreme Court held the penalty was, based on the manner by which it is collected, a tax. In other words, Congressional word play is not enough. Courts must look beyond labels and look at what is actually going on. The penalty here is a reduction in compensation only enforced through the reduction in compensation of the pay of the member of Congress. This mandate was enforced "in the same manner as" a pay cut. *Id.* It therefore violates the Twenty-Seventh Amendment.

### C. Under Article I, §5, The Imposition of Fines for Behavior that is Not Disorderly is Beyond the Power of the House

Article I, § 5, clause 2 of the Constitution provides that "[e]ach House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member." Under *Ballin*, Members may be punished only for behavior that is "disorderly," as this language is a textual "constitutional restraint" on the type of behavior for which a Member may be punished. 144 U.S. at 5.

Below, Defendants engaged in unsurprisingly self-serving, circular logic sought to define "disorderly" as any "conduct that is 'contrary to rules.'" However, this definition eviscerates any constitutional limit and it runs contrary to a legal interpretation maxim of rendering all words in a particular provision to have meaning. *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 70 (2011). A simple

29

example suffices to demonstrate this point.  What if the House passed a rule that said votes only can be cast in favor of measures favored by the Speaker? According to Defendants, this would be constitutional because failing to follow the rule would be considered disorderly, even though such a rule would defy the very core of legislative independence, democracy, and the purposes of Article I.

Not surprisingly, other Courts previously have held that the question of whether conduct is disorderly is reviewable.  *Rangel v. Boehner*, 20 F. Supp. 3d 148, 171 (D.C.D. 2013).  There, the District Court observed:

> To take defendants' argument to its logical extreme, imagine the House locking a Member in the basement of the Capitol for one year based only on an internal disciplinary vote. If the House's disciplinary power were truly unbridled, such a case would be nonjusticiable.  But as the Court explained in the closely related context of the Rulemaking Clause in *Ballin*, the Constitution empowers each House to discipline its Members, but it may not by doing so "ignore constitutional restraints or violate fundamental rights." (citations omitted).

> Hence, to determine whether the alleged conduct here is beyond the authority of the judiciary, "it is necessary to determine whether members of the House have acted outside of the zone of their discretion under the Discipline Clause – i.e., whether they have, by disciplining Rangel and by engaging in the alleged misconduct, ignored constitutional restraints." *Id.*

In the instant case, those acts include levying fines deducted from Members' salary for behavior that is not "disorderly."  "[T]he specific enumeration of the particular classes of cases ought to be construed as excluding all others not

enumerated, upon the known maxim, . . . *expressio unius est exclusio alterius.*" *Ex parte City Bank of New Orleans*, 44 U.S. 292, 313 (1844) (Story, J.).

Here, the Discipline Clause permits the House to punish only conduct that is disorderly (a term with substantive meaning), not just any infraction of any rules. Were it otherwise, an oppressive House majority could enact any rule it wished to use as a cudgel to punish the minority, including compelling speech favored by the majority.

Neither the Constitution itself nor any case defines the meaning of "disorderly behavior" as used in the Discipline Clause, and it should be given its ordinary meaning as understood at the time of ratification.  Using a relevant dictionary relied upon by Defendants, the most applicable definition of "disorderly" – used in the Constitution as an adjective – is "irregular; tumultuous," not the aforementioned circular definition suggested by Defendants (*i.e.*, anything that violates the rules of the House). Samuel Johnson, A Dictionary of the English Language, (1785).[22]

A Member walking into the House Chamber without suspicion or allegation of wrongdoing by that Member is not engaged in "disorderly" behavior.  There is

---

[22] "Disorderly" is a word whose meaning has changed little, if at all, since the founding period. *See, e.g.,* Black's Law Dictionary, 6th ed., 1991 (abridged), still defined the word as: "violative of the public peace or good order; turbulent, riotous, or indecent" (exclusive of its reference to rules, that being circular in the present case).

nothing "irregular or tumultuous," much less "riotous or indecent" about a Member entering the House Chamber. In fact, there hardly could be a more routine occurrence in the course of a Member's day.[23]  The baselessness of the claim that rule-breaking, *ipso facto*, is "disorderly conduct" is belied by the fact that no tumult arose in the House's proceedings upon Speaker Pelosi's, and other members of the House majority's, violation of the Rule.[24]

At the current stage of pleading, the plausibility of Plaintiffs' position is all that was required to deny Defendants' Motion to Dismiss on this ground.  Article I, § 5 was violated and the District Court erred in holding to the contrary.

### D.    A Claim Has Been Stated for a Violation of Article I, §§ 6 and 7

Article I, Section 6 provides: "The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law,[25] and paid out

---

[23] *See also,* Justice John Marshall Harlan: *Lectures on Constitutional Law, 1897-98, Lecture 7, Nov. 20, 1897*, 81 GEO. WASH. L. REV. Arguendo 12, 84 (July 2013) ("'Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour ....' Punish them, how? ... Put him in jail if he is guilty of misbehavior. If a member of the House should stagger into that body some day drunk, that is disorderly behavior. He can be fined by that body, and punished for that disorderly behavior.").

[24] Pl.'s Compl. ¶¶33, 35, 42, JA024-JA027.

[25] The capitalization of the term "Law," which is not capitalized in the Twenty-Seventh Amendment, takes on an important context in this regard.  As opposed to "law," the capitalization of the term refers expressly to the passage of a statute. Thus, when looking at the meaning of the term "Law," in Article I, Section 6, and Article I, Section 7, the term refers to enactments of bills by Congress that have been presented to the President.

of the Treasury of the United States."   Article I, Section 7, Clause 2 requires passage by each house of Congress and Presentment to the President for a law to be passed.

There is no doubt here that the measures in question – passed by only the House – are not "Laws" within the meaning of Article I, Section 7, Clause 2. *Clinton v. City of New York*, 524 U.S. 417 (1998).  Defendants claim that the fine – taken directly from Congressional compensation – did not vary compensation and thus is not violative of the Clause.  Again, this is mere word play, as deducting the bottom line on a paycheck is a reduction in compensation.  The fact that this reduction in compensation may not be permanent does not change the reality that Plaintiffs' compensation will be less than what the established Law says it should be, and the fine is therefore an illicit reduction.   Further, the fact that the determination of whether or when such salary reductions occur are at the whim of staffers within the House, and not Congress itself, runs afoul of the bedrock principle behind the Ascertainment Clause: accountability.  *Humphrey v. Baker*, 848 F.2d 211 (D.D.C. 1988); *Pressler v. Simon*, 428 F. Supp. 302, 305-306 (D.C.D. 1976) (by law in terms of compensation determinations must be passed laws).  Thus, Article I, §§ 6 and 7 were violated and the District Court erred in ruling to the contrary.

**E.    A Claim Has Been Stated Under the First Amendment**

H. Res. 38, as applied, violated the First Amendment.

1.    <u>Symbolic speech (going to the floor unmasked)</u>

Symbolic speech is protected, and refusal to wear a mask under the circumstances presented here is within the ambit of symbolic speech. *Texas v. Johnson*, 491 U.S. 397 (1989) (burning of the American flag symbolic speech); *Cohen v. California*, 403 U.S. 15 (1971) (wearing an offensive jacket protected); *Tinker v. Des Moines*, 393 U.S. 503 (1969) (wearing an offensive arm band in school protected).

Expressive conduct has long been held to be implicated in protest activity: a sit-in by blacks in a "whites only" area to protest segregation, *Brown v. Louisiana*, 383 U.S. 131, 141-142 (1966); the wearing of American military uniforms in a dramatic presentation criticizing American involvement in Vietnam, *Schacht v. United States*, 398 U.S. 58 (1970); and picketing about a wide variety of causes, *see, e. g., Food Employees v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 313-314 (1968); *United States v. Grace*, 461 U.S. 171, 176 (1983), to name a few examples.

The First Amendment extends to "prevent the government from compelling individuals to express certain views." *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001). Thus, "one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." *Hurley*

34

*v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (quotations omitted).

"The First Amendment literally forbids the abridgment only of 'speech,'" but the Supreme Court has "long recognized that its protection does not end at the spoken or written word." *Johnson*, 491 U.S. at 404; *see Hurley*, 515 U.S. at 569 ("[T]he Constitution looks beyond written or spoken words as mediums of expression."). The First Amendment broadly protects expressive conduct such as the symbolic "wearing of an armband for the purpose of expressing certain views" about the Vietnam War, *Tinker*, 393 U.S. at 505 (1969), and the burning of an American flag as protest, *Johnson*, 491 U.S. at 406.

*Spence v. Washington*, 418 U.S. 405, 94 S. Ct. 2727, 41 L. Ed. 2d 842 (1974) (per curiam), addressed First Amendment protection of the display of symbols. In *Spence*, a college student hung a United States flag upside down outside his apartment window with a peace symbol attached to both sides. *Id.* at 406. He was arrested and prosecuted under a state statute that forbade such conduct. *Id.* at 407. The student challenged his conviction under the First Amendment. *Id.*

Noting that the student had not "articulate[d] his views through printed or spoken words," the Court still asked "whether his activity was sufficiently imbued with elements of communication to fall within the scope of the First and

35

Fourteenth Amendments." *Id.* at 409.   It concluded that such symbolic communication qualified.  *Id.* at 410.  This was so because "[a]n intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Id.* at 410-11.

Spence's "particularized message" language reappeared in *Johnson*, the flag-burning case.  The *Johnson* Court restated that, "[i]n deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Johnson*, 491 U.S. at 404 (quoting *Spence*, 418 U.S. at 410-11).  In both cases, and as part of this inquiry, the Court considered two relevant factors: (1) an intent to convey a particularized message, and (2) a great likelihood that the message would be understood by those who viewed the symbolic act or display.  *Johnson*, 491 U.S. at 404; *Spence*, 418 U.S. at 410-11.

Following that line of cases, in *Hurley*, 555 U.S. 557, the Court suggested the *Spence-Johnson* factors are not necessarily prerequisites for First Amendment protection for symbolic speech.  Before addressing the compelled speech issue, the *Hurley* Court addressed whether parades constitute First Amendment activity.  *Id.*

The Court instructed that the "inherent expressiveness of marching to make a point," *id*. at 568, was not undermined simply because a parade might "combin[e] multifarious voices" or lack an isolated, exact message, *id*. at 570. Referring to *Spence*, the Court said that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Id.* at 569 (citation omitted).

Federal circuit courts have interpreted *Hurley*'s effect on the *Spence-Johnson* factors in different ways. The Third Circuit has said that "*Hurley* left open how courts should evaluate symbolic speech claims" and "eliminated the 'particularized message' aspect of the *Spence-Johnson* test." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 160 (3d Cir. 2002). That circuit views the *Spence-Johnson* factors as "signposts rather than requirements." *Id.*

In contrast, the Second Circuit views the *Spence-Johnson* factors as intact after *Hurley*. *See Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 n.6 (2d Cir. 2004). The Sixth and Ninth Circuits seem to apply the *Spence-Johnson* factors together with *Hurley*'s statement that a "narrow, succinctly articulable message is not a condition of constitutional protection." *See Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 388 (6th Cir. 2005); *Kaahumanu v.*

*Hawaii*, 682 F.3d 789, 798 (9th Cir. 2012); *but c.f. Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060 (9th Cir. 2010) (suggesting that certain expressive activities need not satisfy the *Spence-Johnson* factors).

The Eleventh Circuit has concluded that *Hurley* "liberalized" the *Spence* test such that conduct is expressive if a "reasonable person would interpret it as some sort of message, not whether an observer would necessarily infer a specific message." *Holloman ex rel. Holloman v. Hartland*, 370 F.3d 1252, 1270 (11th Cir. 2004). This Circuit has not taken a position on this precise issue.

Here, the facts militate strongly towards meeting these elements. First, there is no doubt but that there was a communicative intent on the part of the Congressional Plaintiffs. (Compl. ¶¶27, 29, JA022-JA023). Part of that stems from the public nature of the act, in the Hall of the House (indeed, this is the corollary to the compelled speech issue below: the mandate was only applicable in the Hall of the House so it was not about "science" but was meant to convey a message). *Id.* And, second, the message was clearly understood as a protest: it was widely carried and reported by the media as a such. *Id.*

Turning back to *Tinker*, 393 U.S. 503, the expressive speech (at least in schools) must be "divorced from actually or potentially disruptive conduct by those participating in it." *Id.* at 505. School settings have less protection of speech than in other contexts, as the Supreme Court recognized. *Id.* at 507. In *Tinker*, First

Amendment protection of symbolic speech prevailed because the defendants "sought to punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners." *Id.* at 508. So too here.

As *Johnson* observed, while "[t]he government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word … [i]t may not, however, proscribe particular conduct because it has expressive elements." 491 U.S. 397, 406. "[W]hat might be termed the more generalized guarantee of freedom of expression makes the communicative nature of conduct an inadequate basis for singling out that conduct for proscription." *Id.* Of significance in *Johnson* was the observation that "no disturbance of the peace actually occurred or threatened to occur because of Johnson's burning of the flag." *Id.* at 408. Likewise, Plaintiffs' protest here was not *actually* disruptive to any proceedings (any more than wearing white as a protest at a State of the Union was), and therefore it was protected. The District Court erred in finding otherwise.

2.    Compelled speech (the requirement to be masked)

The compelled speech doctrine has its roots in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943). In *Barnette*, the Supreme Court addressed the constitutionality of requiring public school children to engage in a "stiff-arm salute" of the American flag and to recite the Pledge of Allegiance. *Id.*

at 627-28.  Those who did not faced punishment.  *Id.* at 629.  The Court held that "compelling the flag salute and pledge . . . invade[d] the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control."  *Id.* at 642.  "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."  *Id.*

Over three decades later, the Court revisited *Barnette* in *Wooley v. Maynard*, a decision that is highly relevant to this appeal.  *Wooley* concerned the constitutionality of New Hampshire's requirement that noncommercial vehicles display license plates featuring the state motto, "Live Free or Die."  430 U.S. 705, 713 (1977).  The plaintiffs objected to displaying the motto and filed suit.  *Id.* at 707.

The Court recognized that First Amendment protection "against state action includes both the right to speak freely and the right to refrain from speaking at all." *Id.* at 714.  New Hampshire's measure forced "an individual … to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable."  *Id.* at 715.  Requiring the plaintiffs to become a "mobile billboard for the State's ideological message or suffer a [criminal] penalty" implicated First Amendment protections and could be justified only by a "sufficiently compelling"

40

state interest. *Id.* at 715-16 (quotations omitted). The Court determined that New Hampshire's interest in requiring drivers to display the state motto was not sufficiently compelling. *Id.* at 716-17.

Thus, in *Barnette* and *Wooley*, the Court "invalidated [the] outright compulsion of speech." *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 557 (2005). The Court also has invoked *Barnette* and *Wooley* to strike down content-based requirements that burden a plaintiff's free speech rights. *See Riley v. Nat'l Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 797-98 (1988) (holding it unconstitutional for the state to require professional fundraisers to disclose certain factual information to potential donors before soliciting funds). This is because the "general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573.

Although the *Wooley* Court described the "Live Free or Die" license plate motto as conveying an "ideological message," the Supreme Court's case law is clear that ideological speech is not the only form of forbidden compelled speech. *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006); *United Foods*, 533 U.S. at 413; *Hurley*, 515 U.S. at 573; *Riley*, 487 U.S. at 797-98 (1988).

41

In *Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004), the Tenth Circuit analyzed a case in which a University of Utah theater student alleged a First Amendment violation because she was required to utter certain swear words as part of a script. *Id.* at 1281-83. The Court stated that even though *Barnette* and *Wooley* involved the state compelling individuals to espouse its ideological message, those cases did not require the speech in the theater script to be ideological for the student to receive compelled speech protection. *Id.* at 1284 n.4. The Court explained that "First Amendment protection does not hinge on the ideological nature of the speech involved." *Id.* The constitutional harm of compelled speech – "being forced to speak rather than to remain silent" – "occurs regardless of whether the speech is ideological." *Id.* Again, so too here: the compelled speech here violated the First Amendment and the District Court erred in holding otherwise.

### 3.   Forum analysis

The forum analysis also has bearing in this matter. While the outside of the Capitol has long been established to be a public forum, entitled to robust protection, *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995), obviously the inside, and particularly the Hall of the House, is a different matter. It appears clear that the Hall of the House, limited to congressional speakers only, and perhaps limited at times to the matters that are discussed and debated there, is

a limited public forum.  *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).  This is because it is "limited to use by certain groups or dedicated solely to the discussion of certain subjects."  *Id.* at 470.  Thus, "[i]n such a forum, a governmental entity only may impose restrictions on speech that are reasonable and viewpoint-neutral."  *Id.*

Here, one viewpoint was favored over another.  And, in a limited public forum, viewpoint discrimination is *ipso facto* unconstitutional.  *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001).  Again, the forced mask wearing here was compelled speech in violation of the First Amendment, and the District Court erred in holding otherwise.

## II.    The District Court Erred in Concluding Defendants Had Speech and Debate Immunity

Defendants, the Speaker, Sergeant-at-Arms and Chief Administrative Officer of the House of Representatives, asserted, and the District Court held, that Defendants had immunity from suit encapsulated in the Constitution's Speech or Debate Clause.  *See* U.S. Const., Art. I, § 6, cl. 1.  Erroneously, the District Court reasoned that because Plaintiffs did not assert viable constitutional claims, any further challenges would be barred by Speech or Debate.  As noted, Plaintiffs ***only*** brought constitutional claims.

Longstanding precedent establishes that congressional rules and practices are subject to judicial review where a constitutional violation is alleged, and that

43

congressional staff (and indeed even Members) are subject to federal court jurisdiction when the challenged conduct is not a speech or debate function. Here, the congressional staff functions at issue – screening for mandated face covering and engaging in payroll deductions – are purely administrative in nature, and not within the Speech or Debate Clause's ambit.

## A.    Supreme Court & D.C. Circuit Precedents Mandate That House Rules Subject to Allegations of Unconstitutionality Be Subject to Judicial Review

The circumstances under which House rules are susceptible to judicial review were established in *Ballin*, 144 U.S. 1 (*reaff'd, NLRB*, 573 U.S. 513, 551). As the D.C. Circuit observed in *Consumers Union of U.S., Inc. v. Periodical Correspondents' Assoc.,* 515 F.2d 1341, 1347 (1975) that the general rule under *Ballin* is that each house of Congress's "power to make rules" under Art. I, § 5 "is a continuous power, always subject to be exercised by the house" and "absolute," but "within the limitations suggested [in the *Ballin* opinion]." *Id.*, (quoting *Ballin*, 144 U.S. at 5). Thus, while the House ordinarily has substantial authority to enact rules free from judicial review, that authority has outer limits, whereupon judicial scrutiny is appropriate: "[1] It may not by its rules ignore constitutional restraints or [2] violate fundamental rights, and [3] there should be a reasonable relation between the mode or method of proceeding established by the rule and the result

44

which is sought to be attained." *Ballin*, 144 U.S. at 5.  All three circumstances allowing judicial review exist here.

"It has long been settled . . . that rules of Congress and its committees are judicially cognizable." *Yellin v. United States,* 374 U.S. 109, 114 (1963) (internal citations omitted).  And, "it is perfectly clear that the Rulemaking Clause is not an absolute bar to judicial interpretation of the House Rules." *U.S. v. Rostenkowski*, 59 F.3d 1291, 1305 (D.C. Cir. 1995).  Indeed, this Court has already held that a congressman's Twenty-Seventh Amendment salary alteration claim against the Clerk of the House of Representatives is judicially cognizable.  *Boehner v. Anderson*, 30 F.3d 156, 160 (1994).  In that same case, this Court acknowledged the federal courts' obligation to exercise jurisdiction "when a congressman suffers an effective nullification of his vote, or if his influence is substantially diminished." *Id.* (citing *Goldwater v. Carter,* 617 F.2d 697, 702-03 (D.C. Cir. 1979) (*en banc), vacated on other grounds,* (the Congress had no way to block the President's action terminating a treaty without Senate consent)); *Kennedy v. Sampson,* 511 F.2d 430 (D.C. Cir. 1974); *Moore v. U.S. House of Rep.,* 733 F.2d 946, 951-52 (D.C. Cir. 1984) (where Senate originated revenue bill, Representative deprived of constitutionally guaranteed opportunity to debate and vote on same prior to Senate action); *Vander Jagt v. O'Neill,* 699 F.2d 1166 (D.C. Cir. 1983).

Plaintiffs have alleged just such a violation of their fundamental rights of representation here.[26]

Furthermore, the *Ballin* Court's condition that "there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained" is violated by House Resolution 38's implementation through (1) the use of salary deductions; and (2) a mask mandate that violates the First Amendment. Once again, while the House certainly has the constitutional authority to enact rules for discipline and safety, it may not violate the Constitution when it does so.

## B.    Enforcing a Mask Mandate & Administering Payroll Are Not Core Legislative Functions Covered by the Speech or Debate Clause

The Speech or Debate Clause does not insulate from suit legislative functionaries, or even Members, when they carrying out non-legislative tasks. *Doe v. McMillan*, 412 U.S. 306, 315 (1973). Congressional employees may only accrue Speech or Debate immunity from suit "insofar as the conduct of the [employee] would be a protected legislative act if performed by the Member himself." *Rangel v. Boehner*, 785 F.3d 19, 24-25 (D.C. Cir. 2015) (*quoting Gravel v. U.S.*, 408 U.S. 606, 618 (1972)). "Legislative acts are those 'generally done in a session of the House by one of its members in relation to the business before it.'"

---

[26] The *Boehner* court held that altering a congressional salary in violation of the Twenty-Seventh Amendment would comprise both an official and a personal injury to the Member. 30 F.3d at 160.

*McCarthy v. Pelosi,* 5 F.4th 34, 39 (D.C. Cir. 2021) (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880)). In general, the Supreme Court has followed a functional approach to legislative immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 810 (1982). "The key consideration, the Supreme Court cases teach, is the *act* presented for examination, not the *actor*." *Rangel*, 785 F.3d at 25 (emphasis added by *Rangel*), (quoting *Walker v. Jones*, 733 F.2d 923, 929 (D.C. Cir. 1984) (Ginsburg, J.)).

However, even "legislative acts are not all-encompassing" of the Speech or Debate Clause. *Gravel*, 408 U.S. 606, 625. "The heart of the Clause is speech or debate in either House." *Id.* "Insofar as the Clause is construed to reach other matters, those matters must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Id.* In *Rangel*, this Court summarized the kind of legislative activities that fall within the Speech or Debate Clause for both Members and employees. 785 F.3d at 24-25 (collecting cases); *see also*, *McCarthy*, 5 F.4th 34, 39 ("rules governing how Members may cast their votes [ ] concern core legislative acts").

47

In contrast, numerous activities well within the normal course of a legislator's or congressional staff's duties have been held not to be protected by the Speech or Debate Clause, like contacting executive branch employees and agencies and seeking to influence them, privately publishing documents obtained in the course of congressional duties; assistance in obtaining government contracts, preparing constituent newsletters, press releases, speeches, and documents delivered outside of Congress. *See, e.g., Gravel*, 408 U.S. at 624-26; *U.S. v. Brewster*, 408 U.S. 501, 512-13 (1972); *Doe*, 412 U.S. at 317. Moreover, non-legislative functions occurring within the legislative branch, such as an opening prayer by a chaplain employed by the House, or personnel actions in the course of superintending congressional food service facilities, are also plainly not subject to the Clause's immunity. *See, e.g., Barker v. Conroy*, 921 F.3d 1118 (D.C. Cir. 2019); *Walker*, 733 F.2d at 930-32.

As then-Judge Ginsberg pointed out in *Walker,* the argument that every administrative function performed by the House falls within the Speech or Debate Clause is "far-fetched." *Walker*, 733 F.2d at 931. As Judge Ginsburg explained in that matter, activities that may "contribute importantly to our legislators' well-being and promote their comfort and convenience in carrying out Article I business," are not sufficient to confer immunity, and the immunity does not extend to "the vast array of administrative functions performed by the House do not fall

48

within the Speech or Debate Clause unless they are integral to the core legislative functions of deliberation and communication among members concerning the public's business." *Id.*

Defendants have never pointed to a contrary case suggesting that their administrative functions of mask enforcement and payroll deductions might constitute "legislative acts." Nor can they, because "the Clause has not been extended beyond the legislative sphere." *Gravel*, 408 U.S. at 624-25. Defendants invoked *Consumers Union of U.S.*, 515 F.2d 1341, for the proposition that by merely adopting internal disciplinary rules, the "administration and enforcement" of such House rules "are obviously legislative acts that fall squarely within the Clause." But, *Consumers Union* says no such thing. That case involved the refusal of the houses of Congress to accredit a certain periodical for the press gallery. *Id.* at 1342.

And *Consumers Union* rested on several rationales not applicable here. The Court pointed to the historical precedent of each chamber historically, including the authority to decide which members of the press have access to its proceedings. *Id.* at 1343-47. By contrast, the instant case involves four constitutional limitations on congressional rules that were not present in *Consumers Union*: (1) the prohibition on salary alteration under the Twenty-Seventh Amendment; (2) the prohibition against punishing members for behavior that is not "disorderly" under

49

Article I, § 5, Clause 2; (3) modification of compensation in contravention of Article I, §§ 6 and 7; and (4) a First Amendment violation for compelled viewpoint-based symbolic speech and punishment for symbolic speech that exerts a contrary viewpoint.

As is clear from the foregoing discussions in *Ballin* and *Boehner*, transgressions of limitations contained in the Constitution are plainly justiciable, a point this Court reiterated just two years ago in *Barker*. 921 F.3d at 1128 ("Congress may not by its rules ignore constitutional restraints or violate fundamental rights.") (*quoting Ballin*, 144 U.S. at 5).

This Court also emphasized in *Barker* (which explicated *Consumers Union*), that the Speech or Debate Clause was implicated in *Consumers Union* precisely because allowing press access to Congress implicated direct press interference in congressional deliberations. *Barker*, 921 F.3d at 1128. Here, no such consideration of lawmakers' independence exists – in fact, these claims vindicate the independence of individual lawmakers.

*Barker* involved the House Chaplain invoking the Speech or Debate Clause to claim immunity from suit by an atheist seeking to lead the House in prayer as a guest chaplain. *Barker*, 921 F.3d at 1121. This Court held that "[the House chaplain's] administration of the guest chaplain program is not an integral part of the House's deliberative and communicative processes." *Id*. Just as a chaplain's

50

prayer prior to House deliberations does not "regulate the very atmosphere in which lawmaking deliberations occur" and "poses no threat to the integrity of the legislative process," neither does mask wearing (here where that occurred during a recess) or the administration of payroll deductions. *Id.*

Defendants below cited to *Rangel*, a case that is distinguishable because Congressman Rangel's complaint was directed explicitly to communications by House staff members during the House Ethics Committee's investigation of his misconduct. 785 F.3d 19, 21-22 (D.C. Cir. 2015). This was quintessentially legislative in character because it was directed to speech during a committee hearing. 785 F.3d at 23-25.

In contrast, carrying out mask enforcement and payroll deductions are not remotely "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings." *Gravel,* 408 U.S. at 624-25. In fact, it has been held that "the only reasonable reading of the Clause, consistent with its history and purpose, is that it does not prohibit inquiry into activities that are casually or incidentally related to legislative affairs but not a part of the legislative process itself." *Brewster*, 408 U.S. 501 at 528. So, while providing mask enforcement and administering payroll may well be important functions that contribute to the well-being of Members and the smooth running of House operations, the desirability of those activities does not convert them into

51

legislative activities, much less speech or debate. *See Walker*, 733 F.2d at 931. Accordingly, the Speech or Debate Clause's immunity from suit is not available to Defendants here.

**C.    To Prevent Illegal Conduct, House Employees Are Not Immune From Suit, Even if the Members of Congress Who Authorized That Conduct Are Immune**

Defendants falsely claim that because the actions they take to execute House Resolution 38 are taken pursuant to a rule enacted as part of the legislative process for which Members themselves are immune, they "inherit" that immunity as implementing employees and Members.

The Supreme Court categorically rejected this reasoning in *Gravel.* 408 U.S. at 618-622. *Gravel* made plain that the deliberations, communications, and debate by Members and their staff are an entirely different function from carrying out a deed, which must be analyzed on its own merits. *Id.*

In *Gravel,* three controlling cases were discussed. First, in *Kilbourn,* the Court held that the Speech or Debate Clause:

> [p]rotected House Members who had adopted a resolution authorizing Kilbourn's arrest; that act was clearly legislative in nature. But the resolution was subject to judicial review insofar as its execution impinged on a citizen's rights as it did there. That the House could with impunity order an unconstitutional arrest afforded no protection for those who made the arrest. … The Speech or Debate Clause could not be construed to immunize an illegal arrest even though directed by an immune legislative act.

*Gravel*, 408 U.S. at 618-19 (quoting *Kilbourn*, 103 U.S. at 200, 202).

Second, the Court in *Gravel* noted that it similarly had held in *Dombrowski v. Eastland*, 387 U.S. 82 (1967) that Speech or Debate immunity would not protect the committee counsel who was involved with carrying out "an illegal seizure of records that the committee sought for its own proceedings." *Gravel*, 406 U.S. at 619-20 (citing *Dombrowski*, 387 U.S. at 84).

Finally, *Gravel* pointed out that in *Powell*, the Court found that claims could proceed "against House aides seeking to implement the invalid resolutions." *Gravel*, 406 U.S. at 620 (citing *Powell*, 395 U.S. at 506). In sum, *Gravel* explained that Speech or Debate immunity is "unavailable [to congressional employees] because they engaged in illegal conduct that was not entitled to Speech or Debate Clause protection." *Gravel*, 408 U.S. at 620-21. *McCarthy* is not to the contrary, as the court specifically acknowledged that the act at issue there, i.e., voting by proxy, was a core legislative act, as were the acts required of House staffers to implement the rule at issue. 5 F.4th 34, 39.

This Circuit likewise recognizes the distinction between legislative acts and execution thereon for purposes of ascertaining when Speech or Debate immunity applies. *Walker*, 733 F.2d at 931-32 (cleaned up) (*citing Gravel,* 408 U.S. at 620-21; *Doe*, 412 U.S. 306 at 314-15). Carrying out a decision, "even if the decision itself is properly called 'legislative,' is not cloaked with Speech or Debate

immunity, for execution or carrying out directions post-dates what the Clause protects – the *process* leading up to the issuance of legislative directions." *Walker*, 733 F.2d at 932 (emphasis in original).

As in *Powell*, 395 U.S. 486, "House employees acting pursuant to express orders of the House does not bar judicial review of the constitutionality of the underlying legislative decision." *Id.* at 504, *citing Kilbourn*, 103 U.S. 168 (finding House Sergeant at Arms liable and a proper party in a case involving wrongful imprisonment). And, while *Powell* might well suggest that Defendant Pelosi is not a proper Defendant because the House members were dismissed under Speech and Debate Clause immunity, two stand for the proposition that she is not immune insofar as her purely administrative duties (which are challenged here) are concerned.

In *Fields v. Office of Johnson*, 459 F.3d 1, 9 (D.C. Cir. 2009), this Court observed that for legislators, "some personnel decisions would not qualify" for such immunity. *Id.* at 10. That is because "many personnel decisions by Members' personal offices lack even 'some nexus,' …to these types of legislative acts." *Id.* at 11. In *Fields*, the acts were determined not to be legislative because it was not "necessary to inquire into how [the Member] spoke, how he debated, how he voted," or debate in the chamber or in a committee in order to make out a violation" of the Accountability Act. *Id.* at 13. So too here.

In *Walker*, 733 F.2d 923, this Court again articulated a standard that "execution of a decision, even if the decision itself is properly called 'legislative,' is not cloaked with Speech or Debate immunity, for execution or carrying out directions post-dates what the Clause protects – the process leading up to the issuance of legislative directions." *Id.* at 932.

Under *Walker*, Defendant Pelosi is a proper Defendant if: (a) she is not sued in connection with the enactment or passage of any challenged legislation itself (she is not); (b) she is not questioned in connection with such enactment or passage of legislation (and she will not be); but rather (c) is sued solely in connection with administrative directives she gave to Walker or Spzindor to engage in enforcement of the mandates outside of official directives from the floor (which is the scope of her involvement in this matter).  (Compl. ¶¶ 8, 24, JA015-JA021).  Speech or Debate immunity does not bar these claims.

## CONCLUSION

The District Court erred in dismissing this case and its judgment should be reversed.

Respectfully submitted,

/s/Christopher Wiest_____
Christopher Wiest (OH 0077931)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd., Suite 104
Crestview Hills, KY 41017
Tel:   513/257-1895
chris@cwiestlaw.com

Thomas Bruns (OH 0051212)
Bruns Connell Volmar Armstrong
4555 Lake Forrest Dr., Suite 330
Cincinnati, Ohio 45242
Tel.:   513/312-9890
tbruns@bcvalaw.com
*Attorneys for Plaintiffs/Appellants*

## CERTIFICATE OF SERVICE

I have served the foregoing upon Defendants/Appellees, through service of this Brief via CM/ECF, this 15th day of June, 2022, as well as by ordinary mail this same date.

/s/Christopher Wiest_____
Christopher Wiest

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(g) and D.C. Cir. R. 32(e)(1), I certify that this Brief contains 12,960 words. This response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Times New Roman font using Microsoft Word.                              /s/ Christopher Wiest_____

**ADDENDUM**

## <u>TABLE OF CONTENTS</u>

| <u>**Description of Item**</u> | <u>**Addendum Page No.**</u> |
| --- | --- |
| U.S. Const. Art. I, §§ 5-7 | Add. 1 |
| U.S. Const. amend. I | Add. 3 |
| U.S. Const. amend. XXVII | Add. 4 |

# U.S. Const. Art. I, §§ 5, 6, 7

**Section 5.**

Each House shall be the judge of the elections, returns and qualifications of its own members, and a majority of each shall constitute a quorum to do business; but a smaller number may adjourn from day to day, and may be authorized to compel the attendance of absent members, in such manner, and under such penalties as each House may provide.

Each House may determine the rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of two thirds, expel a member.

Each House shall keep a journal of its proceedings, and from time to time publish the same, excepting such parts as may in their judgment require secrecy; and the yeas and nays of the members of either House on any question shall, at the desire of one fifth of those present, be entered on the journal.

Neither House, during the session of Congress, shall, without the consent of the other, adjourn for more than three days, nor to any other place than that in which the two Houses shall be sitting.

**Section 6.**

The Senators and Representatives shall receive a compensation for their services, to be ascertained by law, and paid out of the treasury of the United States. They shall in all cases, except treason, felony and breach of the peace, be privileged from arrest during their attendance at the session of their respective Houses, and in going to and returning from the same; and for any speech or debate in either House, they shall not be questioned in any other place.

No Senator or Representative shall, during the time for which he was elected, be appointed to any civil office under the authority of the United States, which shall have been created, or the emoluments whereof shall have been increased during such time: and no person holding any office under the United States, shall be a member of either House during his continuance in office.

**Section 7.**

All bills for raising revenue shall originate in the House of Representatives; but the Senate may propose or concur with amendments as on other Bills.

Every bill which shall have passed the House of Representatives and the Senate, shall, before it become a law, be presented to the President of the United States; if he approve he shall sign it, but if not he shall return it, with his objections to that House in which it shall have originated, who shall enter the objections at large on their journal, and proceed to reconsider it. If after such reconsideration two thirds of that House shall agree to pass the bill, it shall be sent, together with the objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a law. But in all such cases the votes of both Houses shall be determined by yeas and nays, and the names of the persons voting for and against the bill shall be entered on the journal of each House respectively. If any bill shall not be returned by the President within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law, in like manner as if he had signed it, unless the Congress by their adjournment prevent its return, in which case it shall not be a law.

Every order, resolution, or vote to which the concurrence of the Senate and House of Representatives may be necessary (except on a question of adjournment) shall be presented to the President of the United States; and before the same shall take effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the rules and limitations prescribed in the case of a bill.

**U.S. Const. amend. I**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

## U.S. Const. amend. XXVII

No law, varying the compensation for the services of the Senators and Representatives, shall take effect, until an election of Representatives shall have intervened.